# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| THE MUNICIPALITIES OF BAYAMÓN, CAGUAS, LOÍZA, LARES, BARRANQUITAS, COMERÍO, CAYEY, LAS MARÍAS, TRUJILLO ALTO, VEGA BAJA, AÑASCO, CIDRA, AGUADILLA, AIBONITO, MOROVIS, MOCA, BARCELONETA, CAMUY, CATAÑO, SALINAS, ADJUNTAS, ARROYO, CULEBRA, DORADO, GUAYNABO, HORMIGUEROS, JUNCOS, LAJAS, MANATÍ, NAGUABO, NARANJITO, UTUADO, VILLALBA, COAMO, OROCOVIS, VIEQUES, and YABUCOA on behalf of themselves and others similarly situated, known as the MUNICIPALITIES OF PUERTO RICO, <br><br> Plaintiffs, <br><br> v. <br><br> EXXONMOBIL CORP, SHELL PLC F.K.A. ROYAL DUTCH SHELL PLC, CHEVRON CORP, BP PLC, CONOCOPHILLIPS, MOTIVA ENTERPRISES LLC, OCCIDENTAL PETROLEUM F.K.A. ANADARKO PETROLEUM CORP, BHP, RIO TINTO PLC, AMERICAN PETROLEUM INSTITUTE, XYZ CORPORATIONS 1-100, and JOHN AND JANE DOES 1-100, <br><br> Defendants. | Civil Case No. 3:22-cv-01550-SCC-HRV <br><br> Re: <br> Consumer Fraud; Deceptive Business Practices; Racketeer and Corrupt Organizations Act, 18 U.S.C. § 1962; Sherman Act, 15 U.S.C. § 1 et seq.; Public Nuisance; Strict Liability – Failure to Warn; Strict Liability – Design Defect; Negligent Design Defect; Private Nuisance; Unjust Enrichment |

## DEFENDANTS' JOINT MOTION TO DISMISS AMENDED COMPLAINT[1]

---

[1] On November 16, 2023, to facilitate and streamline the briefing on the anticipated motions to dismiss, Plaintiffs and Defendants filed a Joint Motion For Extension of Time to Answer or Otherwise Respond to the Complaint and to Establish Briefing Schedule and Other Procedural Terms Concerning Motion to Dismiss (ECF Doc. No. 209, the "Joint Motion"). The Joint Motion requested an Order setting a briefing schedule for the motions to dismiss and related papers and granting other procedural stipulations, including page limitations on the motions, oppositions and replies and the period of time that Plaintiffs or Defendants would have to file the corresponding papers. *Id.* ¶ 7. By Order entered on November 27, 2023, the Court granted the Joint Motion. *See* ECF Doc. No. 211. This Motion to Dismiss is filed pursuant to the Joint Motion and the November 27 Order.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 7

LEGAL STANDARD............................................................................................ 9

ARGUMENT ...................................................................................................... 11

I.    All of Plaintiffs' Claims Are Time Barred ...................................... 11

    A.    Plaintiffs' RICO and Antitrust Claims Are Untimely.  (Claims 4, 5, 6, 7, 8) ................................................................. 11

    B.    No Exception to the Statute of Limitations Applies. ............... 12

    C.    The Puerto Rico Law Claims Are Untimely.  (Claims 1, 2, 3, 9, 10, 11, 12, 13, 14) ........................................................................ 15

II.    Plaintiffs Fail to State a RICO Claim (Claims 4, 5, 6, 7) ................... 17

    A.    Plaintiffs' Claims Are Barred by the First Amendment and *Noerr-Pennington*. ............................................................................... 18

    B.    Plaintiffs Have Not Pleaded the Requisite Elements of a RICO Claim. ...................................................................................... 24

        1.    Plaintiffs Fail to Plausibly Allege That the Claimed Predicate Acts Proximately Caused Their Purported Injuries............................... 25

        2.    Plaintiffs Fail Adequately to Allege an *Enterprise*...................... 29

        3.    Plaintiffs Have Not Adequately Alleged *Racketeering Activity*... 31

        4.    Plaintiffs Have Not Adequately Alleged a *Pattern* of Racketeering Activity. ................................................................ 34

        5.    Plaintiffs Fail to Allege That Defendants *Conducted* the Alleged Enterprise. ................................................................... 34

        6.    Plaintiffs Have Not Alleged Defendants *Invested In or Acquired or Maintained Control* of the Alleged Enterprise. ........................... 35

        7.    Plaintiffs Fail Adequately to Allege a Conspiracy. ..................... 36

C.    Plaintiffs Cannot Recover Under RICO for Their Residents' Alleged Injuries or for Their Own Governmental Expenditures. ............ 37

III.    Plaintiffs Fail to Adequately Plead an Antitrust Violation (Claim 8)................... 38

A.    The Complaint Does Not Plausibly Allege an Anticompetitive Agreement. ................................................................. 38

B.    Plaintiffs Have Not Alleged an Antitrust Injury. ...................................... 41

C.    Plaintiffs Lack a Cause of Action Under the Antitrust Laws to Assert Injuries Allegedly Sustained by Their Residents.......................... 42

IV.    Plaintiffs' Puerto Rico Law Claims Are Barred By Federal Law and Are Inadequately Pleaded (Claims 1, 2, 3, 9, 10, 11, 12, 13, 14) ............................... 43

A.    Federal Law Governs Plaintiffs' Purported Puerto Rico Law Claims. ................................................................. 44

1.    Plaintiffs' Claims Intrude Upon, and Are Precluded and Preempted by, Federal Constitutional Structure, Law, and Policy. ............... 44

2.    Plaintiffs' Claims Are Precluded and Preempted Because They Intrude On Foreign Affairs. ......................................... 48

B.    Plaintiffs' Puerto Rico Law Claims Are Preempted by the Clean Air Act. ................................................................. 50

C.    Plaintiffs Have Not Pleaded Cognizable Puerto Rico Law Claims. (Claims 1, 2, 3, 9, 10, 11, 12, 13, 14)......................................... 52

1.    Plaintiffs' Fraud-Based Claims Are Not Cognizable.  (Claims 1, 2, 3) ................................................................. 52

2.    Plaintiffs Fail to Plead Any Design "Defect" That Caused Their Injuries.  (Claims 11, 12) ......................................... 54

3.    Defendants Had No Duty to Warn of Climate Risks. (Claim 10) 57

4.    Plaintiffs' Nuisance Claims Fail.  (Claims 9, 13) ....................... 58

5.    Plaintiffs Cannot Sue for Unjust Enrichment Because They Seek Other Legal Remedies.  (Claim 14) ............................... 59

D.    Plaintiffs Lack a Cause of Action Under Puerto Rico Law to Assert Injuries Allegedly Sustained by Their Residents..................................... 59

CONCLUSION........................................................................................................ 60

- ii -

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*303 Creative LLC v. Elenis,*
143 S. Ct. 2298 (2023)................................................................4, 19, 21, 22

*Aetna Cas. & Sur. Co. v. P & B Autobody,*
1994 WL 717998 (1st Cir. Dec. 29, 1994) .........................................35

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.,*
483 U.S. 143 (1987)...............................................................................11

*Aguadilla Paint Center v. Esso,*
183 P.R. Dec. 901 (2011)......................................................................54

*Aldahonda-Rivera v. Parke Davis & Co.,*
882 F.2d 590 (1st Cir. 1989)................................................................16

*Alexander v. Sandoval,*
532 U.S. 275 (2001)...............................................................................53

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
458 U.S. 592 (1982)...............................................................................37

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
486 U.S. 492 (1988)...............................................................................23

*Alvarez-Crespo v. Olavarría-Rivera,*
994 F.2d 35 (1st Cir. 1993)..................................................................52

*Álvarez-Maurás v. Banco Popular of P.R.,*
919 F.3d 617 (1st Cir. 2019)...........................................................11, 12

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011)..............................................2, 14, 20, 44, 47, 48, 51

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003)..........................................................................48, 49

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.,*
850 F.3d 52 (1st Cir. 2017)..................................................................23

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451 (2006)......................................................................5, 25, 27

*Aronstein v. Massachusetts Mut. Life Ins. Co.,*
15 F.4th 527 (1st Cir. 2021).................................................................57

*Arroyo Cruz v. Mun. de San Juan,*
2016 WL 885382 (P.R. Cir., Jan. 28, 2016) ........................................60

*In re Asbestos School Litig.*,
    46 F.3d 1284 (3d Cir. 1994) .................................................................................30

*Ashcroft v. Am. Civil Liberties Union*,
    535 U.S. 564 (2002) ............................................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................1, 10

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ............................................................................................41

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ........................................................................................6, 41

*Aut. de Puertos v. Mun. de San Juan*,
    23 P.R. Offic. Trans. 437, 1989 WL 607311 (1989) .........................................60

*Ayala Rosa v. ATPR*,
    16 P.R. Offic. Trans. 414, 1985 WL 301240 (P.R. 1985) .................................14

*Baretto Peat, Inc. v. Luis Ayala Colon Sucrs. Inc.*,
    896 F.2d 656 (1st Cir. 1990) .............................................................................16

*Baum-Holland v. Hilton El Con Mgmt., LLC*,
    964 F.3d 77 (1st Cir. 2020) ...............................................................................54

*Bd. of Cnty. Comm'rs of Arapahoe Cnty. v. Denver Bd. of Water Comm'rs*,
    718 P.2d 235 (Colo. 1986) ................................................................................60

*Bd. of Comm'rs v. Kokomo City Plan Comm'n*,
    330 N.E.2d 92 (Ind. 1975) ................................................................................60

*Beck v. Prupis*,
    529 U.S. 494 (2000) ...........................................................................................36

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................5, 6, 10, 26, 38, 39, 41

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ..............................................................................51

*Bocanegra-Acevedo v. Toyota Motor Sales USA, Inc.*,
    2009 WL 1098084 (D.P.R. Apr. 23, 2009) ......................................................16

*Boyle v. United States*,
    556 U.S. 938 (2009) ...........................................................................................29

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ...........................................................................................45

*Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ...........................................................................................40

*Brown v. Hartlage,*
    456 U.S. 45 (1982)............................................................................20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)..........................................................................41

*Buck v. Am. Airlines, Inc.,*
    476 F.3d 29 (1st Cir. 2007)..............................................................53

*Café Rico, Inc. v. Mun. de Mayagüez,*
    155 P.R. Dec. 548 (2001).................................................................60

*Carballo-Rodriguez v. Clark Equip. Co.,*
    147 F. Supp. 2d 66 (D.P.R. 2001).........................................54, 55, 56

*Caro-Bonet v. Lotus Mgmt., LLC,*
    195 F. Supp. 3d 428 (D.P.R. 2016)...................................................10

*Casey v. City of Newport,*
    308 F.3d 106 (1st Cir. 2002)............................................................19

*Casiano Sales v. Lozada Torres,*
    91 P.R.R. 473 (1964)..................................................................58, 59

*Ciminelli v. United States,*
    598 U.S. 306 (2023)..........................................................................32

*Cintron-Luna v. Roman-Bultron,*
    668 F. Supp. 2d 315 (D.P.R. 2009)..................................................15

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010)...........................................................18, 19, 24

*In re Citric Acid Litig.,*
    191 F.3d 1090 (9th Cir. 1999) .........................................................20

*City & Cnty. of Honolulu v. Sunoco LP,*
    537 P.3d 1173 (Haw. 2023)..............................................................46

*City of Oakland v. BP P.L.C.,*
    325 F. Supp. 3d 1017 (N.D. Cal. 2018)...........................................46

*City of Oakland v. BP P.L.C.,*
    960 F.3d 570 (9th Cir. 2020) ...........................................................46

*City of Oakland v. BP P.L.C.,*
    969 F.3d 895 (9th Cir. 2020) ...........................................................46

*City of New York v. BP P.L.C.,*
    325 F. Supp. 3d 466 (S.D.N.Y. 2018)..............................................46

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021)...................................1, 4, 44, 45, 47, 48, 52

*City of Oakland v. BP P.L.C.*,
    2019 WL 2250196 (9th Cir. May 17, 2019) ................................................................50

*City of Safety Harbor v. Birchfield*,
    529 F.2d 1251 (5th Cir. 1976) .......................................................................................60

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
    851 F.2d 478 (1st Cir. 1988) .........................................................................................39

*Clark Cnty. v. City of Las Vegas*,
    574 P.2d 1013 (Nev. 1978) ...........................................................................................60

*Cnty. of Lexington v. City of Columbia*,
    400 S.E.2d 146 (S.C. 1991) ...........................................................................................60

*Collazo-Santiago v. Toyota Motor Corp.*,
    937 F. Supp. 134 (D.P.R. 1996), *aff'd*, 149 F.3d 23 (1st Cir. 1998) ......................56

*Colón Prieto v. Géigel*,
    15 P.R. Offic. Trans. 313 (P.R. 1984)..........................................................................15

*Colorado River Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985) .........................................................................................60

*Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*,
    57 F.3d 56 (1st Cir. 1995)..............................................................................................36

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
    277 F.3d 499 (4th Cir. 2002) ...........................................................................................6

*Container Corp. of Am. v. Franchise Tax Bd.*,
    463 U.S. 159 (1983) .......................................................................................................49

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014).....................................................................................23

*N.C., ex rel. Cooper v. TVA*,
    615 F.3d 291 (4th Cir. 2010) .........................................................................................51

*Cordero-Hernandez v. Hernandez Ballesteros*,
    449 F.3d 240 (1st Cir. 2006).........................................................................................10

*Counterman v. Colorado*,
    143 S. Ct. 2106 (2023)...............................................................................................4, 21

*Cruz-Vargas v. R.J. Reynolds Tobacco Co.*,
    348 F.3d 271 (1st Cir. 2003).........................................................................................58

*Democratic Nat'l Comm. v. Russian Fed'n*,
    392 F. Supp. 3d 410 (S.D.N.Y. 2019)..........................................................................30

*Dillon v. Combs*,
    895 F.2d 1175 (7th Cir. 1990) ......................................................................................38

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) .......................................................................................2, 22, 23

*Efron v. Embassy Suites (P.R.), Inc.*,
   223 F.3d 12 (1st Cr. 2000) ........................................................................................34

*Estados Unidos Mexicanos v. DeCoster*,
   229 F.3d 332 (1st Cir. 2000) .....................................................................................37

*Figueroa v. Municipality of San Juan*,
   98 P.R.R. 52 (1970) ..................................................................................................15

*In re Fin. Oversight & Mgmt. Bd.*,
   578 F. Supp. 3d 267 (D.P.R. 2021), *aff'd*, 54 F.4th 42 (1st Cir. 2022) ...................59

*First Nat'l Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) ..................................................................................................24

*Foisie v. Worcester Polytechnic Inst.*,
   967 F.3d 27 (1st Cir. 2020) ................................................................................10, 52

*Franchise Tax Bd. of Cal. v. Hyatt*,
   139 S. Ct. 1485 (2019) ..............................................................................................45

*Fremaint v. Ford Motor Co.*,
   258 F. Supp. 2d 24 (D.P.R. 2003) ............................................................................56

*Friendly Hotel Boutique Corp. v. ME & A Cap., LLC*,
   2012 WL 4062795 (D.P.R. Sept. 14, 2012) .............................................................35

*In re German Auto. Mfrs. Antitrust Litig.*,
   392 F. Supp. 3d 1059 (N.D. Cal. 2019) ...................................................................40

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ..................................................................................................20

*Giuliano v. Fulton*,
   399 F.3d 381 (1st Cir. 2005) .....................................................................................31

*Gonzalez-Caban v. JR Seafood Inc.*,
   48 F.4th 10 (1st Cir. 2022) ........................................................................................29

*Gonzalez-Camacho v. Banco Popular de Puerto Rico*,
   318 F. Supp. 3d 461 (D.P.R. 2018) ..........................................................................10

*Gonzalez-Camacho v. Banco Popular de Puerto Rico*,
   No. 17-1973, 2020 WL 5543934 (1st Cir. July 21, 2020) ........................................10

*H.J. Inc. v. N.W. Bell Tel. Co.*,
   492 U.S. 229 (1989) ..................................................................................................34

*Hawaii v. Standard Oil Co. of California*,
   405 U.S. 251 (1972) ..................................................................................................37

*Hayduk v. Lanna*,
    775 F.2d 441 (1st Cir. 1985) ................................................................. 33

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ................................................................. 5, 25, 27

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................. 49

*Hipólito Rivera Ortiz v. Municipio de Guaynabo*,
    141 P.R. Dec. 257 (1996) ................................................................. 53

*Hodge v. Parke Davis & Co.*,
    833 F.2d 6 (1st Cir. 1987) ................................................................. 16

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ................................................................. 5, 27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ................................................................. 19

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ................................................................. 42, 43

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972) ................................................................. 44

*Illinois v. Life of Mid-Am. Ins. Co.*,
    805 F.2d 763 (7th Cir. 1986) ................................................................. 38

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ................................................................. 50, 51, 52

*InterGen N.V. v. Grina*,
    344 F.3d 134 (1st Cir. 2008) ................................................................. 14

*J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*,
    76 F.3d 1245 (1st Cir. 1996) ................................................................. 13

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    138 S. Ct. 2448 (2018) ................................................................. 19

*Johnson v. Am. Standard, Inc.*,
    43 Cal. 4th 56 (2008) ................................................................. 48

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020) ................................................................. 48

*Kansas v. Colorado*,
    206 U.S. 46 (1907) ................................................................. 45

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) ................................................................. 31

*Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*,
    329 F.3d 216 (1st Cir. 2003) .................................................................................34

*Kerin* v. *Titeflex Corp.*,
    770 F.3d 978 (1st Cir. 2014) .................................................................................12

*Kotler v. Am. Tobacco Co.*,
    926 F.2d 1217 (1st Cir. 1990) ..............................................................................56

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ..............................................................................26

*Lares Group, II v. Tobin*,
    47 F. Supp. 2d 223 (D.R.I. 1999) .........................................................................12

*Libertad v. Welch*,
    53 F.3d 428 (1st Cir. 1995) .................................................................................31

*Liu v. Amerco*,
    677 F.3d 489 (1st Cir. 2012) .................................................................................53

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ..................................................................42

*Lopez-Flores v. Cruz-Santiago*,
    526 F. Supp. 2d 188 (D.P.R. 2007) ......................................................................15

*M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*,
    31 F. Supp. 2d 226 (D.P.R. 1998) ........................................................................15

*Maple Flooring Mfrs.' Ass'n v. United States*,
    268 U.S. 563 (1925) ............................................................................................40

*Martínez Romero v. Super Asphalt Pavement, Co.*,
    2018 WL 3037397 (P.R. Cir. Apr. 23, 2018) ......................................................58

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ............................................................................................14

*McIntyre v. United States*,
    367 F.3d 38 (1st Cir. 2004) .................................................................................16

*McMillan v. Rodríguez-Negrón*,
    511 F. Supp. 3d 75 (D.P.R. 2020) ...................................................................12, 17

*Medicaid and Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*,
    58 F.4th 5 (1st Cir. 2023) ....................................................................................50

*Medina-Rodriguez v. $3,072,266.59 in United States Currency*,
    471 F. Supp. 3d 465 (D.P.R. 2020) ......................................................................32

*Merrick v. Diageo Ams. Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) ...............................................................................51

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
  No. 07-cv-10470, 2015 WL 3763645 (S.D.N.Y. June 16, 2015) ............................................58

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
  No. 1:00-1898, 2014 WL 4290433 (S.D.N.Y. Aug. 29, 2014)........................................14, 15

*Montalvo v. Gonzalez-Amparo*,
  587 F.3d 43 (1st Cir. 2009) .......................................................................................................15

