UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| THE MUNICIPALITIES OF BAYAMÒN, CAGUAS, LOIZA, LARES, BARRANQUITAS, COMERIO, CAYEY, LAS MARIAS, TRUJILLO ALTO, VEGA BAJA, AÑASCO, CIDRA, AGUADILLA, AIBONITO, MOROVIS, MOCA, BARCELONETA, CAMUY, CATAÑO, SALINAS, ADJUNTAS, ARROYO, CULEBRA, DORADO, GUAYNABO, HORMIGUEROS, JUNCOS, LAJAS, MANATÍ, NAGUABO, NARANJITO, UTUADO, VILLALBA, COAMO, OROCOVIS, VIEQUES, and YABUCOA, on behalf of themselves and others similarly situated, known as the MUNICIPALITIES OF PUERTO RICO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 22-CV-1550-SCC-HRV |
| v. | ) ) | |
| EXXON MOBIL CORP, ET AL. | ) ) | |
| Defendants. | ) | |

**AMERICAN PETROLEUM INSTITUTE'S
MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)**

*Attorneys for Defendant American Petroleum Institute*

## <u>TABLE OF CONTENTS</u>

**Page**

Introduction ........................................................................................................... 1

Background ............................................................................................................ 2

Argument .............................................................................................................. 2

I.      Plaintiffs' attempt to punish API's advocacy violates bedrock constitutional guarantees. ..................................................................................................... 2

      A.     Plaintiffs seek to abridge API's freedom of speech. ............................... 3

             1.     Plaintiffs' claims against API are subject to strict scrutiny. ...................... 4

                  a.     Plaintiffs' claims try to suppress noncommercial speech. .............. 4

                  b.     Even if the speech were commercial speech, Plaintiffs seek to impose improper content-based restrictions on it. .......................... 6

             2.     Plaintiffs' claims are subject to strict scrutiny. .......................................... 8

             3.     The chilling effect of Plaintiffs' claims against API confirms that they should be dismissed now ................................................................... 10

      B.     The Amended Complaint violates API's right to petition the government for redress ................................................................................................ 11

      C.     The doctrine of constitutional avoidance also warns against a broad reading of Plaintiffs' fraud-based claims. ............................................... 14

II.     Plaintiffs' claims against API are time-barred. ................................................. 14

III.    Plaintiffs' RICO claims fail as to API. .............................................................. 15

      A.     API cannot be liable for the alleged API Enterprise. ............................... 16

      B.     Plaintiffs fail to allege that API engaged in any racketeering activities with respect to the alleged GCC Enterprise. .................................................. 17

IV.    Plaintiffs' product liability claims fail for independent reasons. ....................... 18

      A.     Plaintiffs cannot state a strict product liability claim against a defendant that neither manufactures nor sells the product. .................................... 18

      B.     Plaintiffs' negligent design defect claim fails because Plaintiffs do not allege that API owes them a duty of care. ................................................ 19

      C.     Plaintiffs' nuisance claims fail for additional reasons. ......................... 20

Conclusion .......................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*,
    191 F.3d 429 (4th Cir. 1999) ...................................................5

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
    228 F.3d 429 (3d Cir. 2000)...............................................20, 21

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*,
    850 F.3d 52 (1st Cir. 2017)..................................................12

*Ashcroft v. Am. Civil Liberties Union*,
    542 U.S. 656 (2004)...........................................................9

*Atiles-Gabriel v. Puerto Rico*,
    256 F. Supp. 3d 122 (D.P.R. 2017).......................................14

*Bailey v. Memphis Bonding Co.*,
    No. 18-2115, 2019 WL 1300092 (W.D. Tenn. Mar. 21, 2019)............16

*Beasock v. Dioguardi Enterprises, Inc.*,
    494 N.Y.S.2d 974 (Sup. Ct. 1985)....................................19, 20

*Bonilla-Olmedo v. United States*,
    677 F. Supp. 2d 511 (D.P.R. 2009).......................................14

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)...........................................................8

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)..........................................................11

*Carey v. Brown*,
    447 U.S. 455 (1980)...........................................................3

*Caribbean Int'l News Corp. v. Fuentes Agostini*,
    12 F. Supp. 2d 206 (D.P.R. 1998)........................................3, 7

*Casey v. City of Newport, R.I.*,
    308 F.3d 106 (1st Cir. 2002).................................................9

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001)..........................................................16

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993)................................................................................4, 5, 9

*In re ClassicStar Mare Lease Litig.*,
  727 F.3d 473 (6th Cir. 2013) ..............................................................16

*Council for Emp't & Econ. Energy Use v. WHDH Corp.*,
  580 F.2d 9 (1st Cir. 1978)....................................................................13

*Counterman v. Colo.*,
  143 S. Ct. 2106 (2023)...........................................................................6

*Dell'Aquila v. LaPierre*,
  491 F. Supp. 3d 320 (M.D. Tenn. 2020)..............................................16

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961).................................................................12, 13, 14

*Evenson v. Osmose Wood Preserving, Inc.*,
  760 F. Supp. 1345 (S.D. Ind. 1990) .....................................................20

*Friendly Hotel Boutique Corp. v. ME & A Capital, LLC*,
  No. CIV. 11-1709 JAG, 2012 WL 4062795 (D.P.R. Sept. 14, 2012) ....................17

*Gordon & Breach Sci. Publishers S.A., STBS v. Am. Inst. of Physics*,
  859 F. Supp. 1521 (S.D.N.Y. 1994).........................................6, 10, 11

*Green Mountain Realty Corp. v. Fifth Estate Tower, LLC*,
  13 A.3d 123 (N.H. 2010) .................................................................12, 13

*Green v. Miss U.S., LLC*,
  52 F.4th 773 (9th Cir. 2022) ................................................................11

*Harmon v. Nat'l Auto. Parts Ass'n*,
  720 F. Supp. 79 (N.D. Miss. 1989).......................................................20

*Harris v. Quinn*,
  573 U.S. 616 (2014)...............................................................................5

*Howard v. Poseidon Pools, Inc.*,
  133 Misc. 2d 50, 506 N.Y.S.2d 523 (Sup. Ct. 1986), *aff'd*, 134 A.D.2d 926,
  522 N.Y.S.2d 388 (1987), *aff'd*, 72 N.Y.2d 972, 530 N.E.2d 1280 (1988)..............19

*Int'l Outdoor, Inc. v. City of Troy, Mich.*,
  974 F.3d 690 (6th Cir. 2020) .................................................................8

