# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| THE MUNICIPALITIES OF BAYAMÓN, CAGUAS, LOÍZA, LARES, BARRANQUITAS, COMERÍO, CAYEY, LAS MARÍAS, TRUJILLO ALTO, VEGA BAJA, AÑASCO, CIDRA, AGUADILLA, AIBONITO, MOROVIS, MOCA, BARCELONETA, CAMUY, CATAÑO, SALINAS, ADJUNTAS, ARROYO, CULEBRA, DORADO, GUAYNABO, HORMIGUEROS, JUNCOS, LAJAS, MANATÍ, NAGUABO, NARANJITO, UTUADO, VILLALBA, COAMO, OROCOVIS, VIEQUES, and YABUCOA on behalf of themselves and others similarly situated, known as the MUNICIPALITIES OF PUERTO RICO, <br><br> Plaintiffs, <br><br> v. <br><br> EXXON MOBIL CORP., SHELL PLC F.K.A. ROYAL DUTCH SHELL PLC, CHEVRON CORP, BP PLC, CONOCOPHILLIPS, MOTIVA ENTERPRISES, LLC, OCCIDENTAL PETROLEUM F.K.A. ANADARKO PETROLEUM CORP, BHP, RIO TINTO PLC, AMERICAN PETROLEUM INSTITUTE, XYZ CORPORATIONS 1-100, and JOHN AND JANE DOES 1-100, <br><br> Defendants. | CIVIL NO. 22-1550 (SCC)(HRV) <br><br> RE: <br> CONSUMER FRAUD; DECEPTIVE BUSINESS PRACTICES; RACKETEER AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962; CLAYTON ACT, 15 U.S.C. § 15 ET SEQ.; PUBLIC NUISANCE; STRICT LIABILITY – FAILURE TO WARN; STRICT LIABILITY – DESIGN DEFECT; NEGLIGENT DESIGN DEFECT; PRIVATE NUISANCE; UNJUST ENRICHMENT |

**MAGISTRATE JUDGE'S OMNIBUS REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

Plaintiffs, the municipalities of Bayamón, Caguas, Loíza, Lares, Barranquitas, Comerío, Cayey, Las Marías, Trujillo Alto, Vega Baja, Añasco, Cidra, Aguadilla, Aibonito, Morovis, Moca, Barceloneta, Camuy, Cataño, Salinas, Adjuntas, Arroyo, Culebra, Dorado, Guaynabo, Hormigueros, Juncos, Lajas, Manatí, Naguabo, Naranjito, Utuado, Villalba, Coamo, Orocovis, Vieques, and Yabucoa (together, "Plaintiffs"), initiated this lawsuit on November 22, 2022 in their own right and on behalf of the proposed class, the 78 Municipalities of Puerto Rico. Defendants are Exxon Mobile Corporation ("Exxon"), Shell PLC ("Shell"), Chevron Corporation ("Chevron"), BP PLC ("BP"), Motiva Enterprises LLC ("Motiva"), Occidental Petroleum Corporation ("Occidental"), BHP Group Limited ("BHP"), Rio Tinto PLC ("Rio Tinto"), ConocoPhillips Company ("Conoco"), and American Petroleum Institute ("API"). Defendants are ten of the largest fossil fuel companies in the world. Plaintiffs claim that Defendants engaged in a decades-long campaign to misrepresent the dangers of carbon-based and fossil fuel products which they marketed and sold. It is alleged that Defendants conduct ultimately led to the catastrophic destruction brought about by the 2017 storms.

After Plaintiffs amended the complaint (Docket No. 205), Defendants moved for dismissal, both jointly and individually. The presiding District Judge referred the motions to dismiss as well as related motions to take judicial notice to the undersigned for report and recommendation.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' pleadings. Plaintiffs initiated this lawsuit claiming that defendant's exploitation of fossil fuel products have caused extensive losses, fatalities, and property damage during the storms of September 2017 and their subsequent effects. (Docket No. 205, ¶ 1). The action seeks redress for the economic damages and detrimental effects on Puerto Rico's climate directly attributable to Defendants' activities. (Id., ¶ 9).

This is a summary of Plaintiffs' main allegations:

1. For decades, the Defendants were aware of scientific information establishing that the products they marketed and sold in Puerto Rico accelerated climate change and could likely lead to dangerous storms. (Id., ¶ 1).

2. Defendants had a duty of disclosure under Puerto Rico and United States consumer protection laws but failed to disclose: (a) that their own scientists confirmed climate change was an actual threat, (b) that their products were a direct cause of that climate change, (c) the anticipated effects upon Puerto Rico. (Id., ¶ 7(b)).

3. Rather than disclosing the information and warning the public, Defendants colluded with other fossil fuel-dependent companies to form the Global Climate Coalition ("GCC") and the American Petroleum Institute ("API") through which they funded climate change denial marketing campaigns. (Id., ¶ 2).

4. In masking the true source of their marketing, Defendants violated consumer protection laws in both Puerto Rico and the United States. (Id., ¶ 7(c)).

5. Defendants' scheme sought to maintain energy production monopoly, lower prices, and block the development of alternative energy sources. (Id., ¶ 7(d)).

6. The Plaintiffs relied on this misleading information to continue purchasing and using carbon-based products and endanger the lives of their residents and communities. (Id., ¶ 3).

3

7. Defendants were required by their own Best Business Practices (adopted in the 1980s) to disclose what they internally knew about upcoming super storms in the North Atlantic. (Id., ¶ 7(f)).

8. Defendants Best Business Practices also prevented them from colluding to deceive the Plaintiffs. (Id., ¶ 7(e)).

9. As publicly-traded companies, Defendants were required by their adopted Best Business Practices and corporate law to disclose to their investors that their products were contributing to the magnitude and acceleration of climate change and that these corporate acts would not only increase the ferocity of storms that hit Puerto Rico's shores but would inevitably result in a catastrophic loss of lives and property such as occurred in 2017 and since. (Id., ¶ 7(i)).

10. The Defendants have intentionally interfered with the citizens of the Municipalities of Puerto Rico's rights to life, liberty, and the enjoyment of property as guaranteed by Article II, Section 7 of the Constitution of Puerto Rico. (Id., ¶9).

11. Defendants have also interfered with Puerto Rico and its consumers' human rights as recognized in Section 20, Article II of the Puerto Rico Constitution guaranteeing citizens the right to education, to obtain employment, an adequate standard of living, social protection, and family assistance. (Id.).

Based on these allegations, the Amended Complaint asserts fourteen causes of action: common law consumer fraud (First Cause of Action), conspiracy to commit common law consumer fraud and deceptive businesses practices (Second Cause of Action), misleading practices and advertisement under Rule 7 of the Puerto Rico Rules (Third Cause of Action), violations to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961(3)("RICO")(Fourth, Fifth, Sixth and Seventh Causes of Action), antitrust violations pursuant to 15 U.S.C.§1 et seq. (Eighth Cause of Action), public nuisance pursuant to 32 L.P.R.A. §2761 (Ninth Cause of Action), strict liability – failure to warn (Tenth Cause of Action), strict liability-design defect (Eleventh Cause of

Action), negligent design defect (Twelfth Cause of Action), private nuisance pursuant to 32 L.P.R.A. §2761 (Thirteenth Cause of Action), restitution-unjust enrichment (Fourteenth Cause of Action).

The Defendants moved to dismiss, both jointly and on independent grounds. The Presiding Judge referred to me Defendant's Joint Motion to Dismiss for lack of personal jurisdiction (Docket No.234) and Motion to Dismiss for failure to state a claim (Docket No. 235). The Judge also referred to the undersigned Defendant's individual motions to dismiss at Docket Nos. 232 (Occidental)[1]; 236 (BP PLC's); 237 (Conoco Philips); 239 (Chevron's); 240 (Motiva); 242 (Exxon); 243 and 245 (BHP); 244 (Shell); 246 and 247 (Rio Tinto); 254 (API).

Plaintiffs opposed the Joint Motions to Dismiss, (Docket Nos. 281 and 280, respectively). [2] Defendants replied jointly (Docket No. 296, 297 and 305) and individually, Docket Nos. 290 (API); 292 (Shell); 293 (Occidental); 294 (BP P.L.C.); 295 (Conoco); 299 (Chevron); 301 (Exxon); 302 (Motiva); 303 and 304 (BHP); 306 and 307 (Rio Tinto).

Also before the Court are two motions for judicial notice at Docket Nos. 238 and 241, as well as Plaintiffs' opposition thereto, (Docket No. 282), Defendants' reply (Docket No. 298 (joint reply) and Chevron's reply (Docket No. 300).

_____

[1] Occidental later filed a notice of supplemental authority. (Docket No. 314).

[2] Subsequently, Plaintiffs supplemented their Opposition at Docket No. 280 to include two additional cases. (Docket No. 313).

### III.    APPLICABLE LAW AND DISCUSSION

#### A.    Legal Standards

Defendants claim that dismissal is warranted under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

##### 1.    *Fed. R. Civ. P. 12(b)(2)*

A party may move to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). When examining a motion to dismiss for lack of personal jurisdiction, a district court may choose from among several methods to determine whether plaintiff has met its burden to show that jurisdiction has attached. *Naicom Corp. v. DISH Network Corp.*, No. 3:21-CV-01405-JAW, 2024 WL 1363755, at *13 (D.P.R. Mar. 29, 2024)(citing *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674 (1st Cir. 1992)). For cases in the early stages of litigation, the court employs the prima facie standard. *Rodriguez v. Dixie S. Indus., Inc.,* 113 F. Supp. 2d 242, 249 (D.P.R. 2000)(citing *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83-84 (1st Cir. 1997)). The prima facie approach is also the standard when a court rules on a motion to dismiss without holding an evidentiary hearing. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).

Under the prima facie approach, the Court examines whether the plaintiff "has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). In conducting the inquiry, the district court acts "as a data collector" rather than as a "factfinder." *Rodriguez-Rivera*

*v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 160 (1st Cir. 2022)(internal citations omitted)). All allegations most be construed "in the light most favorable to the plaintiff." *Santiago-González v. Motion Powerboats*, Inc., 334 F. Supp. 2d 98, 101 (D.P.R. 2004).

A plaintiff bears the burden of demonstrating personal jurisdiction over each defendant. *LP Solutions LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018). Establishing personal jurisdiction under the Fourteenth Amendment may take the form of specific, or general jurisdiction. *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009). Plaintiffs rely on specific jurisdiction which requires that their claims relate to the defendant's contacts. *Id.* (citing *Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir.2005)).[3]

"The proper exercise of specific in personam jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution. *See Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994)(citing *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir.1994); *United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1086 (1st Cir.1992); and *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 51 (1st Cir.1983)). To establish specific jurisdiction, a plaintiff must show: (1) relatedness, (2) purposeful availment, and (3) reasonableness. *See Phillips Exeter*

---

[3] General jurisdiction, in contrast, requires plaintiff to show "continuous and systematic general business contacts" between defendant and the forum. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 619 (1st Cir. 2001)(quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

*Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir.1999)(The exercise of specific personal jurisdiction requires that:  "(1) the claim underlying the litigation must directly relate to or arise out of Defendant's contacts with the forum; (2) those contacts must constitute purposeful availment of the benefits and protections afforded by the forum's laws; and (3) jurisdiction must be reasonable in light of a number of factor's touching upon fundamental fairness.") "Questions of specific jurisdiction are always tied to the particular claims asserted." *Astro-Med, Inc.,* 591 F.3d at 9 (citing *Phillips Exeter Acad.,* 196 F.3d at 289).

Notwithstanding a plaintiff's required proffer of evidence, the First Circuit has "long held that a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." *Grp. of Former Emps. of Sprague Caribe v. Am. Annuity Grp., Inc.*, 388 F. Supp. 2d 3, 5 (D.P.R. 2005)(citing *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir.1997)). Also, "wide latitude must be accorded to the plaintiff to establish the minimum contacts with Puerto Rico and that defendant." *Id.* (citing *Puerto Rico v. SS Zoe Colocotroni*, 61 F.R.D. 653, 657 (D.P.R.1974)(citing *Com. Oil Refining Co. v. Houdry Process Corp.*, 22 F.R.D. 306, 308 (D.P.R.1958)); *see also Mullaly v. Sunrise Senior Living Mgmt., Inc.*, 224 F. Supp. 3d 117, 123 (D. Mass. 2016)(citing *Swiss Am. Bank*, 274 F.3d at 625 (internal quotation marks, citations and emphasis omitted)). Whether to permit such jurisdictional discovery is within the broad discretion of the district court. *Swiss Am. Bank*, 274 F.3d at 626.

Plaintiffs also assert jurisdiction under Section 1965(b) of RICO, which provides:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that *the ends of justice require* that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U. S. C. § 1965(b). Section 1965 permits a court overseeing a valid RICO claim to exercise "personal jurisdiction over an out-of-state defendant [based on nationwide contacts] so long as the Court has jurisdiction established by the minimum contacts of at least one defendant [with the forum State]." *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.*, 2015 WL 5719801, at *3 (D.P.R. Sept. 29, 2015), report and recommendation adopted, (D.P.R. Mar. 31, 2016); *see also Casio Computer Co. Ltd. v. Savo*, 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000).

## 2.    *Fed. R. Civ. P. 12(b)(6)*

To determine if a complaint's allegations survive the 12(b)(6) stage, the Court must examine whether, taking the complaint's well-pled (non-conclusory, non-speculative) facts as true and drawing all reasonable inferences in the pleader's favor, the amended complaint's allegations state a plausible claim for relief. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Cay-Montanez v. AXA Equitable Life Ins. Co.*, No. CV 19-1124 (SCC), 2021 WL 4251338, at *2 (D.P.R. Sept. 17, 2021). While a complaint need not give detailed factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

### 3.    *Judicial Notice*

A district court is generally limited to considering only facts and documents that are part of the complaint, but may also consider "maters susceptible to judicial notice." *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020)(internal citations omitted). Pursuant to Fed. R. Evid. 201(b), the court may take judicial notice of "a fact that is not subject to reasonable dispute because if: 1) is generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 204–05 (D. Mass. 2022).

### B.    Jurisdiction

Plaintiffs claim that they have established jurisdiction over Defendants on several basis. First, in accordance with 28 U.S.C. §1332(a), because the Municipalities of Puerto Rico and the named Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Second, Plaintiffs assert there is special jurisdiction over defendants because they conduct business in Puerto Rico and the United States through marketing, transporting, trading, distributing, refining, manufacturing, selling, and/or consuming of oil and coal. Plaintiffs describe Defendants' purposeful activities toward Puerto Rico and the United through a campaign of deception and misinformation.

Lastly, plaintiffs aver that the Court also has personal jurisdiction over all the Defendants under 18 U.S.C. §1965(b). They argue that the Court may exercise nationwide

jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiffs demonstrate national contacts in the United States generally. Here, the ends of justice require, Plaintiffs say, that the Municipalities of Puerto Rico be permitted to bring the Defendants before the Court in a single trial.

For background, this is not the first time that an action of this nature reaches our Circuit. In *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 50 (1st Cir. 2022), the First Circuit examined whether removal to federal court was proper and ultimately affirmed the district court's order remanding the case to Rhode Island state court. This ruling follows other similar actions brought in state courts throughout the United States. *See*, e.g., *County of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), and *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019). Judicial discourse to date has centered not around whether the companies can be held liable, but rather, whether federal or state courts should decide.

Unlike those cases, this action was filed first in federal court under both diversity and federal question jurisdiction. According to Plaintiffs, there is personal jurisdiction over each Defendant. In addition, they posit that Section 1965 of RICO only requires that they have jurisdiction over one defendant for the matter to move forward.

Because Section 1965 jurisdiction requires that the Court have jurisdiction over at least one of the RICO defendants, I will first analyze whether there is *in personam* jurisdiction over Defendants.

### 1. *In Personam* Jurisdiction

"When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the

first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir. 1992) (citing *Lorelei Corp. v. County of Guadalupe,* 940 F.2d 717, 719 (1st Cir.1991) (per curiam); *Whistler Corp. v. Solar Elecs., Inc.,* 684 F. Supp. 1126, 1128 (D.Mass.1988)). "In such circumstances, the Constitution requires only that the defendant have the requisite 'minimum contacts' with the United States, rather than with the particular forum state (as would be required in a diversity case)." *Id.* (citing *Lorelei,* 940 F.2d at 719; *Trans–Asiatic Oil Ltd. v. Apex Oil Co.,* 743 F.2d 956, 959 (1st Cir.1984)).

A federal court sitting in diversity may exercise personal jurisdiction over an out-of-state defendant only after engaging in a two-step analysis. First, the court must determine whether the state long-arm statute authorizes jurisdiction over the nonresident defendant. Second, the court must consider whether the exercise of personal jurisdiction would not deny defendant his constitutional right to due process of law. *See Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S. Ct. 404, 98 L.Ed.2d 415 (1987).

Although it is undisputed that the Defendants are nonresidents of Puerto Rico, Plaintiffs argue that all three elements of the specific jurisdiction test are met. First, all Defendants purposefully availed themselves of the privilege of conducting business activities in Puerto Rico because each of them sold, marketed and promoted fossil fuels on the island. Second, Plaintiff's claims arise out of or relate to Defendant's production, marketing, and sale of those products in Puerto Rico. Lastly, Defendants did not meet the burden to show that personal jurisdiction would be unreasonable.