*In re MTBE Prods. Liab. Litig.*,
  No. 1:00-cv-1898, 2013 WL 5230814 (S.D.N.Y. July 17, 2013).............................................59

*Mulder v. Kohl's Dep't Stores, Inc.*,
  865 F.3d 17 (1st Cir. 2017) .......................................................................................................54

*In re Multidistrict Vehicle Air Pollution*,
  538 F.2d 231 (9th Cir. 1976) ...............................................................................................6, 42

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*,
  481 F.2d 122 (9th Cir. 1973) ....................................................................................................59

*Muñiz Negrón v. Worthington Cylinder Corp.*,
  2021 WL 1199014 (D.P.R. Mar. 30, 2021) ........................................................................55, 57

*Muñiz-Núñez v. Am. Home Prod. Corp.*,
  582 F. Supp. 459 (D.P.R. 1984)................................................................................................55

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..................................................................................................................18

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958)..................................................................................................................21

*NAACP v. Claiborne Hardware*,
  458 U.S. 934 (1982) ..................................................................................................................22

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984).....................................................................................................................39

*Nat'l Rev., Inc. v. Mann*,
  140 S. Ct. 344 (2019)................................................................................................................19

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
  663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012) .........................46

*Nena Air Servs., Inc. v. Cessna Aircraft Co.*,
  449 F.3d 85 (1st Cir. 2006) .......................................................................................................54

*Next Step Med. Co., Inc. v. Biomet, Inc.*,
  2015 WL 993095 (P.R. Cir. Jan. 30, 2015) ..............................................................................53

*In re Number Nine Visual Tech. Corp. Sec. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999) .............................................................................................26

*Ocasio Salgado v. NDA Services Corp.*,
   2019 WL 4410340 (P.R. Cir. June 21, 2019) ...................................................54

*Ocasio-Hernandez v. Fortuno-Burset*,
   640 F.3d 1 (1st Cir. 2011) ..............................................................................10

*Ortiz Andújar v. E.L.A.*,
   22 P.R. Offic. Trans. 774, 780, 1988 WL 580737 (P.R. 1988) ...........................59

*P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*,
   485 U.S. 495 (1988) ......................................................................................50

*P.R. Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriquena, Inc.*,
   118 F. Supp. 3d 447 (D.P.R. 2015) .................................................................17

*P.R. Tel. Co. v. SprintCom, Inc.*,
   662 F.3d 74 (1st Cir. 2011) ............................................................................59

*Padron v. People of Puerto Rico ex rel Castro*,
   142 F.2d 508 (1st Cir. 1944) ..........................................................................60

*Pers. Dep't, Inc. v. Pro. Staff Leasing Corp.*,
   297 F. App'x 773 (10th Cir. 2008) .................................................................23

*Philibotte v. Nisource Corp. Services Co.*,
   793 F.3d 159 (1st Cir. 2015) .....................................................................13, 17

*Prado Alvarez v. R.J. Reynolds Tobacco Co.*,
   313 F. Supp. 2d 61 (D.P.R. 2004), *abrogated on other grounds*, *Portugues-
   Santana v. Rekomdiv Int'l*, 657 F.3d 56 (1st Cir. 2011) ....................................56

*Puerto Ricans for Puerto Rico Party v. Dalmau*,
   544 F.3d 58 (1st Cir. 2008) ............................................................................15

*Puerto Rico Pub. Housing Admin. v. U.S. Dep't of Hous. & Urban Dev.*,
   59 F. Supp. 2d 310 (D.P.R. 1999) ..................................................................59

*Quintana-Ruiz v. Hyundai Motor Corp.*,
   303 F.3d 62 (1st Cir. 2002) ............................................................................57

*Ramos v. Hyundai Motor Co.*,
   431 F. Supp. 2d 209 (D.P.R. 2006), *aff'd sub nom. Díaz-Ramos v. Hyundai
   Motor Co.*, 501 F.3d 12 (1st Cir. 2007) ..........................................................53

*Retractable Tech. Inc. v. Becton Dickinson & Co.*,
   842 F.3d 883 (5th Cir. 2016) ..........................................................................40

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ......................................................................................34

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ......................................................................................60

*Rhode Island v. Shell Oil Prods. Co.*,
  979 F.3d 50 (1st Cir. 2020) ................................................................................3, 14, 16, 47

*Rhode Island v. Shell Oil Products Co., L.L.C.*,
  35 F.4th 44 (1st Cir. 2022) ....................................................................................47

*Rivera-Diaz v. Humana Ins. of P.R., Inc.*,
  748 F.3d 387 (1st Cir. 2014) ............................................................................13, 17

*Rivera-Muñiz v. Horizon Lines Inc.*,
  737 F. Supp. 2d 57 (D.P.R. 2010) ..............................................................................59

*Rodriguez-Suris v. Montesinos*,
  123 F.3d 10 (1st Cir. 1997) ....................................................................................15

*Roman Rivera v. Puerto Rico Elec. Power Auth.*,
  2012 WL 13170557 (D.P.R. Sept. 25, 2012) ....................................................................35

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995) ...........................................................................................19

*Rubert Armstrong v. E.L.A.*,
  97 P.R.R. 573 (1969) ..........................................................................................15

*Rx.com v. Medco Health Solutions, Inc.*,
  322 F. App'x 394 (5th Cir. 2009) ...............................................................................12

*Salinas v. United States*,
  522 U.S. 52 (1997) ............................................................................................37

*Sanchez v. Pereira-Castillo*,
  590 F.3d 31 (1st Cir. 2009) ....................................................................................10

*Santopietro v. Howell*,
  857 F.3d 980 (9th Cir. 2017) ...................................................................................22

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*,
  113 F.3d 405 (3d Cir. 1997) ..................................................................................6, 42

*Silva v. Am. Airlines, Inc.*,
  960 F. Supp. 528 (D.P.R. 1997) .................................................................................57

*Simonet v. SmithKline Beecham Corp.*,
  506 F. Supp. 2d 77 (D.P.R. 2007) ...............................................................................53

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
  884 F.3d 489 (4th Cir. 2018) ...................................................................................27

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ...................................................................................41

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ...........................................................................................18

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) .................................................................................23

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ..................................................................................13

*State of Delaware v. BP Am., Inc.*,
    2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ..................................2, 4, 7, 11, 14, 33, 47, 52

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011) .................................................................................42

*Sterling Merchandising, Inc. v. Nestle, S.A.*,
    724 F. Supp. 2d 245 (D.P.R. 2010) ......................................................................41

*Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*,
    990 F.3d 31 (1st Cir. 2021) .............................................................................28, 29

*Steward Health Care Sys. LLC v. Southcoast Health Sys., Inc.*,
    2016 WL 9022444 (D. Mass. Sept. 2, 2016) ........................................................40

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ..............................................................................................45

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ..............................................................................................19

*Torres v. E.I. Dupont De Nemours & Co.*,
    219 F.3d 13 (1st Cir. 2000) ...................................................................................15

*Town of Mamakating, v. Lamm*,
    No. 15-cv-2865, 2015 WL 5311265 (S.D.N.Y. Sept. 11, 2015) ............................30

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..............................................................................................36

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965) ..............................................................................................23

*United States v. Abdelaziz*,
    68 F.4th 1 (1st Cir. 2023) ......................................................................................32

*United States v. Alvarez*,
    567 U.S. 709 (2012) ..............................................................................................18

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ..................................................................................32

*United States v. City of Pittsburg*,
    661 F.2d 783 (9th Cir. 1981) .................................................................................37

*United States v. Kelerchian*,
    937 F.3d 895 (7th Cir. 2019) .................................................................................32

*United States v. London,*
   66 F.3d 1227 (1st Cir. 1995) ............................................................. 34

*United States v. Playboy Entm't Grp., Inc.,*
   529 U.S. 803 (2000) ......................................................................... 18

*United States v. Rodriguez-Torres,*
   939 F.3d 16 (1st Cir. 2019) ......................................................... 29, 37

*United States v. Velazquez-Fontanez,*
   6 F.4th 205 (1st Cir. 2021) ............................................................. 31

*Vazquez-Filippetti v. Banco Popular de Puerto Rico,*
   504 F.3d 43 (1st Cir. 2007) ............................................................. 55

*White v. Lee,*
   227 F.3d 1214 (9th Cir. 2000) ......................................................... 23

*White v. R.M. Packer Co.,*
   635 F.3d 571 (1st Cir. 2011) ........................................................... 39

*Woods v. Wells Fargo Bank, N.A.,*
   733 F.3d 349 (1st Cir. 2013) ........................................................... 33

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
   401 U.S. 321 (1971) ......................................................................... 11

*Zschernig v. Miller,*
   389 U.S. 429 (1968) ......................................................................... 49

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. VI, cl. 2 ..................................................................... 44

U.S. Const. amend. I .......................................................................... 17

## STATUTES

15 U.S.C. § 15a .................................................................................. 43

15 U.S.C. § 15b .................................................................................. 11

15 U.S.C. § 15c .................................................................................. 43

15 U.S.C. § 45 .................................................................................... 31

15 U.S.C. § 55 .................................................................................... 31

15 U.S.C. § 1961 ................................................................................ 31

18 U.S.C. § 1341 .................................................................................................31

18 U.S.C. § 1343 .................................................................................................31

18 U.S.C. § 1962 .................................................................................................17

18 U.S.C. § 1964 .................................................................................................17

28 U.S.C. § 1331 .................................................................................................47

42 U.S.C. § 7401 .................................................................................................48

42 U.S.C. § 7602 .................................................................................................50

48 U.S.C. § 864 ...................................................................................................15

Article 1815, 2020 Civil Code ...........................................................................52

Article 1.005 of the Municipal Code ..................................................................60

Article 1.006 of the Municipal Code ..................................................................60

Article 1.008 of the Municipal Code ..................................................................60

P.R. Laws Ann. tit. 21, § 7011 ...........................................................................60

P.R. Laws Ann. tit. 21, § 7013 ...........................................................................60

P.R. Laws Ann. Tit. 31, 5241 .............................................................................15

P.R. Laws Ann. tit. 31, § 341e ...........................................................................54

P.R. Laws. Ann., tit. 31 § 5141 ..........................................................................54

P.R. Laws Ann. tit. 31, § 5298 ...........................................................................15

P.R. Laws Ann. tit. 31, § 11720 .........................................................................52

P.R. Laws Ann. tit. 32, § 2761 ...........................................................................58

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ......................................................48

## RULES

Fed. R. Civ. P. 8(a)(2) ........................................................................................10

Fed. R. Civ. P. 9(b) .........................................................................10, 33, 35, 52, 54

Fed. R. Evid. 201 ................................................................................................13

## Regulations

16 C.F.R. Part 255...........................................................................................31

16 C.F.R. Part 260...........................................................................................31

16 C.F.R. § 260.1.............................................................................................53

P.R. Dep't of Consumer Aff., Regul. 9158 (Feb. 6, 2020)...........................53

## Treatises

5A Wright & Miller, *Federal Practice & Procedure* § 1297 (4th ed. Apr. 2023 update)..............................................................................................................33

W. Prosser, *Law of Torts*, § 41 (4th Ed. 1971) ............................................55

## Other Authorities

Andrew C. Revkin, *A Deep Dive into What Exxon Knew About Global Warming and When (1978) It Knew It*, N.Y. Times (Sept. 16, 2015) .....................................13

Angela Fritz, *Harvey. Irma. Maria. Why Is This Hurricane Season So Bad?*, Wash. Post (Sep. 23, 2017).............................................................................14

Felicity Barringer, *Flooded Village Files Suit, Citing Corporate Link to Climate Change*, N.Y. Times (Feb. 27, 2008).............................................................13

Kathy Mulvey & Seth Shulman, *The Climate Deception Dossiers: Internal Fossil Fuel Industry Memos Reveal Decades of Corporate Disinformation*, Union of Concerned Scientists (July 2015).................................................................13

Lauren Lluveras, *Puerto Rico's Bankruptcy Will Make Hurricane Recovery Brutal - Here's Why*, The Conversation (Sep. 26, 2017) .................................29

Puerto Rico Climate Change Council, *Puerto Rico's State of the Climate* (2013).....................14

Umair Irfan, *One of the Clearest Signs of Climate Change in Hurricanes Maria, Irma, and Harvey Was the Rain*, Vox (Sep. 29, 2017) ..........................................13

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants respectfully move to dismiss the Amended Complaint.[2]

## INTRODUCTION

Plaintiffs claim that harms from individual hurricanes can be causally attributed to the alleged statements and conduct of just nine publicly-traded companies and a trade association. But, as the Second Circuit found in affirming dismissal of a similar lawsuit, "[g]lobal warming is one of the greatest challenges facing humanity today" in part because "every single person who uses gas and electricity—whether in travelling by bus, cab, Uber, or jitney, or in receiving home deliveries via FedEx, Amazon, or UPS—contributes to" it. *City of New York v. Chevron Corp.*, 993 F.3d 81, 86 (2d Cir. 2021). Plaintiffs—a purported class of municipalities and themselves long-time consumers of fossil fuels—nonetheless seek to impose liability on ten select Defendants for the damage that Hurricanes Irma and Maria caused Puerto Rico in September 2017.

After Defendants moved to dismiss Plaintiffs' initial Complaint, Plaintiffs did not attempt to defend the sufficiency of their claims. Instead, Plaintiffs dodged Defendants' motions by filing an Amended Complaint. But that Amended Complaint fails to remedy the myriad pleading deficiencies that Defendants already identified. The amendments are at best window dressing. Some even undermine Plaintiffs' case. The Amended Complaint falls far short of stating any viable claim:

1. Plaintiffs replaced coal defendants with the American Petroleum Institute ("API"), a trade association that does not produce or sell fossil fuels but engages in lobbying and speech on issues of public importance. Plaintiffs' addition of API only confirms that this action is an improper attack on (protected) speech that Plaintiffs disfavor, doubling down on the Complaint's constitutional and other defects.

2. In an attempt to resurrect their causation allegations in the face of on-point U.S. Supreme Court precedent foreclosing Plaintiffs' RICO and other claims, Plaintiffs now allege that Defendants controlled API and the Global Climate Coalition ("GCC") through their participation in or funding of those organizations, which engage in

---

[2] Plaintiffs' allegations are accepted as true solely for purposes of this motion. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

constitutionally protected speech on issues of public importance.  But such group and highly generalized allegations regarding protected speech activities do not suffice.

3. Plaintiffs now attempt to attribute to Defendants all emissions of their alleged joint venture partners, many of which are foreign state-owned entities that Defendants neither own nor control, and that are engaged in activities far beyond the Commonwealth's jurisdiction.  While Plaintiffs disclaim any intent to enjoin Defendants' fossil fuel production, the Amended Complaint makes clear Plaintiffs seek to regulate emissions and fuel production through this lawsuit.  Such attempts are precluded and preempted by the U.S. Constitution's structure and the Clean Air Act.  *See, e.g.*, *State of Delaware v. BP Am., Inc.*, 2024 WL 98888, at *9 (Del. Super. Ct. Jan. 9, 2024) (holding that climate change related-claims "seeking damages for injuries resulting from out-of-state or global greenhouse emissions" are "beyond the limits of [state] common law").

Equally revealing is what the Amended Complaint now omits, as Plaintiffs attempt to distance themselves from the original Complaint's allegations confirming their claims are hopelessly time-barred.  Gone, for example, are references to many 2017 articles that Plaintiffs cited—allegations that, despite their omission now, nonetheless constitute binding admissions that Plaintiffs were on notice by 2017 at the latest of the harms that they now belatedly allege Defendants caused.  While Plaintiffs now try to run from their own prior allegations, they cannot hide from them.

Thus, despite some cosmetic changes, the Amended Complaint, like its predecessor, is fatally deficient in numerous respects.  At its core, it is premised on the breathtaking notion that Defendants may be held liable for all carbon emissions, everywhere and at any time, because, Plaintiffs claim, Defendants produced lawful products used all over the world and/or spoke about climate change in ways with which Plaintiffs now disagree.  Such a theory is untenable.

**Plaintiffs' claims founder on fundamental issues of constitutional law** regarding the ability of States, Commonwealths, and municipalities to regulate interstate—and indeed international—air pollution and speech about how to address it.  *See, e.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421–22 (2011) ("*AEP*"); *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961).  Plaintiffs theorize that Defendants' alleged statements about fossil fuels and climate change, and their asserted participation in lobbying and trade groups, led

inexorably to the regulatory acts and fossil-fuel emissions by governments and consumers over the course of decades, all around the world—most of which have nothing to do with Defendants. This supposedly resulted in incremental increases in production, purchases, and uses of fossil fuels worldwide, which allegedly caused or exacerbated global climate change and purportedly led to the 2017 hurricanes. Plaintiffs thus do not seek to hold these select Defendants liable for their own carbon emissions (either in Puerto Rico or elsewhere), or even the emissions of end-users who purchased Defendants' products in Puerto Rico, but for the alleged worldwide impacts of global emissions purportedly spurred by Defendants' speech and conduct—and the conduct of countless other entities and individuals not party to this litigation. No federal court has ever found such a far-fetched theory to state a claim for relief. This Court should not be the first.

**This Court need not reach these questions, because Plaintiffs' claims are time-barred.** The allegations make plain that Plaintiffs knew in 2017—when the hurricanes hit—that they had been damaged, and Plaintiffs cannot plausibly claim they only recently became aware of an alleged link between fossil fuels, climate change, and hurricanes. By 2017, public materials—some of which Plaintiffs cite, and more of which Plaintiffs referenced previously—already alleged such a link. Indeed, the First Circuit noted that "[i]n 2018, faced with . . . more frequent and severe . . . hurricanes . . . , Rhode Island sued . . . nearly every oil and gas company under the sun." *Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 53–54 (1st Cir. 2020) (affirming remand). Plaintiffs have no justification for sitting on their claims for five years and cannot plead around this public record. Omitting now-inconvenient allegations from the Amended Complaint *after* Defendants pointed out this failing in their prior motions to dismiss is of no effect. Plaintiffs' federal claims are barred by a four-year statute of limitations, and their putative Puerto Rico law claims by one-year limitations periods. As a Delaware court recently held in dismissing similar climate change

claims:  The "general public had knowledge of or had access to information about the disputes, regarding the existence of climate change and effects, decades prior to the expiration" of the limitations period.  *Delaware*, 2024 WL 98888, at \*19.  That alone requires dismissal.

**Plaintiffs' claims also fail on the merits, just as similar claims have failed elsewhere.**  *See City of New York*, 993 F.3d at 86 (affirming Rule 12(b)(6) dismissal of substantially similar complaint).  Plaintiffs cannot plausibly impose liability for the 2017 hurricanes on Defendants' lawful sale of vital fuels for decades, much less for Defendants' First Amendment protected speech—or *purported* speech, since Plaintiffs improperly try to tag the disparate Defendants named here with statements made by entities for which Defendants are not responsible.

**Plaintiffs' civil Racketeer Influenced and Corrupt Organizations Act ("RICO") and antitrust claims are meritless.**  Like their other claims, Plaintiffs premise their RICO claims on alleged speech that is constitutionally protected—such as core political speech aimed at preventing U.S. adoption of the Kyoto Protocol.  Am. Compl. ¶¶ 391, 396.  The importance of climate change as a public policy issue means that Defendants' speech is entitled to substantial constitutional protection.  The First Amendment protects not only the heartland of political speech, but even "the *prospect* of chilling fully protected expression."  *Counterman v. Colorado*, 143 S. Ct. 2106, 2115 (2023) (emphasis added).  *See also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2320 (2023) (reaffirming constitutional protections for speech despite alleged profit motive).  Because the only speech Plaintiffs identify as supposedly having caused their harm (*i.e.*, 2017 hurricane injuries) is political lobbying and publicity campaigns allegedly aimed at influencing the views of lawmakers and the public, Plaintiffs' claims violate the First Amendment and the *Noerr-Pennington* doctrine.