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) .................................................................4

*Jefferson v. Lead Indus. Ass'n, Inc.*,
    930 F. Supp. 241 (E.D. La. 1996), *aff'd,* 106 F.3d 1245 (5th Cir. 1997) ...............................18

*Klein v. Council of Chem. Ass'ns*,
    587 F. Supp. 213 (E.D. Pa. 1984) .....................................................................................18, 20

*Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*,
    192 F. Supp. 2d 519 (M.D. La. 2001) ...................................................................................13

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) ..............................................................................................16

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994).............................................................................................................6, 7

*Magnus v. Fortune Brands, Inc.*,
    41 F. Supp. 2d 217 (E.D.N.Y. 1999) ......................................................................................18

*McBride v. Merrell Dow & Pharms. Inc.*,
    717 F.2d 1460 (D.C. Cir. 1983) ..............................................................................................11

*McCoy v. Town of Pittsfield*,
    No. 1:20-CV-362-JL, 2020 WL 7321522 (D.N.H. Dec. 10, 2020), *aff'd sub*
    *nom. McCoy v. Town of Pittsfield, N.H.*, 59 F.4th 497 (1st Cir. 2023) ....................................8

*Meyers v. Donnatacci*,
    531 A.2d 398 (N.J. Super. Ct. Law Div. 1987) ................................................................19, 20

*N.A.A.C.P. v. Button*,
    371 U.S. 415 (1963).................................................................................................................3

*N.A.A.C.P. v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982).................................................................................................................3

*N.C. Right to Life, Inc. v. Leake*,
    344 F.3d 418 (4th Cir. 2003) .................................................................................................10

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)............................................................................................................3, 5

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)...........................................................................................................10

*Nat'l Servs. Grp., Inc. v. Painting & Decorating Contractors of Am., Inc.*,
    No. SACV06-563, 2006 WL 2035465 (C.D. Cal. July 18, 2006)............................................6

*New York Pub. Interest Research Grp., Inc. v. Insurance Info. Inst.*,
    161 A.D.2d 204 (N.Y. Sup. Ct. 1990) .....................................................................................4

*Newman v. Motorola, Inc.*,
    125 F. Supp. 2d 717 (D. Md. 2000) ................................................................18

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    193 F.3d 781 (3d Cir. 1999) ......................................................................5

*Pan Am. v. Municipality of San Juan, P.R.*,
    No. CV 18-1017 (PAD), 2018 WL 6503215 (D.P.R. Dec. 10, 2018) ....................10

*Penelas v. Arms Tech., Inc.*,
    No. 99-1941 CA-06, 1999 WL 1204353 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*,
    778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) ......................................................21

*Picone v. Shire PLC*,
    No. 16-CV-12396-ADB, 2017 WL 4873506 (D. Mass. Oct. 20, 2017)..................12

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993).............................................................................11, 12

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)...........................................................................3, 7, 8

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015)...........................................................................4, 8, 9

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)..................................................................................17

*Rideout v. Gardner*,
    838 F.3d 65 (1st Cir. 2016) ......................................................................9

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)..................................................................................5

*Rodriguez v. Municipality of San Juan*,
    659 F.3d 168 (1st Cir. 2011) ....................................................................15

*Rodriguez-Cotto v. Pierluisi-Urrutia*,
    No. CV 20-1235 (PAD), --- F. Supp. 3d ---, 2023 WL 2726995 (D.P.R. Mar.
    31, 2023) .................................................................................................8

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995).................................................................................8

*Semco, Inc. v. Amcast, Inc.*,
    52 F.3d 108 (6th Cir. 1995) ......................................................................6

*Sizemore v. Georgia-Pac. Corp.*,
  No. 6:94-2894 3, 1996 WL 498410 (D.S.C. Mar. 8, 1996) *aff'd sub nom.*
  *Sizemore v. Hardwood Plywood & Veneer Ass'n*, 114 F.3d 1177 (4th Cir.
  1997) ..........................................................................................................................20

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..................................................................................................3, 4

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)..................................................................................................5, 7

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) ......................................................................................12

*Suburban Restoration Co., Inc. v. ACMAT Corp.*,
  700 F.2d 98 (2d Cir. 1983)..........................................................................................12

*Swartzbauer v. Lead Indus. Ass'n, Inc.*,
  794 F. Supp. 142 (E.D. Pa. 1992) ...............................................................................18

*Tuttle v. Lorillard Tobacco Co.*,
  118 F. Supp. 2d 954 (D. Minn. 2000)..........................................................................19

*United Mine Workers of Am. v. Pennington*,
  381 U.S. 657 (1965)....................................................................................................12

*United States v. Associated Press*,
  52 F. Supp. 362 (S.D.N.Y. 1943) .................................................................................3

*United States v. Williams*,
  553 U.S. 285 (2008)....................................................................................................11

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980)......................................................................................................9

*Wallace v. Town of Stratford Bd. of Educ.*,
  674 F. Supp. 67 (D. Conn. 1986).................................................................................15

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)..................................................................................................3, 7

*Washington Post Co. v. Keogh*,
  365 F.2d 965 (D.C. Cir. 1966) .....................................................................................10

*Washington Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) .........................................................................................9

*Watchtower Bible Tract Soc'y of N.Y., Inc. v. Municipality of Santa Isabel,*
    869 F. Supp. 2d 215 (D.P.R. 2012)..................................................................2

*Whaley v. Auto Club Ins. Ass'n,*
    No. 95-1918, 1997 WL 720451 (6th Cir. Nov. 12, 1997) .......................................17

*Williams v. United States Postal Service,*
    873 F.2d 1069 (7th Cir. 1989) ...........................................................................15

*Wissel v. Ohio High Sch. Athletic Ass'n,*
    78 Ohio App. 3d 529, 605 N.E.2d 458, *cause dismissed*, 64 Ohio St. 3d 1434,
    595 N.E.2d 943 (1992)........................................................................18, 19

**Statutes**

18 U.S.C. § 1962 ...................................................................................................16

Connecticut Unfair Trade Practices Act .................................................................12

New Hampshire Consumer Protection Act...............................................................12

Sherman Act...........................................................................................................12

Rule 7 of the Puerto Rico Rules Against Misleading Practices and Advertisements ...................14

**Other Authorities**

Fed. R. Civ. P. 15(c) ..............................................................................................15

Puerto Rico Constitution Amendment I. Article II, § 4.............................................2

U.S. Const. Amendment I ..................................................................................*passim*

## INTRODUCTION

Several municipal governments in Puerto Rico ("Plaintiffs") seek to punish the American Petroleum Institute ("API") for advocating a view contrary to Plaintiffs' preferred narrative on one of the most difficult and important public policy issues of our time.  But that policy debate over the costs and benefits of fossil fuels—which touches on both their foundational importance to 150 years of economic progress and their contributions to climate change—has more than one side. And neither the First Amendment, Puerto Rico law, federal law, nor common sense allows Plaintiffs to muzzle that debate with the threat of years of litigation, allegations of criminal activity, and extraordinary civil liability.