I will examine each requirement in turn.

### a.    *Purposeful Availment*

As per the Amended Complaint, Defendants purposefully availed themselves of the privilege of doing business in Puerto Rico by "marketing, transporting, trading, distributing, refining, manufacturing, selling, and/or consuming of oil and coal." (Docket No. 205, ¶13). In addition, the citizens of the Municipalities purchased Defendants' products and invested in the publicly traded corporate Defendants. (Id., at ¶¶15-16). Furthermore, some Defendants allegedly availed themselves of the benefits and protections of Puerto Rican law by registering an agent for service of process. (Id.). Lastly, the target of Defendants' actions included citizens and consumers in Puerto Rico. (Id., at ¶14).

"The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous'" contacts with the forum state. *See Sawtelle v. Farrell,* 70 F.3d 1381, 1391 (1st Cir. 1995)(citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)). The cornerstones of the analysis are "voluntariness and foreseeability." *Adelson*, 510 F.3d at 50. The contact with the forum "must be voluntary and not based on the unilateral actions of another party." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). As to foreseeability, the defendant's contacts in the forum state must give him notice such that he could "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S Ct. 559, 62 L.Ed.2d 490 (1980).

The Amended Complaint alleges that Puerto Rico is mostly dependent on oil and coal imports for its electricity. For the fiscal year ending in June 2017, petroleum supplied just under half of the island's electricity and coal continued to supply about one-sixth of electricity. (Docket No. 205, ¶174). Defendants, however, dispute jointly and individually, that they conduct activities on the island.

Courts have found that even if a defendant does not conduct business activities in a forum, the transportation and sale to a forum's consumers through agents and subsidiaries amounts to purposeful direction of activities on the forum. *See City of Oakland v. BP p.l.c.,* No. C 17-06011 WHA, 2018 WL 3609055, at *3 (N.D. Cal. July 27, 2018); *City of Long Beach v. Total Gas & Power N. Am., Inc.,* 465 F. Supp. 3d 416, 438 (S.D.N.Y. 2020), *aff'd*, No. 20-2020-CV, 2021 WL 5754295 (2d Cir. Dec. 3, 2021)("It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'").

In *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.,* 480 U.S. 102, 111, 107 S. Ct. 1026, 1032, 94 L. Ed. 2d 92 (1987) the Supreme Court adopted the view that the Due Process Clause requires something more than merely placing a product into the stream of commerce to exert jurisdiction over a foreign defendant. For context, the plaintiff did no business in the United States; had no office, affiliate, subsidiary, or agent in the United States; manufactured its component parts outside the United States and delivered them to Toyota Motor Company in Japan. *Id.* at 111. In concluding that purposeful action towards the forum State was needed, the Court expressed:

> Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State,

> **advertising in the forum State**, establishing channels for
> providing regular advice to customers in the forum State, **or
> marketing the product through a distributor** who has
> agreed to serve as the sales agent in the forum State.

*Id.* at 112 (emphasis supplied). The First Circuit has followed in line with *Asahi*.

In *Knox v. MetalForming, Inc.,* 914 F.3d 685, 691–92 (1st Cir. 2019), our appellate court concluded that "specific targeting of a forum" is not "the only means" of showing purposeful availment. Considering the facts, a defendant's "'regular flow or regular course of sale' in the [forum]" could make the exercise of jurisdiction foreseeable to the defendant. *Id.* (citing *Plixer Int'l, Inc. v. Scrutinizer GmbH,* 905 F.3d 1, 10 (1st Cir. 2018)). Likewise, advertising and marketing activities may constitute purposeful activities for jurisdictional purposes. *See, e.g.*, *AARP v. Am. Fam. Prepaid Legal Corp.,* 604 F. Supp. 2d 785, 803 (M.D.N.C. 2009)(Approving the creation and purposeful direction of lead cards containing AARP references to North Carolina found to be purposeful activity directed at the forum); *Lindora, LLC v. Isagenix Int'l, LLC,* 198 F. Supp. 3d 1127, 1139 (S.D. Cal. 2016)(in finding purposeful availment in a trademark infringement action in California, Court considered that Plaintiff provided its California Associates with infringing marketing materials, held training workshops and promotional events in California using the marks in dispute, and operated a website where the infringing marks were used.); *Ponzio v. Mercedes-Benz USA, LLC,* 447 F. Supp. 3d 194, 216–17 (D.N.J. 2020)(Finding that Plaintiffs had established with reasonable particularity sufficient contacts between the defendants and the forum state after considering, among other factors, Defendants' marketing activities within the forum, and Plaintiff's allegations that they viewed the marketing material prior to

purchasing the product and that "each relied on the alleged misrepresentations made through Mercedes' marketing and advertisements when they purchased their Mars Red vehicles.").

Here, Plaintiffs make the following specific allegations against Defendants:

(i)    Defendants refining "upstream" operations utilize Buckeye Partners, LP to provide their oil-based products in Puerto Rico. (Docket No. 205, at ¶85).

(ii)   Esso Oil PR, a subsidiary of Exxon, had extensive presence in Puerto Rico until 2008, when it sold its 145 service stations and access to terminals and airports in Puerto Rico and St. Thomas to Total Petroleum Puerto Rico Corp. (Id., at ¶96-99.).

(iii)  Exxon's downstream operation (consisting of marketing, refining and retail operations), includes sale of its petroleum-based consumer products in Puerto Rico. (Id., at ¶97). Exxon advertises, markets, and sells its products in Puerto Rico. Plaintiffs are customers of Exxon and have invested in Exxon as a publicly traded company.

(iv)   Chevron sold its fuel distribution and storage business in PR and the USVIs in 2012 but continues to market and sell its products in Puerto Rico. (Id., at ¶¶126 and 128).

(v)    BP had an aviation business at the Luis Munoz Marin International Airport in San Juan servicing over 4 million passengers per year, which it sold to Puma Energy in 2015. BP continues to market and sell its products in Puerto Rico, including the Castrol brand for industrial and automotive lubricants. (Id., at ¶¶137-140).

(vi)   Shell branded gasoline was sold in Puerto Rico through the Sol Group ("Sol") and Sol Puerto Rico Limited ("Sol P.R."), the exclusive distributor of Shell Fuels in Puerto Rico. Shell's website reflects 121 Shell gas stations in Puerto Rico as of November 14, 2022. (Id., at ¶111).

(vii)  In July 2012 Chevron sold its fuel distribution and storage businesses in Puerto Rico and the United States Virgin Islands to Puma Energy, including 192 Texaco service

stations, an aviation fuel supply and storage tanks with a combined capacity of 430,000 barrels. Chevron continues to sell the "Delo," "Ursa," "Havoline," "IsoClean" and "Techron" heavy duty diesel engine oils, coolants/antifreeze, transmission fluids, gear oils, greases and hydraulic oils in and Puerto Rico. (Id., at ¶123, 126).

(viii)   Conoco markets and sells its products in Puerto Rico, including its Phillips 66 lubricants. (Id., at ¶150). Plaintiffs have been, and remain, customers of Conoco and have invested in Conoco as a publicly traded company. (Id., at ¶153).

(ix)    Motiva markets and sells its products in Puerto Rico through its joint ventures with codefendants. At all relevant times, The Municipalities of Puerto Rico and/or their citizens have been customers of Motiva. (Id., at ¶163).

(x)     Occidental markets and sells consumer products worldwide, including in Puerto Rico. Plaintiffs have been, and remain, customers of either Occidental or Anadarko and have invested in Occidental and previously Anadarko as a publicly traded company. (Id., at ¶169).[4]

(xi)    Defendant BHP is 1/3 owner of the Cerrejón coal mine, which imports about 1.6 million short tons of coal annually to supply Puerto Rico's coal-fired electricity generating plant at Guayama. The Municipalities of Puerto Rico and/or their citizens have invested in BHP as a publicly traded company and are customers of BHP. (Id., at ¶179).

(xii)   Defendant Rio Tinto as a publicly traded company in which the Municipalities of Puerto Rico and/or their citizens have invested in. (Id., at ¶186).

---

[4] Occidental avers that as a company engaged primarily in the upstream segment of the oil-and-gas industry, OPC's business is in states and countries where it extracts hydrocarbons, not Puerto Rico. (Docket No. 232 at pg. 1).

At this stage and relying on Plaintiffs' well-pleaded allegations claiming that Defendants marketed, promoted, and sold products in Puerto Rico, I conclude that the purposeful availment test is met. However, I understand that limited discovery on the issue of jurisdiction is proper in this case because a more developed record would assist the Court in making its jurisdictional finding.

A court has "broad discretion in determining whether to grant jurisdictional discovery." *Blair v. City of Worcester*, 522 F.3d 105, 110–11 (1st Cir. 2008)(citing *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d at 626). In general, the threshold showing to allow limited discovery "is relatively low." *Id.* (citing *Surpitski v. Hughes–Keenan Corp.*, 362 F.2d 254, 255–256 (1st Cir. 1966)(per curiam)); *see also United States v. Swiss Am. Bank, Ltd.*, 274 F.3d at 625 ) (citing *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir.1997)) ("We have long held that 'a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction *may* well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense.'"); *Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 672–73 (S.D. Cal. 2001)(citing *America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 801 (9th Cir.1989)(citations omitted)("It is clear that the question of whether to allow discovery is generally within the discretion of the trial judge. [W]here pertinent facts bearing on the question of jurisdiction are in dispute, discovery should be allowed.")

### b.    Relatedness

The least developed prong of the due process inquiry is the relatedness prong. *Sawtelle,* 70 F.3d at 1389 (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201,

206 (1st Cir. 1994)). It focuses on whether the claim underlying the litigation is related to or directly arose out of Defendants' forum-state activities. *Id*. The First Circuit has adopted the view that a flexible approach to the jurisdictional inquiry, particularly in the early stages of a case. In that respect, the Court has expressed:

> By this approach, we intend to emphasize the importance of proximate causation, but to allow a slight loosening of that standard when circumstances dictate. We think such flexibility is necessary in the jurisdictional inquiry: relatedness cannot merely be reduced to one tort concept for all circumstances.

*Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 716 (1st Cir. 1996). Within this framework, I analyze the contacts between the Defendants and the forum.

Plaintiffs allege that Defendants had a duty to disclose information regarding the impact of its products on the environment, particularly in the acceleration of climate change and the formation of super storms. This failure to disclose allegedly caused the Municipalities to underestimate the potential impact to their citizens and to continue purchasing Defendants' products. Both parties rely on *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 592 U.S. 351, 359, 141 S. Ct. 1017, 1024, 209 L. Ed. 2d 225 (2021) for support, though each offer a different reading of its holding.

*Ford* held that personal jurisdiction may exist over an out-of-state company where "[1] it serves a market for a product in the forum State and [2] the product malfunctions there" "[3] caus[ing] injury in the State to one of its residents." *Ford,* 141 S. Ct. at 1022, 1026-27. Defendants distinguish the exercise of personal jurisdiction in that case because, unlike the *Ford* plaintiffs, the Municipalities' claims are unrelated to the use and malfunction of Defendants' products within the State. Furthermore, they state

that Plaintiffs cannot tie the purported climate change injuries solely to their conduct. Climate change, they add, is a complex phenomenon that cannot be ascribed only to Defendants' actions.

For their part, Plaintiffs respond that the standard for personal jurisdiction does not require a strict but-for causal relationship between the defendant's in-forum activities and the injury. Rather, the nexus needed to establish personal jurisdiction is a "flexible, relaxed standard." *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994). Citing to *Ford*, they argue instead that the Court rejected the causation-only approach in favor of requiring a mere "affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 1025.

Following those requirements, Plaintiffs claim they satisfy the relatedness factor because Defendants have conducted extensive activities in Puerto Rico that are related to this litigation and have also engaged in fraudulent acts to misinform Plaintiffs. Specifically, Plaintiffs point to the following actions: (1) Defendants "promote[d] and/or s[old] fossil fuel products throughout Puerto Rico, have done so for years, and have worked together through trade organizations, such as the API and the previously active GCC, to target consumers including Plaintiffs' residents as well as municipal officials";[5] (2) at least two of the Defendants, Exxon and Chevron, operated at some point service

---

[5] (Docket No. 205, ¶¶ 25, 207, 211(a)-(h), 362-385); Docket No. 205-1, ¶¶ 3(b), 8(b)(xii), 8(d)(ii)(a)-(c), 8(e), 9, 18, 30.

stations in Puerto Rico, through their own businesses or their subsidiaries[6]; (3) Defendants have promoted, marketed, and sold their branded fossil fuel products in Puerto Rico and to Puerto Rico consumers[7];(4) Defendants have individually and in concert failed to warn the Plaintiffs about the risks posed by the intended use of their fossil fuel products.;[8] (5) Defendants have continuously and deliberately exploited the forum for fossil fuel products. (Docket No. 281, at 28).

The First Circuit has held that in-forum effects of non-forum activities, standing alone, may be too indirect to fulfill the relatedness prong. *See, A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016)(citing *Sawtelle v. Farrell,* 70 F.3d at 1390–91). Instead, courts must "look to whether the plaintiff has established cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20–21 (1st Cir. 2018)(citing *Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998) (internal quotation marks and citations omitted)); *see also United States v. Swiss Am. Bank, Ltd.*, 274 F.3d at 625 (citing *Mass. Sch. of Law v. Amer. Bar Ass'n*, 142 F.3d 26, 35–36 (1st Cir.1998))("We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and

---

[6] (Docket No. 205, ¶¶ 99, 126.).

[7] (Id., ¶¶ 101-103, 111, 113, 123, 128, 137, 140- 141, 150, 153, 163, 169, 174, 176, 179, 184, 186).

[8] (Id., ¶¶ 7(d), 346, 586, 616, 643, 652, 697, 711, 783-797.)

have found in the negative."); *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 261 (1st Cir. 2022).

Entering into a contract, for example, is not in and of itself sufficient to establish minimum contacts with a forum. *Swiss Am. Bank,* 274 F.3d at 621.[9] Neither are isolated phone and email communications. *Sawtelle*, 70 F.3d at 1389–90.

The basis of the consumer fraud, fraudulent misrepresentation, negligent misrepresentation, negligent fraudulent concealment, conspiracy to defraud, and RICO claims are that Defendants engaged in a nationwide marketing campaign with the purpose of deceiving or misleading consumers regarding the hazardous effects of their fossil fuel products. Defendants' marketing and promotional activities in Puerto Rico are conceivably related to the misrepresentations and falsities that Plaintiffs claim. So are the injuries. According to Plaintiffs, Defendants relied on those false statements to continue purchasing Defendants' products.[10]

Similarly, the RICO claim is premised on Defendants' knowingly and intentionally devising a scheme to defraud and sell their product to consumers by relying on materially false and fraudulent representations regarding the impact of fossil fuels on climate

---

[9] In contractual disputes, "the Court must examine prior negotiations and contemplated future consequences of the contract in addition to the parties' actual course of dealing." *Swiss Am. Bank*, 274 F.3d at 621; *see also Naicom Corp.,* 2024 WL 1363755, at *17; and *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 26 (1st Cir. 2019).

[10] Defendants cite the case of *City of Oakland v. BP p.l.c.,* where the Court applied the "but for" standard to determine whether the effects of the sea level rise induced by global warming would have occurred but for the defendants' California-related activities. The Court concluded that global warning would not have stopped absent defendants' activities in the forum. *City of Oakland v. BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 3609055, at *3 (N.D. Cal. July 27, 2018). This case, however, is not about emissions or accusations of global warming. The suit charges Defendants with engaging in a disinformation campaign that misled the public to continue reaping financial benefits from gas and oil sales.

change. These representations were allegedly made as part of the marketing and advertising disinformation campaign in Puerto Rico.

I find that, taking as true plaintiffs' allegations that defendants are conducting a sweeping marketing and promotional activities in Puerto Rico, there is sufficient relatedness. However, I recommend that further discovery would put the Court in a better position to decide these issues.

### c.    *Reasonableness*

Having found that the first two requirements were fulfilled, I next evaluate the "reasonableness" factor. This prong is analyzed using the so-called "gestalt factors" which include: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 150 (1st Cir. 1995).

Courts must consider the inconvenience of travelling to the forum when assessing the burden of appearing. *See Ticketmaster,* 26 F.3d at 210 ("The burden associated with forcing a California resident to appear in a Massachusetts court is onerous in terms of distance, and there are no mitigating factors to cushion that burdensomeness here. This burden, and its inevitable concomitant, great inconvenience, are entitled to substantial weight in calibrating the jurisdictional scales."). The concept of burden, however, is "inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost

always inconvenient and/or costly,...this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker*, 42 F.3d at 64.

Defendants have not convinced me that there is an unusual burden in litigating this case in Puerto Rico.

On the second factor, and taking as true plaintiff's allegations, as I am bound to do, I find that Puerto Rico has an interest in exercising jurisdiction in this case. "The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders." *See Ticketmaster-New York,* 26 F.3d 211 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S. Ct. 1473, 1479, 79 L.Ed.2d 790 (1984)).

Plaintiffs are Puerto Rico Municipalities and have chosen to litigate their claims here. In addition, several causes of action are based on Puerto Rico law. Thus, Puerto Rico demonstrably has an interest in serving as forum for a purported class action related to fraud and misinformation to its consumers. Thus, this factor weighs in favor of the exercise of specific jurisdiction.