**In addition, the civil RICO and antitrust allegations fail plausibly to allege multiple required elements.**  For example, Plaintiffs must plead facts showing a *direct* causal relation

between the alleged acts of racketeering and the claimed injuries.  *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).  Failing to do so, Plaintiffs instead allege an attenuated, speculative chain of indirect and intervening causes consisting of *at least six* alleged steps, including that: (1) Defendants promoted climate change denial; (2) that promotion resulted in a marginal increase in the sales of Defendants' products and a corresponding increase in the use of those products by Plaintiffs, their residents, and billions of other actors worldwide; (3) that incremental purchase and use resulted in increased petroleum production and emissions of greenhouse gases; (4) those incremental greenhouse gas emissions mixed with other greenhouse gases emitted throughout the world to exacerbate climate change to some unspecified degree; (5) global climate change contributed to the hurricanes in Puerto Rico in 2017; and (6) those hurricanes damaged Plaintiffs.  The Supreme Court repeatedly has rejected far less attenuated causal chains on motions to dismiss.  *See id.* at 10; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–59 (2006); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270–74 (1992).  The Amended Complaint also admits—fatally— that the purported "enterprise" (the Global Climate Coalition ("GCC")) *disbanded in 2002*.  Am. Racketeering Case Stmt. ¶¶ 2(b), 8(b).  While Plaintiffs allege that the GCC continues operating "informally" through other organizations like API, Plaintiffs' allegations are conclusory, superficial, and fail to carry the burden that RICO places on them to plead an enterprise.

**Plaintiffs' antitrust claim fails for additional reasons as well.**  Plaintiffs have not pleaded an anticompetitive agreement, as required under Section 1 of the Sherman Act.  In addition to improperly seeking to burden constitutionally protected speech, Plaintiffs plead no facts supporting their conclusory assertion that Defendants agreed to "maintain their energy monopoly, fix prices, and increase obstacles for competitive entry into the [energy] market."  Am. Compl. ¶ 767.  That alone defeats Plaintiffs' antitrust claim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548

(2007) ("absent some factual context suggesting agreement, as distinct from identical independent action," a complaint alleging a Section 1 violation "should be dismissed").  Nor have Plaintiffs pleaded any adverse effect on competition; indeed, Plaintiffs claim that Defendants' alleged conduct "*increased production*" and "*lower[ed] prices*" for consumers.  Am. Compl. ¶¶ 7(d), 767 (emphases added).  That also requires dismissal because an alleged antitrust conspiracy must involve a "'competition-*reducing* aspect or effect of the defendant's behavior,' that is, . . . 'acts that *reduce output* or *raise prices* to consumers.'"  *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).  Finally, the antitrust laws cannot be used to recover for alleged climate-related harms. *See, e.g.*, *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236 (9th Cir. 1976) (holding antitrust laws cannot be used to remedy environmental injuries); *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 414 n.9 (3d Cir. 1997) (same).

**Plaintiffs' putative Puerto Rico law claims suffer from additional defects.  In particular, under the United States Constitution, transboundary pollution may be governed only by federal law,** so Plaintiffs' purported Puerto Rico law claims must fail.  Our federal constitutional structure prohibits Plaintiffs from invoking Puerto Rico tort law to address global greenhouse gas emissions and climate change.  As the Second Circuit made clear in *City of New York*, however artfully pleaded, these issues are inherently interstate and international in nature.  Plaintiffs' Complaint is replete with the same types of allegations regarding transboundary pollution.  Under our federal constitutional system, only federal law—not state or commonwealth law—can govern such interstate and international issues associated with climate change.  And even if our federal constitutional structure did not preclude Plaintiffs' Puerto Rico law claims, the Clean Air Act ("CAA") would preempt them.  Indeed, in a similar lawsuit over alleged climate deception brought by the

State of Delaware, the court concluded that "the CAA preempts state law to the extent a state attempts to regulate air pollution originating in other states," which is precisely what Plaintiffs' sprawling lawsuit seeks to do here.  *Delaware*, 2024 WL 98888, at *10.  Finally, Plaintiffs fail to plead the elements of any Puerto Rico law claim, which they lack the capacity to bring on behalf of their residents in any event.

Accordingly, the Court should dismiss the Amended Complaint with prejudice.

## BACKGROUND

Plaintiffs are Puerto Rico municipalities.  They bring this action against Defendants to recover for losses resulting from the September 2017 hurricanes that struck Puerto Rico.[3]  According to the Amended Complaint, Defendants' products played a "primary role . . . in causing the losses, deaths and destruction of property resulting from the catastrophic storms of September 2017 and their aftermath."  Am. Compl. ¶ 1.  Defendants allegedly had an "early awareness" of the danger of fossil fuels, but "misrepresented the dangers" and "embarked on a corporate *worldwide* strategy to hide that information" in order "to maintain their economic monopoly on *the world's* energy supply."  *Id.* ¶¶ 2, 3 (emphasis added).  Plaintiffs implausibly contend that they "relied upon the Defendants' misrepresentations," *id.* ¶ 3, and only "just recently" learned of the dangers of fossil fuels, *id.* ¶ 20, about which they supposedly "did not know and could not have known through the exercise of reasonable diligence," *id.* ¶ 23.

Plaintiffs' allegation that Defendants engaged in a "worldwide" strategy of deception is premised on alleged efforts by Defendants to petition governments for favorable regulatory treatment. For example, the Amended Complaint alleges that "Defendants publicly fought against climate

---

[3] Defendant API is a trade association and Rio Tinto plc is a global mining company engaged in the exploration, extraction, and processing of mineral resources.  Neither produces, markets, or sells fossil fuels.  This brief sometimes refers to defendants as "energy companies."  Neither API nor Rio Tinto concedes it is an energy company, or is engaged in producing, marketing or selling fossil fuel products.  API and Rio Tinto expressly reserve all rights.

science" and "championed anti-regulation . . . propaganda" "to protect their profits from the impact of regulation." *Id.* ¶¶ 72, 73; *see also id.* ¶ 415 (Defendants "mounted a campaign against regulation of their business practices."); ¶ 589 ("Defendants embarked on a decades-long marketing campaign designed to maximize continued dependence on their products and undermine national and international efforts to rein in greenhouse gas emissions").

In short, while Plaintiffs purport to disclaim liability based on public advocacy and lobbying, *id.* ¶ 10, the Amended Complaint is premised precisely upon such speech—even without considering, as this Court must, those allegations that Plaintiffs have attempted to evade by omitting them from the Amended Complaint. For example, the original Complaint affirmatively alleged that Defendants supposedly "funded advertising campaigns and distributed material to misinform the public about climate change, with the specific purpose of preventing U.S. adoption of the Kyoto Protocol," Compl. ¶ 365, and that "[t]he Global Climate Coalition (GCC) was formed in 1989 as a public relations and international lobbyist group of businesses that opposed action to reduce greenhouse gas emissions," *id.* ¶ 364. As explained below, to the extent Plaintiffs have now omitted any such allegations, Plaintiffs cannot avoid the debilitating legal effect of such allegations merely by silently dropping them from an amended pleading. *See infra*, at 14, n.8.

Plaintiffs' claims also are not limited to the marketing, sale, or combustion of fossil-fuel products *in Puerto Rico*, much less *by Defendants* in Puerto Rico. The Amended Complaint nowhere alleges a causal connection between the September 2017 hurricanes and *anyone's* Puerto Rico-specific consumption of fossil fuel products. Nor does it allege any causal connection between any injuries and what could be at most a marginal increase in the fossil fuel products sold in Puerto Rico because of any allegedly misleading statements directed to Puerto Rico. The Amended Complaint contains no allegations at all regarding the volume of fossil fuels used or sold in Puerto Rico.

Plaintiffs instead seek to impose liability on Defendants for the global production, marketing, sale, and combustion of their products, after being mixed with emissions for which they have no alleged involvement. They also seek to attribute to Defendants all emissions of their alleged joint venture partners, many of which are foreign state-owned entities. *See* Am. Compl. ¶¶ 75–76. Plaintiffs allege that Defendants and "their joint-venture carbon majors" are together "directly responsible for at least 39.6% of all *global* industrial GHG emissions from 1965-2022." *Id.* ¶ 75 (emphasis added); *see also, e.g.*, *id.* ¶ 295 ("$CO_2$ emissions that are attributable to fossil fuels that Defendants extracted from the earth and injected into the market are responsible for a substantial percentage of greenhouse gas pollution since 1965"), ¶ 102 (Defendants' products "are sold worldwide"), ¶ 345 (Defendants acted "to ensure unabated emissions and the sale of their products to consumers worldwide and in Puerto Rico"), ¶ 615 (Defendants "controlled a vast majority of worldwide energy production").[4] In fact, Plaintiffs more than 100 times cite to nationwide and international emissions and $CO_2$ levels. *E.g.*, *id.* ¶¶ 74 & n.20, 76 n.25, 80, 107, 114–19, 200, 129–32, 143–46, 154, 164, 170, 177–78, 185, 195–96, 204, 214–22, 245–46, 312, 319–38, 342–45, 344–45, 372, 380, 383, 587, 591, 594, 597–99, 601–05, 639–40, 649, 757, 800, 803, 811. It is these "global" "collective emissions" from the "industrial" and "end use" of Defendants' products and those of non-party "joint-venture carbon majors" that purportedly "were a substantial factor in the increase in intensity of the 2017 Atlantic Hurricane Season." *Id.* ¶¶ 75, 591.

## LEGAL STANDARD

A complaint must "contain enough factual material to 'raise a right to relief above the speculative level.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (quoting

---

[4] Defendants reserve all rights to challenge Plaintiffs' improper conflation of their activities with activities of others, including separately organized predecessors, subsidiaries, and affiliates, as well as alleged "joint venture" partners and end users.

*Twombly*, 550 U.S. at 555); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "[M]ere labels and conclusions" do not suffice.  *Ocasio-Hernandez*, 640 F.3d at 12.  A complaint must also "allege sufficient facts that comply with the basic elements of the cause of action."  *Gonzalez-Camacho v. Banco Popular de Puerto Rico*, 318 F. Supp. 3d 461, 471 (D.P.R. 2018), *aff'd in part*, No. 17-1973, 2020 WL 5543934 (1st Cir. July 21, 2020); *see also Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009).  Plaintiffs may not "merely parrot the elements of the cause of action."  *Ocasio-Hernandez*, 640 F.3d at 12.  The Court must ignore bare legal conclusions and use its "judicial experience and common sense" to determine if "plaintiff has stated a claim upon which relief may be granted." *Gonzalez-Camacho*, 318 F. Supp. 3d at 471.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  And inferences "must be at least as plausible as any 'obvious alternative explanation.'"  *Gonzalez-Camacho*, 318 F. Supp. 3d at 471 (quoting *Iqbal*, 556 U.S. at 679–680).

Allegations sounding in fraud must "state with particularity the circumstances constituting" the fraud, Fed. R. Civ. P. 9(b), including "the time, place and content of the alleged [actions] perpetrating that fraud."  *Caro-Bonet v. Lotus Mgmt.*, LLC, 195 F. Supp. 3d 428, 433 (D.P.R. 2016); *see also Cordero-Hernandez v. Hernandez Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006).  As discussed below, all of Plaintiffs' claims are governed by this more exacting standard.  "Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims 'effectively charge fraud.'"  *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020) (cleaned up).

## ARGUMENT

### I.   All of Plaintiffs' Claims Are Time Barred

Plaintiffs have sued Defendants for their alleged role "in causing the losses . . . resulting from the catastrophic storms of September 2017 and their aftermath." Am. Compl. ¶ 1.[5]  Plaintiffs knew of their alleged injuries when they occurred in 2017, and—as another court recently found in a similar climate change lawsuit—"the general public had knowledge of or had access to information . . . regarding the existence of climate change and effects" well before then.  *See Delaware*, 2024 WL 98888, at *19.  Yet Plaintiffs waited more than five years after allegedly suffering losses from the September 2017 hurricanes before filing suit.  That unjustified delay bars all their claims.

### A.   Plaintiffs' RICO and Antitrust Claims Are Untimely.  (Claims 4, 5, 6, 7, 8)

Plaintiffs' RICO and antitrust claims are subject to a four-year statute of limitations.  Civil RICO claims must be brought within four years of "when a plaintiff knew or should have known of his injury." *Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625 (1st Cir. 2019) (internal quotation marks omitted); *see also Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987).  As the First Circuit has explained, "[t]his means discovery of *the injury*, not discovery of the other elements of a claim, is what starts the clock" on a RICO claim.  *Álvarez-Maurás*, 919 F.3d at 626 (emphasis added).  A civil antitrust suit must likewise be brought within four years of "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *see* 15 U.S.C. § 15b.

---

[5] *See also* Am. Compl. ¶ 11 (alleging Plaintiffs' claims are premised on "the devastating storms of September 2017, all subsequent storms, and the aftermath of those storms which occurred as a result of the Defendant's [sic] acts and omissions"); *id.* ¶ 76 (alleging Defendants' conduct was "a substantial factor contributing to the Municipalities' damages in September 2017 and thereafter"); *id.* ¶ 78 (alleging, absent Defendants, "the Municipalities would not have suffered the intense 2017 storms and subsequent losses and damages and severe storms thereafter"); *id.* ¶ 79 (alleging Defendants' conduct led to an accelerated pace of ferocious storms "reaching a new peak in September 2017").  Plaintiffs specify that they do not "claim damages for future storms or catastrophes," but rather only for "the damages that [they] suffered beginning with the hurricanes in September 2017 and all of the ensuing impacts." *Id.* ¶ 10.

Plaintiffs allege RICO and antitrust injuries as of September 2017, purportedly arising from Hurricanes Irma and Maria. Am. Compl. ¶¶ 1, 10, 11, 735, 770. The statute of limitations therefore expired in September 2021, more than one year before Plaintiffs filed suit.

### B. No Exception to the Statute of Limitations Applies.

None of Plaintiffs' attempts to avoid the statute of limitations succeeds. First, Plaintiffs claim their "losses are continuous, wrongful, and ongoing." Am. Compl. ¶ 20. But ongoing losses from a completed wrong do not extend the limitations period. *See McMillan v. Rodríguez-Negrón*, 511 F. Supp. 3d 75, 83 (D.P.R. 2020). Thus, even accepting *arguendo* Plaintiffs' allegation that Defendants committed wrongful acts that caused the September 2017 hurricanes, those alleged acts were completed and the statute of limitations began to run by 2017; ongoing losses are irrelevant.[6]

Second, Plaintiffs assert that Defendants' conduct "has just recently come to the[ir] knowledge." Am. Compl. ¶ 20. Even if Plaintiffs' assertions were supported by the alleged facts—and they are not—under the RICO Act and the antitrust laws "'the meter begins to tick when the plaintiff discovers the *injury*, even if the plaintiff is unaware of the precise acts of racketeering that caused the injury.'" *Álvarez-Maurás*, 919 F.3d at 626 (emphasis added) (quoting *Lares Group, II v. Tobin*, 47 F. Supp. 2d 223, 230 (D.R.I. 1999)); *see Rx.com v. Medco Health Solutions, Inc*., 322 F. App'x 394, 397 (5th Cir. 2009) (applying same standard in antitrust case). Regardless of when Plaintiffs learned of Defendants' alleged acts, Plaintiffs' allegations establish that they knew—more than four years before filing suit in November 2022—that they were injured because of the hurricanes in September 2017. Am. Compl. ¶ 10. Accordingly, the statute of limitations began to run in September 2017 and expired in September 2021.

Third, Plaintiffs contend that the limitations period should be equitably tolled because, they

---

[6] To the extent Plaintiffs seek relief for future injuries—for which they allege only an increased risk, *see* Am. Compl. ¶¶ 262, 271, 272—they lack standing to do so, *see Kerin* v. *Titeflex Corp.*, 770 F.3d 978, 983 (1st Cir. 2014).

allege, Defendants fraudulently concealed wrongful acts. *Id.* ¶¶ 23, 25. Equitable tolling "is to be employed sparingly and should be reserved for exceptional cases." *Rivera-Diaz v. Humana Ins. of P.R., Inc.*, 748 F.3d 387, 390 (1st Cir. 2014). This is not such a case. Plaintiffs have not "plead[ed] with particularity the facts giving rise to the fraudulent concealment claim." *J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996). The Amended Complaint lacks any particularized allegations of concealment by Defendants, and certainly lacks any such allegations of concealment since the hurricanes struck in 2017.

Nor have Plaintiffs alleged that they "exercise[d] reasonable diligence," *Philibotte v. Nisource Corp. Services Co.*, 793 F.3d 159, 164 (1st Cir. 2015), or that they failed to meet their filing deadline due to "circumstance beyond [their] control," *Rivera-Diaz*, 748 F.3d at 390–91. Plaintiffs knew of their alleged injuries when the storms ended in 2017, and other municipalities filed complaints making similar allegations even before those storms made landfall. *See, e.g.*, Complaint, *Cnty. of San Mateo v. Chevron Corp.*, ECF No. 1-2, No. 17-cv-4929 (N.D. Cal. Aug. 24, 2017). Major media outlets also aired similar allegations well before then. *See, e.g.*, Andrew C. Revkin, *A Deep Dive into What Exxon Knew About Global Warming and When (1978) It Knew It*, N.Y. Times (Sept. 16, 2015), https://nyti.ms/3I0WmRz; Felicity Barringer, *Flooded Village Files Suit, Citing Corporate Link to Climate Change*, N.Y. Times (Feb. 27, 2008), https://bit.ly/3KzfSXv.[7]

Indeed, Plaintiffs themselves cite publicly available sources from 2015 that would have put them on notice of the alleged misconduct. *See, e.g.*, Am. Compl. ¶ 368 n.395 (citing Kathy Mulvey & Seth Shulman, *The Climate Deception Dossiers: Internal Fossil Fuel Industry Memos Reveal Decades of Corporate Disinformation*, Union of Concerned Scientists (July 2015),

---

[7] In ruling on a motion to dismiss, the Court may take judicial notice of news articles to show information was publicly disseminated. Fed. R. Evid. 201; *see, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

bit.ly/3SiffnX).[8]  And numerous lawsuits filed before Plaintiffs' Complaint, including cases that proceeded to the U.S. Supreme Court, alleged that fossil fuels were causing climate change and related weather events, including hurricanes.  *See, e.g.*, *AEP*, 564 U.S. at 417 (noting EPA's determination that the "dangers of greenhouse gas emissions" from fossil fuels include "more frequent and intense hurricanes"); *Massachusetts v. EPA*, 549 U.S. 497, 522 (2007) (noting that fossil fuels and the related release of carbon dioxide into the atmosphere "may contribute to the ferocity of hurricanes"); *see also Rhode Island*, 979 F.3d at 53–54 (noting 2018 filing of climate change lawsuit by State of Rhode Island alleging increased hurricanes).  Indeed, a recent decision from a Delaware court dismissed similar climate change claims as time-barred, holding that the "general public had knowledge of or had access to information about the disputes, regarding the existence of climate change and effects, decades prior to the expiration" of the limitations period.  *Delaware*, 2024 WL 98888, at *19.