Plaintiffs assert fourteen claims against API, each of which fails for the reasons in Defendants' Joint Motion to Dismiss (ECF No. 235), which API adopts and incorporates in full.

But API should be dismissed from this case for at least four additional reasons.  ***First***, Plaintiffs have sued API for its pro-energy advocacy, so *all* of Plaintiffs' claims against API necessarily attack API's speech.  Even if Plaintiffs could otherwise state any claim (they cannot), the First Amendment and its Puerto Rico analogue fully protect API's speech on this important issue from government censorship couched as a lawsuit.  ***Second***, API cannot be liable under RICO when its only alleged involvement in the alleged "API Enterprise" is that of the enterprise itself. Plaintiffs do not otherwise allege that API engaged in the necessary "racketeering activity."  ***Third***, Plaintiffs' strict liability claims fail at the outset because Plaintiffs have not alleged that API manufactured or sold a product, let alone one that caused them harm.  ***Fourth***, the Court should dismiss Plaintiffs' negligent design defect claim because no duty of care arises from the remote relationship between a trade association and the end users of products.

**BACKGROUND**

API is a nationwide, non-profit trade association representing over 600 companies throughout the petroleum and natural-gas industry. Am. Compl. ¶ 205. As Plaintiffs recognize, "API's mission seek[s] to 'influence public policy in support of a strong, viable U.S. oil and natural gas industry[.]'" Am. Compl. ¶ 207 (quoting *About API*, American Petroleum Institute, https://www.api.org/about). Absent from the Amended Complaint is any allegation that API sells, produces, refines, or transports fossil fuels—and indeed it does not.

Plaintiffs seek to use the federal RICO and antitrust statutes, as well as statutory and common law tort claims to punish API for its public advocacy. Plaintiffs cloak their efforts to suppress this disfavored speech by asserting that API concealed the dangers of fossil fuel products, promoted misleading information designed to undermine public support for the regulation of greenhouse gas emissions, and, along with the Oil and Gas Defendants, made misleading statements about climate change, the relationship between climate change and their fossil-fuel products, and the urgency of the problem. *See* Am. Compl. ¶¶ 383, 400, 406, 429, 431, 529; ECF No. 205-1 ¶¶ 68, 70-71, 75-76, 81.

**ARGUMENT**

I.    **Plaintiffs' attempt to punish API's advocacy violates bedrock constitutional guarantees.**

Plaintiffs' claims against API violate the First Amendment's proscription on "abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Article II, section 4 of the Puerto Rico Constitution provides the same rights. *See Watchtower Bible Tract Soc'y of N.Y., Inc. v. Municipality of Santa Isabel*, 869 F. Supp. 2d 215, 217 (D.P.R. 2012) (explaining that the "[Puerto Rico] Constitution recognizes and grants some fundamental rights with a more global and protective vision than does the United States Constitution.") (quotation and citation omitted). Plaintiffs' claims against API

violate these core speech rights by seeking to censor public discourse and advocacy on a matter of significant controversy and public importance.

A.   **Plaintiffs seek to abridge API's freedom of speech.**

Freedom of speech is sacrosanct under U.S. law.  Indeed, "expression on public issues 'has always rested *on the highest rung of the hierarchy of First Amendment values*.'"  *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)) (emphasis added).  Speech on important public issues "is the essence of self-government." *Id.*  The First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection."  *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.).  The nation has "a profound [] commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  This "constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered.'"  *Id.* at 271 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963)); *see also id.* at 271–72 (recognizing "[t]hat erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'") (quoting *Button*, 371 U.S. at 433).

Yet the Complaint unabashedly tries to suppress API's speech "because of disagreement with the message the speech conveys."  *Caribbean Int'l News Corp. v. Fuentes Agostini*, 12 F. Supp. 2d 206, 217 (D.P.R. 1998) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92 (1992) ("[The government] has no authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.").  Though Plaintiffs are using a civil lawsuit as the means, the end is the same censorship barred by the First Amendment.  *See Snyder v. Phelps*, 562 U.S. 443, 452

(2011); *James v. Meow Media, Inc.*, 300 F.3d 683, 695–97 (6th Cir. 2002) (affirming dismissal because complaint that sought to regulate speech through tort liability raised "significant constitutional problems under the First Amendment"). To safeguard free speech, courts have dismissed similar speech regulations masquerading as tort claims, including consumer protection claims. *See, e.g.*, *New York Pub. Interest Research Grp., Inc. v. Insurance Info. Inst.*, 161 A.D.2d 204, 206 (N.Y. Sup. Ct. 1990) (dismissing consumer protection suit against defendants seeking "to influence public officials, voters and citizens in general in order to increase sympathy for the concerns of the insurance industry" because they "engaged in precisely the sort of free debate which the First Amendment was intended to safeguard").

The First Amendment requires the same result here. The debate over the benefits of fossil fuels and the risks posed by global climate change is one of the most difficult and controversial public policy issues of our time. There is no doubt that Plaintiffs could pass no law directly prohibiting API from weighing in on these matters of critical public importance. The First Amendment equally forbids the same impermissible regulation through this lawsuit.

### 1.      Plaintiffs' claims against API are subject to strict scrutiny.

Because the speech Plaintiffs attack is untethered to any commercial transaction, the speech is noncommercial, or policy, speech subject to strict scrutiny. But even if the speech were commercial, Plaintiffs seek to silence only opinions with which they disagree; such content-based restrictions are also subject to strict scrutiny. Either way, strict scrutiny applies. And either way, Plaintiffs' claims violate the First Amendment.