Regarding plaintiffs' convenience, the First Circuit has held that a plaintiff's choice of forum must be given deference with respect to the issue of its own convenience. *See Sawtelle,* 70 F.3d at 1395. Certainly, it would be more convenient for the Municipalities to litigate their claims in their home state rather than elsewhere.

As to the last factor, I find that it weighs in favor of finding that jurisdiction in Puerto Rico is reasonable. All sovereigns share an interest in preventing disinformation and fraudulent communications in detriment of its cities, Municipalities and dependencies. Seeing this case would promote that goal insofar as it seeks to vindicate

the rights of Puerto Rico Municipalities against an alleged concerted misinformation campaign.

In the aggregate, these factors weigh in favor of finding that Puerto Rico has jurisdiction over the Defendants.

### 2. *18 U.S.C. § 1965(b) jurisdiction*

Most courts to have interpreted the statute—including the Second, Seventh, Ninth, and Tenth Circuits—have found that Section 1965(b) is the controlling provision for jurisdictional purposes in civil RICO actions. *Dispensa v. Nat'l Conf. of Cath. Bishops*, No. 19-CV-556-LM, 2020 WL 2573013, at *9 (D.N.H. May 21, 2020).[11] Under Section 1965(b), two requirements are needed: (1) "personal jurisdiction over another civil RICO defendant otherwise exists in the forum," and (ii) "'the ends of justice require' that the court exercise personal jurisdiction over the civil RICO codefendant lacking the requisite contacts." *Id.* (citing *Cory v. Aztec Steel Bldg.*, *Inc.,* 468 F.3d 1226, 1232 (10th Cir. 2006)).

Several cases from this district have analyzed the extent of Section 1965(b) jurisdiction. In *Marrero-Rolón*, 2015 WL 5719801, at *3, the Court applied Section 1965(b) to find personal jurisdiction, after concluding that the ends of justice requirement was satisfied. In *Naicom Corp. v. DISH Network Corp.*, however, the Court

---

[11] A minority of Courts have found instead that the controlling jurisdictional provision is Section 1965(d), which does not require an "ends of justice" inquiry. *Id.* (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) and *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997)).

declined to "break new ground on an unsettled jurisdictional issue" and focused instead on assessing the claims on the merits. *Id.*, 2024 WL 1363755, at *20.[12]

Other sister courts within the First Circuit, are also split. In *Dispensa*, the Court adopted the majority approach, thus deeming Section 1965(b) as the controlling statute. As to the "ends of justice" requirement, it found that it was a "flexible concept uniquely tailored to the facts of each case." *Dispensa*, 2020 WL 2573013, at *10 (citing *Cory*, 468 F.3d at 1232). Ultimately, though, the Court found that plaintiffs had not established personal jurisdiction because there was an alternative forum that had a closer relationship to the parties' dispute. *See also*, *Ayasli v. Korkmaz*, No. 19-CV-183 -JL, 2020 WL 4287923, at *16 (D.N.H. July 27, 2020), *on reconsideration in part*, 559 F. Supp. 3d 1 (D.N.H. 2020); *Ginsburg v. Dinicola*, No. 06-11509, 2007 WL 1673533, at *4 (D. Mass. Jun. 7, 2007) (Zobel, J.); *but see Bridge v. Invest Am., Inc.*, 748 F. Supp. 948, 950 (D.R.I. 1990).

Because § 1965(b) requires a finding of jurisdiction over at least one defendant, I recommend that the analysis under this section be conducted once jurisdictional discovery is completed. This recommendation falls in line with the *Naicom* decision and

---

[12] In *Naicom*, the Court did a survey of the case law regarding the central issue on how to determine the "ends of justice" requirement. *Naicom*, No. 3:21-CV-01405-JAW, 2024 WL 1363755, at *20 (D.P.R. Mar. 29, 2024). While some Courts require plaintiffs to "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators," *Id.* (citing *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986), others have found the ends of justice to be a "flexible concept uniquely tailored to the facts of each case"). *Id.* (citing *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006)).

recognizes that the applicability of Section 1965(b) to RICO actions is not a settled matter in our Circuit.

Having examined the jurisdictional arguments presented in Defendants' joint motion, I now turn to those raised in their individual motions to dismiss.

**Occidental's Supplemental Motion to Dismiss (Docket No. 232)**

One such defendant is Occidental, which alleges that it was improperly served. (Docket No. 232 at pg. 4). According to Occidental, Plaintiffs failed to comply with Fed. R. Civ. P. 4(h), thus divesting the court of jurisdiction.

Under Rule 4(h), a corporation must be served either: (1) in the manner prescribed for serving an individual; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent authorized to receive service of process and also mailing a copy of each to the defendant. Under the first option, service can be effectuated by:

> (A) delivering a copy of the summons and of the complaint to the individual personally;
>
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>
> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(2). Rule 4(h), on the other hand, states that service on a corporation is proper if the service complies with the legal requirements of the state where the District Court is located (Puerto Rico), or where service is made (Texas). Fed. R. Civ. P. 4(h).

P. R. R. of Civ. P. 4.4(e) mirrors the provisions of Fed. R. Civ. P. 4(e)(2), stating that a corporation may be served by "delivering a copy of the summons and of the complaint to an officer, managing or general agent, or to any other agent authorized by appointment or designated by law to receive service of process." In Texas, on the other hand, proper service is in line with the state's requirements by serving the president, vice president, or registered agent of the corporation. *See* Tex. Bus. Orgs. Code §§ 5.255 (1), 5.201(a), (b).

According to Occidental, on February 13, 2023, a process server went to OPC's Houston, Texas headquarters to serve process. (Docket No. 232, at 5). However, instead of serving one of OPC's authorized agents, the server "left" the summons and complaint with an unidentified individual in its mailroom. (Id., n. 5). The box, rather than being addressed to OPC, was addressed to: "The UPS Store, 11152 Westheimer Rd, Houston, TX 77042" with a return address of "ABC Legal Services, 633 Yesler Way, Seattle, WA 98104-9678." (Docket No. 232-2). Leaving the box in Occidental's mailroom does not constitute effective service of process, it argues. Its mailroom is not an agent for service of process by law or through internal designation.

Plaintiffs respond that, as indicated in the Proof of Service, they delivered copy of the Summons and of the Complaint "to Office Services who indicated they were the person authorized to accept with identity confirmed by subject stating their name." (Docket No. 8-1). In any case, says Plaintiffs, Occidental has not been prejudiced since it has been on due notice of the claims against it and has actively participated in the case.

The Proof of Service that Plaintiffs submitted indicates that summons was served on "Office Services" and expands on the circumstances:

> I delivered the documents to Office Services who indicated they were the person authorized to accept with identity confirmed by subject stating their name. The individual tried to refuse service by refusing to take documents and did not state reason for refusal (documents left, seen by subject). The individual appeared to be a black-haired black male contact 45-55 years of age, 5'8"-5'10" tall and weighing 180-200 lbs with glasses.

(Docket No. 3-1, at 7).

In its Opposition, Plaintiffs do not expand on what division within Occidental is "Office Services" or who in Office Services indicated that they were authorized to accept the service documents. In fact, the notes state that the individual refused to take the documents and, thus, the documents were left there. (Id.) Plaintiffs have not cited any local or federal law which authorizes unnamed Office Services or—taking Occidental's version of the facts—mailroom staff, to receive process on behalf of corporation. There is no indication that the unnamed man who is mentioned in the Proof of Service was appointed to receive service of process for Occidental. Therefore, I cannot assume such appointment. For a similar analysis, *see Boateng v. Inter Am. Univ. of P.R.*, 188 F.R.D. 26, 29 (D.P.R. 1999). I thus find that Occidental was not served in accordance with the requirements of Rule 4(h).

**BHP Group Limited's Supplemental Motion to Dismiss (Docket No. 245)**

BHP claims that Cerrejón's activities cannot be considered for the minimum contacts analysis because the mines are not owned or operated by BHP, but rather by separate corporate entities of which BHP subsidiaries were only 1/3 shareholders. BHP goes into a detailed explanation of the corporate governance and structure of the entities, affiliates and subsidiaries. Furthermore, they claim that the last coal imports from the

29

Cerrejón mines to the coal plant in Guayama, Puerto Rico, occurred in 2009, 13 years before the Complaint was filed. In fact, they state that the BHP Subsidiaries sold their interests in the Cerrejón Entities in January 2022. For these reasons, BHP posits that Plaintiffs cannot overcome the presumption of corporate separateness between BHP's subsidiaries and these other entities.

Plaintiffs counter that BHP admitted being a 1/3 owner of the Cerrejón entities, which exported 1.6 million short tons of coal every year to Puerto Rico's coal-fired electricity plant. Plaintiffs cite to the portions of the Amended Complaint where they alleged that BHP conducted sales, marketing, and promotion activities in Puerto Rico.

The doctrine of corporate separateness provides that a corporation is legally independent from its subsidiary. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992)(citations omitted)("Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent."). That presumption, however, "[may] be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." *Id.* (citing *Escudé Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir. 1980); *accord Third Nat'l Bank v. WEDGE Group Inc.,* 882 F.2d 1087, 1090 (6th Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990); *cf. Mangual v. General Battery Corp.,* 710 F.2d 15, 21 (1st Cir. 1983)).

To conduct that analysis, Courts look at the facts on the record. *Id.* Here, however, the record needs to be further developed to make such a determination. I find that, at

this stage, limited discovery is needed regarding the extent of BHP's activities in Puerto Rico to determine where it had sufficient minimum contacts on the forum.

**Motiva's Supplemental Motion to Dismiss (Docket No. 240)**

Motiva moves for dismissal on jurisdictional grounds. It alleges that the Amended Complaint improperly attributes conduct from Saudi Arabia Oil Company ("Aramco" or "Saudi Aramco") to Motiva, which is a wholly owned subsidiary of Saudi Refining, Inc. and Aramco Financial Services Co. (Docket No. 26).

Likewise relying on the corporate separateness doctrine, it argues that Aramco is not a defendant in this lawsuit and that the Complaint fails to allege facts sufficient to pierce the corporate veil between Aramco and Motiva. Further, Motiva states that the Amended Complaint's allegation that Aramco is "the world's largest contributor to global industrial GHG" is not attributable to Motiva and should not be included in the Court's analysis of the motions to dismiss. (Docket No. 205, ¶1642.).

As previously noted, these alleged grounds for dismissal should be revisited following an opportunity to conduct discovery.

**Rio Tinto's Motion to Dismiss (Docket No. 246)**

Rio Tinto alleges that Plaintiffs have failed to establish personal jurisdiction because the Amended Complaint merely alleges that Plaintiffs invested in Rio Tinto as a public company. Even taking that allegation as true, it is insufficient to establish the minimum contacts required for the exercise of jurisdiction. According to Rio Tinto, this application of the jurisdictional requirement does not consider the voluntariness factor that is key to establish purposeful availment.

To support its motion, Rio Tinto attached the Sworn Declaration of Michael Pasmore, Head Secretariat at Rio Tinto. (Docket No. 246-1). Pasmore affirms that Rio Tinto does not sell or market its products in Puerto Rico and never has, nor does it have any other contacts with Puerto Rico. (Id). Furthermore, Rio Tinto asserts that it " has never sold or marketed coal, or any other fossil fuel, in or to Puerto Rico, its municipalities, or its citizens." (Docket Nos. 246, at 7, and 246-1, at ¶ 9.) In fact, Rio Tinto affirms that none of its affiliates has produced or sold coal anywhere in the U.S. since 2013, and that it divested itself of all coal production operations globally years ago. (Id. ¶¶ 9-11).

Plaintiffs respond that Rio Tinto's membership and participation with the National Mining Association, the GCC, and the America Political Action Committee took place in the United States. (Docket No. 281, at 11-12). The actions that they carried out through those groups had a direct impact on the citizens of the U.S. and P.R. (Id., at 12, citing Docket No. 205, ¶¶ 183, 211(b), 368, 381, 430(c), 483, 575).

Without more, I am not prepared to recommend dismissal for lack of jurisdiction without further record development.

**C.    Statute of limitations**

Defendants' Joint Motion to Dismiss asserts that Plaintiffs' claims fail on both procedural and substantive grounds. As to the former, Defendants argue that the statute of limitations began to run on September of 2017 at the latest. It was during that time when Hurricanes Irma and Maria hit the island, which should have put Plaintiffs on notice of their injuries. Even prior to that date, Defendants claim, a plethora of articles and reports were available that tied climate change to oil companies' activities. Plaintiffs,

however, claim that they only became aware of Defendants' causal link to their injuries after a report published in March 2022.

### 1. *Judicial Notice*

Before delving into the statute of limitations argument, I will discuss Defendants' requests for judicial notice because the documents submitted for judicial notice are directly tied to Defendants' position on whether the claims are time-barred. Defendants move the Court to take judicial notice of several articles and reports (Docket No. 238), and a legal services contract. (Docket No. 241). Their proffer is that the articles—Exhibits A-B—are not being offered for the purported truth of their contents, but to show that information was publicly available. (Docket No. 238, at 2). Under the same rationale, the reports—Exhibits C-G—are being offered to show information was publicly available. (Id.). As to the legal services contract between the Municipality of Vega Baja and Milberg Coleman Bryson Phillips Grossman LLC, dated November 17, 2022, Defendants offer it to prove that the investigation into Plaintiffs' claims has been ongoing since at least 2019. (Docket No. 241).

Plaintiffs oppose, arguing that Defendants are using the judicial notice rule improperly to submit the documents for the truth of their contents to bolster their argument that the claims are time-barred. (Docket No. 282).

Under Rule 201(b) of the Federal Rules of Evidence, a district court can take judicial notice of a fact not subject of reasonable dispute when it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Regarding newspaper articles, a judge in this district has found that "[a]t the

motion to dismiss stage, a Court may take judicial notice of the fact that press coverage, prior lawsuits or regulatory filings contained certain information, without regard to the truth of the contents." *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 470 n. 15 (D.P.R. 2020) (citing *Rodi v. S. New England Sch. Of Law*, 389 F.3d 5, 12-19 (1st Cir. 2004) and *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). Other sister courts in our District have ruled accordingly. *See Seguin v. Textron*, No. 13-CV-012-SJM-LM, 2013 WL 5704947, at *2 (D.R.I. Oct. 17, 2013); *Seguin v. Suttell*, No. 13-CV-095-JNL-LM, 2013 WL 5523703, at *1 (D.R.I. Oct. 3, 2013); *Crespo-Caraballo v. United States*, 200 F. Supp. 2d 73, 78 (D.P.R. 2002), aff'd sub nom, *Caraballo v. U.S. D.E.A.*, 62 Fed. Appx. 362 (1st Cir. 2003) (Taking judicial notice that The San Juan Star is a general circulation newspaper in Puerto Rico.). And the Plaintiffs have not refuted that the articles and reports were published.

I thus take judicial notice only of the fact that Exhibits A through E were published, but do not take judicial notice regarding the truth of their contents. I also take judicial notice only of the fact that Exhibit F was published by the Union of Concerned Scientists in July 2015 and made available online, and that Exhibit G was published by the Puerto Rico Climate Change Council in 2013.

Finally, with regards to the legal services contract, I can take judicial notice of information from an official government website that is "not subject to reasonable dispute." *Morales Posada v. Cultural Care*, Inc., 554 F. Supp. 3d 309, 314 n. 2 (D. Mass. 2021)(citing *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010)(internal citations omitted.).

The contract in question is published on a government website as is required because one of its parties is a Municipality. However, a legal document between two parties published on a government website is not the same as official information published or posted by a government entity on its website. The cases Defendants cite from our jurisdiction all refer to information from agencies, such as the CDC. In fact, the sole case that Defendants cite where the Court takes judicial notice of a "contract" pertains to an Auction Terms and Conditions prepared and published by the City of Chicago. *See Sroga v. Laboda*, 748 Fed Appx. 77, 78 n. 1 (7th Cir. 2019).

Here, in contrast, the Contract between the Municipality and the law firm makes no mention of the purported investigation. The information that Defendants allude to is contained in a proposal and brochure that are attached to the Contract and seems to have been prepared by the law firm. (Docket No. 241-1). Therefore, I find that the information here is "subject to reasonable dispute" and I am not permitted to take judicial notice.

Therefore, I recommend that the motion at Docket 238 be granted, but only as to taking notice of the fact that the articles and reports were published. I also recommend that the motion at Docket No. 241 be denied.

### 2.    *Continuous tort*

The statute of limitations for Plaintiffs' RICO and antitrust claims is four years[13] and one year for the Puerto Rico law claims.[14] The statute of limitations begins to run

---

[13] *See Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625 (1st Cir. 2019)(Although RICO does not specify a statute of limitations, the Supreme Court imported the four-year deadline from the Clayton Act's civil enforcement provisions).

[14] 10 P.R. Laws Ann. tit. 31, § 5298.

from the time the aggrieved person had notice of the injury and notice of the person who caused it. *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226, 239 (D.P.R. 1998)(citing *Colón Prieto v. Geigel*, 115 D.P.R. 232, 247 (1984); and *Rosado Serrano v. E.I. Dupont de Nemours & Co.*, 797 F .Supp. 98, 102 (D.P.R.1992)). Notice "does not require actual knowledge; it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information." *Lopez-Flores v. Cruz-Santiago*, 526 F. Supp. 2d 188, 190 (D.P.R. 2007).