Fourth, Plaintiffs assert that statutes of limitation cannot run against them as municipalities because they seek "recovery of the public properties of the Municipalities of Puerto Rico."  Am. Compl. ¶ 21.  To the extent this is an attempt to invoke the doctrine of *nullum tempus* (*i.e.*, time does not run against the sovereign), it is not recognized in Puerto Rico.  *Ayala Rosa v. ATPR*, 16 P.R. Offic. Trans. 414, 1985 WL 301240 (P.R. 1985); *see also In re Methyl Tertiary Butyl Ether*

---

[8] In their original Complaint, Plaintiffs also cited various publications from 2017 purporting to link Hurricanes Irma and Maria to the effects of climate change.  *See, e.g.*, Compl. ¶ 209 n.187 (citing Umair Irfan, *One of the Clearest Signs of Climate Change in Hurricanes Maria, Irma, and Harvey Was the Rain*, Vox (Sep. 29, 2017), bit.ly/3S40R2a; *id.* ¶ 240 n. 217 (citing Angela Fritz, Harvey. Irma. Maria. *Why Is This Hurricane Season So Bad?*, Wash. Post (Sep. 23, 2017), bit.ly/3S2inUI; *id.* ¶ 263 n.245 (citing Puerto Rico Climate Change Council, *Puerto Rico's State of the Climate* (2013) at 32, 68 (noting increase in global temperatures "very likely due to increase in anthropogenic greenhouse gas concentrations," with "[w]armer sea surface temperatures around . . . Puerto Rico likely to increase the intensity of . . . hurricanes").  In an effort to avoid the statute of limitations on their Puerto Rico law claims, Plaintiffs have deleted these references from the Amended Complaint.  But the Court may take judicial notice of these articles and, in all events, the prior allegations remain binding party admissions that may not be evaded by simple omission from a later pleading.  *See, e.g.*, *InterGen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2008) (allegations in superseded complaint "may be party admissions, usable as such despite subsequent amendment of the complaint").

*(MTBE) Prod. Liab. Litig.*, No. 1:00-1898, 2014 WL 4290433, at *5 (S.D.N.Y. Aug. 29, 2014)

("[T]he common law doctrine of *nullum tempus* . . . does not apply in Puerto Rico[.]").[9]

### C.  The Puerto Rico Law Claims Are Untimely.  (Claims 1, 2, 3, 9, 10, 11, 12, 13, 14)

Each of Plaintiffs' Puerto Rico law claims is barred by a one-year statute of limitations.[10]  P.R.

Laws Ann. tit. 31, § 5298; *see Cintron-Luna v. Roman-Bultron*, 668 F. Supp. 2d 315, 319 (D.P.R.

2009) (fraud); *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (design

defect); *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc*., 31 F. Supp. 2d 226, 240 (D.P.R.

1998) (nuisance).  This period begins to run "from the time the aggrieved person had knowledge"

of the harm—*i.e.*, when the victim "has (1) 'notice of the injury' and (2) 'notice of the person who

caused it.'"  *Torres*, 219 F.3d at 18 (quoting *Colón Prieto v. Géigel*, 15 P.R. Offic. Trans. 313, 330

(P.R. 1984)).  Notice "does not require actual knowledge; it is enough that the would-be plaintiff

had notice that would have led a reasonable person to investigate and so uncover the needed infor-

mation."  *Lopez-Flores v. Cruz-Santiago*, 526 F. Supp. 2d 188, 190 (D.P.R. 2007).  "Once a plain-

tiff is made aware of facts sufficient to put her on notice that she has a potential tort claim, she

must pursue that claim with reasonable diligence."  *Rodriguez-Suris v. Montesinos*, 123 F.3d 10,

16 (1st Cir. 1997).

The First Circuit has held that "[i]f a plaintiff brings an action more than a year after the injury

took place, she bears the burden of proving [at summary judgment] that she lacked the requisite

---

[9] The only potential exceptions involve inapplicable circumstances, such as when a private party is seeking to acquire certain types of government property by adverse possession, *see In re MTBE Prod. Liab. Litig.*, 2014 WL 4290433, at *5, or in certain types of cases brought by the Commonwealth of Puerto Rico, *see* P.R. Laws Ann. Tit. 31, 5241 (statute of limitations does not operate on certain "claims of the Commonwealth of Puerto Rico").  Plaintiffs also cite cases holding that actions to establish public rights to public property are not subject to statutes of limitations.  *See Rubert Armstrong v. E.L.A.*, 97 P.R.R. 573, 600–01 (1969); *Figueroa v. Municipality of San Juan*, 98 P.R.R. 523 (1970).

[10]  Because Plaintiffs do not suggest they are invoking the law of any state or territory other than Puerto Rico, for purposes of this motion, Defendants assume that Puerto Rico law applies.  Puerto Rico's statutes of limitations govern when federal courts "apply[] Puerto Rico law to substantive matters."  *Montalvo v. Gonzalez-Amparo*, 587 F.3d 43, 46 (1st Cir. 2009).

'knowledge' at the relevant times." *Hodge v. Parke Davis & Co.*, 833 F.2d 6, 7 (1st Cir. 1987) (Breyer, J.). That same reasoning applies with equal force on a motion to dismiss. *See Baretto Peat, Inc. v. Luis Ayala Colon Sucrs. Inc.*, 896 F.2d 656, 658 (1st Cir. 1990) (applying *Hodge* on motion to dismiss); *Bocanegra-Acevedo v. Toyota Motor Sales USA, Inc*., 2009 WL 1098084, at *2 (D.P.R. Apr. 23, 2009) (same). Plaintiffs do not plausibly allege they lacked that "requisite knowledge," *Hodge*, 833 F.3d at 7, so even "reading [Plaintiffs'] pleadings in the most favorable light possible, the only logical conclusion that can be drawn is that" Plaintiffs knew of their alleged injuries when they occurred in September 2017, *Aldahonda-Rivera v. Parke Davis & Co.*, 882 F.2d 590, 593 (1st Cir. 1989). And they indisputably knew, or should have known, of the alleged link between Defendants' alleged conduct and climate change well before that. *See, e.g.*, *Rhode Island*, 979 F.3d at 53–54. Plaintiffs' argument boils down to an implausible proposition: that they had no reason to investigate the supposed causes of the September 2017 storms until November 2021 (one year prior to filing their Complaint). *See* Am. Compl. ¶¶ 20, 23–24.

But as described above (*see* n.9), Plaintiffs' initial allegations show they were on notice of their claims when their alleged injuries occurred. And there were public allegations of misconduct by Defendants even before those storms. *See supra* Part I.A; *see McIntyre v. United States*, 367 F.3d 38, 60–61 (1st Cir. 2004) (affirming dismissal of complaint as time-barred where press coverage triggered inquiry notice for statute of limitations). Moreover, the Amended Complaint expressly concedes that the damages from the 2017 hurricanes were immediately apparent. Plaintiffs' attempt to hide those concessions by deleting their most forthright admissions only confirms that they have long been on notice of their alleged injuries.

Plaintiffs seek to recover for "the damages that [they] suffered beginning with the hurricanes in September 2017 and all of the ensuing impacts," Am. Compl. ¶ 10, and expressly disclaim

"damages for future storms or catastrophes." *Id.* Their claims therefore accrued in September 2017, and purported ongoing losses from a completed wrong provide no basis for extending the statute of limitations. *McMillan*, 511 F. Supp. 3d at 83. Once Plaintiffs were on notice, they had one year to file. *See Philibotte*, 793 F.3d at 164; *Rivera-Diaz*, 748 F.3d at 390–91; *see also supra* Part I.A. They failed to do so, and therefore their claims must be dismissed as untimely.

## II.  Plaintiffs Fail to State a RICO Claim (Claims 4, 5, 6, 7)

Plaintiffs' fourth, fifth, sixth, and seventh causes of action allege RICO violations. *See* 18 U.S.C. §§ 1962, 1964. To plead a civil RICO claim, Plaintiffs must allege "(1) injury caused by (2) conduct, (3) of an enterprise, (4) through a pattern, (5) of racketeering activity." *P.R. Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriqueña, Inc.*, 118 F. Supp. 3d 447, 454 (D.P.R. 2015). Plaintiffs' claims fail for multiple reasons.

First, the RICO claims are premised on Defendants' alleged speech, membership in advocacy organizations, and participation in a public debate on climate change—an issue of undisputed public importance. The claims therefore violate the First Amendment and the *Noerr-Pennington* doctrine. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."). Second, the Complaint fails adequately to plead RICO's elements. Most notably, Plaintiffs' attenuated causal chain—running from alleged speech to "ensuing impacts" from hurricanes—fails under binding Supreme Court precedent. Third, Plaintiffs' RICO claims fail to the extent Plaintiffs purport to seek damages for injuries allegedly sustained by their residents, rather than Plaintiffs themselves, and to the extent Plaintiffs seek damages for the costs of government services.

**A. Plaintiffs' Claims Are Barred by the First Amendment and *Noerr-Pennington*.**

All of Plaintiffs' claims threaten Defendants' First Amendment rights, but this threat is most apparent in Plaintiffs' purported RICO claims. Each of the supposed actions that allegedly formed the basis of a "corrupt" enterprise is nothing more than an allegation of protected speech or alleged membership in a lawful organization that purportedly maintained certain goals for influencing public policy. Specifically, Plaintiffs—each of which is a government entity—are suing Defendants for their public statements relating to climate change allegedly made over the course of several decades in an alleged effort to defeat or shape treaties, legislation, and regulation relating to fossil fuels. *See, e.g.*, Am. Compl. ¶¶ 327, 365, 387, 391, 418, 517, 665. The First Amendment and the *Noerr-Pennington* doctrine bar such attempts to hold Defendants liable for core political speech.

"The general proposition that freedom of expression upon public questions is secured by the First Amendment" has "long been settled." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). There is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 270. As a general matter, then, "the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)). When the government regulates speech because it disagrees with the speaker's message, "[t]he First Amendment requires heightened scrutiny." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). And when applying this heightened scrutiny, the government "bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000). There is "[n]o sufficient governmental interest" that justifies limits on the "political speech . . . of . . . for-profit corporations." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Indeed, as

the Supreme Court reiterated just this past Term, speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech. This fact underlies our cases involving everything from movie producers to book publishers to newspapers." *303 Creative*, 143 S. Ct. at 2312. Whether penalties for speech violate the First Amendment is a legal question for the Court to decide. *See Casey v. City of Newport*, 308 F.3d 106, 110 (1st Cir. 2002).

"[C]limate change" is a "matter[] of profound value and concern to the public." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (internal quotations omitted). Speech relating to climate change thus "occupies the highest rung of the hierarchy of First Amendment values" and warrants "special protection." *Id.* (internal quotation marks omitted). "The constitutional guarantee of freedom of expression serves" its "most important role i[n] protect[ing] . . . robust and uninhibited debate on important political and social issues" such as climate change, which has "staked a place at the very center of this Nation's public discourse." *Nat'l Rev., Inc. v. Mann*, 140 S. Ct. 344, 346, 348 (Mem.) (2019) (Alito, J., dissenting from denial of cert.). It is "axiomatic" that government may not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828–29 (1995). "[T]he First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340. No "consensus"—scientific or otherwise—is regarded by the law as above criticism or disagreement. That is because "the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided.'" *303 Creative*, 143 S. Ct. at 2312 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995)). Nor may government "compel a person to speak its own preferred messages." *Id.* (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–506 (1969)). "[U]nder the regime of [the First]

Amendment 'we depend for . . . correction not on the conscience of judges and juries but on the competition of other ideas.'" *Brown v. Hartlage*, 456 U.S. 45, 61 (1982) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)). As Justice Ginsburg observed in the Supreme Court's seminal case on climate change, conflicting views on the practical tradeoffs posed by diverse proposals are the foundation of sound regulatory policy, not inconvenient expressions to be punished: "The appropriate amount of regulation in any particular greenhouse gas producing sector cannot be prescribed in a vacuum: As with other questions of national or international policy, *informed assessment of competing interests is required*. Along with the environmental benefit potentially achievable, *our Nation's energy needs and the possibility of economic disruption must weigh in the balance*." *AEP*, 564 U.S. at 427 (emphasis added).

Plaintiffs—a putative class of municipal governments—cannot hold Defendants liable for the purported environmental consequences of speech on matters of public importance. They impermissibly seek to hold private parties liable for alleged speech with which they disagree—speech that, they claim, minimizes or denies climate change. Plaintiffs' addition of API as a defendant proves the point. API is a trade association—not an oil and gas company—and the Amended Complaint's only allegations regarding API concern its funding and dissemination of research with which Plaintiffs disagree, or its funding of other groups whose missions are aligned with API's— as trade associations typically do. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("[T]rade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services."); *see also, e.g.*, Am. Compl. ¶¶ 327 (alleging that scientists from API and other Defendants "began the 'CO2 and Climate Task Force' to monitor and to freely share industry knowledge on climate research between 1979 and 1983"), 414 (alleging that "API and its member

companies channeled significant funding" to "conservative think tanks, including ALEC, CEI, and the GMI, to produce climate denial"). As much as Plaintiffs might disagree with them, these expressive activities are protected by the First Amendment.

That Plaintiffs are attempting to punish Defendants for protected speech is particularly evident with respect to their RICO claims, which are unapologetically premised on Defendants' alleged association with organizations—trade associations, lobbying groups, and think tanks—whose objectives include speaking on issues of public concern and petitioning the government. *See, e.g.*, Am. Compl. ¶ 405 (alleging that "[t]hrough API and other trade associations and front groups, Defendants coordinated funding and campaigns to continue the mission of the [Global Climate Coalition], obstruct climate action, and ensure their own profits."). Indeed, Plaintiffs allege that one of the core purposes of the GCC—the alleged "enterprise"—was "to oppose the Kyoto Protocol." Am. Compl. ¶ 211(a). The original Complaint was even more direct about the political objective at issue, accusing Defendants of "preventing U.S. *adoption of* the Kyoto Protocol." Compl. ¶ 365 (emphasis added).[11] But advocacy to encourage defeat of proposed legislation is core political speech, and "[i]t is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is" Defendants' First Amendment right. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *303 Creative*, 143 S. Ct. at 2312 (noting that "the First Amendment protects acts of expressive association").

The importance of climate change as a public policy issue means that Defendants' speech is entitled to *more* constitutional protection, not less. The First Amendment protects against even "the *prospect* of chilling fully protected expression." *Counterman*, 143 S. Ct. at 2115 (emphasis

---

[11] *See also, e.g.*, Am. Compl. ¶¶ 516 (noting "Influence Map released a report tracking nearly **$1 billion** in lobbying funds and narrative capture by four big oil companies, including ExxonMobil, Shell, Chevron, and BP"); 518 ("Annually, Influence Map found that ExxonMobil, Shell, Chevron, and BP alone were spending a total of **$135 million** a year just on climate lobbying.").

added).  That some Defendants are commercial entities is irrelevant.  "[T]he First Amendment extends to all persons engaged in expressive conduct, including those who seek profit." *303 Creative*, 143 S. Ct. at 2320.  And that remains true when, as here, the specific theory of liability is supposed "omissions":  "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include.  All that offends the First Amendment just the same." *Id.* (citations omitted).  Because Plaintiffs do not identify any alleged harmful speech *except* for protected lobbying and advocacy activity, Plaintiffs cannot meet their burden.

Even if Plaintiffs could show that they also attack some alleged conduct or speech that is not protected, Plaintiffs must plead facts showing that they are basing their claims *only* on that unprotected conduct or speech. *See NAACP v. Claiborne Hardware*, 458 U.S. 886, 934 (1982) (plaintiff bears "[t]he burden of demonstrating that [unprotected conduct] rather than protected conduct" caused injury).  They must further show that this unprotected speech was made by each individual Defendant, not by some organization that happened to include a Defendant as one member among many. *See, e.g.*, *Santopietro v. Howell*, 857 F.3d 980, 990 (9th Cir. 2017) (under *Claiborne*, plaintiffs cannot allege the defendant is responsible for a group's conduct).  Here, too, Plaintiffs fail.

Dismissal is also required under the *Noerr-Pennington* doctrine, which protects activities intended to influence the government—including campaigns designed to influence voters—under the Petition Clause of the First Amendment.  The doctrine was first articulated in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), a case brought by trucking plaintiffs against railroads and affiliated defendants.  The trucking plaintiffs alleged the railroads violated the Sherman Act by "conduct[ing] a publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of

the trucking business," and "creat[ing] an atmosphere of distaste for the truckers among the general public." *Id.* at 129. The plaintiffs alleged this "publicity campaign" was "fraudulent," because "the publicity matter circulated in the campaign was made to appear as spontaneously expressed views of independent persons and civic groups when, in fact, it was largely prepared and produced by [the railroads' PR firm] and paid for by the railroads." *Id.* at 130. After a bench trial, the district court awarded "substantial damages" and a "broad injunction" to the plaintiffs. *Id.* at 133–34.

The Supreme Court reversed, explaining that "publicity campaign[s]" aimed at influencing governmental action cannot be the grounds for civil liability, as "representative democracy . . . depends upon the ability of the people"—including businesspeople—"to make their wishes known to their representatives." *Id.* at 137. That the defendants "deliberately deceived the public and public officials" was irrelevant. *Id.* at 145. The Court soon reiterated that defendants could not be subject to civil liability for "a concerted effort to influence public officials." *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70 (1965); *see also Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 56 (1st Cir. 2017) ("[A] Sherman Act violation cannot be 'predicated upon mere attempts to influence the passage or enforcement of laws.'") (quoting *Noerr*, 365 U.S. at 135). Protected conduct includes "indirect petitioning," such as "a publicity campaign directed at the general public" that is "part of an effort to influence legislative or executive action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499, 503 (1988) (*Noerr-Pennington* applies to activities "incidental to a valid effort to influence governmental action").[12]

Plaintiffs' claims that the GCC opposed Congress's adoption of the Kyoto Protocol, and that

---

[12] Courts regularly apply *Noerr-Pennington* to RICO and business torts. *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (RICO and tortious interference claims); *Pers. Dep't, Inc. v. Pro. Staff Leasing Corp.*, 297 F. App'x 773, 779 (10th Cir. 2008) (tortious interference claims); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933 (9th Cir. 2006) (RICO). The doctrine is particularly apt here, where all of Plaintiffs' claims are based on the same underlying allegations. *See Sosa*, 437 F.3d at 931 (holding that *Noerr-Pennington* "applies equally in all contexts") (quoting *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000)).

some Defendants sponsored ad campaigns to defeat ballot initiatives, implicate core petitioning activity. Am. Compl. ¶¶ 387, 391, 396, 517. Plaintiffs also complain about an "Action Memo" that "outlin[ed] plans to reach the media, the public, and policy makers," *id.* ¶ 429, disseminating a "petition," *id.* ¶ 434, money spent on "climate lobbying," *id.* ¶ 518, and efforts to influence legislators, *see* Am. Racketeering Case Stmt., ¶ 8(b). Plaintiffs' deletions of certain passages from their original Complaint are unavailing—and particularly revealing—including deleting prior characterizations *of the same conduct that continues to be alleged* as Defendants' "advocacy activities including lobbying government officials," Compl. ¶ 370, and allegations of videos distributed to "policy makers," *id.* ¶ 382; attempts to reach "state elected officials," *id.* ¶ 527; a plan to send a "model bill" to "policy makers nationwide," *id.* ¶ 560; and letters sent to members of the House of Representatives, *id.* ¶¶ 470–72. Plaintiffs repeatedly and unabashedly complain about efforts to "change public opinion" to influence public policy. Am. Compl. ¶¶ 482, 674, 728(h). Plaintiffs cannot constitutionally use their municipal powers to attach financial liability to Defendants' lobbying and political advocacy activities because "the First Amendment protects the right of corporations to petition legislative and administrative bodies." *Citizens United*, 558 U.S. at 355 (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.31 (1978)). *Noerr-Pennington* ensures that they cannot use this Court to do so either.

**B.    Plaintiffs Have Not Pleaded the Requisite Elements of a RICO Claim.**

Although the failure to plead even a single element of a RICO claim would be fatal, Plaintiffs have failed to plead *any* of the essential elements: no causation, no enterprise, no racketeering activity, no pattern, no management or control, no investment, no acquisition, and no conspiracy.