### a.      Plaintiffs' claims try to suppress noncommercial speech.

The API speech that Plaintiffs seek to muzzle is noncommercial speech, which is guaranteed full First Amendment protection. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015) (restraints on noncommercial speech are subject to strict scrutiny). "[T]he proposal of

a commercial transaction [is] the test for identifying commercial speech." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993); *see also Harris v. Quinn*, 573 U.S. 616, 648 (2014) (confirming that the Supreme Court's "precedents define commercial speech as speech that does no more than propose a commercial transaction").

 API's policy campaigns are plainly noncommercial speech because they propose no transaction. *City of Cincinnati*, 507 U.S. at 423. And they address a topic of great public importance. Indeed, the Complaint identifies no commercial transaction API proposed. Even if advocacy takes the form of an advertisement, that "does not necessarily render such speech commercial in nature." *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 440 (4th Cir. 1999). The litmus test is whether a commercial transaction is proposed, not whether the speaker paid to have his or her voice heard. After all, even the landmark *N.Y. Times v. Sullivan* decision addressed a paid advertisement addressing an important policy issue.

 Any effort to recast API's policy advocacy as commercial speech must fail. Notably, the Supreme Court has cast doubt on the proposition that commercial speech merits any less protection than noncommercial speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). Regardless, any commercial element of API's speech would be intertwined with noncommercial speech to influence public policy, which entitles API's challenged speech to full First Amendment protection. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–98 (1988) (explaining that for "inextricably intertwined" speech, "we apply our test for fully protected expression," and that if "the means chosen to accomplish [the state's purported interest] are unduly burdensome and not narrowly tailored[,]" the regulation cannot stand); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 793 (3d Cir. 1999) (applying *Riley* where "speech consists of complex mixtures of commercial and noncommercial elements").

Courts have often recognized that trade association speech is noncommercial.  *See, e.g.*, *Nat'l Servs. Grp., Inc. v. Painting & Decorating Contractors of Am., Inc.*, No. SACV06-563, 2006 WL 2035465, at \*6 (C.D. Cal. July 18, 2006) (concluding that a trade association's article was "economically motivated only in an indirect sense" and it "attempt[ed] to inform its members of an issue affecting their economic interests" rather than promoting the services of its members); *Gordon & Breach Sci. Publishers S.A., STBS v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1539–41 (S.D.N.Y. 1994) (concluding that challenged statements made by nonprofit entity that ranked its own publications higher than that of the plaintiff was noncommercial, and "[t]he fact that [the defendants] stood to benefit from publishing [the challenged statement]—even that they intended to benefit—is insufficient by itself to turn the articles into commercial speech").  That recognition makes good sense: public policy advocacy, like the trade association speech attacked by Plaintiffs, does not cross the line into commercial speech unless it is "peppered with advertising" to buy a particular company's products.  *See Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112–13 (6th Cir. 1995).  Of course that is not the case here, because API does not sell fossil fuels.

In sum, Plaintiffs' allegations fail to identify any commercial transaction proposed by API, let alone a transaction that can be disentangled from API's noncommercial speech in the policy debate.  The challenged API speech thus is noncommercial speech, and Plaintiffs' attempt to punish it is subject to strict scrutiny.

> **b.  Even if the speech were commercial speech, Plaintiffs seek to impose improper content-based restrictions on it.**

Even if, contrary to fact, the speech Plaintiffs attack were commercial speech, Plaintiffs' effort to censor speech based on its content would still violate the First Amendment.[1]  "The

---

[1] Last year, the Supreme Court reiterated that the few exceptions to this rule must be policed scrupulously.  *Counterman v. Colo.*, 143 S. Ct. 2106, 2113–17 (2023).

government may not regulate speech based on hostility—or favoritism—towards the underlying message expressed." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994).  "Content-based restrictions are presumptively invalid under the First Amendment." *Caribbean Int'l News Corp. v. Fuentes Agostini*, 12 F. Supp. 2d 206, 217 (D.P.R. 1998) (citation omitted); *see also Sorrell*, 564 U.S. at 566 ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'") (quoting *Ward*, 491 U.S. at 791).  "Commercial speech is no exception." *Id.*  The Supreme Court thus rejected the argument that "a different analysis applies" where a regulation "burdens only commercial speech" because "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Id.* at 571.

In *R.A.V. v. St. Paul*, the Supreme Court reversed the defendant's conviction for cross burning under an ordinance that proscribed certain categories of speech calculated to arouse resentment on the basis of "race, color, creed, religion or gender." 505 U.S. at 380-81.  The Court held the ordinance "facially unconstitutional." *Id.* at 381.  Although the Court recognized that the categories of speech covered by the ordinance might be proscribed as unprotected speech under the "fighting words" doctrine, the ordinance violated the First Amendment by proscribing only certain categories of fighting words related to race, color, creed, religion, or gender, while leaving uncensored other categories of fighting words related to issues such as political affiliation, union membership, or homosexuality. *Id.* at 391.  The point is even more compelling here because, unlike fighting words, commercial speech is a protected category of speech, but Plaintiffs seek to censor only commercial speech *favorable* to fossil fuels, while allowing unfettered (and questionably accurate) commercial speech *critical* of fossil fuels by, for example, sellers of solar panels.  The First Amendment prohibits the government from discriminating among opposing messages in this way, even if the speech falls into a category like fighting words or libel that the

government can proscribe. *Id.* at 392.  "The government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government."  *Id.* at 384 (emphasis in original).

Viewpoint discrimination occurs when "the government 'targets not particular subject matter but particular views taken by speakers on a subject.'" *Rodriguez-Cotto v. Pierluisi-Urrutia*, No. CV 20-1235 (PAD), --- F. Supp. 3d ---, 2023 WL 2726995, at \*10 n.12 (D.P.R. Mar. 31, 2023) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)).  "Viewpoint discrimination is 'an egregious form of content discrimination' in which 'the government targets not subject matter, but particular views taken by speakers on a subject.'" *McCoy v. Town of Pittsfield*, No. 1:20-CV-362-JL, 2020 WL 7321522, at \*3 (D.N.H. Dec. 10, 2020), *aff'd sub nom. McCoy v. Town of Pittsfield, N.H.*, 59 F.4th 497 (1st Cir. 2023) (quoting *Rosenberger*, 515 U.S. at 829).