According to Defendants, Plaintiffs were aware of the RICO and antitrust injuries as of September 2017, when hurricanes Irma and Maria passed through Puerto Rico. The statute of limitations therefore expired in September 2021, more than one year before Plaintiffs filed suit.

Plaintiffs respond that they filed within one year of knowing that the Hurricanes could be tied to Defendants' activities; that Defendants' actions constitute continuous wrongful conduct; that the doctrine of equitable tolling applies; and that class actions such as this one automatically toll the statute of limitations.

The Puerto Rico Supreme Court has defined the continuous tort doctrine as a "continued, or uninterrupted, disturbance of unlawful acts or omissions which cause foreseeable lasting damages." *McMillan v. Rodriguez-Negron*, 511 F. Supp. 3d 75, 83 (D.P.R. 2020)(citing *Rivera Ruiz v. Mun. de Ponce*, 196 P.R. Dec. 410, 417 (P.R. 2016)). "Since the tortfeasor's illegal acts are continuous, the cause of action continually renews itself, for the statute of limitation purposes, until the tortfeasor ceases his harmful conduct." *Id.* A "continuous tort", however, arises from ongoing unlawful conduct, not from a continuing harmful effect. *See Torres v. Hosp. San Cristobal*, 831 F. Supp. 2d

540, 544 (D.P.R. 2011), *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226, 240 (D.P.R.1998)(citing *Arcelay v. Sanchez*, 77 D.P.R. 824, 838 (1955)). In that respect, this District has expressed:

> For there to be a continuous tort, Defendants must be continuously acting, i.e., continuing to dump pollutants on Plaintiffs' land. Defendants are not continuously acting when the pollutants entering the land are doing so without any further impetus on the part of the Defendants beyond that committed in 1988.

*Id.*

In this case, Plaintiffs pleaded a pattern of interrupted acts of deceit on Defendants' part.

> Through the GCC, Defendants funded a marketing campaign of deception that continues to this day, in violation of federal and Puerto Rico consumer protection rules, anticompetitive practices, racketeering statutes, and common law. (Docket No. 205, ¶6).

> Because Defendants continue to this day to deceive the public and harm the Plaintiffs and their injury is ongoing and extends the limitations period. (Id., ¶¶ 23-25).

> In response to this development, and to stave off approval of the treaty by the U.S. Senate and other climate action in the United States, the GCSCT's memo ("GCSCT Action Memo") mapped out a multifaceted deception strategy for the fossil fuel industry that continues to this day—outlining plans to reach the media, the public, and policy makers with a message emphasizing "uncertainties" in climate science. (Id., ¶429).

> While Defendants now outsource outright climate denial, their public-facing deception continues to this day through a variety of "greenwashing" campaigns. (Id., ¶501).

> All of these greenwashing tactics have been and continue to be used to conceal the Defendants' continuous sponsorship of climate denial and their record-breaking profits from fossil. (Id., ¶557).

At this stage, based on the above, I find that Plaintiffs have sufficiently alleged that Defendants engaged in a continued pattern of unlawful acts or omissions which cause foreseeable damages. Although my analysis could stop at this point, I will address Plaintiffs' other arguments regarding tolling of the statute of limitations.

### 3.    *Equitable Tolling*

Even if the Court deems that the conduct is not continuous, Plaintiffs argue, the limitations period is tolled regarding Defendants pre-2017 statements because they fraudulently concealed the nature of their disinformation campaign.

"The equitable tolling doctrine extends statutory deadlines in extraordinary circumstances for parties who were prevented from complying with them through no fault or lack of diligence of their own." *See Neves v. Holder*, 613 F.3d 30, 36 (1st Cir. 2010) (citing *Fustaguio Do Nascimento v. Mukasey*, 549 F.3d 12, 18–19 (1st Cir.2008) and *Gonzalez v. United States*, 284 F.3d 281, 291 (1st Cir. 2002)).

To receive the benefit of equitable tolling, a plaintiff must satisfy two essential elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Bah v. Enter. Rent-A-Car Co. of Bos., LLC*, 699 F. Supp. 3d 133, 138 (D. Mass. 2023), judgment entered, No. CV 17-12542-MLW, 2024 WL 185446 (D. Mass. Jan. 17, 2024)(citations omitted). In addition, the First Circuit has identified five criteria that courts may consider "as factors within the Supreme Court's two-part standard": (1) a lack of actual notice of a time limit; (2) a lack of constructive notice of a time limit; (3) diligence in the pursuit of one's rights; (4) an

absence of prejudice to a party opponent; and (5) the claimant's reasonableness in remaining ignorant of the time limit. *Id.* (citing *Neves*, 613 F.3d at 36 n.5.).

Plaintiffs argue that they have been diligently pursuing their rights and that they were unable to file suit before because Plaintiffs deliberately concealed the extent of their actions. Plaintiffs point to the release in March 2022 of a report titled "How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors" as the pivotal point in their awareness of the injury. (Docket No. 280, at 7)("After reviewing this report, Plaintiffs learned which entities have a causal link to Plaintiffs' injuries and their respective market shares in the fossil fuel industry.").

Defendants refute that analysis and argue instead that Plaintiffs should have known of their alleged injuries when the storms passed in 2017. In fact, they state, several municipalities across the nation filed similar complaints in the aftermath of the Hurricanes, *e.g. Cnty. of San Mateo v. Chevron Corp.*, ECF No. 1-2, No. 17-cv-4929 (N.D. Cal. Aug. 24, 2017). Plaintiffs also cite several major media outlets that covered the subject, such as the New York Times. Based on this wealth of evidence, Defendants argue, Plaintiffs should have uncovered the connection between fossil fuels and climate change with minimal diligence.[15]

---

[15] Defendants Conoco, API and Chevron argue that Plaintiffs' claims are time-barred in their separate Motions to Dismiss. (Docket Nos. 237, 254 and 239). Conoco avers that its publicly filed 2012 Form 10-K discusses state, national, and international responses to climate change that should have put Plaintiffs on notice that they could be injured. (Docket No. 237, at 14). API argues that in their case, the statute of limitations is even further expired because Plaintiffs' claims against API do not relate back to the original Complaint. Finally, Chevron alleges that Plaintiffs' counsel undertook a three-year investigation into Defendants' potential liability that began no later than 2018 or 2019. Thus, since at least that time,

Plaintiffs riposte that general knowledge of fossil fuels' connection to climate change would not be enough to trigger the statute of limitations. Because this is an action based on fraud and concealment, the key is when Plaintiffs learned of the deception.

The doctrine of equitable tolling only applies "if a plaintiff exercising reasonable diligence could not have discovered information essential to the suit." *Abdallah v. Bain Cap. LLC*, 752 F.3d 114, 120 (1st Cir. 2014)(citing *Bernier v. Upjohn Co.*, 144 F.3d 178, 180 (1st Cir.1998) and *Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615, 631, 682 N.E.2d 624 (1997)).

Examining the criteria for equitable tolling set forth above, I find that Plaintiffs have established that the doctrine applies here. Plaintiffs have alleged that they pursued their rights diligently, conducting investigations prior to filing. They also allege that extraordinary circumstances exist because Defendants conducted a well-organized campaign of deceit.  I am not convinced by Defendants pointing to several articles and reports regarding the relationship between climate change and fossil fuels and even the concerted efforts of the major fuel companies to misinform the public. Their contention that these articles should have put Plaintiffs on notice even prior to 2017 of their potential cause of action is unavailing because I only took judicial notice of the fact that those documents were published, not of the truth of their contents.

---

Plaintiffs should have been aware that they had a cause of action. (Docket No. 239, at 11-12). I need not address these arguments because they do not alter the conclusion that Plaintiffs' claims are timely based on the continuous tort doctrine.

For these reasons, I find that even if the injury wasn't continuous, equitable tolling would make Plaintiffs' claims timely.

### 4.    *Class action tolling*

As to the last point, Plaintiffs cite a Puerto Rico case for the proposition that the filing of a class action automatically tolls the statute of limitations. In *Nevarez Agosto v. United Surety & Indemnity Company*, 209 D.P.R. 346, 2022 WL 1523597 (P.R., 2022), the Court held that when a case is presented as a class action, the statute of limitations is automatically tolled both for the plaintiffs who were part of the original lawsuit and for all potential plaintiffs who are members of the class, including those who were unaware of the proceedings. *Id*. The tolling, however, applies to prospective claims, not the original class action. That case, which triggers the tolling, which must be brought within the statutory limits. In *Nevarez Agosto*, for example, the plaintiff benefitted from the tolling of the statute of limitations to bring an independent action against insurance company United after the Secretary of the Department of Consumer Affairs filed a class action against several insurance companies, United included.

Moreover, *Gonzalez v. Merck*, 166 D.P.R. 659, 683–84, 2006 TSPR 2 (Jan. 5, 2006), clearly delineates the rule by stating: "There is no doubt of the tolling effect that filing a class action has for a later action filed by the individual defendants."

In conclusion, I find that Plaintiffs' claims are not time-barred, as discussed above, under the continuous tort rule. However, their arguments regarding class action tolling under Puerto Rico law are unconvincing.

### D.    **Failure to State a Claim**

### 1.    *RICO*

41

Plaintiffs' fourth, fifth, sixth, and seventh causes of action allege RICO violations in the form of mail and wire fraud under Sections 1962(a)-(d). Defendants move for dismissal on several grounds. First, because Plaintiffs' RICO claims are based on Defendants' membership on API and GCC and participation in public debates about climate change they are precluded by the First Amendment and the *Noerr-Pennington* doctrine. Second, that the Complaint fails adequately to plead the elements of a RICO cause of action. And third, that Plaintiffs' RICO claims improperly seek damages for injuries allegedly sustained by the Municipalities' residents, rather than Plaintiffs themselves, and for the costs of government services.

### a. First Amendment and the Noerr-Pennington doctrine

Defendants categorize all of Plaintiffs' RICO allegations as protected speech or membership in a lawful organization. In essence, Defendants state that Plaintiffs are suing them for their public statements on climate change through the course of decades. Those are protected activities and the First Amendment and the *Noerr-Pennington* doctrine bar Plaintiffs' attempts to hold Defendants liable for political speech.

"[T]he First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)); *see also* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."). Relevant to this case, the Supreme Court has held that "political speech does not lose First Amendment protection 'simply because its

source is a corporation.'" *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 342, 130 S. Ct. 876, 900, 175 L. Ed. 2d 753 (2010)(citing *First Nat. Bank of Boston v. Belloti*, 435 US. 765, 784 98 S. Ct. 1407 and *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.,* 475 U.S. 1, 8, 106 S. Ct. 903, 89 L.Ed.2d 1 (1986)).

In their response, Defendants distinguish between protected speech and fraudulent statements within a concerted disinformation campaign. Given that the Amended Complaint charges Defendants with deliberately misleading the public through fraud, they reason that neither the First Amendment, nor the *Noerr-Pennington* doctrine apply to bar their claims.

Fraudulent statements are not protected by the First Amendment. *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 84 (1st Cir. 2008), *abrogated by Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011)("Such communications—e.g., insider information about securities, fraudulent statements, or speech that would violate intellectual property laws—are routinely regulated without First Amendment inquiry."); *Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 496, 116 S. Ct. 1495, 1504, 134 L. Ed. 2d 711 (1996)(The Supreme Court has held that the First Amendment "protect[s] the dissemination of truthful and nonmisleading commercial messages about lawful products and services.").

The Noerr-Pennington doctrine, "which derives from the First Amendment's guarantee of 'the right … to petition the government for redress of grievances,' U.S. Const. amend. I, shields from antitrust liability entities who join together to influence government action—even if they seek to restrain competition or to damage competitors."

*Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000). The doctrine has a "sham" exception, "which withholds immunity when a party's resort to governmental process from antitrust immunity when such resort is objectively baseless and intended only to burden a rival with the governmental decision-making process itself." *Guimerfe, Inc. v. Perez-Perdomo*, No. CIV. 08-1243CCC, 2009 WL 918933, at *3 (D.P.R. Mar. 31, 2009)(citing *Davric Maine Corporation,* 216 F.3d. at 147).

        This is precisely the type of conduct that Plaintiffs denounce in their allegations. Making the assessment of whether Noerr-Pennington immunity applies is a highly factual determination. Our District has taken the position that assessing the applicability of Noerr-Pennington amounts to a "highly factual determination[ ] inappropriate for a dismissal motion." *Abarca Health, LLC v. PharmPix Corp*., 915 F. Supp. 2d 210, 216 (D.P.R. 2012)(citing *Guimerfe, Inc.,* 2009 WL 918933, at *3–4 ). "Whether this is, in fact, the case, and whether or not defendant fall within the immunity provided by the Noerr–Pennington doctrine, are highly factual determinations inappropriate for a dismissal motion." *Guiferme*, 2009 WL 918933, at *4.

        I thus find that, at this stage, Defendants' request for dismissal under the First Amendment and the Noerr-Pennington doctrine should be denied.[16]

_____

[16] Four defendants, Conoco, Chevron, Chevron, Shell, and API raised First Amendment and/or Noerr-Pennington doctrine arguments in their individual motions to dismiss. (Docket Nos. 237, 239, 244 and 254). Their arguments, however, mirror those in the Joint Motion and were discussed and ruled upon in that section. Only Chevron raised specific arguments regarding the insufficiency of the allegations as to its participation in the alleged scheme at the heart of this suit. However, a review of the Amended Complaint shows otherwise. Plaintiffs alleged particularized facts regarding Chevron's involvement in the RICO conspiracy. (Docket No. 205, ¶¶205, 211(a), 309, 327, 365, 368, 369, 372, 386, 406, 498).

### b.    *Proximate Cause*

Next, Defendants move for dismissal for failure to adequately plead a RICO cause of action. According to Defendants, Plaintiffs have failed to plead any of the essential elements: no causation, no enterprise, no racketeering activity, no pattern, no management or control, no investment, no acquisition, and no conspiracy.

RICO makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c). To state a plausible RICO claim under §1962(c), a plaintiff must allege each of the four elements required by the statute: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 14–15 (1st Cir. 2000); *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005). "Racketeering activity," as defined in § 1961(1)(B), may include, among others, two "predicate acts" of mail or wire fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively. To constitute a "pattern", at least two acts of racketeering activity must occur within ten years of each other. *Id.* § 1961(5). In addition, a RICO plaintiff must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Giuliano v. Fulton*, 399 F.3d at 386–87 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L.Ed.2d 195 (1989)).

Defendants posit that Plaintiffs' RICO claims fail on the first requirement, because they failed to plead that anybody relied on Defendants' purported misrepresentations.

45

Plaintiffs don't even plead that they in fact purchased Defendants' products. Instead, they allege that they are Defendants' customers "on information and belief". (Docket No. 235, at 26, referencing Docket No. 205, at ¶¶103–186). But more importantly, Defendants argue, that the causal link is too attenuated because there are too many steps in the causal chain. As Defendants put it, the injury to Plaintiffs would depend on the acts of possibly every human being or entity on Earth that has combusted oil and gas. In that sense, Defendants categorize Plaintiffs' claims as speculative and "facially implausible" because they suggest that the damage of the 2017 storms and its impact was caused by Defendants' actions.

Plaintiffs counter that they plead enough to survive dismissal at this stage, pointing to Claims Four through Seven of the Amended Complaint and to the RICO statement. (Docket No. 205, at 250-269 and 206). Regarding causation, Defendants describe their causal theory as follows: "Defendants...have funded a fraudulent marketing campaign of deception that continues to this day, to convince all consumers, including Plaintiffs, that Defendants' fossil fuel-based products did not—and would not—adversely alter the climate, while knowing the disastrous consequences of their combined carbon pollution on the world and Plaintiffs more so than most." (Docket No. 280, at 34). The harm adduced is that Plaintiffs increased their consumption of fossil fuels, under those false pretenses, which in turn destroyed Puerto Rico's infrastructure and property during the 2017 Hurricane Season. (Docket No. 206, ¶¶ 2(h), 5, 8(a), 30, 31.).

According to the Supreme Court, proximate causation requires a direct relationship between the injury asserted and the injurious conduct alleged. *Holmes v.*

46

*Sec. Inv. Prot. Corp.,* 503 U.S. 258, 274, 112 S. Ct. 1311, 1321, 117 L. Ed. 2d 532 (1992)(*citing Associated General Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 545, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)).

Defendants correctly point out that the First Circuit has identified three functional factors to assess whether there is proximate cause under RICO. *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35–36 (1st Cir. 2021) (citing *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 35-36 (1st Cir. 2013) and *Holmes*, 503 U.S. at 269-70)). The first factor is "concerns about proof" because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors". *Sterling*, 990 F.3d at 35-36 (citing *In re Neurontin*, 712 F.3d at 36.). The second factor is "concerns about administrability and the avoidance of multiple recoveries." *Id.* The third and final factor is "the societal interest in deterring illegal conduct and whether that interest would be served in a particular case." *Id.*

Defendants direct the Court to *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010), arguing that dismissal at the pleading stage for an "attenuated causal link" is proper. In *Hemi Group*, the Supreme Court held that the chain of causation was too attenuated because the Defendant's theory of liability rested not only on separate actions, but on separate actions carried out by separate parties. *Id.* at 11. Defendants say that the *Hemi* Court granted dismissal with a "far less attenuated chains of causation" than the one in this case. (Docket No. 235, at 27).