1. **Plaintiffs Fail to Plausibly Allege That the Claimed Predicate Acts Proximately Caused Their Purported Injuries.**

Plaintiffs' attenuated theory of causation begins with decades-old speech and ends with the 2017 hurricanes. In between are a host of mediating factors, including the greenhouse gas emissions of billions of persons around the globe that mix with other emissions in the Earth's atmosphere. Common sense and binding U.S. Supreme Court precedent preclude a finding of proximate causation for such a remote and attenuated theory. Plaintiffs' failure to adequately allege causation is fatal to all of their claims, for the reasons discussed elsewhere in this brief.

"[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp.,* 559 U.S. at 9. Proximate cause "requires some *direct* relation between the injury asserted and the injurious conduct alleged." *Id.* (emphasis added) (quotations omitted). That "link" between the alleged predicate criminal activity—here, the purported acts of mail and wire fraud based on supposed misrepresentations about climate change—and the alleged injury cannot be "remote, purely contingent, or indirec[t]." *Id.* (quotations omitted) (alteration in original). The "central question [a court] must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza*, 547 U.S. at 460–61 (emphasis added). Indeed, "[t]he general tendency of the law[] . . . is not to go beyond the first step" in the causation chain, and that "tendency applies with full force to proximate cause inquiries under RICO." *Hemi Grp.*, 559 U.S. at 2 (quotations omitted) (alteration in original).

Plaintiffs' RICO allegations go far beyond the first step. Indeed, their chain of causation has *at least six* distinct steps, almost all of which themselves consist of multiple, diffuse components:

1. Defendants, "over the course of decades" (*i.e.*, beginning in 1989 to the present), allegedly "engaged in an . . . enterprise . . . to promote climate change denial and undermine scientific consensus as a deceptive means to manipulate Plaintiffs and their residents

into continuing to purchase their products." Am. Racketeering Case Stmt., ¶ 2(h). Defendants then purportedly promoted false narratives and made deceptive pledges regarding their commitment to net-zero goals in order to "maintain Plaintiffs and their residents purchasing their products rather than environmentally friendly alternatives." *Id.* ¶ 2(k); *see also id.* ¶¶ 8(b)(xiii), (xiv) (alleging that Defendants created "greenwashing campaigns" and engaged in other forms of deception).

2. As a result of those allegedly deceptive statements, Plaintiffs and their residents allegedly continued to purchase Defendants' products, resulting in some marginal increase in the amount of Defendants' products purchased and used by Plaintiffs—and their residents, who are not properly before the Court, as demonstrated in Section II.C.

3. By purchasing and using Defendants' products, Plaintiffs and their residents produced greenhouse gases.

4. Those greenhouse gases combined with greenhouse gas emissions produced by billions of third parties and other sources across the planet for decades, allegedly exacerbating *global* climate change in some unspecified and marginal manner.

5. As a result of *global* climate change, Puerto Rico was hit by hurricanes in 2017.

6. Puerto Rico sustained damages (including damages to infrastructure, and crops, as well as the cost of emergency services and decreased tax revenue) because of the hurricanes.

Plaintiffs' claims fail at step one because they do not plead facts showing that they or anybody else relied on Defendants' supposed misrepresentations—only conclusory assertions. *See*, *e.g.*, Am. Compl. ¶¶ 3, 73, 611, 614. Plaintiffs do not even plead that they purchased Defendants' products. Instead, they allege, "on information and belief," that they are Defendants' customers. *See* Am. Compl. ¶¶103–186. But fraud-based allegations "must go beyond mere information and belief," *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 9 (D. Mass. 1999), and, in any event, whether Plaintiffs' are Defendants' customers is fully within their knowledge and is thus not properly alleged on information or belief, *see Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) ("[P]leadings on information and belief require an allegation that the necessary information lies within the defendant's control[.]"). Additionally, Plaintiffs do not allege when they heard the alleged statements or how the alleged statements caused them to do anything different from what they already were doing. *See Twombly*, 550 U.S. at 557.

- 26 -

In any event, Plaintiffs' alleged causal chain is too indirect to support any liability. Beyond the six steps listed above, some of Plaintiffs' alleged damages require a seventh, eighth, or even ninth step. For example, Plaintiffs allege that because of greater environmental damages, Puerto Rico became incrementally less attractive to tourists and residents, and "taxes previously collected by the Municipalities were significantly reduced." Am. Compl. ¶¶ 255 (tourism); 254 (emigration); 733 (RICO claim). Plaintiffs even suggest that Defendants are responsible for a higher suicide rate in the aftermath of Hurricane Maria. *Id.* ¶ 270.

The Supreme Court has held that far less attenuated chains of causation fail as a matter of law and must be dismissed at the pleading stage. In *Hemi Group*, the Supreme Court held that the City of New York could not hold an online cigarette retailer liable under RICO. 559 U.S. at 9. The City alleged that it suffered tax losses when the retailer failed to pass along data to New York State; the City claimed the data may have enabled it to pursue the retailer's customers for cigarette taxes, which the City alleged many customers did not pay. *Id.* The Supreme Court held that the chain of causation was too attenuated because the conduct directly responsible for the City's harm was the customers' failure to pay taxes, not the alleged fraud, and thus the City could not show the alleged fraud proximately caused the tax losses. *Id.* at 9–11; *see also Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (focus of RICO inquiry is "direct-ness," not "on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct"). The Court thus affirmed Rule 12(b)(6) dismissal. *See Hemi Grp*, 559 U.S. at 7, 18.

The Supreme Court repeatedly has rejected indirect, contingent injuries. *See, e.g.*, *Anza*, 547 U.S. at 457–59 (affirming dismissal of RICO action by retailer against competitor on the theory that the competitor's failure to charge and remit sales tax allowed the competitor to charge artifi-cially low prices); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270–74 (1992) (holding that

RICO does not permit insurer to recover losses due to stock manipulation that victimized third parties because the alleged injuries were attenuated and indirect); *see also Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 36 (1st Cir. 2021) (affirming grant of motion to dismiss and rejecting as too attenuated theory of causation that "[defendant's] wrongful conduct cost [a third party] the gaming license, which in turn cost [plaintiff] the benefit of a potential lease with [the third party]"). Here, Plaintiffs' multistep causal chain relies on the acts of billions of third parties—every human being or entity that has combusted any oil and gas product, and also turns on the vagaries of how and where a hurricane developed and made landfall. Such an attenuated chain cannot establish proximate cause.

To make matters worse, Plaintiffs cannot plausibly allege that Defendants' alleged speech or conduct was the but-for cause of the 2017 hurricanes. In contrast to their Amended Complaint, which alleges damages resulting from Defendants' *global* conduct, *see* Am. Compl. ¶¶ 107, 114, 119, 128, 132, 142, 146, 154, in their Racketeering Case Statement, Plaintiffs base their RICO claims on sales in Puerto Rico, *see, e.g.*, Am. Racketeering Case Stmt. ¶¶ 8(a), 8(b), 8(c), 8(d). But Puerto Rico makes up just a tiny fraction of global energy consumption and carbon production, and climate change is a global phenomenon. Plaintiffs themselves allege that stopping the harms of climate change would require a lengthy global effort. *See* Am. Compl. ¶ 599. Plaintiffs cannot plausibly argue that had Defendants not sold the incrementally more fossil fuel products *to Puerto Rico municipalities* between 1989 and 2017, climate change would have been stopped, and the 2017 hurricanes would not have occurred or would not have caused Plaintiffs' damages. Plaintiffs even admit that Puerto Rico is located in the "notorious Hurricane Alley." *Id.* ¶ 4. That it repeatedly has been struck by hurricanes and severe tropical storms renders any causal link between Defendants' conduct and the 2017 storms less plausible, not more. To suggest that the damage

caused by the 2017 storms (and their impacts on the municipalities, or even Puerto Rico citizens) was caused by Defendants' allegedly deceptive statements, rather than other factors, is sheer speculation and facially implausible.  *See* Lauren Lluveras, *Puerto Rico's Bankruptcy Will Make Hurricane Recovery Brutal – Here's Why*, The Conversation (Sep. 26, 2017) (cited in Am. Compl. ¶ 229 n.207), http://bit.ly/3EhBxAq; *see also Gonzalez-Caban v. JR Seafood Inc.*, 48 F.4th 10, 17 (1st Cir. 2022) (proximate cause cannot be established by "pure speculation" (citation omitted)). Thus, Plaintiffs fail to allege but-for and proximate causation.[13]

## 2.    Plaintiffs Fail Adequately to Allege an *Enterprise*.

Under RICO, an "enterprise" is a long-lasting group acting together to advance a common purpose.  *United States v. Rodriguez-Torres*, 939 F.3d 16, 24 (1st Cir. 2019).  Plaintiffs allege that Defendants formed an "association-in-fact" enterprise, which requires "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Id.* (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)) (brackets in *Rodriguez-Torres*).  Plaintiffs inadequately plead these elements here.

To have the requisite "purpose," "the group must share the 'common purpose of engaging in a course of conduct.'"  *Id.* (quoting *Boyle*, 556 U.S. at 946).  Plaintiffs allege that Defendants acted "through their enterprises-in-fact—the GCC, API, and [their] members."  Am. Racketeering Case Stmt., ¶ 2(h).  Plaintiffs cannot premise their RICO claim on the actions of the GCC, which they concede ceased operating in 2002, more than two decades ago.  *See* Am. RICO Statement ¶¶ 2(b),

---

[13] The First Circuit has identified three additional factors relevant to causation:  (1) "concerns about proof;" (2) "concerns about administrability and the avoidance of multiple recoveries;" and (3) the "societal interest in deterring illegal conduct and whether that interest would be served in a particular case."  *Sterling Suffolk Racecourse¸* 990 F.3d at 35–36 (internal quotation marks omitted).  These factors further illustrate the infirmities in Plaintiffs' allegations.  Questions of proof abound.  Plaintiffs have not plausibly described how to determine whether and to what extent Defendants—as opposed to state and local governments, consumers, and companies in other industries across the world—have caused global warming.  Nor have Plaintiffs plausibly explained how to attribute the damage to Puerto Rico from the 2017 hurricanes to any alleged conduct by Defendants.  And there is substantial risk of multiple recoveries here, as Plaintiffs' allegations involve global conduct allegedly giving rise to global harms.

8(b)(ii).  While Plaintiffs allege the GCC somehow continues operating "informally," their post-2002 allegations are generic and amorphous.  They plead no facts showing that the alleged "enterprise" was, in fact, an enterprise, or that it functioned as a continuing unit after the GCC disbanded no later than 2002.  Plaintiffs' base assertion that two of the GCC's founding members continued in existence after the GCC was disbanded does not support Plaintiffs' contention that the GCC "continues informally today through other associations like API and the National Association of Manufacturers as an association-in-fact of the Defendants."  Am. Compl. ¶ 211(a).

At most, Plaintiffs allege that various entities, including entities not named as defendants, "funded, promoted or disseminated" articles and advertisements that opined on global warming and expressed opinions with which Plaintiffs disagree.  Am. Racketeering Case Stmt. ¶ 8(b)(ii); *see also, e.g.*, Am. Compl. ¶¶ 383–84, 388.  But for nearly all named Defendants, Plaintiffs do not identify any advertisements that they are alleged to have disseminated.  For instance, Plaintiffs allege that the American Coalition for Clean Coal Energy ("ACCCE") funded "advertisements, radio ads, and/or other media broadcasts" in 1990 or 1991.  *Id.* ¶ 8(b)(iv).  But no facts are pleaded to suggest that the Defendants had anything to do with the ACCCE or its advertisements, or the other advertisements to which Plaintiffs make vague, non-specific references.  The Amended Complaint fails to plead facts showing these entities or Defendants operated as a "continuing unit" after 2002.  *See Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019) ("A plaintiff may not simply 'string' [ ] together . . . various defendants and label[ ] them an enterprise.") (quoting *Town of Mamakating, v. Lamm*, No. 15-cv-2865, 2015 WL 5311265, at *9 (S.D.N.Y. Sept. 11, 2015)).  Plaintiffs also fail to allege, as they must, what role each Defendant played in the enterprise or how their roles differed from those of other alleged members.  *See In re Asbestos School Litig.*, 46 F.3d 1284, 1290 (3d Cir. 1994) (Alito, J.) (recognizing that, generally,

a "member of a trade group or other similar organization does not necessarily endorse everything done by that organization or its members"). The Amended Racketeering Case Statement fares no better. It merely adds vague references to "[o]ther misrepresentations" such as unidentified "[a]dvertisements of 'low-carbon' fuels" and "[a]dvertisements for alternative energy sources." *Id.* § 8(d)(ii)(a), (b). And, in any event, Plaintiffs fail to plead that the GCC engaged in racketeering activity under RICO when it was operating, prior to 2002.

At bottom, all that Plaintiffs allege is a supposed "similarity of viewpoint, rhetoric and strategy." *Libertad v. Welch*, 53 F.3d 428, 443 (1st Cir. 1995), *abrogated on other grounds as recognized by United States v. Velazquez-Fontanez*, 6 F.4th 205 (1st Cir. 2021). But the First Circuit has emphasized that "liability for mere membership in an association, particularly when that association is ideological, may conflict with the First Amendment." *Id.* Thus, it is "particularly important" in such cases that plaintiffs be able to point to sufficient facts "beyond [defendants'] similarity of viewpoint, rhetoric and strategy, to show an enterprise." *Id.* Plaintiffs have failed to do so here.

### 3. Plaintiffs Have Not Adequately Alleged *Racketeering Activity*.

"'Racketeering activity' means an act that violates one of the federal laws specified in the RICO statute, including the mail and wire fraud statutes." *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005) (citations omitted). Plaintiffs plead no such unlawful conduct here.

Plaintiffs allege two racketeering predicates: mail fraud and wire fraud.[14] Am. Racketeering Case Stmt. ¶ 8(b), (d) (citing 18 U.S.C. §§ 1341, 1343). Both offenses must be pleaded with particularity with respect to each Defendant and require, as an element, that the Defendant act to deprive the victim of money or property. *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020);

---

[14] Plaintiffs also allege that Defendants violated Puerto Rico Rule 7, 15 U.S.C. §§ 45, 55, 16 C.F.R. Part 255 & Part 260, and the common-law rule against fraud. Am. Racketeering Case Stmt., ¶¶ 2(h)–(j), 15(a)–(c). But none of these provisions is a predicate act of "racketeering activity" under 15 U.S.C. § 1961(1).

*United States v. Abdelaziz*, 68 F.4th 1, 33 (1st Cir. 2023). Plaintiffs failed to allege fraud with particularity as to each Defendant and, even in the aggregate, have not alleged any predicate offense because they fail to allege that they did not receive the full economic benefit of the complained of commercial transactions—purchases of oil and gas products. Indeed, as noted above, Plaintiffs do not even adequately allege that they are Defendants' customers. *See supra* Part II.B.1.

Courts "'have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.'" *Medina-Rodriguez v. $3,072,266.59 in United States Currency*, 471 F. Supp. 3d 465, 478 (D.P.R. 2020) (quoting *United States v. Kelerchian*, 937 F.3d 895, 912 (7th Cir. 2019)). Indeed, just this year the Supreme Court held that mail or wire fraud cannot be predicated on the notion that the supposed victim merely was denied information, as opposed to property, by means of the alleged deception. *See Ciminelli v. United States*, 598 U.S. 306 (2023). Just so here: at most, Plaintiffs allege that consumers were deprived of information about fossil fuels, not that they were defrauded of any property when they chose to purchase, and then received, fossil fuel products. Courts including the First Circuit "repeatedly [have] rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015), *abrogated on other grounds by Ciminelli*, 598 U.S. 306.

Plaintiffs do *not* allege that they were deprived of the money they spent when they purchased some of Defendants' products. Thus they do not seek damages based on a failure to receive the property for which they bargained. Rather, Plaintiffs allege that they and their residents were harmed because, purportedly unbeknownst to them, by using Defendants' products, they

contributed to climate change and, in some attenuated fashion, to the 2017 hurricanes.  But, in the absence of allegations that Defendants deprived Plaintiffs of the benefit of the products they purchased (which could not plausibly be pleaded), Plaintiffs have failed to plead mail or wire fraud.

Moreover, Plaintiffs fail to plead fraudulent conduct with the requisite particularity.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  That requirement is even "more demanding . . . for claims under [RICO], particularly with regard to pleading the predicate acts for claims of extortion and wire and mail fraud."  5A Wright & Miller, *Federal Practice & Procedure* § 1297 & n.21 (4th ed. Apr. 2023 update) (collecting cases).  Because Plaintiffs do not allege "when, where, and how often the allegedly false statements were made or what, specifically, was stated," their allegations of fraud as a racketeering predicate "fall[ ] short of Rule 9(b)'s particularity requirement."  *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013); *see also Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985) ("[M]ere allegations of fraud, . . . averments to conditions of mind, or referrals to plans and schemes are too conclusory to satisfy the particularity requirement . . . .").  Plaintiffs' vague references to unspecified "[a]dvertisements of 'low-carbon' fuels that are essentially still fossil fuels" and "[a]dvertisements for alternative energy sources that Defendants have no actual intention of pursuing or using," Am. Racketeering Case Stmt. ¶ 8(d)(ii)(a), (b), do not satisfy this rigorous requirement.  Indeed, in a similar climate change case, the Delaware Superior Court recently concluded that ""[a]ll claims alleging misrepresentations, including 'greenwashing,' must be dismissed" because the State there "failed to specifically identify alleged misrepresentations for each individual defendant." *Delaware*, 2024 WL 98888 *17.

The Amended Complaint's Appendix of "Racketeering Acts" does not solve these defects. Am. Compl. ¶ 725; App'x to Am. Compl.  It merely repackages the complaint's vague allegations.

There is no allegation of *anyone* being deprived of the benefit of a transaction, and the allegations do not explain what, precisely, each of several Defendants did, when it occurred, or what was said.

### 4. Plaintiffs Have Not Adequately Alleged a *Pattern* of Racketeering Activity.

To allege a pattern, Plaintiffs must show "at least two predicate acts of 'racketeering activity.'" *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003). These acts must be "related" and "amount to or pose a threat of continued criminal activity." *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000) (quoting *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Plaintiffs attempt to allege solely an open-ended pattern, *e.g.*, Am. Racketeering Case Statement, ¶ 2(h), which is one consisting of "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Their attempt fails.

Plaintiffs do not allege any facts suggesting that the alleged racketeering activities will continue into the future. They admit that the GCC's activities ceased more than two decades ago. *See id.* ¶ 2(b). At most, Plaintiffs allege that some unspecified acts of Defendants "continue today." Am. Racketeering Case Stmt. ¶¶ 5, 9(a)(i). Plaintiffs attempt to overcome these defective allegations by invoking the activities of various alleged "co-conspirators," such as the Competitive Enterprise Institute, the Heartland Institute, and the Committee for a Constructive Tomorrow. *Id.* But none of these entities is alleged to be part of the RICO enterprise, so their activities cannot constitute the required predicate acts. *United States v. London*, 66 F.3d 1227, 1244 (1st Cir. 1995) (requiring nexus between actors and enterprise). Therefore, Plaintiffs' pattern allegations fail.

### 5. Plaintiffs Fail to Allege That Defendants *Conducted* the Alleged Enterprise.

Additionally, Plaintiffs' RICO claims fail because they do not plead sufficient facts showing each (or any) Defendant *conducted* the alleged enterprise, much less that they did so through a pattern of predicate crimes. To state a claim under § 1962(c), a plaintiff must "plead sufficient

facts to allow for a plausible inference that the defendant somehow 'le[d], [ran], manag[ed], or direct[ed] the enterprise's affairs.'" *Friendly Hotel Boutique Corp. v. ME & A Cap., LLC*, 2012 WL 4062795, at *2 (D.P.R. Sept. 14, 2012) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993)) (brackets in *Friendly Hotel*)). Even "aid[ing] or abett[ing] the enterprise's affairs" is insufficient. *Id.* at *3. Plaintiffs fail to surmount this high bar.