Plaintiffs' allegations confirm that they seek to regulate API's speech because of its content and because of its viewpoint.  The Amended Complaint targets API's pro-energy speech because it told consumers that the petroleum industry "could help them 'live better lives'" and touted the industry's initiatives in tackling climate change.  ECF No. 205-1, ¶¶ 68, 70-71, 75-76.  Plaintiffs also attack decades-old statements made by API representatives on the public benefits of the energy industry.  Am. Compl. ¶¶ 383, 400, 431, 529.  Plaintiffs are trying to snuff out any pro-fossil fuel advocacy.  Regardless of whether the speech is noncommercial or commercial, Plaintiffs' claims are a viewpoint-based restriction and thus "still subject to strict scrutiny under *Reed*." *Int'l Outdoor, Inc. v. City of Troy, Mich.*, 974 F.3d 690, 702–03 (6th Cir. 2020).

### 2.      Plaintiffs' claims are subject to strict scrutiny.

Strict scrutiny "is a demanding standard." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011).  It is the highest and most rigorous form of judicial review. *Reed*, 576 U.S. at 163–

64. It requires a court to examine "whether a regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Casey v. City of Newport, R.I.*, 308 F.3d 106, 110 (1st Cir. 2002) (internal citations and quotations omitted). "Narrow tailoring in the strict scrutiny context requires the statute to be 'the least restrictive means among available, effective alternatives.'" *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) (quoting *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004)).

As applied to API's alleged statements, Plaintiffs' claims fail strict scrutiny because they are not narrowly tailored to any compelling government interest. To the contrary, Plaintiffs attack API's broad energy information campaigns, which discuss initiatives to reduce the industry's carbon footprint and to provide general information on the oil and gas industry. Am. Compl. ¶¶ 383, 400, 406, 429, 431, 529; ECF No. 205-1 ¶¶ 68, 70-71, 75-76, 81. Endorsing Plaintiffs' theory here would allow government regulation of policy debates about the benefits of the energy industry, regardless of that regulation's "fit" with any deceptive merchandising practice. *City of Cincinnati*, 507 U.S. at 415, 428 (holding that a city's ban on distribution of commercial material via news racks violated First Amendment absent an established "'fit' between its goals and its chosen means" of restriction); *see also Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) ("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation."). This lack of fit is fatal here, as is the sweeping breadth of Plaintiffs' speech restrictions. *See, e.g.*, *Washington Post v. McManus*, 944 F.3d 506, 510–12, 521, 523 (4th Cir. 2019) (striking down state statute where the law "burden[ed] too much and further[ed] too little[,]" and the statute did "surprisingly little to further its chief objective"). Even if Plaintiffs had a compelling interest here in protecting consumers from deception, it is entirely unclear what pro-energy messaging would *not* be prohibited.

- 9 -

To survive strict scrutiny, Plaintiffs must also demonstrate that there is no less oppressive way of achieving the same state interest. *See Pan Am. v. Municipality of San Juan, P.R.*, No. CV 18-1017 (PAD), 2018 WL 6503215, at *18 (D.P.R. Dec. 10, 2018). Here, Plaintiffs could achieve their purported interest—that is, ensuring that consumers hear Plaintiffs' message about climate change—through their own speech, meaning there certainly is a less restrictive way of serving the state interest. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (striking down an alleged consumer protection law because the state could take a counter-position to that of the regulated party "with a public-information campaign"). Although it would be cheaper for Plaintiffs to foist that responsibility on API, "[a]dministrative convenience . . . does not present a sufficient justification for infringing First Amendment freedoms." *N.C. Right to Life, Inc. v. Leake*, 344 F.3d 418, 433 (4th Cir. 2003).

### 3. The chilling effect of Plaintiffs' claims against API confirms that they should be dismissed now.

Allowing Plaintiffs' claims to proceed would also have an irreparable chilling effect on policy advocacy. Forcing API to litigate for years claims that plainly violate the First Amendment would act as a warning shot with the following message for any trade association that questions Plaintiffs' preferred message on a disputed topic: enter the public debate and risk the government's heavy hand coming down on you. For this reason, when speech is the subject of a lawsuit, courts routinely recognize the importance of early resolution to avoid inadvertently and unnecessarily suppressing speech. *See, e.g.*, *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("In the First Amendment area, summary procedures are . . . essential. For the stake here, if harassment succeeds, is free debate . . . The threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself."); *Gordon*, 859 F. Supp. at 1542 ("The conclusion we reach here is supported by a

consideration of the chilling effect on speech in the academic and *non-profit context* that could be the result of allowing actions such as this to proceed.") (emphasis added).

There is no reason to postpone resolving this First Amendment issue "at the earliest possible junction" since "the First Amendment's protections extend to not only unconstitutional laws, but also to unnecessary *litigation* that chills speech." *Green v. Miss U.S., LLC*, 52 F.4th 773, 800 (9th Cir. 2022) (emphasis in original). Deferring resolution of these matters would "run[] directly counter to the First Amendment's right, not just to speak, but to be free of protracted speech-chilling litigation." *Id.* at 793; *see also McBride v. Merrell Dow & Pharms. Inc.*, 717 F.2d 1460, 1467 (D.C. Cir. 1983) (noting that the "harassment of lawsuits," unless stopped by the courts, promotes self-censorship). The Court should resolve this issue now because "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 553 U.S. 285, 292 (2008).

**B.  The Amended Complaint violates API's right to petition the government for redress.**

Plaintiffs' claims against API also should be dismissed because they impermissibly target API's petitioning activities, which are also protected by the First Amendment. *See* U.S. Const. amend. I ("Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances."). This bedrock protection allows groups to "use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972).

An integral component of the right to petition is the *Noerr-Pennington* doctrine, which provides individuals and entities with immunity from liability based on activities arising out of their attempts to influence the passage or enforcement of particular laws. *See Prof'l Real Estate*

*Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669–72 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961).  The doctrine most typically applies in antitrust claims. *See, e.g.*, *Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 56 (1st Cir. 2017) ("[A] Sherman Act violation cannot be 'predicated upon mere attempts to influence the passage or enforcement of laws.'") (quoting *Noerr*, 365 U.S. at 135).  But courts have also applied *Noerr-Pennington* to RICO claims, *see, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933–42 (9th Cir. 2006), as well as state unfair trade practices acts and state consumer protection laws.  *See, e.g.*, *Suburban Restoration Co., Inc. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir. 1983) ("[W]e are confident that Connecticut's courts would carve out a similar exception to [the Connecticut Unfair Trade Practices Act] and the common law, whether or not they believed that they were required to do so by the Constitution."); *Green Mountain Realty Corp. v. Fifth Estate Tower, LLC*, 13 A.3d 123, 130–31 (N.H. 2010) (applying *Noerr-Pennington* to New Hampshire Consumer Protection Act).  Courts in the First Circuit apply *Noerr-Pennington* to tort claims too.  *See, e.g.*, *Picone v. Shire PLC*, No. 16-CV-12396-ADB, 2017 WL 4873506, at *5 n.5 (D. Mass. Oct. 20, 2017).