A case from our Circuit, *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 25–26 (1st Cir. 2013), provides a more fitting factual scenario. The case concerned a class

action claiming that defendants had engaged in the fraudulent marketing of Neurontin for off-label uses. Plaintiffs asserted claims under RICO, as well as state-law claims for common law fraud, violation of consumer protection statutes, and unjust enrichment. *Id*. at 26.

On the issue of causality, the Court of Appeals echoed the holding of *Bridge v. Phoenix Bond & Indemnity Co*., 128 S. Ct. 2131, to find that first-party reliance on misrepresentations is not an element of proximate cause in a mail fraud RICO claim. That means that even where the citizens instead of the Municipalities were the direct recipients of the misrepresentations, Plaintiffs have asserted enough for proximate causation under RICO. *In re Neurontin Mktg. & Sales Pracs. Litig*., 712 F.3d at 38 (internal citations omitted) ("The *Bridge* Court rejected the attempt to impose a direct reliance requirement on top of the statutory language providing a private right of action under RICO, finding no support for it in the common law. We likewise find none here."). The First Circuit thus rejected the multiple steps defense, finding that the argument "misconstrue[d] the way in which the Court framed the direct relation test." *Id*. at 38.

Plaintiffs pled that they directly suffered the consequences of Plaintiffs' intentional misrepresentations. (Docket No. 205, ¶¶3, 7(h), 614,652, 654). Therefore, like the *In re Neurontin* court, I believe the amended complaint has set forth enough factual allegations of proximate cause under RICO.

### c.    Failure to allege an "enterprise"

Civil RICO requires a showing "(1) that there existed an enterprise, which affected interstate commerce; (2) that codefendants were employed by or associated with the enterprise; (3) that codefendants participated in the conduct of the enterprise's affairs;

and (4) that codefendants' participation was through a pattern of racketeering activity." *Corporación Insular de Seguros v. Reyes-Muñoz,* 849 F. Supp. 126, 133–34 (D.P.R. 1994). The RICO statute provides that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). The term thus has a broad reach, "encompassing 'any ... group of individuals associated in fact.'" *Boyle v. United States*, 556 U.S. 938, 944, 129 S. Ct. 2237, 2243, 173 L. Ed. 2d 1265 (2009) (citing § 1961(4)).

So-called associations-in-fact may be an enterprise "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. 938, 944 (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528, 69 L. Ed. 2d 246 (1981)). RICO does not require that the enterprise be driven by an economic motive. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257, 114 S. Ct. 798, 803–04, 127 L. Ed. 2d 99 (1994).

Plaintiffs allege that Defendants acted "through their enterprises-in-fact—the GCC, API, and [their] members." (Docket No. 206, ¶ 2(h)). To be more specific, Plaintiffs allege that only the Oil and Gas Defendants participate in the conduct of the API Enterprise's affairs, and that all Defendants (basically all Defendants except API) participate in the conduct of the GCC Enterprise's affairs. (Docket No. 205, ¶729). The purpose of the enterprises was to mislead regarding climate science and influence public perception of fossil fuel's contribution to climate change. (Docket No. 205, ¶¶ 718-723).

Defendants, point out that the GCC ceased operating in 2002, and Plaintiffs cannot rely on that entity to establish the enterprise because they failed to plead that

Defendants operated as a "continuing unit" after 2002. In their Amended Complaint, Plaintiffs admitted that the GCC "was discontinued in 2001." However, it allegedly continues to operate "informally today through other associations like API and the National Association of Manufacturers as an association-in-fact of the Defendants." (Docket No. 205, ¶ 211(a); and 206 ¶¶ 3(b)(v), 10)).

The law does not require that a RICO enterprise be a legal entity. *See United States v. Rodriguez-Torres*, 939 F.3d 16, 24 (1st Cir. 2019). In fact, the group does not need a "hierarchical structure," "chain of command," or "decisionmaking framework." *Boyle*, 556 U.S. at 948. What is required is that the group have "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946; *see also Rodriguez-Torres*, 939 F.3d at 24.

Regarding the "purpose" factor, the association must have the "common purpose of engaging in a course of conduct." *Id.* (citing *Boyle*, 556 U.S. at 946). To establish the "relationships" there must be "evidence that the group members came together to advance 'a certain object' or 'engag[e] in a course of conduct.'" *Id.* Finally, as to "longevity", the association must have a shared purpose for a "sufficient duration to permit an association to 'participate' in [the enterprise's affairs] through 'a pattern of racketeering activity,' " *Id.* There is no requirement, however, that the duration factor be continuous. *Id.* ("nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.").

A review of Plaintiffs' allegations shows that they sufficiently pled that the API and the GGC operated as an as an association-in-fact enterprise. Plaintiffs allege that the

50

purpose of the organizations was to engage in a propaganda campaign to misrepresent the effects of fossil fuels on climate change. Plaintiffs also pled that the members of those organizations came together for a common purpose. To that end, they commissioned reports, distributed videos, and issued statements and directives as a united group. (Docket No. 205, at ¶¶362-392). As to the last point, Plaintiffs include allegations that the associations have engaged in that common purpose for decades and continue to do so until today. Defendants allege specific actions undertaken by the associations for at least a decade. In *Rodriguez-Torres*, the Court found that continuing as a cohesive unit for at least eight years was enough to satisfy the "longevity" requirement. *Rodriguez-Torres*, 939 F.3d at 25.

### d.    *Racketeering Activity*

Plaintiffs in RICO mail and wire fraud actions such as this one, must comply with the Fed. R. Civ. P. 9(b) heightened pleading standard[17] and "state the time, place and content of the alleged mail and wire communications perpetrating that fraud." *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987).

Defendants argue that the Amended Complaint does not comply with this standard and fails to plead adequately a pattern of racketeering activity and the individual Defendants' participation in conducting the affairs of the enterprise. As noted,

---

[17] Fed. R. Civ. P. 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

to sufficiently allege a "pattern," a plaintiff must establish at least two acts of racketeering occurred within ten years of each other. 18 U.S.C § 1961(5). Additionally, a "pattern" also requires "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989).

According to Defendants, Plaintiffs fail to allege mail and wire fraud with particularity as to each Defendant and in the aggregate. Defendants distinguish between schemes that lead their victims to enter into unwanted transactions versus those that include a misrepresentation of a key factor of the bargain. *See Medina-Rodriguez v. $3,072,266.59 in United States Currency*, 471 F. Supp. 3d 465, 478 (D.P.R. 2020) (quoting *United States v. Kelerchian*, 937 F.3d 895, 912 (7th Cir. 2019)). The former does not violate mail and wire fraud statutes, while the latter does. Defendants cite a recent Supreme Court case, *Ciminelli v. United States*, 598 U.S. 306 (2023), 143 S. Ct. 1121, 1124–25, 215 L. Ed. 2d 294 (2023), in support of their argument that the mail and wire fraud statutes are inapplicable where a victim was denied information as opposed to property. Defendants thus move the Court to adopt the view that Plaintiffs can only be defrauded when they are denied actual property. In essence, because Plaintiffs received fuel when they bought fuel, they cannot sustain a claim under the mail and wire statutes.

The wire fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *See* 18 U.S.C. § 1343. The Supreme Court has interpreted the statute to require that the Government prove not only that wire fraud defendants "engaged in deception," but also that money or property was "an object of their fraud." *Kelly v. United*

*States*, 590 U.S. 391, 391, 140 S. Ct. 1565, 1566, 206 L. Ed. 2d 882 (2020); *Ciminelli*, 598 U.S. at 312. Further interpreting and defining the contours of the *Kelly* decision, the First Circuit recently held that "property need only be 'an object' of [defendants'] scheme, not the sole or primary goal." *United States v. McGlashan*, 78 F.4th 1, 8 (1st Cir. 2023) (quoting *United States v. Gatto*, 986 F.3d 104, 116 (2d Cir. 2021)).

In *Ciminelli*, which Defendants rely upon, the Supreme Court held that "potentially valuable economic information necessary to make discretionary economic decisions is not a traditional property interest," and thus, does not form "a valid basis for liability under § 1343." *Ciminelli*, 598 U.S. at 309 (international quotations omitted).[18]

The allegations in this case, however, do not turn on whether Defendants crafted a scheme to deprive Plaintiffs of their intangible right to "valuable economic information." The object of the RICO conspiracy, as alleged, was to create and disseminate erroneous, misleading information, with the purpose of obtaining property of value, i.e., money, from the sale of Defendants' products to Plaintiffs. (Docket No. 205, at ¶480). Thus, the facts in this case are distinguishable.

Next, Defendants argue that Plaintiffs fail to plead fraudulent conduct with the requisite particularity required under Fed. R. Civ. P. 9(b). Plaintiffs failed to allege the essential "when, where, and how often the allegedly false statements were made or what, specifically, was stated." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir.

---

[18] The ruling thus rejected the Second Circuit's "right to control" theory of property. *Ciminelli*, 598 U.S. at 314.

2013) and *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). Such omissions warrant dismissal according to the Defendants.

Plaintiffs respond that the First Circuit is reluctant to automatically dismiss RICO cases at the pleading stage if some details are missing. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987). Instead, they move the Court to allow discovery after considering the following factors laid out in *Becher*: (1) whether the plaintiff presents "a general scheme to defraud," (2) whether the plaintiff's allegations "make it likely that the defendant used interstate mail or telecommunications facilities," and (3) whether "the specific information as to use is likely in the exclusive control of the defendant." *Id*. at 290-91.

Looking at Plaintiffs' pleadings, I find that more information is needed to satisfy Rule 9(b). Although plaintiffs alleged a "general scheme to defraud" that used mail and wire communications for economic gain (Docket No. 205, at ¶¶ 718, 720, 721, 723, 724(a)-(l), 725, 728, 729, 757) and identified certain sender, dates, and content of allegedly fraudulent correspondence, I find that the specificity required of Rule 9(b) falls short.

However, following the ruling of *Becher*, I recommend that Plaintiffs be allowed to conduct discovery on the RICO claims. Plaintiffs have sufficiently pled that most of the information pertaining to the predicate acts is likely under the control of Defendants. Taking as true Plaintiffs' allegations, as I must, it is reasonable to deduce that Defendants should have discoverable information regarding the "who, what, when, where" of the communications. *See Becher*, 829 F.2d at 290 ("We advocate this procedure because of the apparent difficulties in specifically pleading mail and wire fraud as predicate acts.").

### e.    *A pattern of racketeering activity*

Defendants next argue that Plaintiffs have not alleged a "pattern", which requires "at least two predicate acts of 'racketeering activity'" occurring within ten years of each other. 18 U.S.C § 1961(5); *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003). Additionally, as noted earlier, a "pattern" also requires "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. at 239. Predicate acts of racketeering are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. To establish the continuity aspect of a RICO claim, the scheme must extend "over a substantial period of time" or "show signs of extending indefinitely into the future." *Efron*, 223 F.3d at 16.

According to Plaintiffs, this is a case of closed continuity which involves "a series of related predicates extending over a substantial period of time."[19] *H.J.*, 492 U.S. at 242. (Docket No. 280, at 43). Defendants refute this view, stating that are no facts suggesting that the alleged racketeering activities will continue. For one, GCC ceased its activities more than two decades ago. And, secondly, Plaintiffs only state—at best—that Defendants' activities continue in the present day but without properly pleading allegations to substantiate their statement.

---

[19] On the other hand, "open continuity" is applicable where (1) the defendants' activities "involve a distinct threat of long-term racketeering activity[;]" and (2) the predicate acts "are part of an ongoing entity's regular way of doing business." *United States v. Chin*, 965 F.3d 41, 48 (1st Cir. 2020) (citation omitted).

Here, Plaintiffs proffer 81 predicate acts in the Appendix to the Amended Complaint (Docket No. 205-1). These acts span decades, well above the ten-year threshold. (Id.). Plaintiffs identify approximate dates, contents of the communications, senders, and recipients. (Id.) The predicate acts identified "have a similar purpose" and involve "similar participants." (Id.) As alleged, the events are not isolated, but a link in an elaborate, concerted scheme. That is enough to survive dismissal at this stage.

### f. Conduct of the Enterprise

Defendants also seek dismissal on the basis that Plaintiffs fail to plead sufficient facts showing that each, or any Defendant, conducted the alleged enterprise.

RICO's Section 1962(c) requires that a defendant "conduct or participate, directly or indirectly, in the conduct" of the enterprise. 18 U.S.C. § 1962(c). All that is statutorily required is that the defendant have "some participation in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). Furthermore, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. Although "primary responsibility for the enterprise's affairs" is not necessary, "some part in directing the enterprise's affairs is required." *Id.* at 179; *see also United States v. Hurley*, 63 F.3d 1, 9 (1st Cir. 1995); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994). For example, the First Circuit has held that an accountant who only carries out ordinary accounting function does not control the enterprise. *See United States v. Houlihan*, 92 F.3d 1271, 1298 (1st Cir. 1996).

Defendants' position is that there are no plausible factual allegations asserting that they exercised control over any enterprise. Whatever pleadings there may be that

address the issue are "conclusory," "boilerplate," and only claim mere association, not "control." (Docket No. 235, at 52).

Plaintiffs counter that their pleadings outline specific facts that show Defendants were not mere associates in the GCC and API enterprises. As per their allegations, Defendants effectively controlled the enterprises through several activities that maintained operative power. Specifically, Plaintiffs allege: senior executives of Defendants have served as API Board of Director; the API Board of Directors has been chaired by executives of Defendants every year for the past five years Chevron (2022-present), Conoco (2020-2022), Exxon(2018-2020), and Phillips 66, a subsidiary of Defendant Conoco (2016-2018); Defendants have made financial contributions to API that make up a large portion of its yearly income; Defendants have contributed financially to the enterprises in tens of millions of dollars annually; Defendants have organized, controlled and participated in API committees, task forces, initiatives, marketing efforts, lobbying and communications for the past 50 years. (Docket No. 205, at ¶746(a-d)). Plaintiffs provide additional examples of the involvement of some of the Defendants in leadership positions in the enterprises. (Id., at ¶747).

Taking these facts as true, I find that Plaintiff has adequately pled that Defendants participated in the operation and management of the alleged enterprise. *See*, *e.g.*, *Duggan v. Martorello*, 596 F. Supp. 3d 158, 193 (D. Mass. 2022).

### g.    Dismissal of claims under 18 U.S.C. §§1962(a-b)

Additionally, Defendants seek dismissal of Plaintiffs' claims under sections 1962(a) and (b) for failing to plead any injuries attributable to Defendants' actions.

57

RICO makes it a crime to invest income derived from a pattern of racketeering activity in an enterprise "which is engaged in, or the activities of which affect, interstate or foreign commerce," 18 U.S.C. § 1962(a); or to acquire or maintain an interest in an enterprise through a pattern of racketeering activity, § 1962(b). Under Section 1962(a), the alleged "injury resulting from the investment of racketeering income" must be "distinct from an injury caused by the predicate acts themselves." *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995)(cleaned up). Likewise, Section 1962(b) requires proof of harm "beyond that resulting from the fraud which constituted the predicate act." *Id.* at 92. "It is not enough for a plaintiff to allege an injury caused by defendants' predicate acts of racketeering." *Puerto Rico Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriquena, Inc.,* 118 F. Supp. 3d 447, 459 (D.P.R. 2015).

In their opposition, Plaintiffs do not rebut Defendants' arguments regarding Sections §§1962(a-b).

In this case, the damages alleged relate to the scheme to misinform the public and the Municipalities, which are the predicate acts of racketeering described in the Appendix to the Amended Complaint (Docket No. 205-1). Plaintiffs have not pled that Defendants' acquisition or maintenance of control over the enterprises is what caused the harm, nor have they pled that they suffered injuries from the use or investment of any income derived from the racketeering activities. *See Puerto Rico Med. Emergency Grp., Inc.,* 118 F. Supp. 3d at 459. Therefore, Plaintiffs have failed to state a claim for relief under sections 1962(a) and (b). I recommend that Defendants' motion to dismiss Plaintiffs' sections 1962(a) and (b) be granted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### h.     Failure to sufficiently allege a conspiracy

Defendants urge the Court to also dismiss for failure to state a claim, the cause of action under section 1962(d), which prohibits conspiracies to violate RICO.

In addition to the other elements under RICO, a claim of conspiracy under the statute requires one additional element: "an agreement with others to commit a substantive RICO violation." *United States v. Marino*, 277 F.3d 11 (1st Cir. 2002). Defendants affirm that Plaintiffs have only made conclusory allegations in support of their claim of an agreement between any of the ten Defendants.

According to Plaintiffs, however, the First Circuit follows the standard set forth in *Salinas v. United States,* 522 U.S. 52, 61, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)). *Salinas* merely requires a showing that a Defendant intended to further the enterprise "with the knowledge and intent that at least one member of the RICO conspiracy would commit at least two racketeering acts in pursuit of the goals of the enterprise." *United States v. Velazquez-Fontanez*, 6 F.4th 205, n.11 (1st Cir. 2021). (Docket No. 280, at 46).