Plaintiffs do not plausibly allege that any Defendants exercised control over any enterprise. Although Plaintiffs assert in a boilerplate fashion that the "Oil and Gas Defendants" generally have "participated at some point and/or maintained in the operation and control" of "the API enterprise" and "the GCC enterprise," Am. Compl. ¶¶ 746–47, Plaintiffs' cited examples suggest nothing more than that Defendants were associated with API and the GCC. *See, e.g.*, *id.* ¶¶ 746(a) (alleging that senior representatives of several Defendants were members of API); 746(c) (alleging that Defendants made financial contributions to API); 747(a) (alleging that Defendants were "members of the GCC"). Mere association is insufficient. And there are no individualized allegations and certainly none with sufficient Rule 9(b) particularity.

Plaintiffs plead no non-conclusory facts suggesting anything other than that the Defendants had similar viewpoints and strategies and worked to advance their own views and interests. This is not remotely enough to plead that Defendants "conducted" the alleged enterprise. *See Aetna Cas. & Sur. Co. v. P & B Autobody*, 1994 WL 717998, at *11 (1st Cir. Dec. 29, 1994) (requiring showing that "defendants' activities affected, in a material degree, the direction" of the enterprise).

### 6. Plaintiffs Have Not Alleged Defendants *Invested In or Acquired or Maintained Control* of the Alleged Enterprise.

Plaintiffs' claims under sections 1962(a) and (b) should be dismissed because the Amended Complaint fails to plead injuries caused by Defendants' purported violations of those subsections.

"A claim brought pursuant to Section 1962(a) is premised on injury by means of [a]

defendant['s] *investment* of racketeering income." *Roman Rivera v. Puerto Rico Elec. Power Auth.*, 2012 WL 13170557, at *5 (D.P.R. Sept. 25, 2012) (emphasis added) (quotations omitted). And the alleged "injury resulting from the investment of racketeering income" must be "distinct from an injury caused by the predicate acts themselves." *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995) (quotations omitted). But Plaintiffs fail to allege how they suffered any injuries from the use or investment of any alleged income that are distinct from damages they allegedly sustained in connection with the 2017 storms.

To state a claim under Section 1962(b), Plaintiffs must plead "that they were harmed by reason of [Defendants'] *acquisition or maintenance of control* of an enterprise through a pattern of racketeering activity." *Compagnie De Reassurance D'Ile de France*, 57 F.3d at 92 (emphasis added). Again, however, Plaintiffs fail to allege that Defendants acquired or maintained control of the alleged enterprise or that they sustained "a harm beyond that resulting from the fraud which constituted the predicate act." *Id.*

### 7.  Plaintiffs Fail Adequately to Allege a Conspiracy.

Plaintiffs fail to state a claim under section 1962(d), which prohibits conspiracies to violate RICO, and requires Plaintiffs to allege that Defendants committed an overt act that is "independently wrongful under [a] substantive provision of the statute." *Beck v. Prupis*, 529 U.S. 494, 506 (2000).  They have made no such allegation.  *See supra* Part II.B.  Plaintiffs also lack standing because, as shown above, they do not allege that they suffered a concrete injury directly caused by the alleged conspiracy.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–430 (2021) (requiring plaintiffs be concretely harmed by the conduct constituting the alleged violation).

Further, "a RICO-conspiracy conviction requires proof"—and thus stating such a claim requires an adequate allegation—"that the defendant knowingly joined the conspiracy, agreeing with

one or more coconspirators 'to further [the] endeavor which, if completed, would satisfy all the elements of a substantive [RICO] offense.'" *Rodriguez-Torres*, 939 F.3d at 23–24 (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). Plaintiffs offer nothing but conclusory assertions that any of the ten Defendants agreed to do anything with one another. Despite the Amended Complaint's length, Plaintiffs never actually allege facts evidencing the existence of an agreement. *See* Am. Compl. ¶¶ 24–633. The conclusory allegations that Defendants "agreed and conspired to violate 18 U.S.C. § 1962(a), (b) and (c)," *id.* ¶ 757; *see also id.* ¶ 758, do not suffice.

### C.  Plaintiffs Cannot Recover Under RICO for Their Residents' Alleged Injuries or for Their Own Governmental Expenditures.

The Amended Complaint is replete with references to Plaintiffs' residents' alleged injuries, but Plaintiffs cannot sue *parens patriae* to recover for injuries sustained by their residents.[15]

It is the "normal rule" of adjudication that individuals may sue to redress only their own injuries. The doctrine of *parens patriae* is a limited "exception" that allows a "State" to pursue its "quasi-sovereign interests in the 'well-being of its populace.'" *Estados Unidos Mexicanos v. De-Coster*, 229 F.3d 332, 335 (1st Cir. 2000) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600 (1982)). A *parens patriae* right of action must be "narrowly construed." *Id.* Fatal here, municipalities lack *any* cause of action to pursue claims in a *parens patriae* capacity, a power reserved for "[o]nly the states and the federal government." *See United States v. City of Pittsburg*, 661 F.2d 783, 787 (9th Cir. 1981). Plaintiffs are political subdivisions that lack their own sovereignty, meaning there is no sovereign interest they can pursue in court. Further, "RICO does not authorize a state to obtain relief on account of a fraud practiced against its residents. RICO allows suits by the federal government, § 1964(b), but otherwise only by persons injured in their 'business

---

[15] Although *parens patriae* is sometimes referred to as a doctrine of "standing," it concerns whether the plaintiff has a cause of action to bring a representative claim; for example, in *Hawaii v. Standard Oil Co. of California*, the Court held a State lacked a *cause of action* under the antitrust laws to pursue a claim *parens patriae*. 405 U.S. 251 (1972).

or property,' § 1964(c), a phrase that does not include sovereign or derivative interests." *Dillon v. Combs*, 895 F.2d 1175, 1177 (7th Cir. 1990).[16]  Therefore, to the extent Plaintiffs seek damages on behalf of their citizens, those claims should be dismissed.  And to the extent Plaintiffs seek reimbursement for alleged increases in the costs of providing services, *e.g.*, Am. Compl. ¶¶ 5, 733, that claim fails as a matter of law.  *See Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976, 980 (9th Cir. 2008) (holding that law enforcement and public health care services are not recoverable, as there is no property interest in the provision of governmental services).

### III. Plaintiffs Fail to Adequately Plead an Antitrust Violation (Claim 8)

Plaintiffs' antitrust claim should be dismissed because it does not plausibly allege the existence of any agreement—much less an anticompetitive one—and Plaintiffs cannot use the antitrust laws to recover for alleged environmental harms or for harms sustained by their residents.

#### A.  The Complaint Does Not Plausibly Allege an Anticompetitive Agreement.

To plausibly plead an antitrust conspiracy, a plaintiff must allege that a Defendant entered into an anticompetitive agreement.  That, in turn, requires "some factual context" excluding the possibility of "independent action."  *Twombly*, 550 U.S. at 549.

Plaintiffs allege no such context:  they never allege the existence of an agreement in their lengthy "factual" recitation.  *See* Am. Compl. ¶¶ 24–633.  Instead, they assert that the Defendants had an "agreement" to "maintain their energy monopoly, fix prices, and increase obstacles for competitive entry into the [energy market]."  Am. Compl. ¶ 767.  That conclusory assertion is insufficient to plead an antitrust conspiracy.  *See Twombly*, 550 U.S. at 557 ("conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality").

---

[16] The private right of action contained in the RICO statute uses language "identical" to the Clayton Act's damages provision.  But unlike the Clayton Act, Congress has never amended RICO to permit *parens patriae* actions in any context.  *Illinois v. Life of Mid-Am. Ins. Co.*, 805 F.2d 763, 767 (7th Cir. 1986).  *See infra* Part III.C.

Nor could Plaintiffs plead any facts supporting an anticompetitive agreement: Because Defendants are competitors, they had every incentive to "increase[] production" and "lower prices." Am. Compl. ¶¶ 7(d), 767. Accordingly, no agreement can be inferred, and the antitrust claim must be dismissed. *See Twombly*, 550 U.S. at 566 (antitrust complaint failed where plaintiff essentially alleged that "companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that . . . pleading a § 1 violation against almost any group of competing businesses would be a sure thing"). Section 1 of the Sherman Act "does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." *White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011) (citations omitted).

Nor can Defendants' membership in trade organizations establish an unlawful agreement. *See Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (holding that parallel conduct by trade association members is insufficient to show an agreement under the Sherman Act). Here, each Defendant would have promoted its product regardless of any other Defendant's conduct, and mere membership in trade organizations does not tend to exclude the possibility of independent action. *See Twombly*, 550 U.S. at 569.

Even if Plaintiffs could allege the existence of an agreement, they have not plausibly alleged an *anticompetitive* agreement—an agreement that increases price or decreases output to consumers' detriment. If anything, Plaintiffs allege Defendants are competing too much. They allege that Defendants excluded rival "alternative energy companies" by "*increas[ing]* production," Am. Compl. ¶ 767 (emphasis added); *see also id.* ¶ 7(g) ("Defendants *increased their production* to monopolize their control of the world's energy" (emphasis added)), and "jointly schemed to maintain their energy production monopoly" by "*lower[ing] prices*" to "block the development of alternative energy sources," *id.* ¶ 7(d) (emphasis added). Setting aside that Defendants—save, of

course, for API—are competitors in the market for the sale of oil and gas products, and thus cannot be accurately described as an "energy monopoly," increasing output or lowering prices is *pro-competitive* behavior that the antitrust laws encourage, rather than prohibit.  *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 114 (1984) (if challenged business practice "produced procompetitive efficiencies, [it] would increase output and reduce the [relevant] price," whereas "operat[ing] to raise prices and reduce output" are "hallmarks of anti-competitive behavior"); *see also In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1072–73 (N.D. Cal. 2019) (dismissing Section 1 claim because the "prices [plaintiffs] paid for [the] inputs would presumably have dropped" due to agreements).

Moreover, to the extent the claim is premised on alleged promotional activities, under the Sherman Act "co-operative advertising" is a permitted and even procompetitive type of arrangement. *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 566 (1925).  Such conduct *increases* output and is not a restraint on trade.  And even if Defendants had engaged in *false* advertising (they did not), that would still not give rise to a viable antitrust claim.  "[F]alse advertising alone hardly ever operates in practice to threaten competition."  *Retractable Tech. Inc.* v. *Becton Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016) ("*RTI*").  The antitrust laws "do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce."  *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).  Indeed, "[u]nfair competition is still competition . . . [and therefore], absent a demonstration that a competitor's false advertisements had the potential to eliminate, or did in fact eliminate, competition, an antitrust lawsuit will not lie."  *RTI*, 842 F.3d at 895; *see also Steward Health Care Sys. LLC* v. *Southcoast Health Sys., Inc.*, 2016 WL 9022444, at *7 (D. Mass. Sept. 2, 2016) (dismissing Sherman Act claim premised on allegedly defamatory statements

because "even false statements made by a competitor are outside the reach of antitrust laws because, inter alia, the effects of such statements are minimal at best"). At most, as in *RTI*, clean energy competitors allegedly "may have lost some sales or market share because of [Defendants' purported] false advertising, but [they] remain[] [] vigorous competitor[s]" and Plaintiffs do "not contend that [Defendants'] advertising erected barriers to entry in the" energy market. *Id.* Accordingly, the boilerplate references to a "conspiracy" with an "anticompetitive purpose," Am. Compl. ¶ 766, "fail[] to state a valid § 1 claim." *Twombly*, 550 U.S. at 569.

### B. Plaintiffs Have Not Alleged an Antitrust Injury.

Plaintiffs also have failed to plead the "threshold requirement" of antitrust injury—competitive harm. *Somers v. Apple, Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013). Plaintiffs must allege an "injury of the type that the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Sterling Merchandising, Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 258 (D.P.R. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "The injury must originate in proscribed anti-competitive activity . . . and it must also be sufficiently direct, nonspeculative, and measurable." *Id.* (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 533 (1983)). The antitrust laws are not a panacea to be asserted any time a plaintiff suffers harm from an alleged conspiracy; the alleged conspiracy must relate to "some competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344. Plaintiffs have not done so here; at best, they complain about Defendants' alleged pro-competitive activities to promote and sell more of their products.

Further, Plaintiffs' attempt to use antitrust laws to address alleged *environmental* harms is inappropriate. Plaintiffs' alleged injuries arise from the environmental events of Hurricanes Irma and Maria, which Plaintiffs do not, and cannot, allege create "the type of injury the antitrust

violation would cause *to competition.*" *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) (emphasis in original). At most, Plaintiffs allege that Defendants' alleged activities "prevent[ed] market entry by alternative energy sources" and "unfairly ke[pt] the alternative fuel sources from the marketplace." Am. Compl. ¶¶ 692, 694. To the extent Plaintiffs' injury can be interpreted as the purported deprivation of access to alternative energy sources, however, such injury is not a cognizable "antitrust injury." *See Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 414 (3d Cir. 1997) (where plaintiff alleged that defendant had impermissibly curtailed purchases of electric energy and that created harm "by reducing the availability to consumers of power produced using alternative, environmentally pro-active energy sources," court found that "[d]epriving consumers of 'energy sources' is not, however, cognizable antitrust injury"); *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236–37 (9th Cir. 1976) (stating that liability for pollution under antitrust laws was "never intended by the drafters").

Finally, Plaintiffs' alleged injuries are far too indirect and attenuated from Defendants' alleged conduct to be cognizable. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977) (antitrust law permits recovery by "direct" purchasers); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 908 (S.D.N.Y. 2018) (no antitrust liability where damages depend on "attenuated" series of events). As discussed above, *supra* II.B.1, Plaintiffs cannot plausibly allege that the injuries they claim—damage from storms—have any direct connection to Defendants' alleged conduct, where countless actions of intervening actors lie between them.[17]

### C. Plaintiffs Lack a Cause of Action Under the Antitrust Laws to Assert Injuries Allegedly Sustained by Their Residents.

Plaintiffs' antitrust claim also fails—or must at least be substantially narrowed—because

---

[17] API and Rio Tinto do not produce fossil fuel or sell oil or gas. Indeed, Plaintiffs do not even allege any statements or conduct of relevance by Rio Tinto and instead resort to improper group pleading.

Plaintiffs lack a cause of action to pursue their claims *parens patriae* on behalf of their residents. Section 4 of the Clayton Act, the basis of the antitrust claim, provides a private right of action for violations of the antitrust laws, 15 U.S.C. § 15a, and Congress has authorized *State* attorneys general to "bring a civil action in the name of such State, as *parens patriae* on behalf of natural persons residing in such State," 15 U.S.C. § 15c. But § 15c "simply created a new procedural device— *parens patriae* actions by States on behalf of their citizens—to enforce existing rights of recovery under § 4." *Illinois Brick*, 431 U.S. at 735 n.14. By expressly limiting the *parens patriae* cause of action only to suits by an attorney general of a State, Congress necessarily excluded the possibility of a municipality bringing such an action.

## IV. Plaintiffs' Puerto Rico Law Claims Are Barred By Federal Law and Are Inadequately Pleaded (Claims 1, 2, 3, 9, 10, 11, 12, 13, 14)

Plaintiffs assert nine claims under Puerto Rico law: Claim 1 (Common Law Consumer Fraud); Claim 2 (Conspiracy to Commit Common Law Consumer Fraud); Claim 3 (Violation of Puerto Rico Rule 7); Claim 9 (Public Nuisance); Claim 10 (Strict Liability – Failure to Warn); Claim 11 (Strict Liability – Design Defect); Claim 12 (Negligent Design Defect); Claim 13 (Private Nuisance); and Claim 14 (Unjust Enrichment). Although these claims vary in their elements, as pleaded, they turn on the same core factual allegations and fail for three independent reasons.

First, claims for injuries from transboundary pollution can be governed only by federal law, because the federalism principles embodied in the structure of the Constitution leave no room for state or territorial law to govern these types of interstate or international issues. And even if the Constitution did not preclude these claims, the Clean Air Act preempts state-law causes of action that would have the effect of regulating out-of-state emissions. Second, the allegations fail to state claims under Puerto Rico law. Third, Plaintiffs cannot seek relief on behalf of their residents.

### A.  Federal Law Governs Plaintiffs' Purported Puerto Rico Law Claims.

Each of the purported Puerto Rico law claims depends on proof of harms caused by quintes-sentially interstate and international activity: the worldwide combustion of fossil fuels and other sources of emissions and their resulting accumulation in the atmosphere, which in turn has alleg-edly altered the global climate.  Plaintiffs do not contend that the production, allegedly fraudulent marketing, and combustion of fossil fuels *exclusively within the boundaries of Puerto Rico* have altered the world's climate.  Nor do Plaintiffs allege that any supposedly deceptive statements by Defendants within Puerto Rico are responsible for climate change.  Rather, the Amended Com-plaint targets publications and statements by Defendants and others around the country and the globe, as well as corresponding sales of fossil fuels on an equally national and global scale.  *See*, *e.g.*, Am. Compl. ¶ 75 (alleging each Defendants' supposed "global industrial GHG emissions from 1965-2022"), ¶ 591 (alleging that Defendants' purported global "collective emissions were a substantial factor in the increase in intensity of the 2017 Atlantic Hurricane Season").  Given the interstate and international sources of the emissions allegedly causing Plaintiffs' injuries, federal law precludes and preempts application of Puerto Rico law.  *See* U.S. Const. Art. VI, cl. 2.

### 1.  Plaintiffs' Claims Intrude Upon, and Are Precluded and Preempted by, Federal Constitutional Structure, Law, and Policy.

"For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution."  *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021).  One State cannot apply its own law to claims dealing with "air and water in their ambient or interstate aspects," because, under our Constitution, in that context "borrowing the law of a particular State would be inappropriate."  *AEP*, 564 U.S. at 421–22.  "[B]asic interests of fed-eralism … demand[]" this result.  *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6 (1972).  This rule flows from a basic premise that, by virtue of the federal structure of our Constitution, "a few

areas, involving uniquely federal interests, are so committed by the Constitution . . . to federal control that state law is pre-empted." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (citation omitted). These exclusively federal areas include "interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations," and other areas "in which a federal rule of decision is 'necessary to protect uniquely federal interests'"; in such cases, "our federal system does not permit the controversy to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981). "[T]he Constitution implicitly forbids that exercise of power because the interstate nature of the controversy makes it inappropriate for state law to control." *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (cleaned up). Allowing a single State's law to govern claims based on interstate or international environmental phenomena would permit one State to "impose its own legislation on … the others," violating the "cardinal" principle that "[e]ach State stands on the same level with all the rest." *Kansas v. Colorado*, 206 U.S. 46, 97 (1907). Plaintiffs' claims violate these fundamental principles because they allege that their injuries are the result of Defendants' and others' nationwide (indeed, global) conduct producing interstate and global emissions that in turn led to global climate change that allegedly injured Plaintiffs..