Here, Plaintiffs' attack on API's petitioning activities is brazen.  *See, e.g.*, Am. Compl. ¶ 207 (describing API's core function as "seek[ing] to 'influence public policy in support of a strong, viable U.S. oil and natural gas industry[.]'") (quoting *About API*, American Petroleum Institute, https://www.api.org/about); ¶ 429 (explaining that the GCSCT Action Memo "outlin[ed] plans to reach the media, the public, and *policy makers* with a message emphasizing 'uncertainties' in climate science.") (emphasis added); ¶ 503 (referring to Defendants' "lobbying efforts"); ¶ 595 (alleging that Defendants' activities could have reached the "citizens of the [Plaintiffs] and their

policy makers"); ¶ 616 (alleging that Defendants were "lobbying against climate bills, energy regulation, and any impediment to their industry.").[2]

As the Joint Motion to Dismiss explains, *Noerr-Pennington* provides API (and all other Defendants to whom these allegations apply) with First Amendment protection to engage in this type of core legislative and public policy activity.  ECF No. 235 at 18-24; *see also, e.g.*, *Council for Emp't & Econ. Energy Use v. WHDH Corp.*, 580 F.2d 9, 11–12 (1st Cir. 1978) (concluding *Noerr-Pennington* protected activities geared toward "influencing political decisions of the general electorate."); *Green Mountain*, 13 A.3d at 132–33 (same); *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 531–37 (M.D. La. 2001) (finding that *Noerr-Pennington* covered the defendant's campaigning activities).

Plaintiffs may argue that they are not attacking API's protected petitioning activity, but instead address API's other statements and activities.  But that distinction cannot be drawn here. API's petitioning and lobbying of government entities are interrelated with API's promotion of the industry it represents.  *Noerr-Pennington* recognizes that API's promotional activities are part and parcel with API's legislative and public policy activities.  In *Noerr* itself, for example, the Supreme Court held that the First Amendment protected the defendants' publicity campaign, which was "designed to influence the passage of state laws relating to truck weight limits and tax rates on heavy trucks, and to encourage a more rigid enforcement of state laws penalizing trucks for overweight loads and other traffic violations."  *Noerr*, 365 U.S. at 131.  So even if the alleged activities that purport to support Plaintiffs' claims against API were based on API's alleged

---

[2] And as the Joint Motion to Dismiss notes, Plaintiffs' deletion of several allegations from the original Complaint referring to other core petitioning activities is "particularly revealing."  ECF No. 235 at 24.

targeting of consumers rather than regulators, *Noerr* protects a publicity campaign targeting both governmental entities and consumers.

### C. The doctrine of constitutional avoidance also warns against a broad reading of Plaintiffs' fraud-based claims.

As addressed in the Joint Motion to Dismiss, Plaintiffs' two common law consumer-fraud-based claims (Counts 1 and 2) are not cognizable, and Plaintiffs have no authority to bring a claim under Rule 7 of the Puerto Rico Rules Against Misleading Practices and Advertisements (Count 3). ECF No. 235 at 52-54. But even if Plaintiffs could bring those claims, the constitutional avoidance canon requires confining the reach of those claims to conduct in the *sale* of consumer goods. "When two interpretations of a statute are possible, one of which would raise serious constitutional problems, and the other of which would avoid serious constitutional problems, the court is obligated to construe the statute to avoid such problems." *Atiles-Gabriel v. Puerto Rico*, 256 F. Supp. 3d 122, 126–27 (D.P.R. 2017) (quotation and citation omitted); *see also Bonilla-Olmedo v. United States*, 677 F. Supp. 2d 511, 516 n.2 (D.P.R. 2009). Here, the broader the Court reads the fraud-based claims—and the conduct which they cover—the greater danger it poses of encroaching on API's First Amendment rights. As addressed more fully above, API's advocacy is fully protected speech on a matter of great public importance. *See supra* at 3-11. If Plaintiffs' fraud-based claims are construed overbroadly to reach public advocacy on the benefits of an energy ecosystem by a nonseller, that would transform these fraud-based claims into powerful tools of censorship.

## II. Plaintiffs' claims against API are time-barred.

As stated in the Joint Motion to Dismiss, Plaintiffs' claims accrued at the latest by September 2017, and the limitations period for all of Plaintiffs' claims have since expired (in September 2021 for the RICO and Antitrust claims, and in September 2018 for the remaining

claims).  ECF No. 235 at 11-17.  Plaintiffs have provided no basis for tolling the limitations period

for any of these claims.  *See id.* at 12-15.  With respect to API, the limitations period is even further

expired.  The Amended Complaint—filed on November 3, 2023—is determinative as to whether

Plaintiffs timely filed suit within the statutory period *as to API*.  That is so because Plaintffs' claims

*against API* do not "relate[] back" to the original Complaint.  *See* Fed. R. Civ. P. 15(c); *Rodriguez

v. Municipality of San Juan*, 659 F.3d 168, 181 (1st Cir. 2011) (applying Puerto Rico law)

(rejecting argument that adding new defendant to complaint after expiration of limitations period

got plaintiff "around any limitations obstacles"); *Wallace v. Town of Stratford Bd. of Educ.*, 674

F. Supp. 67, 69 (D. Conn. 1986) (concluding that date of the filing of amended complaint was the

"proper date from which to calculate the limitations question" because it did not relate back to

original complaint); *see also Williams v. United States Postal Service*, 873 F.2d 1069, 1073 (7th

Cir. 1989) ("[T]he consequence of allowing a plaintiff to add a defendant after the limitations

period has run, where there has been no actual notice to the defendant, would unfairly prejudice

the defendant by depriving him of the complete defense of the statute of limitations, and certainly

prejudice his defense on the merits.").

## III.    Plaintiffs' RICO claims fail as to API.

Plaintiffs allege two RICO enterprises—an "API Enterprise" and a "GCC Enterprise."