The First Circuit has in fact adopted the *Salinas* standard. In so doing, it has held that proving a RICO conspiracy does not require a showing that the defendant personally committed or agreed to commit the two or more predicate acts required. *See United States v. Cianci,* 378 F.3d 71, 90 (1st Cir. 2004) (*citing Salinas,* 522 U.S. at 61). In a case with multiple Defendants, the plaintiff "does not need to allege that each conspirator agreed to commit (or actually committed) two or more predicate acts." *Laverty v. Massad*, No. CIV. 08-40126-FDS, 2009 WL 1873646, at *6 (D. Mass. Mar. 10, 2009) (citing *Salinas*, 522 U.S. at 64). In fact, "[n]o overt act is required." *Id.* (citing *Salinas*, 522 U.S. at 64).

In their pleadings, Plaintiffs alleged the existence of an illicit agreement between the Defendants, which they entered into with the knowledge an intent to commit predicate acts in furtherance of their endeavor. (Docket Nos. 205, ¶ 757 and 205-1, ¶18). The Amended Complaint states that Defendants "formulated, funded and supported the GCC enterprise to deceive the public, investors, regulators, Plaintiffs and their citizens, persons of ordinary prudence and comprehension, that their products and business model did not accelerate climate change, and/or that climate change was not real or a threat to the public, including the Municipalities and their citizens." (Docket No. 205, ¶ 757). Furthermore, Plaintiffs allege that Defendants conspired to "market[] false and misleading public statements, through mail and wire, conceal[] and suppress[] internal research data from the public and their investors which proximately caused the damage to the Municipalities in Puerto Rico as alleged herein." (Id.). These allegations are enough to clear the 12(b)(6) threshold, and I thus also recommend denial of the motion to dismiss on this ground.[20]

Codefendants Motiva, API, Conoco, BP, Exxon, BHP, Chevron and Shell also moved independently for dismissal for failure to allege a plausible RICO cause of action as to them. I will briefly discuss each of their arguments.

---

[20]Additionally, Defendants raise lack of standing, arguing that Plaintiffs have not alleged that they suffered a concrete injury directly caused by the alleged conspiracy. Other than citing one case, Defendants' argument is not developed. *See, United States v. Ramdihall*, 859 F.3d 80, 95 (1st Cir. 2017)(citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)(arguments raised in a "perfunctory manner" need not be considered by the Court.) Plaintiffs have sufficiently alleged that they suffered an injury. (Docket No. 205, at 760-61).

**Motiva's Motion to Dismiss (Docket No. 240)**

Motiva argues that Plaintiffs have lumped it together with the other Defendants and have failed to identify any Motiva-specific conduct that would satisfy the specificity requirements of Rule 9(b). For example, Motiva posits that there's no specific allegations of fraudulent or deceptive practices, nor of predicate acts.

Plaintiffs respond that they have identified specific conduct by Motiva that justifies their claim for relief. They point the Court to the following allegations: Motiva was one of the organizers and funders of the Global Climate Science Communications Team ("GCSCT"). (Docket No. 205, ¶430). Created within the API, the GCSCT "consisted of representatives from the fossil fuel industry, trade associations, and public relations firms. (Id., at 429). The GCSCT prepared a memo where it mapped out a deception strategy to advance the fossil fuel industry. (Id.). Motiva, together with other Defendants, through the API, purposely hid scientific studies that showed the impact that fossil fuels had on the environment. (Docket No. 205-1, ¶1).

I find that together with the rest of the allegations Plaintiffs have pled enough at this stage to survive dismissal, particularly in light of my earlier recommendation that limited discovery be allowed on the RICO claims.

**API's Motion to Dismiss (Docket No. 254)**

API's grounds for dismissing the RICO cause of action rest mainly on the argument that it cannot be liable under RICO because it is the purported RICO enterprise.

It is clear that to establish RICO liability, a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v.*

*King*, 533 U.S. 158, 161 (2001). Because of that distinctiveness requirement, Plaintiffs cannot seek remedy against API both as the "enterprise" and the "person" subject to RICO liability.

Plaintiffs do not refute the distinctiveness doctrine. Instead, they respond that the enterprise can be held responsible under Section 1962(a) and cite First Circuit precedent for that proposition. Plaintiffs are correct that the First Circuit has recognized that an enterprise may be held liable under Section 1962(a). *Schofield v. First Commodity Corp. of Bos.*, 793 F.2d 28, 31 (1st Cir. 1986)("The language in section 1962(a) does not require a relationship between the person and the enterprise as does section 1962(c), and so it does not require the involvement of two separate entities.").

However, I recommended that the claims under Section 1962(a) be dismissed for failure to adequately plead a cause of action. Accordingly, I similarly recommend that the claims against the API under RICO be dismissed.

**Conoco's Motion to Dismiss (Docket No. 237)**

Conoco's individual request for dismissal mirrors the Defendants' joint motion on the same grounds. In essence, Conoco argues that Plaintiffs fail to state with particularity the circumstances constituting fraud, as required under Rule 9(b). In response, Plaintiffs point to the specific allegations in their pleadings pertaining to Conoco. (Docket No. 280, at 62). The allegations discuss Conoco's membership in different organizations, task forces, and committees related to promoting the interests of the fossil fuels industry (Docket No. 205, ¶¶2, 05, 206, 211, 327, 365, 372, 430, 522); their individualized statements and reports regarding climate change (Id., ¶¶500, 569, 592); their funding and lobbying efforts (Id., at ¶503); their leadership position in the alleged RICO

enterprises (Id., at ¶¶530, 746(b)); their knowledge of the detrimental effect of fossil fuel products (Id., at ¶604(b)); and the racketeering acts in which they were involved (Id., ¶725).

Conoco further argues that some statements and reports Plaintiffs highlight are not false, and even if they were, fraud has not been properly plead and lack factual details. For example, they state, Plaintiffs have not indicated who at Conoco was aware of the supposed falsity of the statements. Plaintiffs riposte that the issue of the falsity of the statements should not be addressed at the motion to dismiss stage. I agree. The issue may be revisited should the presiding District Judge adopt my recommendation of allowing limited discovery on the RICO claims.

**BP's Motion to Dismiss (Docket No. 236)**

In similar fashion, BP argues that Plaintiffs have not pled racketeering conduct specific to BP and have not established how BP directed or managed the alleged enterprises. All that Plaintiffs proffer, according to Defendants, are conclusory allegations that attribute conduct to BP only through third parties.

The First Amended Complaint contains allegations about BP's membership and active participation in the enterprises and in other entities that promote fossil fuels. (Docket No. 205, ¶¶205, 211, 309, 327, 430, 520-21, ). Plaintiffs also make allegations regarding the fraudulent information and theories that BP assisted in disseminating. (Id., at ¶¶365-371, 386, 395, 412, 514, 516-517, 536, 541-545, 669, 724-725 and 728). Plaintiffs provide dates, names of the allegedly fraudulent reports and communications, names of consultants retained to fuel the propaganda campaign (S. Fred Singer), and names of BP executives who wrote communications about the company's policy regarding emissions

(Id., ¶¶545, 669). Based on the allegations contained in the Amended Complaint and the RICO statement, I find that Plaintiffs proffer sufficient facts to support a cause of action for RICO violations against BP.

**Exxon's Motion to Dismiss (Docket No. 242)**

In line with the other Codefendants' motions to dismiss, Exxon argues that Plaintiffs have failed to plead with particularity any instances of fraud. Specifically, Exxon states that the Amended Complaint only identifies six purportedly misleading statements attributable to Exxon and even those, were not plead with particularity. (Docket No. 242, at 5). Moreover, they claim, Plaintiffs failed to allege who supposedly was deceived by any of the identified statements, or who relied on those statements to their detriment. (Id., at 6-7). Lastly, Exxon argues that the remaining allegations fail because they improperly attribute statements to Defendants by grouping them with unrelated third parties. (Id., at 8-11).

After reviewing Plaintiffs' pleadings, I find that they have pled sufficient facts to survive Defendants' motion to dismiss. Plaintiffs assert, rightfully so, that Exxon is the Defendant for which they have pled the most separate acts of racketeering. (Docket Nos. 205, ¶ 725 and 205-1, ¶¶ 1-6, 7(g), 8(i), 17-18, 26-27, 29-41, 46, 51, 53-55, 69, 63-65, 66, 69, 77, 80.). In addition to allegations about membership in trade associations or advocacy groups and their leadership in these organizations, (Id., ¶¶205, 211), Plaintiffs provide details regarding studies and reports produced by either Exxon's employees or commissioned experts, regarding the impact of fossil fuels. (Id., ¶¶ 301, 306, 307, 308,

312, 313, 315, 318, 319, 320, 321). Evidence that Plaintiffs claim was disregarded, withheld, and spun into a different narrative to mislead the public.

As to pleading who were the recipients of Exxon's allegedly fraudulent communications and statements, Plaintiffs have repeatedly pled that it was Puerto Rico consumers and the Plaintiff Municipalities. (Id., ¶¶13-16, 261, 618, 685, 691, 713). Moreover, Plaintiffs have specifically pled that they relied on Defendants' false statements and misrepresentations to continue consuming their products. (Id., ¶¶ 3, 7(h), 73, 611, 614, 652, 677, 697, 711, 770, 781, 787, 796, 801, 807, 817, 827, 833).

Therefore, I find that Plaintiffs have met their burden, particularly given my recommendation that additional discovery be allowed.

**BHP's Motion to Dismiss (Docket No. 243)**

In its Motion to Dismiss, BHP argues that: (1) Plaintiffs have not tied BHP to any RICO enterprise; (2) Plaintiffs do not allege that BHP committed a single racketeering act, let alone "a pattern of racketeering activity," as required under 18 U.S.C. § 1962(a), (b), or (c); (3) Plaintiffs' claim under 18 U.S.C. § 1962(d) must fail because Plaintiffs have not adequately alleged that BHP was part of any conspiracy. (Docket No. 243, at 10).

After reviewing the Amended Complaint, I find that Plaintiffs have alleged specific acts of fraud against BHP (Docket No. 205, ¶¶ 572-574, 725). Plaintiffs have also tied BHP to the alleged enterprises and have asserted that BHP had leadership roles and control and was also a funder of the enterprises. (Id., ¶¶211, 365, 372, 395 556, 572-574 and Docket No. 205-1, ¶¶ 64-65, 78-79).

Furthermore, Plaintiffs have adequately alleged that BHP was part of the RICO conspiracy. As I previously discussed, the First Circuit does not require a plaintiff

alleging a RICO conspiracy to show that the defendant personally committed or agreed to commit the two or more predicate acts required. *See Cianci,* 378 F.3d at 90 (*citing Salinas,* 522 U.S. at 61). Here, Plaintiffs alleged the existence of an illicit agreement between the Defendants, which they entered with the knowledge an intent to commit predicate acts in furtherance of said conspiracy. Consistent with my previous determination on this issue, I find that the RICO conspiracy is sufficiently pled as to BHP as well.

**Chevron's Motion to Dismiss (Docket No. 239)**

Chevron moves the Court to dismiss the RICO claims, alleging that Plaintiffs have not pled "a single fact" related to Chevron's participation in the RICO enterprise. (Docket No. 239, at pg. 10). It further claims that Plaintiffs have failed to allege that Chevron supported the statements of the trade associations and lobbying groups highlighted in the Amended Complaint. I disagree.

Plaintiffs' pleadings include allegations identifying Chevron, not only as a member, but as a key player in these entities. (Docket No. 205-1, ¶¶1, 14-15, 17, 51, 56, 61, 64-65, 80). In addition, Plaintiffs have alleged that Chevron was involved in crafting the narrative that the enterprises used to further their goals. (Docket No. 205, ¶¶ 498, 527(c), 536, 546-548, 565-567). Chevron's motion to dismiss the RICO claims should be denied.

**Shell's Motion to Dismiss (Docket No. 244)**

Shell moves for dismissal on the basis of failure to allege any predicate racketeering acts or that Shell agreed to conspire with anyone. (Docket No. 244, at pg. 19). Plaintiffs respond that it has alleged 43 specific predicate acts under RICO, 15 of

which identify Shell (not Chevron) as also having a leadership role in the fraudulent acts. (Docket No. 205-1, ¶1, 2, 14-15, 17, 19, 22, 51, 57, 61, 64-65, 72-73, 80).

Again, I find that dismissal for failure to allege is not appropriate at this juncture. Plaintiffs have sufficiently pled the elements of a RICO cause of action against Shell and, as I recommended, should be allowed limited discovery. Therefore, I recommend that Shell's motion to dismiss the RICO claims be denied.

### i.  *Applicability of parens patriae*

Defendants' last RICO-related argument is that Plaintiffs may not recover on behalf of their residents under the doctrine of parens patriae so any claims that might be construed under that theory should be dismissed.

States may exert their "quasi-sovereign" interest to represent the interests of individual citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 600–01, 102 S. Ct. 3260, 3265, 73 L. Ed. 2d 995 (1982)(internal citations omitted). To establish a parens patriae action, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest." *Id*. at 607.

According to Defendants, the Municipalities are political subdivisions that lack their own sovereignty, and thus, they do not meet "quasi-sovereign interest" requirement. (Docket No. 235, at 37).

Without the benefit of Plaintiffs' argument in rebuttal, I must agree with Defendants' view. The parens patriae doctrine has developed as to States of the United States and has been extended to the Commonwealth of Puerto Rico. *See Alfred L. Snapp & Son, Inc.,* 458 U.S. at 609 (finding that the Commonwealth of Puerto Rico had parens

patriae standing "to pursue the interests of its residents in the Commonwealth's full and equal participation in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of 1952."). However, it has not been extended to a foreign nation "unless there is a clear indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government." *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 336 (1st Cir. 2000).

Likewise, there is caselaw from other circuits holding that cities, counties and other political subdivisions may "sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants," but have no parens patriae standing. *United States v. City of Pittsburg, Cal.*, 661 F.2d 783, 787 (9th Cir. 1981)(citing *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1188 n. 15 (D.N.M. 2020)(gathering cases); *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979)(citing *In Re Multidistrict,* 481 F.2d at 131).

Here, the Municipalities are suing to vindicate their own proprietary rights in congruence with the interest of their residents. *See United States v. W.R. Grace & Co.-Conn.*, 185 F.R.D. 184, 190 (D.N.J. 1999) ("The doctrine of *parens patriae* does not extend to municipalities, except to the extent that a municipality's own rights are congruent with those of its residents.). Therefore, I find that Plaintiffs have standing to bring this action only as to their own proprietary rights.

### 2.    *Antitrust*

68

Defendants also move the Court to dismiss the Antitrust cause of action for failure to allege the existence of any agreement and/or injury. In addition, Defendants argue that Plaintiffs seek to improperly use antitrust laws to recover for alleged environmental harms or for harms sustained by their residents. Defendants respond that making such a determination is premature because Courts should reserve judgment on motions to dismiss antitrust claims until discovery is conducted.

### a.    Failure to allege an anticompetitive agreement

To plausibly plead an antitrust conspiracy pursuant to the Sherman Act, a plaintiff must establish: "(1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce." *Norte Car Corp. v. FirstBank Corp.*, 25 F. Supp. 2d 9, 16 (D.P.R. 1998) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 52 (1911)).

Defendants maintain that Plaintiffs have not alleged the existence of an agreement, much less an anticompetitive one. (Docket No. 235, at pg. 38). Instead, Plaintiffs merely refer to a supposed "agreement" between Defendants to "maintain their energy monopoly, fix prices, and increase obstacles for competitive entry into the [energy market]." (Id., referencing Docket No. 205, ¶ 767). Defendants view that statement as "insufficient" to assert an antitrust conspiracy. (Id.).

For Sherman Act purposes, "[a]n agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S. Ct. 2731, 81 L. Ed.2d 628 (1984))(internal quotation marks and citation

omitted)). At the pleading stage, the plaintiff "may present either direct or circumstantial evidence of defendants' 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L.Ed.2d 775 (1984)(citation and internal quotation marks omitted)); *see also, Am. Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S. Ct. 1125, 1139, 90 L. Ed. 1575 (1946)("Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."). Therefore, the complaint must allege, at the very least, "the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible." *Id.* at 46.

Plaintiffs allege that Defendants engaged in a coordinated effort to restrain trade. (Docket No. 205, at 765-66). Specifically, Defendants "increased production to maintain their energy monopoly," "fix[ed] prices," and increased obstacles to prevent alternative energy companies from entering the market. (Id., ¶767). According to Plaintiffs, the agreement affected competition because it sought to exclude alternative energy companies through anticompetitive means. (Id., ¶¶ 616, 767). The agreement was purportedly formalized through: (i) the dissemination of evidence that was passed off as being scientific but was actually fabricated to further Defendants' goals (Docket No. 280, at pg. 56; Docket No. 205, ¶¶ 354-59, 361, 377, 378, 380, 384, 463-70); the funding of contrarian climate scientists (Id., ¶¶ 405-13, 441-62); the participation and leadership in formal and informal trade associations (Id. ¶¶ 363-67, 368, 386-87, 391); and the

launching of misleading marketing and propaganda campaigns (Id. ¶¶ 370, 376, 388-89, 501-02, 525-57).

Through these activities, Defendants created allegedly doubt regarding the real effects of climate change and the role of fossil fuels in accelerating it. (Id., ¶¶ 373, 473-86, 593, 595, 610-11). The result being that Defendants effectively excluded renewable energy sources from being available in the energy market. (Id. ¶¶ 3, 7(d), 80, 82, 88, 383, 616, 651-52).