The Second Circuit recently affirmed dismissal of a suit with similar claims. The City of New York alleged that "a group of [energy companies including Defendants in this case] are primarily responsible for global warming and should bear the brunt of these costs," even though "every single person who uses gas and electricity . . . contributes to global warming." *City of New York*, 993 F.3d at 86. New York City brought tort claims for nuisance and trespass under New York law alleging, as here, that the defendants engaged in deception and concealment in the sale of their products and seeking damages to the City caused by global emissions. New York alleged that the

defendants "have known for decades that their fossil fuel products pose a severe risk to the planet's climate" and yet "downplayed the risks and continued to sell massive quantities of fossil fuels." *Id.* at 86–87. The Second Circuit rejected these claims: "Stripped to its essence, . . . the question before us is whether a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may proceed under New York law. Our answer is simple: no." *Id.*

In reaching this conclusion, the Second Circuit emphasized that the dispute "implicate[d] two federal interests that are incompatible with the application of state law"—namely, the "overriding need for a uniform rule of decision" on matters influencing national energy and environmental policy and the "basic interests of federalism." *Id.* at 91–92. The court explained that applying state law would "risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *Id.* at 93. "[M]unicipalities may [not] utilize state tort law to hold multinational oil companies liable for the damages caused by global greenhouse gas emissions," and the Court "cannot condone such an action" because such plaintiffs "seek[] to replace [a series of interlocking and] carefully crafted frameworks [for regulating emissions]—which are the product of the political process—with a patchwork of claims under state nuisance law." *Id.* at 86. Plaintiffs' case here, like New York's, "hinges on the link between the release of greenhouse gases and the effect those emissions have on the environment generally," and Plaintiffs' claimed damages stem entirely from global emissions. *Id.* at 97. Indeed, Plaintiffs' theory is that Defendants' alleged "deception" induced an unreasonably high level of global emissions, which purportedly exacerbated climate change. As a matter of constitutional structure, only federal law can govern such a sweeping theory that seeks to impose and recover for a duty of care beyond Puerto Rico. Accordingly,

federal law precludes and preempts Plaintiffs' commonwealth-law claims.[18]

That the Clean Air Act, rather than federal common law, now generally governs domestic interstate (but not international) emissions, does not mean that any one State's or Commonwealth's law may regulate emissions outside its borders.  As *City of New York* held, "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one"; indeed, such an argument is "too strange to seriously contemplate."  993 F.3d at 98–99.  Indeed, the federal common law arose initially "because state law cannot be used."  *Id*. at 98.[19]

The First Circuit's decision in *Rhode Island v. Shell Oil Products Co., L.L.C.*, 35 F.4th 44 (1st Cir. 2022), is not to the contrary.  *Rhode Island* held only that the defendants in a state-law action alleging nuisance, products liability, trespass, impairment of public trust resources, and state environmental statutes could not *remove* to federal court on the basis of federal common law—*i.e.*, that those claims do not "arise under" federal law for jurisdictional purposes under 28 U.S.C. § 1331.  Indeed, the First Circuit expressly distinguished *City of New York* because *Rhode Island* called for the application of "the heightened standard unique to the removability inquiry."  *Rhode Island*, 35 F.3d at 55.  *Rhode Island* is no barrier to this Court's application of the "preemption defense" consistent with the body of federal case law rejecting on the merits claims similar to those

---

[18] Other courts have reached the same conclusion.  *See City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 471–72 (S.D.N.Y. 2018) (claims of this sort "are ultimately based on the 'transboundary' emission of greenhouse gases," so "our federal system does not permit the controversy to be resolved under state law"); *City of Oakland v. BP P.L.C.*, 325 F. Supp. 3d 1017, 1028 (N.D. Cal. 2018)*, vacated and remanded on other grounds*, 960 F.3d 570 (9th Cir. 2020)*, opinion amended and superseded on other grounds on denial of reh'g*, 969 F.3d 895 (9th Cir. 2020) (same); *but see City & Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173 (Haw. 2023).  And other courts have dismissed similar lawsuits because these purportedly local suits "seek[] to impose liability and damages on a scale unlike any prior environmental pollution case."  *Native Vill. of Kivalina v. ExxonMobil Corp*., 663 F. Supp. 2d 863, 876 (N.D. Cal. 2009)*, aff'd*, 696 F.3d 849, 858 (9th Cir. 2012).  The federal Constitution precludes such overreach.

[19] The CAA does not apply beyond U.S. borders, and thus it does not displace federal common law as to international emissions. *Id*. at 101.  *Accord Delaware*, 2024 WL 98888, at *9 (climate change claims "seeking damages for injuries resulting from out-of-state or global greenhouse emissions" are "beyond the limits of [state] common law").

Plaintiffs press here. *City of New York*, 993 F.3d at 94.

Nor would dismissal leave these matters unregulated. Global energy production is one of the most regulated activities in the world. The federal government, exercising its exclusive constitutional prerogative to regulate transboundary pollution issues, has imposed various regulations concerning matters of "environmental protection," which falls within the "national legislative power" over commerce. *AEP*, 564 U.S. at 421. These regulations, including under the Clean Air Act, 42 U.S.C. § 7401, reflect delicate cost-benefit analyses intended to balance tradeoffs between energy production and environmental concerns*, see AEP*, 564 U.S. at 426–27. The recent Inflation Reduction Act makes many of the same tradeoffs, for example, investing in Alaskan oil drilling while also investing in clean energy—reflecting the federal government's decision that economic incentives rather than mandates (or worse, piecemeal litigation) should guide the transition to clean energy. Pub. L. No. 117-169, 136 Stat. 1818 (2022).

The federal government's decisions regarding fossil fuels and climate change also "require consideration of competing social, political, and economic forces," not to mention "economic [and] defense considerations." *Juliana v. United States*, 947 F.3d 1159, 1167, 1172 (9th Cir. 2020). The federal government "affirmatively promotes fossil fuels in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Id*. Imposing tort liability would undermine such policies. The unworkable consequences that would ensue if municipalities could each seek to wield local law to extract massive damages for harms allegedly caused by interstate and international emissions confirm that the Constitution leaves no room for such claims.

### 2. Plaintiffs' Claims Are Precluded and Preempted Because They Intrude On Foreign Affairs.

The U.S. Constitution "allocat[es] . . . the foreign relations power to the National Government

in the first place." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003). "Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Zschernig v. Miller*, 389 U.S. 429, 442-43 (1968) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941)); *Garamendi*, 539 U.S. at 418 (same). Thus, state "regulations must give way if they impair the effective exercise of the Nation's foreign policy." *Zschernig*, 389 U.S. at 440; *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 193 (1983) (observing that "Federal Government" must not be prevented from "speaking with one voice in international trade") (quotation omitted). "[E]ven in absence of a treaty, a State's policy may disturb foreign relations." *Id.* Accordingly, "state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict." *Garamendi*, 539 U.S. at 418.

Plaintiffs' claims have far more than an "incidental" effect on foreign affairs. Plaintiffs seek to impose monetary liability and require abatement of supposed injuries allegedly caused in Puerto Rico, not by the production, marketing, and sale of fossil fuels only in Puerto Rico or even only in the United States. Rather, Plaintiffs expressly premise their claims on effects in Puerto Rico purportedly arising from "global" emissions by both Defendants and entities they do not own or control. *See, e.g.*, Am. Compl. ¶¶ 75, 591. But, of course, global emissions from Defendants' products and those of their alleged joint venture partners are necessarily the result of activities undertaken in foreign countries, including activities undertaken by foreign governments. Indeed, some of the joint venture partners whose emissions Plaintiffs attempt to attribute to Defendants are owned in part by foreign governments. And the Amended Complaint repeatedly notes that Defendants produce and sell their fossil fuel products in dozens of countries around the world. *See*, *e.g.*, Am. Compl. ¶¶ 109, 121, 137, 150, 161, 168, 193.

Plaintiffs seek to impose monetary liability for Defendants' global exploration, production, marketing, sale, and third-party combustion of fossil-fuel products in other nations on the theory that those activities caused environmental effects worldwide, including in Puerto Rico. Because this extension of Puerto Rico law would affect the energy policies of foreign nations, and thus the relations of the United States, it would intrude upon the exclusive purview of the federal government—as the federal government has noted in similar litigation. *See* Brief for the United States, *City of Oakland v. BP p.l.c.*, 2019 WL 2250196, at *15 (9th Cir. May 17, 2019) ("Where, as here, the Cities seek to project state law into the jurisdiction of other nations, the potential is particularly great . . . for interference with United States foreign policy."). At a minimum, the claims must be dismissed to the extent they seek damages based on the exploration, production, marketing, sale, or combustion of fossil fuels and resulting emissions outside the United States.

**B.    Plaintiffs' Puerto Rico Law Claims Are Preempted by the Clean Air Act.**

Even if the Constitution did not preclude the application of Puerto Rico law to Plaintiffs' claims, Plaintiffs' claims would still fail because the Clean Air Act preempts state-law causes of action that would have the effect of applying state law to out-of-state greenhouse gas emissions.[20] The U.S. Supreme Court held more than 30 years ago that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source" because doing so would "upset[] the balance of public and private interests so carefully addressed by the Act." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). Specifically, the Court relied on the Clean Water Act's "pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law" in concluding that state-law claims are preempted to the extent they target out-of-state

---

[20] The Clean Air Act defines "State" to include the Commonwealth of Puerto Rico, 42 U.S.C. § 7602(d), and "[t]he test for federal preemption of a Puerto Rico law is the same as the test under the Supremacy Clause for preemption of the law of a state," *Medicaid and Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*, 58 F.4th 5, 10–11 (1st Cir. 2023) (citing *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 499 (1988)).

sources of pollution. *Id.* at 492. The Clean Air Act shares all the features of the Clean Water Act that led the Supreme Court to find preemption of State regulation of interstate pollution. Both laws authorize "pervasive regulation" that entail a "complex" balancing of economic costs and environmental benefits, *id.* at 492, 494–95; both laws provide States with a circumscribed role that is "subordinate" to the EPA's role as the federal environmental regulatory agency, *id.* at 491; and both ensure that "control of interstate . . . pollution is primarily a matter of federal law," *id.* at 492.

Accordingly, every federal appellate court to consider the question has held that the preemptive scope of the Clean Air Act is materially identical to that of the Clean Water Act.[21] Through the Clean Air Act, Congress has enacted a comprehensive scheme to regulate interstate air pollution, including economy-wide greenhouse gas emissions resulting from fossil fuels. The EPA is actively carrying out that mandate, promulgating regulations to set permissible levels for greenhouse gas emissions from mobile and stationary sources, while balancing the societal costs and benefits of such regulations against the backdrop of national energy and environmental policy. Plaintiffs' claims—which seek to remedy harms that they expressly connect to emissions stemming from the use of Defendants' products in every State (and around the world), *see, e.g.*, Am. Compl. ¶¶ 1, 74–75, 690—stand in direct conflict with this statutory regime. Imposing liability for the sale and use of oil and gas products outside of Puerto Rico would force Defendants to conform their external conduct to an assessment under Puerto Rico law—rather than the Clean Air Act—of the relative benefits and risks of fossil fuels. *See Ouellette*, 479 U.S. at 495 (damages imposed by one State's court can force a defendant to "change its methods of doing business and controlling pollution to avoid the threat of ongoing liability"). Indeed, a Delaware court recently found *Ouellette* is on all fours with a similar climate lawsuit brought under state law and thus ruled

---

[21] *See, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 194–96 & n.6 (3d Cir. 2013); *N.C., ex rel. Cooper v. TVA*, 615 F.3d 291, 306 (4th Cir. 2010).

that claims "seeking damages for injuries resulting from out-of-state or global greenhouse emissions and interstate pollution[] are pre-empted by the CAA." *Delaware*, 2024 WL 98888, at *9.

While *AEP* reserved the narrow question whether to allow state-law claims brought under "the law of each State *where the defendants operate powerplants*," 564 U.S. at 429 (emphasis added), that potential exception merely proves the rule—one State cannot apply its law to claims based on emissions from another State. Here, Plaintiffs intentionally and expressly target interstate and international emissions. But Plaintiffs are suing under their own Commonwealth's law—which federal law prohibits. *See Ouellette*, 479 U.S. at 495; *City of New York*, 993 F.3d at 92.

The Clean Air Act thus bars the attempt to use Puerto Rico law to obtain damages for injuries allegedly caused by interstate emissions. "The inevitable result of [sustaining these claims] would be that [Puerto Rico] and other States [and Commonwealths] could do indirectly what they could not do directly—regulate the conduct of out-of-state sources." *Ouellette*, 479 U.S. at 495.

### C. Plaintiffs Have Not Pleaded Cognizable Puerto Rico Law Claims. (Claims 1, 2, 3, 9, 10, 11, 12, 13, 14)

Plaintiffs' Puerto Rico claims fail because such claims do not exist or Plaintiffs fail to plead their elements, much less with the particularity Rule 9(b) requires where "the central allegations . . . 'effectively charge fraud.'" *Foisie*, 967 F.3d at 49 (citation omitted).

### 1. Plaintiffs' Fraud-Based Claims Are Not Cognizable. (Claims 1, 2, 3)

Plaintiffs' first, second, and third causes of action all allege some form of fraud. Plaintiffs lack causes of action to assert any of these claims.

For their first and second causes of action, Plaintiffs purport to assert "common law consumer fraud" and conspiracy to do the same. But as a civil law jurisdiction, *Alvarez-Crespo v. Olavarría-Rivera*, 994 F.2d 35, 36 (1st Cir. 1993), Puerto Rico does not recognize "*common law* consumer

fraud."[22]  And "Puerto Rico has no specific consumer protection statute that provides a private right of action for consumer fraud."  *Simonet v. SmithKline Beecham Corp.*, 506 F. Supp. 2d 77, 91 (D.P.R. 2007); *see also Ramos v. Hyundai Motor Co.*, 431 F. Supp. 2d 209, 212 (D.P.R. 2006), *aff'd sub nom. Díaz-Ramos v. Hyundai Motor Co.*, 501 F.3d 12 (1st Cir. 2007).  Nor is there a cause of action for civil conspiracy.  *See Next Step Med. Co., Inc. v. Biomet, Inc.*, 2015 WL 993095, at *13 (P.R. Cir. Jan. 30, 2015) (holding that Puerto Rico law does not recognize civil conspiracy pursuant to Article 1802 of the 1930 Civil Code) (Ex. 1).  Because Plaintiffs' fraud and conspiracy to commit civil fraud claims are not cognizable under Puerto Rico law, they should be dismissed.

To try to save these claims, Plaintiffs cite the Federal Trade Commission ("FTC") Act and FTC regulations.  But "the FTC Act contains no private right of action."  *Liu v. Amerco*, 677 F.3d 489, 492 (1st Cir. 2012).  And the FTC regulations "do not confer any rights on any person and do not operate to bind the FTC or the public."  16 C.F.R. § 260.1.  "Regulations alone cannot create private rights of action; the source of the right must be a statute."  *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 (1st Cir. 2007) (citing *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001)).

For their third cause of action, Plaintiffs purport to assert a cause of action under the Puerto Rico Rules Against Misleading Practices and Advertisements.  P.R. Dep't of Consumer Aff., Regul. 9158 at Rule 14 (Feb. 6, 2020) ("Consumer Rules").[23]  But the Consumer Rules protect consumers, which is limited to "natural persons," *id.* at Rule 5(i), and Plaintiffs are municipalities.

Further, there is no private right of action under the Consumer Rules; the Department of Consumer Affairs ("DACO") has exclusive enforcement jurisdiction.  *See Hipólito Rivera Ortiz v. Municipio de Guaynabo*, 141 P.R. Dec. 257, 268, 269–70 (1996) (explaining that agencies have

---

[22] Because the alleged acts and omissions occurred before 2020, Plaintiffs' claims are governed by the 1930 Civil Code, which does not authorize punitive damages.  *See* Article 1815, 2020 Civil Code, P.R. Laws Ann. tit. 31, § 11720.
[23] Plaintiffs cite now-repealed Rule 7(A) and (B) of the Consumer Rules, provisions that now appear in Rule 14.

exclusive jurisdiction to enforce regulations established by their enabling acts) (Ex. 2).  The Puerto Rico Supreme Court has held that Article 6(x) of DACO's enabling act confers primary exclusive jurisdiction to the agency with respect to certain antitrust or trade regulation matters.  *See Aguadilla Paint Center v. Esso*, 183 P.R. Dec. 901, 928 (2011) (Ex. 3).  The provisions of DACO's enabling act that allow it to enforce the Consumer Rules should not be read any differently.[24]  *See* P.R. Laws Ann. tit. 31, § 341e.  Thus, Plaintiffs cannot sue for violations of the Consumer Rules.

Additionally, consumer fraud must be pleaded with particularity, which Plaintiffs fail to do.  *See, e.g.*, *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21 (1st Cir. 2017).  As discussed above, Plaintiffs fail to plead the time, place, and content of the allegedly fraudulent statements.  Their putative fraud claims thus must be dismissed for that additional reason.  *See* Fed. R. Civ. P. 9(b).

Finally, just as with their RICO claims, Plaintiffs cannot establish proximate causation for the same reasons stated above.  *See Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 88 (1st Cir. 2020) (proximate cause is shown only where the alleged act or omission "in fact caused the injuries and the defendant could have reasonably foreseen that the injuries (or related harms) would result from his actions").

## 2. Plaintiffs Fail to Plead Any Design "Defect" That Caused Their Injuries. (Claims 11, 12)

The 1930 Civil Code has been interpreted to provide causes of action for negligent and strict liability design defect.  P.R. Laws. Ann., tit. 31 § 5141; *see Nena Air Servs., Inc. v. Cessna Aircraft Co.*, 449 F.3d 85, 88 (1st Cir. 2006).  To establish negligent design defect, a plaintiff must show "that (1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) the negligent

---

[24] *Ocasio Salgado v. NDA Services Corp.*, 2019 WL 4410340 (P.R. Cir. June 21, 2019) is not precedential, considered a prior version of the rules, and did not address corporate or municipal plaintiffs.

act or omission caused the plaintiff's harm." *Carballo-Rodriguez v. Clark Equip. Co.*, 147 F. Supp. 2d 66, 72 (D.P.R. 2001). To establish strict liability, "a plaintiff must prove that (1) the product had a defect that made the product unsafe, and (2) the defect proximately caused the plaintiff's injury." *Id.* at 71. "[P]roof of causation is essential." *Muñiz-Núñez v. Am. Home Prod. Corp.*, 582 F. Supp. 459, 462 (D.P.R. 1984). The plaintiff "'must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'" *Id.* (quoting W. Prosser, *Law of Torts*, § 41 (4th Ed. 1971)). For the same reasons stated above, Plaintiffs failed to plead causation for their design defect claims. *Supra* Part II.B.1.

Additionally, Plaintiffs have not alleged any defect. A design is defective only if a plaintiff can satisfy either a consumer expectation test or the cost-benefit analysis test. *See Vazquez-Filippetti v. Banco Popular de Puerto Rico*, 504 F.3d 43, 52 (1st Cir. 2007). Plaintiffs satisfy neither.

Under the consumer expectations test, a product is defective only if a plaintiff demonstrates that the product failed to perform as an ordinary consumer would expect when used in the intended (or a reasonably foreseeable) manner. *See Carballo-Rodriguez v. Clark Equipment Co., Inc.*, 147 F. Supp. 2d 66 (D.P.R. 2001). The consumer expectations test "is reserved for cases in which the *everyday experience* of the product's users permit a conclusion that the product's designs violated *minimum* safety assumptions." *Muñiz Negrón* v. *Worthington Cylinder Corp.*, 2021 WL 1199014, at *4 (D.P.R. Mar. 30, 2021). It is irrelevant for "cases involving complex technical matters." *Id.*

Plaintiffs fail to allege any basis for applying the consumer expectations test. Indeed, Puerto Rico courts have declined to apply the consumer expectations test to matters far simpler than global

climate change, such as automobile safety features.  *See e.g.*, *Fremaint v. Ford Motor Co.*, 258 F. Supp. 2d 24, 29 (D.P.R. 2003) (test not applicable because "an ordinary consumer would simply not know what minimum safety to expect from" the SUV model at issue when plaintiff lost control of the vehicle); *Collazo-Santiago v. Toyota Motor Corp.*, 937 F. Supp. 134 (D.P.R. 1996), *aff'd*, 149 F.3d 23 (1st Cir. 1998) (test inapplicable because the ordinary consumer would probably not know about the technical aspects of the airbag design in defendant's vehicles).