Plaintiffs claim that all of the Oil and Gas Defendants are "associated" with the "API Enterprise,"

and that all Defendants are associated with the "GCC Enterprise."  Am. Compl. ¶¶ 720-21, 723,

729.  As set forth in the Joint Motion to Dismiss, Plaintiffs have not pled any of the essential

elements of their RICO claims.  ECF No. 235 at 22-38.  Plaintiffs' RICO claims fail for two

additional reasons with respect to API.  First, with respect to the alleged "API Enterprise," API

cannot be liable for a RICO violation as the alleged "enterprise" itself.  And second, Plaintiffs fail

to allege that API participated in any racketeering activities with respect to the alleged "GCC Enterprise," as is required under 18 U.S.C. §§ 1962(a), (b), and (c).

### A. API cannot be liable for the alleged API Enterprise.

Even if there were an "API Enterprise," API cannot be liable under RICO when its only alleged involvement in the enterprise was being the enterprise itself.  Under RICO, "'[t]he enterprise itself is not liable for RICO violations; rather, the 'persons' who conduct the affairs of the enterprise through a pattern of racketeering activity are liable.'"  *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1182 (10th Cir. 2019) (quoting *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th Cir. 2013)).  To establish RICO liability, a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  As a result of this "distinctiveness" requirement, "a corporation may not be liable under [RICO] for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members.  An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself."  *In re ClassicStar*, 727 F.3d at 490 (internal citation and quotation omitted); *see also, e.g.*, *Dell'Aquila v. LaPierre*, 491 F. Supp. 3d 320, 332 (M.D. Tenn. 2020) ("[B]ecause the NRA cannot be both an enterprise and a person for purposes of RICO liability, the RICO claims against the NRA must be dismissed.").

Plaintiffs thus "cannot maintain an action against [API] as both the 'enterprise' and the 'person' subject to liability under RICO."  *Bailey v. Memphis Bonding Co.*, No. 18-2115, 2019 WL 1300092, at *4 (W.D. Tenn. Mar. 21, 2019).  But that is exactly what Plaintiffs seek to do with respect to the alleged API Enterprise.  So the RICO claims against API based on the alleged API Enterprise should be dismissed.

**B.      Plaintiffs fail to allege that API engaged in any racketeering activities with respect to the alleged GCC Enterprise.**

Plaintiffs fail to plead that API did anything with respect to the alleged GCC Enterprise beyond functioning as a member of GCC.  But mere participation in an enterprise—absent any racketeering activity—cannot support a civil RICO claim.  Rather, "to survive a motion to dismiss, a RICO plaintiff must plead sufficient facts to allow for a plausible inference that that the defendant somehow 'le[d], [ran], manag[ed], or direct[ed]' the enterprise's affairs." *Friendly Hotel Boutique Corp. v. ME & A Capital, LLC*, No. CIV. 11-1709 JAG, 2012 WL 4062795, at *2 (D.P.R. Sept. 14, 2012) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993)).  This, the Amended Complaint fails to do.

The only activities in which API allegedly engaged with respect to the GCC Enterprise relate to its membership status in GCC—Plaintiffs allege that API was a founding member of GCC.  Am. Compl. ¶¶ 211(a), 364-65.  Plaintiffs fail to allege any additional facts showing how API participated in the alleged GCC Enterprise.  And their conclusory allegations about API's mere membership in the GCC cannot show that API "conducted" or "participated" in the conduct of a RICO enterprise.  Plaintiffs must allege that API played "*some* part in directing the enterprise's affairs" and "participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 177–85 (emphasis in original); *see also Friendly Hotel*, 2012 WL 4062795, at *2; *see also, e.g.*, *Whaley v. Auto Club Ins. Ass'n*, No. 95-1918, 1997 WL 720451, at *2 (6th Cir. Nov. 12, 1997) (rejecting argument that defendant was liable under RICO simply "by virtue of being a participating member of the facility whose representatives sit on the [alleged RICO enterprise's] board of governors.").  Plaintiffs' allegation that API was a member of the GCC thus fails to plausibly plead that API had any role in leading, running, managing, or directing the alleged GCC enterprise.

IV.     **Plaintiffs' product liability claims fail for independent reasons.**

    A.     **Plaintiffs cannot state a strict product liability claim against a defendant that neither manufactures nor sells the product.**

Counts 10 and 11 assert strict liability claims against API based on allegedly defective fossil fuel products.  As explained in the Joint Motion to Dismiss, Count 10 (strict liability – failure to warn) must be dismissed because Defendants had no duty to warn Plaintiffs or their residents about climate change.  ECF No. 235 at 57-58.  Count 11 (strict liability – design defect) must also be dismissed because Plaintiffs have failed to allege a defect, much less that any purported defect caused Plaintiffs' injuries.  *Id.* at 54-57.  But these claims also fail as to API in particular because the Amended Complaint contains no allegation that API has ever designed, manufactured, distributed, or sold any commercial product, let alone the fossil fuel products in question.  That failure is fatal to their strict liability claims for failure to warn (Count 10) and design defect (Count 11).

Overwhelming authority holds that strict liability claims against a trade association must be dismissed when the plaintiff has not alleged that the trade association designed, manufactured, or sold the product.  *See, e.g.*, *Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 724 (D. Md. 2000) (dismissing strict product liability claim against a trade association because the trade association did not "manufacture or sell a product").[3]  Plaintiffs' strict liability claims against API must fail

---

[3] *See also Magnus v. Fortune Brands, Inc.*, 41 F. Supp. 2d 217, 225 (E.D.N.Y. 1999) ("Since the complaint does not allege that [the trade association] manufactured or sold cigarettes, [the trade association] cannot be held liable for failure to warn, negligent and defective design, [or] strict products liability."); *Jefferson v. Lead Indus. Ass'n, Inc.*, 930 F. Supp. 241, 244, 247 (E.D. La. 1996), *aff'd*, 106 F.3d 1245 (5th Cir. 1997) (dismissing strict liability claims against trade association that "neither s[old] nor manufacture[d] a product"); *Swartzbauer v. Lead Indus. Ass'n, Inc.*, 794 F. Supp. 142, 144 (E.D. Pa. 1992) (dismissing strict liability claim against lead paint trade association "because it [was] not a seller or supplier as that term is defined by Pennsylvania law."); *Klein v. Council of Chem. Ass'ns*, 587 F. Supp. 213, 223 (E.D. Pa. 1984) (dismissing strict liability claims against trade association, where "[t]he complaint contain[ed] no allegation that defendant [trade association] sold a product[,]"); *Wissel v. Ohio High Sch. Athletic Ass'n*, 78 Ohio

because Plaintiffs have not alleged—nor could they—that API manufactures, sells, or distributes fossil fuel products.  API thus is not strictly liable for alleged injuries relating to its members' products as a matter of law.