Because they were competitors, Defendants state, they had an incentive to lower their prices and increase their production. These actions, perfectly reasonable in response to competition, cannot be ascribed to an anticompetitive agreement between Defendants. Defendants' argument is not supported by caselaw. Courts have found competitors liable for antitrust conspiracy. *See*, *e.g., Am. Tobacco Co.*, 328 U.S. at 809, (finding the American Tobacco Company, Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company and American Suppliers, Inc., guilty for conspiracy in restraint of trade, among other charges). In fact, "agreement among 'actual or potential rivals' that 'eliminate[ ] some avenue of rivalry among them'—'have traditionally received antitrust's highest level of scrutiny.'" *United States v. Am. Airlines Grp. Inc.,* 675 F. Supp. 3d 65, 108 (D. Mass. 2023), *aff'd,* 121 F.4th 209 (1st Cir. 2024)(citing 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶¶ 1900, 1901b (4th ed. 2018)).

With regards to the anticompetitive aspect, Plaintiffs have pled that Defendants agreed to fix prices and restrict the entry of renewable energy players into the energy

field. (Docket No. 205, ¶¶7(d) and 767).[21] Defendants contend that an agreement needs to increase prices or decrease output to be anticompetitive.[22] The caselaw, however, makes clear that although those two metrics are "paradigmatic examples of restraints of trade,"[23] injury is also measured in terms of "decreased efficiency in the marketplace which negatively impacts consumers." *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1096–97 (1st Cir. 1994) (citing *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 21–22 (1st Cir.1990), *cert. denied,* 499 U.S. 931, 111 S. Ct. 1337, 113 L.Ed.2d 268 (1991) and *Interface Group, Inc. v. Massachusetts Port Auth.,* 816 F.2d 9, 10 (1st Cir.1987)). In short, a practice is not anticompetitive because it harms competitors, but because it harms the "competitive process." *Town of Concord*, 915 F.2d at 21–22)(internal citations omitted)("It harms that process when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods."). *See also, Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir. 1988).

---

[21] As per the Amended Complaint, Defendants "maintained their energy monopoly in Puerto Rico by conspiring, and succeeding, in keeping prices low, to prevent the development of noncarbon-based energy sources and maintain the dependency of the Municipalities and their citizens upon their products." (Docket No. 205, ¶84).

[22] The cases that Defendants cite, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 114 (1984) and *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1072–73 (N.D. Cal. 2019), do not do much to support their arguments. In the former, the Court found that plaintiff had "restricted rather than enhanced the place of intercollegiate athletics" through its anticompetitive practices. *Board of Regents*, 468 U.S. at 120. Whereas in the latter, the Court reasoned that Defendants' consensus to follow certain vehicle specifications and agreement not to use certain features was not a "compelling example of an agreement 'to make a product of inferior quality.'" *In re German Auto. Manufacturers Antitrust Litig.*, 392 F. Supp. 3d at 1069. Particularly given the lack of allegations that consumers even wanted those features and common sense dictating that the opposite would be true for safety reasons. *Id.* This case, in contrast, claims that Defendants' concerted actions presented a barrier to entry for cleaner and safer renewable energy technologies.

[23] *Board of Regents*, 468 U.S. at 104-7 ("Restrictions on price and output are the paradigmatic examples of restraints of trade.").

Defendants also point out that membership in a trade organization, by itself, cannot serve to establish an unlawful agreement. *See Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988). Here, however, Plaintiffs are not alleging mere membership. Their claim is that Defendants created, funded, and led these organizations to act as propaganda machines that put out deceptive materials. Such activities "facilitate collusion," *Evergreen*, 720 F.3d at 49–50, and are not shielded from antitrust scrutiny merely because they emanate from a trade organization. *See*, *e.g., United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 665–66, 85 S. Ct. 1585, 1591, 14 L. Ed. 2d 626 (1965) (finding that union that is otherwise guilty of a conspiracy in violation of the antitrust laws cannot escape liability merely because some of the means of accomplishing the goals of that conspiracy were embodied in a collective bargaining agreement); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S. Ct. 2009, 2018, 90 L. Ed. 2d 445 (1986).

Lastly, Defendants argue that advertising and promotional activities are permitted and even considered "procompetitive." (Docket No. 235, at pg. 40). Actually, Defendants enunciate, even false advertising is not considered antitrust conduct. (Id.). Plaintiffs respond that a deceptive marketing campaign can constitute a violation of Section 1 of the Sherman Act.

Defendants cite a series of cases worth discussing. In *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 565 45 S. Ct. 578, 578, 69 L. Ed. 1093 (1925), the Supreme Court stated that defendant Maple Flooring Manufacturers' Association, which was an unincorporated 'trade association, of which other defendants were members, engaged in many activities that were "admittedly beneficial to the industry and to consumers." *Id*.

These included "co-operative advertising" as well as the "standardization and improvement of its product." *Id*. The Court, however, makes a distinction that sets the case apart from the facts in the instant action. The Court expressed that it was neither alleged nor proved in the extensive record developed that there was an agreement among the organization's members to affect production or fix prices. *Id*. at 567. The Amended Complaint in this case, however, specifically alleges that Defendants engaged in a concerted effort to fix prices and prevent the entry of renewable energy competitors.

Another cited decision is *Retractable Techs., Inc. v. Becton Dickinson & Co.,* 842 F.3d 883, 895 (5th Cir. 2016), where it was held that "false advertising alone hardly ever operates in practice to threaten competition." Should this case turn only on false advertising, that reasoning would perhaps warrant dismissal of the antitrust cause of action. But Plaintiffs' allegations of anticompetitive behavior do not rely solely on false advertising. Instead, Plaintiffs claim that Defendants colluded to fix prices and create barriers of entry in the market.

Likewise, in *Steward Health Care Sys. LLC v. Southcoast Health Sys., Inc.*, No. CV 15-14188-MLW, 2016 WL 9022444, at *3 (D. Mass. Sept. 2, 2016), the Magistrate Judge recommended dismissal of the federal antitrust claim. The Court reasoned that a series of newspaper articles that Plaintiff claimed were defamatory "could logically be considered a publicity campaign, which is immune from antitrust liability, even where unethical and deceptive methods are employed." *Id.*, at *7 (citing *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 849 (7th Cir. 2011)). Again, unlike the *Steward* complaint, the antitrust violations alleged here are not only supported by claims of false advertising and deceptive marketing.

74

The procedural history of these cases is also telling. One of Plaintiffs' salient points throughout their opposition is that Defendants cite cases that were decided at the summary judgment stage, or after a trial was conducted. Having access to such a developed record puts the court in a proper position to decide the issues at hand. But here, Plaintiffs argue, those determinations are premature, and judgment should be reserved until after discovery. For support, Plaintiffs cite *Ticket Ctr., Inc., Banco Popular de Puerto Rico*, 2006 WL 2273603, at *1 (D.P.R. Aug. 8, 2006)(holding that "antitrust actions should rarely be dismissed prior to giving the plaintiff ample opportunity for discovery.")(citing *Morales–Villalobos v. Garcia–Llorens*, 316 F.3d 51, 56 (1st Cir.2003)(reversing lower court dismissal because questions of fact, on which antitrust actions routinely hinge, should not be decided on a motion to dismiss).

I partly agree with Plaintiffs. Although the benefit of a full record would assist in deciding these issues, it is no less true than mere threadbare recitals and conclusory statements do not suffice to establish a cause of action. *Ashcroft v. Iqbal*, 556 U.S.662. 678 (2009). Here, however, Plaintiffs have pled enough to survive dismissal regarding the existence of an anticompetitive agreement.[24]

---

[24] Defendants Conoco, Motiva, Exxon, BHP and Shell also move for dismissal of the antitrust claims in their individual motions to dismiss. (Docket Nos. 237, 240, 242, 243 and 244, respectively). All of the independent motions contend that the pleadings do not allege specific instances of anticompetitive conduct. Because I have already addressed those arguments through Defendants' Joint Motion at Docket No. 235, I will not restate them here. BHP additionally claims that Plaintiffs failed to plead the existence of an anticompetitive agreement. (Docket No. 243). I have also discussed and ruled upon said argument. Finally, Exxon argues that Plaintiffs failed to meet a heightened pleading standard for antitrust claims set in Rule 9(b). However, the First Circuit has held that the heightened pleading standard is not applicable in § 1 claims. *Evergreen*, 720 F.3d at 50. Therefore, I recommend that the individual motions to dismiss the antitrust cause of action be denied.

### b.    Failure to allege an antitrust injury

Defendants also claim that Plaintiffs' antitrust claims fail for the following reasons: (1) failure to plead an injury "of the type that the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful;"[25] (2) improperly using antitrust laws to address environmental harms; and (3) claimed injuries are too indirect and attenuated. (Docket No. 235, at pg. 42).

Regarding the injury requirement, it must be "sufficiently direct, nonspeculative, and measurable to the extent that causality is not in doubt." *Sterling Merch.*, 724 F. Supp. 2d at 258 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 533, 103 S. Ct. 897, 906, 74 L.Ed.2d 723 (1983).

Plaintiffs respond that they have put forward sufficient allegations that Defendants' antitrust violations were a "material cause"[26] of Plaintiffs' injury and that "their injury is the type of injury the antitrust violation would cause to competition."[27] (Docket No. 280, at 65). They recount their allegations of conspiratorial behavior that resulted in lower quality products, restricted consumer choice, and hindered innovation by excluding non-carbon-based energy sources. (Docket No. 205, ¶¶706, 708, 765). Furthermore, Plaintiffs further claim that Defendants held "substantial market power in

---

[25] *Sterling Merchandising, Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 258 (D.P.R. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

[26] *Sullivan*, 34 F.3d at 1097.

[27] *Sterling Merch.*, 656 F.3d at 121.

the energy market" and instituted a "common scheme designed to restrain trade" in that market. (Id. ¶765). These actions prevented Plaintiffs from reducing their purchase of Defendants' products and buying instead "alternative, non-carbon-based energy sources." (Id. ¶ 767).

Though Plaintiffs cite a series of cases purportedly holding that actions leading to decreased innovation are an actionable antitrust injury,[28] (Docket No. 280, at pgs. 65-66), Defendants counter with the opposite. Citing to *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 414 (3d Cir. 1997), Defendants assert that the deprivation of access to other energy sources is not a cognizable "antitrust injury." In *Schuylkill Energy*, the Court framed the proper antitrust inquiry as follows: "whether [Defendant] unlawfully excluded independent power producers like [Plaintiff] from the relevant market, not whether consumers receive electricity generated by nuclear, coal, culm, solar, or any other energy source." *Id.* As previously discussed, the key factor is "injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant." *Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1238 (S.D. Cal. 2015).

Here, Plaintiffs allege that Defendants excluded other renewable players from entering the market. Hence, they pled their claim within the framework laid out in *Schuylkill Energy* and the case law related to antitrust liability previously cited.

_____

[28] *In re Dealer Management Sys. Antitrust Litig.*, 362 F.Supp.3d 510, 535 (N.D. Ill. 2019); *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 WL 316023, at *10 (N.D. Cal. Jan. 24, 2013); *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007) and *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

Furthermore, Plaintiffs reiterate the request to conduct discovery to fully develop the record.

Because I find that Plaintiffs have sufficiently pled an antitrust injury, and in light of the court's remarks in *Ticket Ctr., Inc. v. Banco Popular de Puerto Rico*, 2006 WL 2273603, at *1, I recommend that dismissal of the antitrust cause of action be denied at this time.

### c.    Lack of parens patriae standing

Defendants restate the same argument they raised for the RICO claims, namely, that Plaintiffs lack standing to bring a parens patriae cause of action. Plaintiffs counter that Municipalities are considered "persons" within Section 4 of the Clayton Act. But in any case, they state they are not pursuing a parens patriae cause of action but suing on their own capacity as Municipalities. Therefore, this ground for dismissal should be denied.

### 3.    Puerto Rico Law Claims

Plaintiffs bring nine claims under Puerto Rico law: Claim 1 (Common Law Consumer Fraud); Claim 2 (Conspiracy to Commit Common Law Consumer Fraud); Claim 3 (Violation of Puerto Rico Rule 7); Claim 9 (Public Nuisance); Claim 10 (Strict Liability–Failure to Warn); Claim 11 (Strict Liability–Design Defect); Claim 12 (Negligent Design Defect); Claim 13 (Private Nuisance); and Claim 14 (Unjust Enrichment). (Docket No. 205).

Defendants move to dismiss all the claims for three reasons: (1) claims for injuries from transboundary pollution are preempted; (2) the allegations fail to state claims under Puerto Rico law; and (3) Plaintiffs cannot seek relief on behalf of their residents.

78

### a.    Claims are Preempted

Defendants' constitutional argument goes as follows: insofar as Plaintiffs' Puerto Rico law claims assert injuries caused by the worldwide combustion of fossil fuels—a quintessential interstate and international activity—the claims are preempted. *See* U.S. Const. Art. VI, cl. 2. Defendants direct the Court's attention to *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021). In that case, the court refused the City's categorization of the suit as one concerning "the production, promotion, and sale of fossil fuels," rather than the regulation of emissions. *Id*. Instead, the court deemed the suit one of "global greenhouse gas emissions." *Id*. On that basis, it found that "a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may [not] proceed under New York law." *Id*.

Plaintiffs respond that the federal common law that Defendants rely upon has been displaced and, even if it wasn't, it's inapplicable to their claims. Most importantly, they argue that their claims against Defendants do not interfere with the federal government's foreign policy on climate change because they are tort claims based on Puerto Rico law.

I agree with Plaintiffs' position. The Puerto Rico law-based allegations in this case cannot be read as claims to regulate greenhouse gas emissions directly or to recover for damages for interstate emissions. At the heart of Plaintiffs' claims for relief is a purported decades-long misinformation and propaganda campaign. (Docket No. 205, ¶¶ 65, 595, 599). Thus, the culprit is Defendants' words, not their emissions.

In *City & Cnty. of Honolulu v. Sunoco LP*, 153 Haw. 326, 354, 537 P.3d 1173, 1201 (2023)—which Defendants cite—the Court referenced similar cases where the argument that tort-based cases were really about greenhouse emissions was refused.

> Numerous courts have rejected similar attempts by oil and gas companies to reframe complaints alleging those companies knew about the dangers of their products and failed to warn the public or misled the public about those dangers. The Ninth Circuit did so in this case. And in other cases alleging similar deceptive promotion and failure to warn torts, the Fourth Circuit, Tenth Circuit, and the Districts of Connecticut, Massachusetts, and Minnesota have also rejected attempts to characterize those claims as being about emissions and pollution.

*Id.* (internal citations omitted).[29]

Having carefully reviewed the allegations in this case, I find that Defendants' characterization of Plaintiffs' Puerto Rico law claims as claims about the effect of emissions on the environment is incorrect.

Next, Plaintiffs assert that the Clean Air Act ("CAA") has displaced the federal common law that Defendants allude to and, therefore, the latter cannot have a preemptive effect over their claims. *See Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 55 (1st Cir. 2022) (citing *Mayor & City Council of Baltimore v. BP P.L.C.,* 31 F.4th 178, 199, 205-207 (4th Cir. 2022))("The Clean Water Act and the Clean Air Act — neither of

---

[29] Recently, the United States Supreme Court denied a petition for writ of certiorari seeking review of the Supreme Court of Hawaii's decision. *See Sunoco LP v. City and Cnty. of Honolulu*, No. 23-947, ___ S.Ct. ___, 220 L.Ed.2d 413, 2025 WL 76706, 2025 U.S. LEXIS 146 (Jan. 13, 2025) and *Shell PLC v. City and Cnty. of Honolulu*, No. 23-952, ___ S.Ct. ___, 220 L.Ed.2d 413, 2025 WL 76704, 2025 U.S. LEXIS 256 (Jan. 13, 2025).

which Rhode Island invokes — 'have statutorily displaced any federal common law that previously existed.' So we cannot rule that any federal common law controls Rhode Island's claims."). Defendants recognize that the CAA now governs domestic interstate emissions but argue that the Court may still apply the "preemption defense" in accordance with federal case law because state law is inadequate to regulate emissions beyond its jurisdiction. Though both parties cite case law to support their position, I find that Plaintiffs' more closely follows applicable precedent.

Defendants, for one, rely heavily on the Second Circuit's *City of New York* decision whereas Plaintiffs look to *Rhode Island*, a case from our Circuit. Defendants, in fact, argue that *Rhode Island's* holding is not contrary to their position. I disagree with Defendants' interpretation. The *Rhode Island* opinion makes clear that the CAA did not preempt the state-law claims. *Rhode Island*, 35 F.4th at 57–58 (gathering cases and concluding that the CAA contains two saving clauses that preserve state and local government's right to impose standard and limitations on air pollution that are stricter than national requirements.). I am not persuaded that I should depart from our Circuit's holding.

Next, Defendants argue that Plaintiffs' claims are preempted because they interfere with foreign affairs. In Defendants' view, the causes of action against them have global implications. For starters, Plaintiffs seek to impose monetary damages for sale of fossil fuels that happen outside Puerto Rico and the United States. And second, global emissions from Defendants' products are the result of activities undertaken in foreign countries. Defendants thus move the Court to dismiss Plaintiffs' claims "to the extent

they seek damages based on the exploration, production, marketing, sale, or combustion of fossil fuels and resulting emissions outside the United States." (Docket No. 235, at 50).