Even assuming the consumer expectation test applied, it would not be satisfied.  As the Amended Complaint alleges, it has long been well-known that carbon emissions are an inherent feature of fossil fuel products when combusted by end users.  A design defect claim cannot be stated where the presence of the alleged defect is a characteristic of the product itself.  *Kotler v. Am. Tobacco Co.*, 926 F.2d 1217, 1225 (1st Cir. 1990) (rejecting liability for design defect absent a showing the product was defective in a way aside from its inherent characteristics).

In any event, Plaintiffs do not, and cannot, allege that "the ordinary consumer in Puerto Rico" was unaware of the alleged impact of fossil fuels on global climate change.  *See Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 61, 74 (D.P.R. 2004) (rejecting design defect claim based on injury from using cigarettes because "there [had] been widespread, pervasive common knowledge . . . that cigarette smoking can cause serious, life-shortening diseases"), *abrogated on other grounds*, *Portugues-Santana v. Rekomdiv Int'l*, 657 F.3d 56 (1st Cir. 2011); *see also supra* Part I (documenting long-held knowledge of the alleged link between greenhouse gas emissions and climate change in Puerto Rico).  In other words, Plaintiffs have not pleaded that Defendants' fossil fuel products failed to perform as an ordinary consumer would expect when used in the intended (or a reasonably foreseeable) manner.  *See Carballo-Rodriguez*, 147 F. Supp. 2d 66.

Plaintiffs fare no better under the cost-benefit analysis test.  *See id.* at 72.  To satisfy that test,

a plaintiff must first establish that the defendant's product's design proximately caused its injuries, after which the burden shifts to the defendant to show that the "benefits of the design at issue outweighs the risk of danger inherent in such a design." *Muñiz Negrón*, 2021 WL 1199014, at \*5 (quoting *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 71 (1st Cir. 2002)). Again, Plaintiffs cannot plausibly allege that the purportedly defective design of Defendants' products was the proximate cause of their climate change injuries. That is the end of the inquiry.

### 3.   Defendants Had No Duty to Warn of Climate Risks. (Claim 10)

Plaintiffs' failure-to-warn claim also fails because Defendants had no duty to disclose information about climate risks. No Puerto Rico court has recognized a duty to warn "consumers, the public, and regulators" of climate risks. Am. Compl. ¶ 344. Puerto Rico courts recognize a duty to warn that "extends to all the *uses* that can be reasonably foreseen by the defendant"—that is, a duty to warn product *users* "to assure the safest *use* of the product." *Silva v. Am. Airlines, Inc.*, 960 F. Supp. 528, 533 (D.P.R. 1997) (emphases added). But Plaintiffs do not allege that Defendants violated a duty to warn *users* of specific dangers *to those users* presented by *their use* of Defendants' products; instead, they allege that Defendants violated a duty to warn *the world* about climate risks resulting from the *aggregate global use* of fossil fuels combined with global policy decisions. No such sweeping duty exists under Puerto Rico law—which, in any event, would violate the First Amendment—and this Court should not recognize it under Puerto Rico law in the first instance.[25] Plaintiffs also do not plausibly allege that any warning would have made a difference with respect to the 2017 hurricanes.

Finally, the widespread public discussion of climate risks during the relevant period would

---

[25] "A 'plaintiff, who made a deliberate choice to sue in federal court rather than in . . . state court, is not in a position to ask us to blaze a new trail that the [state] courts have not invited." *Aronstein v. Massachusetts Mut. Life Ins. Co.*, 15 F.4th 527, 534 (1st Cir. 2021) (citations omitted; alteration and omission in original).

vitiate any duty. Under the common knowledge doctrine, "a manufacturer cannot be held liable under either strict liability or negligence for failure to warn of a danger commonly known to the public." *Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 275 (1st Cir. 2003). Because fossil-fuel-related climate risks were common knowledge to average consumers, Defendants cannot be liable for failing to warn. As for the government Plaintiffs, the sophisticated buyer doctrine "provides that [a] manufacturer is not liable to a sophisticated user of its product for failure to warn of a risk, harm, or danger, if the sophisticated user knew or should have known of that risk, harm, or danger." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 07-cv-10470, 2015 WL 3763645, at *4 & n.55 (S.D.N.Y. June 16, 2015) (quotation marks omitted) (making *Erie* prediction on Puerto Rico law). This is because "the failure to provide warnings about risks already known to a sophisticated purchaser usually is not a proximate cause of harm resulting from those risks suffered by the buyer's employees or downstream purchasers." *Id.* The link between greenhouse gas emissions and climate change has been widely publicized for decades. Defendants could not have had a duty to warn sophisticated public entities like Plaintiffs or their residents about a danger about which the public was well-aware.

### 4. Plaintiffs' Nuisance Claims Fail. (Claims 9, 13)

The Puerto Rico Code of Civil Procedure provides causes of action for private and public nuisance. P.R. Laws Ann. tit. 32, § 2761. Plaintiffs must allege facts sufficient to show (among other things) a causal nexus between Defendants' acts or omissions and the harm Plaintiffs suffered. *See Martínez Romero v. Super Asphalt Pavement, Co.*, 2018 WL 3037397, at *11 (P.R. Cir. Apr. 23, 2018) (Ex. 4); *Casiano Sales v. Lozada Torres*, 91 P.R.R. 473 (1964). For the same reasons stated above, *see supra* Part II.B.1, Plaintiffs fail to plead causation for their nuisance claims.

Moreover, the purposes of § 2761 are (1) to obtain injunctive relief in the form of abatement

of the nuisance, and (2) to obtain indemnification. *See Casiano Sales v. Lozada Torres*, 91 P.R. Dec. 488 (1964), 91 P.R.R. 473, 483 (1964). Yet Plaintiffs do not seek to enjoin Defendants' oil and coal activities, Am. Compl. ¶ 10, so it is unclear how this lawsuit could abate the alleged nuisance. And if Plaintiffs cannot obtain abatement, they cannot obtain damages because both purposes of § 2761 must be implemented in tandem. *See Casiano Sales*, 91 P.R.R. at 483.

### 5.    Plaintiffs Cannot Sue for Unjust Enrichment Because They Seek Other Legal Remedies.  (Claim 14)

Unjust enrichment "is unavailable if the plaintiff may seek other forms of relief." *Rivera-Muñiz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 65 (D.P.R. 2010); *see also P.R. Tel. Co. v. Sprint-Com, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011); *In re MTBE Prods. Liab. Litig.*, No. 1:00-cv-1898, 2013 WL 5230814, at *11 (S.D.N.Y. July 17, 2013) ("This principle applies even when unjust enrichment is sought in the alternative."). "When plaintiffs allege conduct that is covered by an applicable statute, even if plaintiffs have failed to sufficiently allege that claim or if the claim is time-barred, it is inappropriate to allow a claim for unjust enrichment." *In re Fin. Oversight & Mgmt. Bd.*, 578 F. Supp. 3d 267, 296 (D.P.R. 2021), *aff'd*, 54 F.4th 42 (1st Cir. 2022). Because Plaintiffs have asserted thirteen other claims under Puerto Rico and federal statutes for the same conduct and injuries, they may not pursue unjust enrichment. Even though Plaintiffs "have failed to sufficiently allege th[ose] claim[s]," their unjust enrichment claim still fails. *Id.; see also Ortiz Andújar v. E.L.A.*, 22 P.R. Offic. Trans. 774, 780, 1988 WL 580737 (P.R. 1988)

### D.    Plaintiffs Lack a Cause of Action Under Puerto Rico Law to Assert Injuries Allegedly Sustained by Their Residents.

Plaintiffs cannot seek representative damages. They have no cause of action to pursue claims for damages suffered by their "citizens." *Puerto Rico Pub. Housing Admin. v. U.S. Dept. of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 326 n.20 (D.P.R. 1999) ("A city, as opposed to a state, usually

lacks *parens patriae* standing.")).  Because municipalities are political subdivisions, they lack the powers of a sovereign, including a right to bring a suit *parens patriae*:  "[A]s entities created by provision of the Legislative Assembly, [the Municipalities'] powers are those expressly delegated to them by law or implied therein." *Arroyo Cruz v. Mun. de San Juan,* 2016 WL 885382, at *6 (P.R. Cir., Jan. 28, 2016) (Ex. 5) (citing *Café Rico, Inc. v. Mun. de Mayagüez*, 155 P.R. Dec. 548, 553–54 (2001) (Ex. 6)); *Aut. de Puertos v. Mun. de San Juan*, 23 P.R. Offic. Trans. 437, at 7 n.1, 1989 WL 607311, (P.R. 1989); Article 1.005 of the Municipal Code.[26]

The Municipal Code of Puerto Rico confirms that municipalities have the power to bring suits only when those suits are municipal and local in nature.  *See* Article 1.006 of the Municipal Code, P.R. Laws Ann. tit. 21, § 7011; *see also* Article 1.008 of the Municipal Code, P.R. Laws Ann. tit. 21, § 7013(o).  Without an "express" (or even an "implied") delegation of power from the Legislative Assembly, the Court should not imply a right of action.  *Arroyo Cruz*, 2016 WL 885382, at *6.[27]  The Court therefore should dismiss all the Puerto Rico law allegations as lacking a cause of action, just as it should for the federal law claims.  At the very least, the doctrine of *parens patriae* makes clear that any cause of action that could survive a motion to dismiss would be limited to damages suffered by Plaintiffs themselves, and not by their residents.

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

**RESPECTFULLY SUBMITTED.**

---

[26] Municipalities have no inherent authority.  *See Reynolds v. Sims*, 377 U.S. 533, 575 (1964) ("Political subdivisions of States" are "created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them"); *Padron v. People of Puerto Rico ex rel Castro*, 142 F.2d 508, 510 (1st Cir. 1944) (a municipal corporation "is a mere agent or instrumentality of the state for the convenient administration of the government").

[27] *Accord Bd. of Cnty. Comm'rs of Arapahoe Cnty. v. Denver Bd. of Water Comm'rs*, 718 P.2d 235, 241 (Colo. 1986); *Bd. of Comm'rs v. Kokomo City Plan Comm'n*, 330 N.E.2d 92, 101 (Ind. 1975); *Clark Cnty. v. City of Las Vegas*, 574 P.2d 1013, 1014 n.1 (Nev. 1978); *Cnty. of Lexington v. City of Columbia*, 400 S.E.2d 146, 147 (S.C. 1991).  *See also Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985) ("[P]olitical subdivisions . . . cannot sue as *parens patriae*[.]"); *City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1256 n.7 (5th Cir. 1976) (same).

In San Juan, Puerto Rico, this 30th day of January 2024.

**CERTIFICATE OF SERVICE**: I, Roberto C. Quiñones-Rivera, certify that, on the above date, I filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the system.

> By:  *Roberto C. Quiñones-Rivera*
> Roberto C. Quiñones-Rivera
> USDC-PR Bar No. 211512
> Eduardo A. Zayas-Marxuach
> USDC-PR Bar No. 216112
> Myrgia M. Palacios-Cabrera
> USDC-PR Bar No. 230807
> MCCONNELL VALDÉS LLC
> P.O. Box 364225
> San Juan, PR 00936-4225
> Telephone:  787-250-2631
> Facsimile:  787-474-9201
> E-mail:  rcq@mcvpr.com
>
> Theodore J. Boutrous, Jr. (*pro hac vice*)
> William E. Thomson (*pro hac vice*)
> Joshua D. Dick (*pro hac vice*)
> GIBSON, DUNN & CRUTCHER LLP
> 333 South Grand Avenue
> Los Angeles, CA 90071
> Telephone: (213) 229-7000
> E-mail: tboutrous@gibsondunn.com
> E-mail: wthomson@gibsondunn.com
> E-mail: jdick@gibsondunn.com
>
> Thomas G. Hungar (*pro hac vice*)
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue NW
> Washington, DC 20036
> Telephone: (202) 887-3784
> E-mail: thungar@gibsondunn.com

Neal S. Manne (*pro hac vice* forthcoming)
Erica Harris (*pro hac vice* forthcoming)
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  713.651.9366
Facsimile:  713.654.6666
E-mail:  nmanne@susmangodfrey.com
E-mail:  eharris@susmangodfrey.com

*Attorneys for Defendant CHEVRON CORPORATION*


By: s/ Néstor M. Méndez Gómez
Néstor M. Méndez Gómez
USDC-PR Bar No. 118409
María D. Trelles Hernández
USDC-PR Bar No. 225106
PIETRANTONI MENDEZ & ALVAREZ LLC
Popular Center, 19th Floor
208 Ponce de León Ave.
San Juan, Puerto Rico 00918
Telephone: (787) 274-1212
Facsimile: (787) 274-1470
Email: nmendez@pmalaw.com
Email: mtrelles@pmalaw.com

Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Yahonnes Cleary (*pro hac vice*)
Caitlin E. Grusauskas (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: twells@paulweiss.com
Email: dtoal@paulweiss.com
Email: ycleary@paulweiss.com
Email: cgrusauskas@paulweiss.com

*Attorneys for Defendant EXXON MOBIL
CORPORATION*

By: s/Kenneth C. Suria
Kenneth C. Suria
USDC-PR Bar No. 213302
ESTRELLA, LLC
P.O. Box 9023596
San Juan, Puerto Rico 00902-3596
Telephone:  (787) 977-5050
Facsimile: (787) 977-5090
E-mail:  kcsuria@estrellallc.com

Tracie J. Renfroe (*pro hac vice*)
KING & SPALDING LLP
1100 Louisiana, Suite 4100
Houston, TX 77002
Telephone:  (713) 751-3200
Facsimile:  (713) 751-3290
E-mail:  trenfroe@kslaw.com

Oliver Thoma (*pro hac vice*)
West, Webb, Allbritton & Gentry, P.C.
1515 Emerald Plaza
College Station, Texas 77845
Ph: (979) 694-7000
Fax: (979) 694-8000
Email: oliver.thoma@westwebblaw.com

*Attorneys for Defendant MOTIVA ENTERPRISES LLC*


By: *s/ David Indiano*
David Indiano
USDC-PR Bar No. 200601
Jeffrey M. Williams
USDC-PR Bar No. 202104
INDIANO & WILLIAMS, P.S.C.
207 del Parque Street; 3rd Floor
San Juan, P.R. 00912

Duke K. McCall, III (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave, NW
Washington D.C., 20004


*Attorneys for Defendant OCCIDENTAL PETROLEUM CORPORATION*

By: *s/Carlos A. Rodriguez Vidal*
Carlos A. Rodriguez Vidal
USDC-PR Bar No. 201213
GOLDMAN ANTONETTI & CORDOVA, LLC
American International Plaza
250 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Telephone: 787-759-4117
Facsimile: 787-767-9177
Email: crodriguez-vidal@gaclaw.com

Victor L. Hou *(pro hac vice)*
Boaz S. Morag *(pro hac vice)*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
Email: vhou@cgsh.com
Email: bmorag@cgsh.com

*Attorneys for Defendant BHP GROUP LIMITED*

By: *s/ Roberto A. Cámara-Fuertes*
Roberto A. Cámara-Fuertes
USDC-PR Bar No. 219002
Jaime A. Torrens-Dávila
USDC-PR Bar No. 223810
Mónica Ramos Benítez
USDC-PR Bar No. 308405
FERRAIUOLI LLC
PO Box 195168
San Juan, Puerto Rico 00919
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
E-mail: rcamara@ferraiuoli.com
E-mail: jtorrens@ferraiuoli.com
E-mail: mramos@ferraiuoli.com

Linda H. Martin (*pro hac vice*)
David Y. Livshiz (*pro hac vice*)
Noelle L. Williams (*pro hac vice*)
Jennifer E. King (*pro hac vice*)

FRESHFIELDS BRUCKHAUS DERINGER US
LLP
601 Lexington Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
E-mail: linda.martin@freshfields.com
E-mail: david.livshiz@freshfields.com
E-mail: noelle.williams@freshfields.com
E-mail: jennifer.king@freshfields.com

Jennifer Loeb (*pro hac vice*)
FRESHFIELDS BRUCKHAUS DERINGER US
LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
E-mail: jennifer.loeb@freshfields.com

*Attorneys for Defendant RIO TINTO PLC*


By: *s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa
USDC-PR Bar No. 206314
Luis A. Oliver Fraticelli
USDC-PR Bar No. 209204
ADSUAR MUNIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.
PO Box 70294
San Juan, Puerto Rico 00936-8294
Telephone: 787.756.9000
Facsimile: 787.756.9010
Email: epo@amgprlaw.com
Email: loliver@amgprlaw.com

*Attorneys for Defendant BP P.L.C.*

By:  *s/Carlos A. Valldejuly*
Carlos A. Valldejuly-Sastre
USDC No. 209505
José J. Colón García
USDC No. 308010
O'NEILL & BORGES LLC
250 Muñoz Rivera Ave., Ste. 800
San Juan, Puerto Rico 00918-1813
Telephone:  (787) 764-8181
Facsimile:  (787) 753-8944
Email:  carlos.valldejuly@oneillborges.com
Email:  jose.colon@oneillborges.com

David C. Frederick (*pro hac vice*)
James M. Webster, III (*pro hac vice*)
Minsuk Han (*pro hac vice*)
Daniel S. Severson (*pro hac vice*)
Grace W. Knofczynski (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
E-mail:  dfrederick@kellogghansen.com
E-mail:  jwebster@kellogghansen.com
E-mail:  mhan@kellogghansen.com
E-mail:  dseverson@kellogghansen.com
E-mail:  gknofczynski@kellogghansen.com

*Attorneys for Defendant SHELL PLC*
*(f/k/a ROYAL DUTCH SHELL PLC)*

By:  *s/Ricardo F. Casellas Sánchez*
Ricardo F. Casellas Sánchez
USDC-PR No. 203114
Heriberto J. Burgos-Pérez
USDC-PR No. 204809
CASELLAS ALCOVER & BURGOS, P.S.C.
2 Tabonuco, Suite 400
San Patricio, PR 00968
Telephone: (787) 756-1400
Facsimile: (787) 756-1401
Email: hburgos@cabprlaw.com
Email: rcasellas@cabprlaw.com

Matthew T. Martens (*pro hac vice*)
Ericka Aiken (*pro hac vice*)

- 66 -

WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: matthew.martens@wilmerhale.com
E-mail: ericka.aiken@wilmerhale.com

Hallie B. Levin (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
E-mail: hallie.levin@wilmerhale.com

Robert Kingsley Smith (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street,
Boston, MA 02109
Telephone: 617-526-6000
Facsimile: 617-526-5000
E-mail: robert.smith@wilmerhale.com

*Attorneys for Defendant ConocoPhillips*

By: *s/ Ramón Dapena*
Ramón Dapena (125005)
Morell Cartagena & Dapena
Ponce de León Ave. 273 Plaza 273, Suite 700
San Juan PR 00908
(t): 787-723-1233
(f): 787-723-8763
Ramon.dapena@mbcdlaw.com
Ivan.Ilado@mbcdlaw.com

Jeremiah J. Anderson (P*ro Hac Vice Forthcoming*)
MCGUIREWOODS LLP
845 Texas Avenue, 24th Floor
Houston, TX 77002-2906
(713) 571-9191

Brian D. Schmalzbach (P*ro Hac Vice Forthcoming)*
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-1000

*Counsel for American Petroleum Institute, Inc.*