### B. Plaintiffs' negligent design defect claim fails because Plaintiffs do not allege that API owes them a duty of care.

Plaintiffs also lump API into the negligent design defect claim in Count 12.  As explained in the Joint Motion to Dismiss, this claim fails because Plaintiffs fail to plead either causation or a design defect.  ECF No. 235 at 54-57.  In addition, this claim fails as to API in particular because a trade association normally does not owe a duty of care to end users of its members' products. *See Tuttle v. Lorillard Tobacco Co.*, 118 F. Supp. 2d 954, 965 (D. Minn. 2000) ("Trade associations are not ordinarily found to have assumed a duty to the purchasing public unless they have some measure of control over their manufacturing members or some direct involvement in the development or marketing the product."); *Meyers v. Donnatacci*, 531 A.2d 398, 402 (N.J. Super. Ct. Law Div. 1987) ("NSPI, as a trade association, owes no duty to the general public who may use products manufactured and/or installed by its members.").

The reason that a duty does not extend from a trade association to a consumer in products liability cases is that they have no "economic relationship."  *Beasock v. Dioguardi Enterprises, Inc.*, 494 N.Y.S.2d 974, 978 (Sup. Ct. 1985); *see id.* at 978 (holding that tire and rim trade association did not assume a duty to public for injuries caused by product of its members where the trade association "neither manufacture[d] nor s[old] tires or rims, nor d[id] it specify

---

App. 3d 529, 539, 605 N.E.2d 458, 464, *cause dismissed*, 64 Ohio St. 3d 1434, 595 N.E.2d 943 (1992) (concluding that athletic equipment trade association could not be held strictly liable for injuries from a defectively designed football helmet, where it did not sell helmet); *Howard v. Poseidon Pools, Inc.*, 133 Misc. 2d 50, 54, 506 N.Y.S.2d 523, 526 (Sup. Ct. 1986), *aff'd*, 134 A.D.2d 926, 522 N.Y.S.2d 388 (1987), *aff'd*, 72 N.Y.2d 972, 530 N.E.2d 1280 (1988) (concluding that swimming pool equipment trade association was not strictly liable to plaintiff for injuries suffered in diving accident).

procedures for tire mounting or any other service or maintenance procedures."). To that end, courts have held that no duty arises from the remote relationship between a trade association and the end user of products produced in that trade. *See, e.g.*, *Sizemore v. Georgia-Pac. Corp.*, No. 6:94-2894 3, 1996 WL 498410, at *4 (D.S.C. Mar. 8, 1996) ("Plaintiffs have adduced no facts sufficient to support a conclusion that HPVA owed any legal duty to plaintiffs as members of the general public. It is undisputed that HPVA does not design, manufacture, distribute, or sell any building products and did not participate in the manufacture, design, sale, or installation of the paneling in plaintiffs' home."), *aff'd sub nom. Sizemore v. Hardwood Plywood & Veneer Ass'n*, 114 F.3d 1177 (4th Cir. 1997).[4]

That prudent refusal to impose a novel duty "at large" on non-profit trade associations has equal force here. API sells no fossil fuel products, so it is not within the realm of a common law negligence cause of action.

### C.   Plaintiffs' nuisance claims fail for additional reasons.

Plaintiffs again lump API into the nuisance claims in Counts 9 and 13 against all Defendants. As explained in the Joint Motion to Dismiss, these claim fails because Plaintiffs fail to plead causation for their nuisance claims and otherwise fail to allege how this lawsuit would abate their claimed nuisance. ECF No. 235 at 58-59. In addition, such nuisance claims do not lie against defendants that do not control the alleged source of the nuisance, such as trade associations like API. *See, e.g.*, *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000)

---

[4] *See also, e.g.*, *Evenson v. Osmose Wood Preserving, Inc.*, 760 F. Supp. 1345, 1349 (S.D. Ind. 1990) ("In the instant case, the plaintiff has alleged no facts showing that AWPI owed him a duty to communicate the dangers of working with CCA. AWPI is a trade association; it is undisputed that AWPI did not manufacture, sell distribute, design, test, conduct safety research on, or set standards for CCA. We believe that there is no relationship upon which plaintiff may base a claim for negligence against AWPI."); *accord Harmon v. Nat'l Auto. Parts Ass'n*, 720 F. Supp. 79, 80–81 (N.D. Miss. 1989); *Klein*, 587 F. Supp. at 225; *Meyers*, 531 A.2d at 402–04.

(affirming dismissal of nuisance claim that included tobacco trade associations as defendants); *Penelas v. Arms Tech., Inc.*, No. 99-1941 CA-06, 1999 WL 1204353, at *3–4 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) (dismissing nuisance claim, among others, against three trade associations and other defendants, stating that "[h]ere, the nuisance is the criminal or reckless misuse of firearms by third parties who are beyond the control of the defendants.  Because defendants have no ability to control the misconduct of these third parties, nuisance does not apply for that reason as well.").  Here, Plaintiffs fail to allege that API had any control over their climate change injuries.  So the nuisance claims against API should be dismissed.

## CONCLUSION

The Court should dismiss Plaintiffs' claims against API with prejudice.

In San Juan, Puerto Rico this 13th day of February, 2024.

MORELL CARTAGENA & DAPENA
Ponce de León Ave. 273 Plaza 273, Suite 700
San Juan PR 00908 Puerto Rico
Telephone: 787-723-1233
Facsimile: 787-723-8763
E-mail: ramon.dapena@mbcdlaw.com
Email: ivan.llado@mbcdlaw.com

*/s/ Ramon Dapena*
Ramón Dapena
Bar No. 125005

*/s/ Iván J. Lladó*
Iván Lladó
Bar No. 302002

Jeremiah J. Anderson (Admitted *Pro Hac Vice*)
**MCGUIREWOODS LLP**
845 Texas Avenue, 24th Floor
Houston, TX 77002-2906
Telephone: (713) 571-9191
E-mail: jjanderson@mcguirewoods.com

- 21 -

Brian D. Schmalzbach (Admitted *Pro Hac Vice*)
**MCGUIREWOODS LLP**
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1000
E-mail: bschmalzbach@mcguirewoods.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that today I have electronically filed this motion with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

<u>*/s/ Ramon Dapena*</u>
Ramón Dapena
Bar No. 125005