Defendants rely on *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003), which held that "state legislation . . . produc[ing] something more than incidental effect in conflict with express foreign policy of the National Government" is preempted. *Id.* at 420 (citing *Zschernig v. Miller*, 389 U.S. 429 (1968)).

Plaintiffs cast doubt on whether *Garamend*i even applies with full force today. Even if it did, they state Defendants have not shown that their claims have "something more than an incidental effect" on foreign affairs. Other courts have rejected similar arguments. *See Baltimore*, 31 F.4th at 214 ("Baltimore's Complaint does not contain any allegations that develop foreign policies with other countries, and nor does it undermine the federal government in the international arena. At best, it involves an intersection between Maryland law and private, international companies."); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 44 (D. Mass. 2020) ("Contrary to ExxonMobil's caricature of the complaint, the Commonwealth's allegations do not require any forays into foreign relations or national energy policy.").

Like those cases, the allegations here do not implicate greenhouse emissions or foreign policy. These are tort-based claims based on advertising, unfair business practices, and consumer protection, all issues within the purview of state regulation. Not a single cause of action pertains to the "exploration, production, marketing, sale, or combustion of fossil fuels and their emissions" as Defendants declare. The allegations pertaining to marketing are related to misleading and deceitful materials in furtherance of Defendants' alleged misinformation campaign. The Court will thus not deem Plaintiffs'

state law claims intrusive of foreign affairs. Consequently, the Court should reject Defendants' arguments regarding preemption.

### b.    Failure to State a Claim

Defendants move to dismiss Plaintiffs' Puerto Rico claims for failure to sufficiently plead the required elements, especially with the particularity required by Rule 9(b). I will examine each ground for dismissal.

### (i)    Plaintiffs' Fraud-based Claims

Plaintiffs' first, second, and third causes of action allege fraudulent behavior. Defendants argue that Puerto Rico law does not recognize the causes of actions under which Plaintiffs seek relief.

The first and second causes of action assert "common law consumer fraud," "deceptive practices" and conspiracy to do the same. (Docket No. 205, ¶¶634-700). Defendants point out that Puerto Rico does not recognize "common law consumer fraud" and has no specific consumer protection statute that provides a private right of action for consumer fraud.[30] Likewise, there is no cause of action for civil conspiracy.[31]

Plaintiffs do not refute that those causes of actions are not codified. Instead, they argue that the legal source of their claims is found in the Federal Trade Commission's "Guides for the Use of Environmental Marketing Claims." *See* 16 C.F.R. § 260.1 et seq.;

---

[30] *Simonet v. SmithKline Beecham Corp.*, 506 F. Supp. 2d 77, 91 (D.P.R. 2007) (Dismissing cause of action for violation of consumer protections statutes because Puerto Rico has no specific consumer protection statute that provides a private right of action for consumer fraud.)

[31] *Next Step Med. Co., Inc. v. Biomet, Inc.*, 2015 WL 993095, at *13 (P.R. Cir. Jan. 30, 2015) (holding that Puerto Rico law does not recognize civil conspiracy pursuant to Article 1802 of the 1930 Civil Code).

*see also* Docket No. 205, ¶¶634- 688. The Guides discourage "unqualified general environmental benefit claims," 16 C.F.R. § 260.4(b), and instruct corporations to use specific language. 16 C.F.R. § 260.4(c). But as Defendants correctly state, FTC regulations "do not confer any rights on any person and do not operate to bind the FTC or the public." 16 C.F.R. § 260.1. Accordingly, "the FTC Act contains no private right of action." *Liu v. Amerco*, 677 F.3d 489, 492 (1st Cir. 2012). Therefore, I recommend that the First Cause of Action be dismissed.

Regarding the third cause of action, Plaintiffs assert a claim under the Puerto Rico Rules Against Misleading Practices and Advertisements. P.R. Dep't of Consumer Aff., Regul. 9158 at Rule 14 (Feb. 6, 2020) ("Rules"). Defendants raise an issue with the application of the Rules to municipalities because they state that it is limited to "natural persons."

As defined in the Rules, a "Consumer" is "any natural person who acquires or uses products or services as their final destination. It includes any other person, association, or entity appointed by Law who is authorized to present a claim to the Department." Rule 5(J), Puerto Rico Regulations Against Misleading Practices and Advertisement, P.R. Dep't of Consumer Affairs, Regul. 8599 (May 29, 2015). Plaintiffs interpret the Rules, in conjunction with the Puerto Rico Municipal Code, as granting municipalities the power to pursue a cause of action under the Misleading Practices Rules. *See* PRS ST T. 21 §§ 7013 and 7028. Defendants, however, aptly highlight that there is no private right of action under the Rules because the Department of Consumer Affairs (DACO for its Spanish acronym) has exclusive enforcement jurisdiction. P.R. Laws Ann. tit. 31, § 341e.

Although Plaintiffs would have the Court read beyond the Rules and interpret the Municipal Code as granting municipalities carte blanche, I decline to do so. Defendants are correct in that dismissal of the Third Cause of Action is warranted.[32]

### (ii)  *Design Defect*

Although the 1930 Civil Code did not explicitly incorporate the doctrine of strict liability, Courts have interpreted it as including causes of action for negligent and strict liability design defect. *Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.*, 449 F.3d 85, 88 (1st Cir. 2006)(citing P.R. Laws. Ann., tit. 31 § 5141)[33]. A plaintiff claiming a design defect must show that: "(1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) the negligent act or omission caused the plaintiff's harm." *Carballo-Rodriguez v. Clark Equip. Co.*, 147 F. Supp. 2d 66, 72 (D.P.R. 2001). As for strict liability, "a plaintiff must prove that (1) the product had a defect that made the product unsafe, and (2) the defect proximately caused the plaintiff's injury." *Id.* at 71.

Plaintiffs carry the burden of establishing the applicable standard of care, and showing that Defendants acted below that minimum standard, and that Defendants'

---

[32] Although Defendants proffer additional arguments regarding failure to plead with particularity under Rule 9(b) and failure to plead causation, I see no need to address them as I recommend dismissal of the causes of action for not being cognizable claims. Likewise, I need not analyze in depth Codefendants BP, Conoco, BHP and Exxon's arguments regarding failure to plead with particularity the state law claims and BP's failure to plead arguments under the same rationale.

[33] Because the acts or omissions alleged in this case occurred before the effective date of the 2020 Puerto Rico Civil Code, liability would be governed by the provisions of the 1930 Puerto Rico Civil Code.

negligence was the proximate cause of Plaintiffs' damages. *Id.* (citing *Tokio Marine & Fire Ins. Co., Ltd. v. Grove Manuf. Co.*, 958 F.2d 1169, 1171-72 (1st Cir. 1992)).

Defendants state that Plaintiffs have alleged neither a defect, nor causation. To establish a defect, a plaintiff must satisfy either the consumer expectation test or the cost-benefit analysis test. *See Vazquez-Filippetti v. Banco Popular de Puerto Rico*, 504 F.3d 43, 52 (1st Cir. 2007). Under the consumer expectations test, a product is defective if it "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115 (1992) (citing *Barker v. Lull Engineering Co., Inc.*, 573 P.2d 443, 455-56 (1978)); see also *Carballo-Rodriguez*, 147 F. Supp. 2d at 66.

The Cost-Benefit Analysis test, on the other hand, requires a plaintiff to establish the defendant's product's design proximately caused its injuries. The burden of proof then shifts to the defendant/manufacturer to show that the "benefits of the design at issue outweighs the risk of danger inherent in such a design." *See Rivera*, 132 D.P.R. 115.

Guided by this framework, I find that Plaintiffs have failed to plead a design defect cause of action. Plaintiffs allege that Defendants' fossil fuel products are defective "because the risks they pose to consumers...outweigh their benefits." (Docket No. 205, at ¶802). Plaintiffs' allegations are textbook conclusory and fail to comply with the requirements of establishing a plausible cause of action. Moreover, to the extent they rely on the consumer expectation test, Plaintiffs have not alleged what is the ordinary consumer's expectation in using the product as intended. *See Collazo-Santiago v. Toyota Motor Corp.*, 937 F. Supp. 134 (D.P.R. 1996), *aff'd*, 149 F.3d 23 (1st Cir. 1998). The same pleading deficiencies are present under the cost-benefit-analysis test. Plaintiffs

have not established that Defendants' fossil fuel products proximately cause a design defect injury. *See Ayala v. Kia Motor Corp.,* 633 F. Supp. 3d 555, 569 (D.P.R. 2022)(citing *Mendoza v. Cervecería Corona*, 97 P.R. Dec. 499, 512 (1969)("In sum, '[i]f the damage is not attributable to a defect of the product, there is no ground for applying the strict liability rule.'").

Therefore, I likewise find that Plaintiffs have failed to adequately plead a design defect cause of action.

### *(iii)   Duty to Warn*

To prove a failure to warn cause of action under Puerto Rico law, Plaintiffs must show that: "(1) the manufacturer knew or should have known of the risk inherent in the product; (2) there were no warnings or instructions, or those provided were inadequate; (3) the absence of warnings made the product inherently dangerous; and (4) the absence of adequate warnings or instructions was the proximate cause of plaintiff's injury." *Cruz Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 276 (1st Cir. 2003) (citing *Aponte Rivera v. Sears Roebuck,* 144 D.P.R. 830 (1998)).

Plaintiffs allege that Defendants were fully aware of the risk inherent to their fossil fuel products yet failed to warn the public or their consumers. (Docket No. 250 ¶¶ 785-790). Defendants counter that there is no legal basis under Puerto Rico law recognizing a duty to disclose information about climate change. At most, they claim, Puerto Rico courts recognize a duty to warn that "extends to all the uses that can be reasonably foreseen by the defendant…to assure the safest use of the product." *Silva v. Am. Airlines*, Inc., 960 F. Supp. 528, 533 (D.P.R. 1997). Plaintiffs, however, do not allege that Defendants failed to warn users of reasonably foreseeable dangers those users may

encounter using the product. Rather, Plaintiffs argue that Defendants failed to warn users of the effects that fossil fuels had on climate change. I do not read the duty to warn in such an expansive manner. For that reason, I recommend that the failure to warn cause of action be dismissed.[34]

### (iv)    Nuisance Claims

Private and public nuisances are actionable under Puerto Rico law. P.R. Laws Ann. tit. 32, § 2761. In the Amended Complaint, Plaintiffs assert both. (Ninth Cause of Action-Public Nuisance and Thirteenth Cause of Action: Private Nuisance).

A nuisance is defined as:

> Anything which is injurious to health, indecent, or offensive to the senses, or an obstruction to free use of property so as to interfere with the comfortable enjoyment of life or property, or that is a nuisance to the wellbeing of a neighborhood, or to a large number of persons or that illegally obstructs free flow traffic in the usual manner by a lake, river, bay, stream channel or navigable basin or by a park, square, street, public road and other similar sic constitute a nuisance and the subject of an action.

P.R. Laws Ann. tit. 32, § 2761.

Plaintiffs defend against dismissal of this cause of action by stating that Defendants are fossil fuel producers and generators of greenhouse emissions and thus have engaged in conduct—causing extreme whether events and impacting climate change—that created unreasonable and substantial interference with Plaintiffs' enjoyment of their property.

_____

[34] Codefendant BP mirrored the allegations regarding failure to warn contained in the Joint Motion to Dismiss at Docket No. 235 in its individual motion at Docket No. 236.

Defendants refute Plaintiffs' position by arguing that the purpose of § 2761 actions are to obtain (1) injunctive relief in the form of abatement and (2) indemnification in the form of damages. *See Casiano Sales v. Lozada Torres*, 91 D.P.R. 488 (1964), 91 P.R.R. 473, 483 (1964); *Marrero-Hernandez v. Esso Standard Oil Co. (Puerto Rico)*, 429 F. Supp. 2d 469, 471 (D.P.R. 2006). But Plaintiffs do not seek to abate by way of injunctive relief, due to Defendants' fossil fuel activities. The cases cited seem to suggest that the recovery of damages is dependent on abatement. In other words, that one goes with the other.

Defendants also argue that Plaintiffs failed to properly plead causation for their nuisance claims. (Docket Nos. 235, 254). I agree. On this score, Plaintiffs' allegations are conclusory, at best. There are no allegations that Defendants are, for example, burning fossil fuels themselves in Puerto Rico, or operating facilities in the Municipalities. In fact, it is undisputed that none have plants or refineries on the island. Plaintiffs have failed to show a causal nexus between Defendants' acts or omissions and the damages claimed for any prior or ongoing conduct that can be said to be injurious to health and that interfered with the enjoyment of property by the Municipalities. I thus recommend that the nuisance causes of action be dismissed.

### (v)    Unjust Enrichment

Defendants seek dismissal of the unjust enrichment cause of action because they claim that Puerto Rico law only permits the remedy where there are no other forms of relief available. For support, they cite to *Rivera Muñiz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 65 (D.P.R. 2010) (Unjust enrichment "is unavailable if the plaintiff may seek other forms of relief.") and *P.R. Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011).

89

Plaintiffs offer no substantive argument in response. Their opposition only focuses on allowing them discovery prior to dismissing the unjust enrichment claim. But to access discovery, a plaintiff's complaint must pass the plausibility test. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Plaintiffs have not passed that hurdle with their unjust enrichment claim for there are other forms of relief available in this case. *See Ocaso, S.A., Compania De Seguros Y Reaseguros v. Puerto Rico Mar. Shipping Auth.*, 915 F. Supp. 1244, 1263 (D.P.R. 1996)(citing *Medina & Medina v. Country Pride Foods Ltd.*, 631 F. Supp. 293, 302 (D.P.R.1986) *aff'd by* 901 F.2d 181 (1st Cir.1990))("C]laims for unjust enrichment are 'subsidiary in nature and will only be available in situations where there is no available action to seek relief.'").

Accordingly, I recommend that the unjust enrichment claim be dismissed.

### (vi)    Lack of Parens Patriae Standing

As they asserted for the other causes of action, Defendants once again argue that Plaintiffs lack parens patriae standing because they are political subdivisions. However, as I have previously reasoned, the Municipalities are suing to vindicate their own rights which happen to be congruent with the interests of their residents. *See United States v. W.R. Grace & Co.Conn.*, 185 F.R.D. at 190. Because I find that Plaintiffs have standing to bring this action as to their own proprietary rights, this is not a basis to obtain dismissal of any of the causes of action that survived.

### IV.    CONCLUSION

In view of the foregoing, I recommend that the Presiding Judge deny the Joint Motion to Dismiss at Docket No. 234 for lack of jurisdiction.

I also recommend that the Joint Motion to Dismiss at Docket No. 235 be granted in part and denied in part. The following Counts should be dismissed for failure to state a claim: Common law consumer fraud (Count I); Conspiracy to commit common law consumer fraud and deceptive business practices (Count II); Rule 7 of Puerto Rico Rules against misleading practices and advertisements (Count III); public nuisance (Count IX); strict liability failure to warn (Count X); strict liability design defect (Count XI); negligent design defect (Count XII); private nuisance (Count XIII), and unjust enrichment (Count XIV).

It is further recommended that dismissal be denied as to the RICO claims under §§1962(c) and (d) but granted as to §§1962 (a) and (b). Dismissal should likewise be denied as to the antitrust cause of action (Counts IV-VII and VIII, respectively).

As to Defendants' individual motions to dismiss, I recommend as follows:

(i)    Grant in part and deny in part Occidental's motion to dismiss at Docket No. 232. Grant as to the failure to serve summons but deny on the other jurisdictional grounds. Grant in part and deny in part regarding the failure to allege all counts of the Amended Complaint as set forth for the Joint Motion at Docket No. 235.

(ii)   Grant in part and deny in part BP's motion to dismiss at Docket No. 236 to reflect the recommendations as to the Joint Motion at Docket No. 235.

(iii)  Deny Conoco's motion to dismiss at Docket No. 237.

(iv)   Deny Chevron's motion to dismiss at Docket No. 239.

(v)    Grant in part and deny in part Motiva's motion at Docket No. 240 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

91

(vi)    Grant in part and deny in part Exxon's motion at Docket No. 242 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

(vii)    Grant in part and deny in part BHP's motion at Docket No. 243 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

(viii)    Grant in part and deny in part Shells' motion at Docket No. 244 as set forth in the Joint Motion to dismiss at Docket No. 235.

(ix)    Deny BHP's motion to dismiss on the basis of lack of jurisdiction at Docket No. 245.

(x)    Deny Rio Tinto's motion to dismiss for lack of jurisdiction at Docket No. 246.

(xi)    Grant in part and deny in part Rio Tinto's motion to dismiss for failure to plead at Docket No. 247, as recommended with respect to the Joint Motion to Dismiss at Docket No. 235.

(xii)    Grant in part and deny in part API's motion to dismiss at Docket No. 254, as recommended for the Joint Motion to Dismiss at Docket No. 235.

Finally, I also recommend that the motion for judicial notice at Docket No. 238 be granted, but only as to taking notice of the fact that the articles and reports were published, and that the motion for judicial notice at Docket No. 241 be denied.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 20th day of February, 2025.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE