# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| THE MUNICIPALITIES OF BAYAMÓN, CAGUAS, LOÍZA, LARES, BARRANQUITAS, COMERÍO, CAYEY, LAS MARÍAS, TRUJILLO ALTO, VEGA BAJA, AÑASCO, CIDRA, AGUADILLA, AIBONITO, MOROVIS, MOCA, BARCELONETA, CAMUY, CATAÑO, SALINAS, ADJUNTAS, ARROYO, CULEBRA, DORADO, GUAYNABO, HORMIGUEROS, JUNCOS, LAJAS, MANATÍ, NAGUABO, NARANJITO, UTUADO, VILLALBA, COAMO, OROCOVIS, VIEQUES, and YABUCOA on behalf of themselves and others similarly situated, known as the MUNICIPALITIES OF PUERTO RICO,<br><br>Plaintiffs,<br><br>v.<br><br>EXXONMOBIL CORP, SHELL PLC F.K.A. ROYAL DUTCH SHELL PLC, CHEVRON CORP, BP PLC, CONOCOPHILLIPS, MOTIVA ENTERPRISES LLC, OCCIDENTAL PETROLEUM F.K.A. ANADARKO PETROLEUM CORP, BHP, RIO TINTO PLC, AMERICAN PETROLEUM INSTITUTE, XYZ CORPORATIONS 1-100, and JOHN AND JANE DOES 1-100,<br><br>Defendants. | Civil Case No. 3:22-cv-01550-SCC-HRV<br><br><br>Re:<br>Consumer Fraud; Deceptive Business Practices; Racketeer and Corrupt Organizations Act, 18 U.S.C. § 1962; Sherman Act, 15 U.S.C. § 1 et seq.; Public Nuisance; Strict Liability – Failure to Warn; Strict Liability – Design Defect; Negligent Design Defect; Private Nuisance; Unjust Enrichment |

## DEFENDANTS' JOINT OBJECTIONS TO REPORT AND RECOMMENDATION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

LEGAL STANDARD ..................................................................................................... 5

ARGUMENT .................................................................................................................. 5

    I.    Plaintiffs Fail to State a RICO Claim (Claims 4, 7) ................................. 5

        A.    Plaintiffs Fail to Adequately Allege Racketeering Activity ...................... 6

        B.    Plaintiffs Fail to Adequately Allege a Direct Causal Relationship Between the Claimed Racketeering Activity and Plaintiffs' Purported Injuries.................................................................................... 8

        C.    Plaintiffs Fail to Adequately Allege a RICO Enterprise........................... 11

        D.    Plaintiffs Do Not Plead a RICO Conspiracy............................................. 12

    II.    Plaintiffs Fail to Plead an Antitrust Violation (Claim 8) ...................................... 13

        A.    Plaintiffs Do Not Plausibly Plead an Agreement of Any Sort................. 13

        B.    Plaintiffs Do Not Plausibly Plead Harm To Competition........................ 17

        C.    Plaintiffs Do Not Plausibly Plead *Antitrust Injury* ................................. 17

    III.    Plaintiffs' Claims Are Barred by the First Amendment and *Noerr-Pennington* ................................................................................................ 20

    IV.    Plaintiffs' Claims Should Be Dismissed As Untimely ......................................... 23

        A.    Plaintiffs Fail to Adequately Allege That the Continuous Tort Doctrine Applies .................................................................................... 24

        B.    Plaintiffs Fail to Adequately Allege Facts Justifying Equitable Tolling.................................................................................................... 26

    V.    Plaintiffs Do Not Establish Personal Jurisdiction Over Any Defendant. ............. 32

        A.    Plaintiffs' Claims Do Not "Arise Out Of Or Relate To" Defendants' Contacts ........................................................................... 32

        B.    Exercising Personal Jurisdiction Over Defendants Would Be Unreasonable And Would Conflict With Principles Of Federalism......... 35

      C.     RICO's Nationwide Jurisdiction Provision Is Inapplicable Here. ............ 36

VI.    Plaintiffs' Puerto Rico Law Claims Should Be Dismissed For Additional Reasons ............................................................................................................ 37

CONCLUSION ...................................................................................................................... 38

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023)..................................................................................................20, 21

*A Corp. v. All Am. Plumbing, Inc.,*
   812 F.3d 54 (1st Cir. 2016)......................................................................................32, 35

*Allied Tube & Conduit Colp. v. Indian Head, Inc.,*
   486 U.S. 492 (1988)..................................................................................................20, 23

*In re Am. Exp. Co. S'holder Litig.,*
   39 F.3d 395 (2d Cir. 1994).............................................................................................11

*American Elec. Power Co., Inc. v. Connecticut,*
   564 U.S. 410 (2011)..................................................................................................29, 37

*Anne Arundel Cnty. v. BP plc,*
   No.C-02-CV-21-000565 (Md. Cir. Ct. Jan. 23, 2025)....................................................1

*Anza v. Ideal Steel Supply Corp.,*
   547 U.S. 451 (2006)....................................................................................................8, 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)...................................................................................2, 10, 14, 28

*Atl. Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990)..................................................................................................18, 19

*B&G Foods v. Embry,*
   29 F.4th 527 (9th Cir. 2022) ..........................................................................................22

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)...............................................................................13, 14, 15, 16

*Bonilla v. Trebol Motor Corp.,*
   913 F. Supp. 655 (D.P.R. 1995)....................................................................................25

*Bonilla v. Volvo Car Corp.,*
   150 F.3d 62 (1st Cir. 1998).............................................................................................8

*Boone v. Redevelopment Agency of City of San Jose,*
   841 F.2d 886 (9th Cir. 1988) ........................................................................................22

*Boyle v. United States,*
   556 U.S. 938 (2009)........................................................................................................12

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.,*
   582 U.S. 255 (2017)..................................................................................................33, 34

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Co.,*
   509 U.S. 209 (1993)...........................................................................................16, 17, 18

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
    429 U.S. 477 (1977)...............................................................................................18

*Cacho González v. Santarrosa*,
    203 D.P.R. 215 (2019)..........................................................................................26

*Ciminelli v. United States*,
    598 U.S. 306 (2023)...............................................................................................7

*City of Annapolis v. BP plc.*,
    No. C-02-CV-21-000250 (Md. Cir. Ct. Jan. 23, 2025)........................................1

*City of New York v. Chevron Corp.*,
    325 F. Supp. 3d 466 (S.D.N.Y. 2018)..................................................................1

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021)................................................................1, 33, 36, 37

*City of New York v. Exxon Mobil Corp.*,
    No. 451071/2021, 2025 WL 209843 (N.Y. Sup. Ct. Jan. 14, 2025)....................1

*City of Oakland v. BP P.L.C.*,
    325 F. Supp. 3d 1017 (N.D. Cal. 2018) .........................................................1, 36

*Comer v. Murphy Oil USA, Inc.*,
    718 F.3d 460 (5th Cir. 2013) ..............................................................................29

*Comer v. Murphy Oil USA, Inc.*,
    No. 1:11-cv-00220-LG-RHW (S.D. Miss. May 27, 2011)..................................29

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014)...........................................................................20

*Counterman v. Colorado*,
    600 U.S. 66 (2023)...............................................................................................21

*Davric Maine Corp. v. Rancourt*,
    216 F.3d 143 (1st Cir. 2000)...............................................................................20

*Douglas v. Hirshon*,
    63 F.4th 49 (1st Cir. 2023)....................................................................................6

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)................................................................................16, 20, 23

*Efron v. Embassy Suites (Puerto Rico), Inc.*,
    223 F.3d 12 (1st Cir. 2000)..................................................................................12

*Efron v. UBS Fin. Servs. Inc.*,
    96 F.4th 430 (1st Cir. 2024)..................................................................................6

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    832 F.3d 1 (1st Cir. 2016)...................................................................................16

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
663 F.2d 253 (D.C. Cir. 1981) ..................................................................................23

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021).................................................................................32, 33, 34

*FTC v. AbbVie, Inc.*,
976 F.3d 327 (3d Cir. 2020) .....................................................................................22

*Geomatrix, LLC v. NSF Int'l*,
82 F.4th 466 (6th Cir. 2023) .....................................................................................22

*Harris v. Quinn*,
573 U.S. 616 (2014).................................................................................................22

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010).........................................................................................8, 9, 11

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992).................................................................................................10

*J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*,
76 F.3d 1245 (1st Cir. 1996) .....................................................................................27

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
585 U.S. 878 (2018).................................................................................................20

*State ex rel. Jennings v. BP Am. Inc.*,
2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ........................................1, 23, 31

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997).............................................................................................24, 25

*Lerner v. Colman*,
26 F.4th 71 (1st Cir. 2022) .........................................................................................6

*Libertad v. Welch*,
53 F.3d 428 (1st Cir. 1995)........................................................................................12

*López-Flores v. Cruz-Santiago*,
526 F. Supp. 2d 188 (D.P.R. 2007)...........................................................................31

*Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.*,
No. CIV. 15-1167 JAG/SCC, 2015 WL 5719801 (D.P.R. Sept. 29, 2015)..................8

*Massachusetts v. EPA*,
549 U.S. 497 (2007).................................................................................................29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................15, 16

*Mayor & City Council of Baltimore v. BP P.L.C.*,
2024 WL 3678699 (Md. Cir. Ct. July 10, 2024)......................................1, 23, 32

*McMillan v. Rodríguez-Negrón*,
    511 F. Supp. 3d 75 (D.P.R. 2020)........................................................................24, 25

*In re Multidistrict Vehicle Air Pollution*,
    538 F.2d 231 (9th Cir. 1976) ..................................................................................19

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ................................................................................16

*N. Bridge Assocs., Inc. v. Boldt*,
    274 F.3d 38 (1st Cir. 2001).......................................................................................7

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958).................................................................................................21

*NAACP v. Claiborne Hardware*,
    458 U.S. 886 (1982).................................................................................................21

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984)...................................................................................................17

*Native Village of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) ...................................................................30

*Negrón-Torres v. Verizon Communications, Inc.*,
    478 F.3d 19 (1st Cir. 2007).....................................................................................34

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
    712 F.3d 21 (1st Cir. 2013).....................................................................................11

*New England Data Services, Inc. v. Becher*,
    829 F.2d 286 (1st Cir. 1987).....................................................................................6

*Nowak v. Tak How Invs., Ltd.*,
    94 F.3d 708 (1st Cir. 1996).....................................................................................32

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998).................................................................................................19

*Platkin v. Exxon Mobil Corp.*,
    2025 WL 604846 (N.J. Super. Ct. Law Div. Feb. 5, 2025) ...............................1, 38

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)...................................................................................................23

*Ramírez Morales v. Rosa Viera*,
    815 F.2d 2 (1st Cir. 1987).......................................................................................27

*Rhode Island v. Shell Oil Products Co., L.L.C.*,
    35 F.4th 44 (1st Cir. 2022)......................................................................................29

*Rhode Island v. Shell Oil Products Co., L.L.C.*,
    979 F.3d 50 (1st Cir. 2020).....................................................................................29

*Rivera-Díaz v. Humana of Puerto Rico, Inc.*,
   748 F.3d 387 (1st Cir. 2014)..............................................................27

*Rodríguez-Suris v. Montesinos*,
   123 F.3d 10 (1st Cir. 1997)..............................................................31

*Rotella v. Wood*,
   528 U.S. 549 (2000)..............................................................25

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989)..............................................................16

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*,
   113 F.3d 405 (3d Cir. 1997)..............................................................19

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..............................................................21

*Sosa v. D1RECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006)..............................................................20

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008)..............................................................31

*Stearns Airport Equip. Co. v. FMC Corp.*,
   170 F.3d 518 (5th Cir. 1999)..............................................................16

*Sterling Merch., Inc. v. Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011)..............................................................17, 18

*Sylva v. Culebra Dive Shop*,
   389 F.Supp.2d 189 (D.P.R. 2005)..............................................................5

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009)..............................................................17

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*,,
   902 F.3d 1 (1st Cir. 2018)..............................................................22, 23

*United Mine Workers v. Pennington*,
   381 U.S. 657 (1965)..............................................................20

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015)..............................................................7

*United States v. Raddatz*,
   447 U.S. 667 (1980)..............................................................5

*United States v. Rodríguez-Torres*,
   939 F.3d 16 (1st Cir. 2019)..............................................................12

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007)..............................................................8

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987).................................................................................7

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001)......................................................................................22

*Vázquez-Ramos v. Triple-S Salud, Inc.*,
    55 F.4th 286 (1st Cir. 2022).........................................................................17

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011)..................................................................13, 15

*Woods v. Wells Fargo Bank, N.A.*,
    733 F.3d 349 (1st Cir. 2013)...........................................................................6

**Statutes**

18 U.S.C. § 1962 ............................................................................................4, 5

18 U.S.C. § 1965 .........................................................................................36, 37

28 U.S.C. § 636 ...................................................................................................5

**Rules**

Fed. R. Civ. P. 9 ..............................................................................4, 6, 7, 26, 27

Fed. R. Civ. P. 12 ...............................................................................................3

Fed. R. Civ. P. 72 ...............................................................................................1

Local Civ. R. 72 ..............................................................................................1, 5

**Other Authorities**

Andrew C. Revkin, *A Deep Dive Into What Exxon Knew About Global Warming And When (1978) It Knew It*, N.Y. Times (Sept. 16, 2015).....................................29

Angela Fritz, Harvey. Irma. María. *Why Is This Hurricane Season So Bad?*,
    Wash. Post (Sep. 23, 2017)............................................................................29

Felicity Barringer, *Flooded Village Files Suit, Citing Corporate Link to Climate Change*, N.Y. Times (Feb.27, 2008).................................................................29

Jiarui Chen, et al., *How Much Have the Supermajors Contributed to Carbon Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors*, Columbia Center of Sustainable Investment (Mar. 2022) .................................................................................................28

Lauren Lluveras, *Puerto Rico's Bankruptcy Will Make Hurricane Recovery Brutal—Here's Why*, The Conversation (Sep. 26, 2017)..........................................29

Puerto Rico Climate Change Council, *Puerto Rico's State of the Climate* (2013).......................29

Richard Heede, "Tracing Anthropogenic Carbon Dioxide and Methane Emissions
     to Fossil Fuel and Cement Producers, 1854–2010." Climate Change 122, no. 1
     (2014) .............................................................................................................................28

Umair Irfan, *One of the Clearest Signs of Climate Change in Hurricanes Maria,
     Irma, and Harvey Was the Rain*, Vox (Sep. 29, 2017) ..............................................29

**TO THE HONORABLE COURT:**

Pursuant to Fed. R. Civ. P. 72(b) and Local Rule 72(d), Defendants respectfully object to the Magistrate Judge's Report & Recommendation ("R&R").

## INTRODUCTION

The Magistrate Judge's recommendation that this Court dismiss Plaintiffs' Puerto Rico-law claims is consistent with the growing, and nearly unanimous, consensus among "federal and state courts across the country that have rejected the availability of state tort law in the climate change context," *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846, at *3 (N.J. Super. Ct. Law Div. Feb. 5, 2025) (collecting cases).[1]  But the recommendation that the Court deny Defendants' motions to dismiss Plaintiffs' anomalous federal law claims is erroneous.  Outside of Puerto Rico, no climate change plaintiff has even alleged—much less successfully alleged—either federal RICO or anti-trust claims.  This case should not be the first.  The Amended Complaint also fails to establish personal jurisdiction over any Defendant. This Court, therefore, should reject those recommendations and dismiss the Amended Complaint in its entirety.

Plaintiffs' RICO and antitrust claims are wholly conclusory, facially implausible, untimely, and barred by the First Amendment.  Indeed, the very premises of those claims defy common sense: Plaintiffs assert that Defendants' alleged promotion of "contrarian theories" regarding climate change primarily in the 1980s and 1990s was somehow the "direct" cause of the hurricanes that struck Puerto Rico in 2017 (Dkt. 205 ¶¶ 362–500, 619), and that Defendants unlawfully "maintain[ed]" a purported "monopoly" by "increasing production" and "keeping prices low" (Am

---

[1] *See, e.g.*, *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021); *City of New York v. Chevron Corp.*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018), *aff'd*, 993 F.3d 81; *City of Oakland v. BP P.L.C.*, 325 F. Supp. 3d 1017 (N.D. Cal. 2018), *vacated on other grounds*, 960 F.3d 570 (9th Cir. 2020); *Mayor & City Council of Baltimore v. BP P.L.C.*, 2024 WL 3678699 (Md. Cir. Ct. July 10, 2024); *State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024); *City of Annapolis v. BP plc*, No. C-02-CV-21-000250 (Md. Cir. Ct. Jan. 23, 2025); *Anne Arundel Cnty. v. BP plc*, No.C-02-CV-21-000565 (Md. Cir. Ct. Jan. 23, 2025)); *cf. City of New York v. Exxon Mobil Corp.*, No. 451071/2021, 2025 WL 209843 (N.Y. Sup. Ct. Jan. 14, 2025).

Compl. ¶ 637)—quintessential *pro*competitive conduct.  To uphold these sprawling claims, the Magistrate Judge improperly credited Plaintiffs' "[t]hreadbare recitals," "naked assertion[s]," and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotations omitted).  He also erroneously invoked tolling doctrines under Puerto Rico law in holding that Plaintiffs' federal claims were timely.  And despite finding that Plaintiffs' claims are based on "Defendant's words, not their emissions," he failed to meaningfully engage with Defendants' arguments under the First Amendment.  Dkt. 315 at 79.

The Magistrate Judge correctly dismissed Plaintiffs' Commonwealth law claims, but he failed to apply the same logic to Plaintiffs' federal claims, notwithstanding that federal law requires an even more stringent analysis.  For example, Plaintiffs' RICO and nuisance claims turn on the same highly attenuated and implausible causal theory—i.e., Plaintiffs allege that Defendants' "decades-long misinformation campaign" somehow, by affecting policymakers and proposed regulatory measures, caused consumers *worldwide* to consume more fossil fuels, which resulted in increased global emissions, which exacerbated global climate change, which caused the 2017 hurricanes that hit Puerto Rico.  *Compare* Dkt. 205 ¶¶ 728–35 *with* ¶¶ 774–76, 821–23.  The Magistrate Judge correctly held that these allegations "failed to show a causal nexus between Defendants' acts or omissions and the damages claimed" for purposes of the nuisance claims.  Dkt. 315 at 89.  But inexplicably—and contrary to binding U.S. Supreme Court authority—he held that Plaintiffs "have asserted enough for proximate causation under RICO."  *Id.* at 48.  Since Plaintiffs' allegations do not suffice to allege proximate cause (or but-for cause) under Commonwealth law, they surely do not satisfy RICO's more demanding federal standard.  The R&R has many similar inconsistencies.

The Magistrate Judge also erred at an even more fundamental level:  The Court lacks personal jurisdiction over any Defendant.  Dkt. 315 at 20–27, *see* Dkt. 234, 296.  Plaintiffs concede that no

Defendant has plants or refineries in Puerto Rico.  Dkt. 315 at 20–21, 89.  The sparse contacts Plaintiffs do allege lack the required "strong" connection to their claims, which are plainly global in scope, but the R&R did not even address Defendants' arguments on that issue.  *Id.* at 23–25.

Accordingly, the Court should reject the objected-to findings and recommendations in the R&R and dismiss all of Plaintiffs' claims with prejudice.

## BACKGROUND

Plaintiffs filed suit on November 22, 2022. Dkt. 1, seeking damages allegedly caused by a series of hurricanes in 2017.  Plaintiffs' theory is that Defendants contributed to climate change by inflating demand for fossil fuels through misleading advertising practices, which increased global emissions, exacerbated global climate change and, in particular, caused the 2017 hurricanes that are the source of Plaintiffs' claimed damages.

Defendants filed joint motions to dismiss Plaintiffs' Amended Complaint under Fed. R. Civ. P. 12(b)(2) (Dkt. 234) and 12(b)(6) (Dkt. 235), and a motion for judicial notice (Dkt. 238), as well as Defendant-specific motions, *see* Dkts. 232, 236, 237, 239, 240–47, 254.

On February 20, 2025, the Magistrate Judge issued his R&R recommending granting the motions in part and denying them in part.  Dkt. 315.  Defendants take all material jurisdictional allegations as true for purposes of the joint motions and objections,[2] and Plaintiffs admit that *no* "Defendants are . . . burning fossil fuels in Puerto Rico, or operating facilities in the Municipalities." *Id.* at 18–23, 89.  The Magistrate Judge nonetheless both found personal jurisdiction *and* recommended jurisdictional discovery—which Plaintiffs never sought.  *Id.* at 18–23

The Magistrate Judge recommended dismissing each claim based on Puerto Rico law on the merits for the following reasons.  First, he held Puerto Rico does not recognize common law

---

[2] Certain Defendants contest the jurisdictional allegations as to them in their separate motions.

consumer fraud or civil conspiracy, Dkt. 315 at 83–84, and a codified fraud claim can be brought only by a specific government agency and only on behalf of "natural persons," not by these Plaintiffs, *id.* at 84. He then held that the design defect claims failed for lack of an alleged defect and failure to plead proximate causation. *Id.* at 86–87. He further found that Defendants had no duty to warn of climate change because it is not a reasonably foreseeable danger associated with Plaintiffs' *use* of the specific products. *Id.* at 87–88. Similarly, he found that the nuisance claims fail because Plaintiffs are not seeking injunctive abatement, and because "Plaintiffs failed to properly plead causation;" Plaintiffs' allegations are conclusory, at best. *Id.* at 89. He also found that Plaintiffs' unjust enrichment claim fails because the complaint does not "pass the plausibility test." *Id.* at 90. Nevertheless, he recommended against finding the Commonwealth-law claims preempted and precluded by the federal structure of the Constitution and under federal law, recommending instead that this Court depart from every other federal court to have decided this issue and to join the minority view of certain state courts. *Id.* at 79–83.

The Magistrate Judge recommended dismissing only two of the four RICO claims, finding that Plaintiffs effectively conceded the infirmity of their § 1962(a) and (b) claims by offering no response to Defendants' arguments that they failed to plead any injuries attributable to Defendants' control over enterprises or investment of racketeering income for purposes of Claims 5 and 6. Dkt. 315 at 58. But the Magistrate Judge recommended against dismissing Claims 4 and 7, which Plaintiff brought pursuant to §§ 1962(c) and (d). He did so despite simultaneously finding that (i) the Amended Complaint failed to satisfy Rule 9(b) with respect to the only predicate acts alleged—mail and wire fraud—and (ii) Plaintiffs failed to plead their injuries were proximately caused by Defendants' actions. Dkt. 315 at 47–48, 51–54, 89.[3]

---

[3] The Magistrate Judge recommended dismissing all RICO claims against API. Dkt. 315 at 62.

The Magistrate Judge also recommended against dismissing the antitrust claim (Claim 8) despite there being no alleged agreement, harm to competition, or antitrust injury. He overlooked that (i) no alleged acts were inconsistent with each Defendant's independent business interest in expanding production, (ii) any supposedly alleged agreement would have been procompetitive and—by Plaintiffs' own telling—resulted in Defendants "lower[ing] their prices and increas[ing] their production," and (iii) the purported injury (damages from the 2017 storms increased by global warming) has no sufficient nexus to any supposed injury to competition. *Id.* at 71–78.

The Magistrate Judge also recommended against dismissal on other grounds that would apply to all claims. Despite all relevant allegations being well publicized years before the 2017 storms, he recommended that the Court deem the claims timely. *Id.* at 32–41. And despite allegations involving core political speech, he summarily rejected the First Amendment and *Noerr Pennington* defenses because Plaintiffs assert fraud, *id.* at 42–44, which the Magistrate Judge elsewhere acknowledged had not been pleaded with the requisite particularity, *id.* at 54.

## LEGAL STANDARD

A timely objection requires *de novo* review of "portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F.Supp.2d 189, 191–92 (D.P.R. 2005) (citing *U.S. v. Raddatz*, 447 U.S. 667, 673 (1980)). "[T]he court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); Local Civ. R. 72(d).

## ARGUMENT

### I.   Plaintiffs Fail to State a RICO Claim (Claims 4, 7)

The Court should dismiss Plaintiffs' claims under 18 U.S.C. § 1962(c) and (d). As Defendants showed, Plaintiffs fail to adequately plead any, much less all, of the elements of these RICO claims.

*See* Dkt. 235 at 17–37; Dkt. 297 at 17–25.[4]

### A.    Plaintiffs Fail to Adequately Allege Racketeering Activity

Wire and mail fraud claims must satisfy Rule 9(b).  *See Lerner v. Colman*, 26 F.4th 71, 84 (1st Cir. 2022).  The Magistrate Judge expressly held that Plaintiffs' allegations "fall[] short" and that "more information is needed to satisfy Rule 9(b)," but declined to dismiss the RICO claims, instead recommending Plaintiffs "be allowed to take discovery."  Dkt. 315 at 54.  This was error.

The Magistrate Judge's reliance on *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987), is misplaced.  In *Becher*, the First Circuit held that where a complaint (1) "falls short of pleading a claim with the heightened particularity required by Rule 9(b), *and* (2) the missing information is 'peculiarly within [the] defendants' knowledge,' a district court *may* have discretion to allow the plaintiffs limited discovery to uncover the missing details."  *Douglas v. Hirshon*, 63 F.4th 49, 59 (1st Cir. 2023) (quoting *Becher*, 829 F.3d at 290–92) (emphasis added).  But "*Becher* discovery (with concomitant leave to amend) is neither automatic, nor of right, for every plaintiff."  *Efron v. UBS Fin. Servs. Inc.*, 96 F.4th 430, 436 (1st Cir. 2024).  Indeed, the First Circuit has "never applied *Becher* in a case . . . where the complaint fell short not only of Rule 9(b)'s heightened particularity requirements but also of the ordinary plausibility standard."  *Hirshon*, 63 F.4th at 59.

*Becher* discovery is not warranted here.  As Defendants explained (and the Magistrate Judge agreed), Plaintiffs failed to identify any allegedly false or misleading public statements—much less allege "when, where, and how often [any] allegedly false statements were made or what, specifically, was stated."  *Woods v. Wells Fargo Bank, N.A.,* 733 F.3d 349, 358 (1st Cir. 2013).  This

---

[4]  The Magistrate Judge appropriately recommended dismissing Claims 5 and 6 because Plaintiff failed to respond to Defendants' arguments.  Dkt. 315 at 58.  But Defendants note that Claims 5 and 6 are also subject to dismissal for the same reasons as Claims 4 and 7, as set forth in their joint motion to dismiss and in these objections.

despite otherwise contending that Defendants' alleged "misrepresentations" were made publicly and were supposedly so globally impactful as to have boosted demand for fossil fuels and even altered the global climate. For Defendants' alleged "misrepresentations" to have had anything like the global impact Plaintiffs baldly assert, by definition they could *not* be in Defendants' exclusive possession and Plaintiffs would not need discovery to plead the who, what, when, where, and how. *See N. Bridge Assocs., Inc.* v. *Boldt*, 274 F.3d 38, 43 (1st Cir. 2001) (characterizing the approach in *Becher* as "gener[ous]" and declining to permit discovery where additional details "could [not] be expected to be exclusively within the defendants' knowledge"). Indeed, neither Plaintiffs nor the Magistrate Judge identify any discovery Plaintiffs purportedly need to satisfy Rule 9(b). *Becher* discovery is therefore inappropriate.

Moreover, the R&R fails to grapple with Plaintiffs' failure to plead a plausible scheme to defraud. Mail or wire fraud cannot be based solely on the notion that the victim was denied information, as opposed to property, by means of the alleged deception. *See Ciminelli v. United States,* 598 U.S. 306, 316 (2023). The R&R attempts to evade that precedent by stating that Defendants' alleged disinformation campaign had "the purpose of obtaining property of value, i.e., money, from the sale of Defendants' products to Plaintiffs." Dkt. 315 at 53. But Plaintiffs—who can only sue in their own capacity, R&R at 68—do not even specifically allege that *they* purchased Defendants' products. Even if they had, the R&R ignores that Plaintiffs do not dispute that they "received the full economic benefit of [their] bargain." *United States v. Binday,* 804 F.3d 558, 570 (2d Cir. 2015), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023). There is no allegation that Plaintiffs did not receive the fuel they purchased or that the fuel did not work as promised. They "received exactly what they paid for." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). "[T]here was no discrepancy between benefits reasonably anticipated and actual

benefits received." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (quotations omitted).[5]

Indeed, the Magistrate Judge's recommendation on wire and mail fraud cannot be reconciled with his conclusion that Defendants had no duty to warn consumers about alleged "effects that fossil fuels have on climate change." Dkt. 315 at 88. As the First Circuit held, "there is no general obligation of the seller to tell the buyer everything negative that the buyer might be interested in learning about the transaction or item to be purchased." *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70 (1st Cir. 1998) (no wire or mail fraud where plaintiffs "received the [Volvo] cars they ordered," even if certain parts were not installed in Sweden). If Defendants had no "legal, professional or contractual duty" to warn consumers about alleged climate effects of fossil fuels, then allegedly not disclosing such effects cannot constitute mail or wire fraud. *Id.* at 70.

## B. Plaintiffs Fail to Adequately Allege a Direct Causal Relationship Between the Claimed Racketeering Activity and Plaintiffs' Purported Injuries

The Magistrate Judge also erred in finding Plaintiffs adequately pleaded proximate causation, as required under binding Supreme Court precedent. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (holding a RICO plaintiff must "show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well"). Proximate cause "requires some *direct* relation between the injury asserted and the injurious conduct alleged." *Id.* The "link" between the alleged misconduct and the alleged injury cannot be "remote, purely contingent, or indirec[t]." *Id.* (quotations omitted) (alteration in original). The "central question [a court] must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 460–61 (2006) (emphasis added). Indeed, "[t]he general tendency of

---

[5] *See also Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.,* No. CIV. 15-1167 JAG/SCC, 2015 WL 5719801, at *8 n.16 (D.P.R. Sept. 29, 2015), *R&R adopted,* No. CV 15-1167 (JAG), 2016 WL 9459821 (D.P.R. Mar. 31, 2016) (RICO claim sufficiently pleaded where plaintiffs alleged "that they paid more for a product than it was worth," as contrasted with other cases where plaintiffs "received what [they] paid for").

the law[] . . . is not to go beyond the first step" in the causation chain, and that "tendency applies with full force to proximate cause inquiries under RICO." *Hemi Grp.,* 559 U.S. at 2 (quotations omitted) (alteration in original).

Plaintiffs' RICO causation allegations go far beyond the first step. Indeed, their chain of causation has *at least* six distinct steps, each of which includes multiple, different components:

1.  Defendants, "over the course of decades" (i.e., beginning in 1989 to the present), allegedly "engaged in an . . . enterprise . . . to promote climate change denial and undermine scientific consensus as a deceptive means to manipulate Plaintiffs and their residents into continuing to purchase their products." Dkt. 206 ¶ 2(h).

2.  As a result of those allegedly deceptive statements, Plaintiffs and their residents allegedly continued to purchase Defendants' products, resulting in some marginal increase in the amount of Defendants' products purchased and used by Plaintiffs.

3.  By purchasing and using more of Defendants' products as a result of the alleged deception, Plaintiffs and their residents produced more greenhouse gases than they otherwise would have.

4.  Those additional greenhouse gases, combined with greenhouse gas emissions produced by billions of third parties and other sources across the planet for decades, allegedly increasing *global* climate change in some unspecified and marginal manner.

5.  As a distinct result of *increased global* climate change, Puerto Rico was hit by hurricanes in 2017.

6.  Plaintiffs sustained damages (*e.g.*, to infrastructure and crops, costs of emergency services, and decreased tax revenue) because of the hurricanes.

As a matter of law, Plaintiffs' alleged causal chain is far too attenuated to support RICO

liability. The Supreme Court has held that much more direct allegations of causation fail at the pleading stage. In *Hemi Group,* for example, the City of New York alleged it suffered tax losses when an online retailer failed to share data that, according to the City, may have enabled it to obtain unpaid taxes from the retailer's customers. *Id.* The Supreme Court held that causal chain was too attenuated because the conduct directly responsible for the City's harm was the customers' failure to pay taxes, not the alleged fraud, and thus affirmed dismissal. *Id.* at 7, 9–11, 18. *See also Anza*, 547 U.S. at 457–59 (rejecting RICO causation theory that a competitor's failure to collect sales tax allowed it to charge artificially low prices); *Holmes v. Sec. Inv'r Prot. Corp.,* 503 U.S. 258, 270–74 (1992) (holding RICO did not permit insurer to recover losses due to stock manipulation that victimized third parties because alleged injuries were attenuated and indirect). Here, Plaintiffs' multistep causal chain relies on the acts of billions of third parties around the globe combusting oil and gas products, and it turns on the vagaries of how and where a hurricane developed and made landfall. Such an attenuated and remote theory cannot establish proximate cause.[6]

In recommending denial, the Magistrate Judge sidestepped Defendants' arguments and concluded that "the amended complaint has set forth enough factual allegations of proximate cause" because "Plaintiffs pled that they directly suffered the consequences of" Defendants' alleged misrepresentations. Dkt. 315 at 48. To be sure, Plaintiffs repeatedly *said* that their injuries were "a direct and proximate result" of Defendants' conduct, *e.g.*, Dkt. 205 ¶¶ 655, 698, 712, 732, but that is inconsistent with their lengthy chain of injury, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*,

---

[6] In fact, Plaintiffs cannot even plausibly allege but-for causation. Plaintiffs acknowledge that Puerto Rico is in the "notorious Hurricane Alley." Dkt. 205 ¶ 4. It is rank speculation that Defendants' allegedly deceptive statements were the but-for reason that hurricanes hit Puerto Rico in 2017. It is equally implausible to suggest that global climate change would have stopped, or the 2017 hurricanes would not have occurred, had Defendants sold less fuel between 1989 and 2017—much less sold less fuel *in Puerto Rico*. See Dkt. 206 ¶¶ 8(a), 8(b), 8(c), 8(d).

556 U.S. at 678. *See also In re Am. Exp. Co. S'holder Litig.*, 39 F.3d 395, 400 n.3 (2d Cir. 1994) ("[W]hile the complaint does cursorily assert that [plaintiff] was a victim of the RICO defendants' acts and that these acts were the proximate cause of [plaintiff's] alleged injuries, these conclusory allegations . . . need not be accepted as true for the purposes of ruling on a motion to dismiss.").

The Magistrate Judge's reliance on *In re Neurontin Mktg. & Sales Pracs. Litig.,* 712 F.3d 21 (1st Cir. 2013), is misplaced. First, invoking it for the proposition that "first-party reliance on misrepresentations is not an element of proximate cause in a mail fraud RICO claim" is a straw-man. Dkt. 315 at 48. Defendants did not argue first-party reliance, and *Neurontin* does not dis-place the Supreme Court's requirement of a "direct relation[ship]" between the alleged fraud and the alleged injury. *Hemi Grp.*, 559 U.S. at 9. Second, *Neurontin* is *not* a "fitting factual scenario." Dkt. 315 at 48. There, a health insurer was the "primary and intended victim" of a drug manufac-turer's alleged scheme to fraudulently inflate prescriptions. *Id.* at 37. While the alleged fraud was *committed*, in part, through marketing to physicians to induce prescriptions for off-label uses, *id.* at 25–26, 37, it ultimately was intended to induce health insurers to directly pay for the purportedly fraudulent prescriptions. *Id.* at 37–38. As such, the causal chain was "anything but attenu-ated." *Neurontin*, 712 F.3d at 38. Here, in contrast, there is no direct link. Plaintiffs do not allege that *they* paid for any fuel that consumers were "fraudulently" induced to buy. Rather, they allege that Defendants' "fraud" on myriad third parties led Plaintiffs—through a series of complex world-wide mechanisms—to suffer downstream injuries from the 2017 hurricanes. This is not *Neurontin*.

## C.  Plaintiffs Fail to Adequately Allege a RICO Enterprise

The Magistrate Judge further erred in finding that Plaintiffs adequately alleged a RICO enter-prise. Plaintiffs allege that Defendants acted "through their enterprises-in-fact—the GCC, API, and [their] members." Dkt. 206 ¶ 2(h). But an "association-in-fact" enterprise requires "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient

to permit these associates to pursue the enterprise's purpose." *United States v. Rodríguez-Torres,* 939 F.3d 16, 24 (1st Cir. 2019) (quoting *Boyle v. United States,* 556 U.S. 938, 946 (2009)). Plaintiffs admit that GCC ceased operating in 2002, more than two decades ago. *See* Dkt. 206 ¶¶ 2(b), 8(b)(ii). Since 2002, Plaintiffs allege only (and vaguely) that GCC "continues informally today through other associations like API and the National Association of Manufacturers as an association-in-fact of the Defendants." Dkt. 205 ¶ 211(a). The Magistrate Judge cited *Rodríguez-Torres* for the proposition that informal organizations can be enterprises. Dkt. 315 at 50. But *Rodríguez-Torres* still required parties to plead facts that demonstrate "the necessary relationships between … members" of the alleged informal enterprise that "reflec[t] that [members] saw themselves as a united, organized group," operated "principally through jointly-undertaken activities," and "continued as a cohesive unit." 939 F.3d at 25. Plaintiffs do not allege any of these things post-2002. Plaintiffs allege only a supposed "similarity of viewpoint, rhetoric and strategy," which is not sufficient to allege a RICO enterprise. *Libertad v. Welch,* 53 F.3d 428, 443 (1st Cir. 1995), *abrogated on other grounds as recognized by United States v. Velázquez-Fontanez,* 6 F.4th 205 (1st Cir. 2021).[7]

### D.   Plaintiffs Do Not Plead a RICO Conspiracy

The Magistrate Judge erred by finding Plaintiffs have alleged a RICO conspiracy. As a threshold failing, Plaintiffs do not plead a substantive RICO violation. *See Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000). And a conspiracy requires knowledge of, and intent to advance, the specific alleged racketeering acts. *Rodríguez-Torres,* 939 F.3d at 24. Plaintiffs' conclusory allegations do not do suffice to plead conspiracy. *See* Dkt. 205 ¶¶ 757–58.

---

[7] The First Circuit has emphasized that imposing "liability for mere membership in an association, particularly when that association is ideological, may conflict with the First Amendment." *Velázquez Fontanez*, 6 F.4th at 205. Thus, it is "particularly important" that plaintiffs identify sufficient facts "beyond [defendants'] similarity of viewpoint, rhetoric and strategy, to show an enterprise." *Id.* Plaintiffs have failed to do so here.

## II. Plaintiffs Fail to Plead an Antitrust Violation (Claim 8)

The Magistrate Judge also erred in recommending that Plaintiffs' antitrust claims be sustained. As Defendants showed, Plaintiffs have not pleaded either an anticompetitive agreement or antitrust injury. *See* Dkt. 235 at 38–43; Dkt. 297 at 25–30.

### A. Plaintiffs Do Not Plausibly Plead an Agreement of Any Sort

The Magistrate Judge erred in finding that "Plaintiffs have pled enough to survive dismissal regarding the existence of an anticompetitive agreement." Dkt. 315 at 75. Plaintiffs do not plead facts showing the existence of an agreement, let alone an anticompetitive one. As the Supreme Court made clear in its seminal *Twombly* decision dismissing an antitrust claim on the pleadings, bare allegations of a conspiracy and parallel conduct do not suffice to state a Section 1 claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Section 1 "does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." *White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011) (citations omitted). Plaintiffs "must establish that it is plausible that [D]efendants are engaged in more than mere conscious parallelism, by pleading and later producing evidence pointing toward conspiracy, sometimes referred to as 'plus factors.'" *Id.* at 577. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556–57.

Plaintiffs' conspiracy allegations are wholly conclusory. Plaintiffs allege that "Defendants maintained their energy monopoly in Puerto Rico by conspiring, and succeeding, in keeping prices low, to prevent the development of noncarbon-based energy sources and maintain the dependency of the Municipalities and their citizens upon their products." Dkt. 205 ¶ 84. But they plead no supporting facts. Plaintiffs also assert Defendants "increased production to maintain their energy monopoly, fix prices, and increase obstacles for competitive entry into the market by alternative

energy companies." *Id.* at ¶ 767.  But these are just "labels and conclusions." *Twombly*, 550 U.S. at 545.  Plaintiffs allege no *facts* supporting these conclusions.

*Twombly* is on point.  As here, the *Twombly* plaintiffs alleged the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry[.]" *Twombly*, 550 U.S. at 551 (quotations omitted).  The Court dismissed these allegations as "merely legal conclusions." *Id.* at 564.  Turning to the "nub" of the complaint—that the defendants engaged in "parallel conduct"—the Court held that "nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy." *Id.* at 566.  "[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions . . . were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing." *Id.*

Plaintiffs' allegations here are similarly deficient.  Plaintiffs do not allege *any* facts suggesting that Defendants agreed to "fix prices," "increase[] production," or "keep[] prices low."  There are no facts about actual prices alleged at all, and their conspiracy allegations are nothing more than "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  The Amended Complaint does not allege any actual or specific prices, price changes, parallel prices, or price activity whatsoever—just boilerplate generalities.[8]  Nor

---

[8] *See, e.g.,* Dkt. 205 at ¶ 7(d) ("[Defendants] jointly schemed to maintain their energy production monopoly, lower prices, and thereby block the development of alternative energy sources."); ¶ 73 ("The Defendants protected their energy monopoly and blocked alternative energy source development by increasing production and keeping prices low."); ¶ 80 ("The production increase was initiated and continued to maintain the Defendants' monopoly on energy sales, maintain low prices and delay the development of alternative energy sources."); ¶ 585 ("[T]he Defendants engaged in those carefully devised actions in order to defraud the Municipalities of Puerto Rico, to continue to produce and sell their products unabated at low prices, earn billions in profit, and delay the development of energy production alternatives."); ¶ 637 ("[Defendants] agree[d] to conspire to maintain their monopoly by increasing production, fixing prices, feigning interest in alternative energy sources and lying about the climate change threat to the Plaintiffs."); ¶ 651 ("[T]he GCC members repeatedly engaged in both material misrepresentations and fraudulent omissions regarding the hazardous effects of their fossil fuel products, and, while doing so, the Defendants produced and sold more and more of their products and prevented alternative fuel sources from competing with their price fixing."); ¶ 654 ("As a direct result of the Defendants' fraudulent and deceptive marketing scheme and price fixing, they were able to extract billions of dollars of revenue from the unfettered sale of fossil fuel products, including significant revenue

does it plead any *facts*—direct or circumstantial—suggesting that Defendants agreed to charge certain prices or implement certain price changes. The R&R identified no specific allegations.

Plaintiffs do not allege that Defendants had meetings, calls, or videoconferences in which they agreed to charge specific prices or coordinate pricing. The only alleged communications relate to the purported climate change "disinformation" campaign—not pricing. But an agreement requires "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that . . . suggests that each competitor failed to make an independent decision." *White*, 635 F.3d at 576 (quotations omitted). No such facts are alleged. Plaintiffs have failed to plead a price-fixing agreement, which is the only claimed *per se* violation.

And the Amended Complaint pleads no "factual context suggesting agreement, as distinct from identical, independent action." *Twombly*, 550 U.S. at 549. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

Plaintiffs do not plead facts excluding the possibility that Defendants acted independently. A typical premise of an antitrust conspiracy is that competitors conspire to do something counter to their short-term individual interests in order to obtain some longer-term benefit—such as restricting output to raise prices, thereby forgoing the short-term incentive to sell more at the higher price. But here, Plaintiffs do not allege that Defendants acted against their individual economic self-interest or in unison, much less that they agreed to do so—only that, over decades, they reduced prices and increased output at various times in unspecified and individual ways. "[C]utting prices

---

from the Municipalities of Puerto Rico and their citizens."); ¶ 708 ("Defendants' deceptive trade practices occurred in the course of Defendants' business and involved the maintenance of their energy monopoly and price fixing to block competitors from entering the marketplace."); ¶ 767 ("Defendants increased production to maintain their energy monopoly, fix prices, and increase obstacles for competitive entry into the market by alternative energy companies.").

in order to increase business often is the very essence of competition," and thus does not support any inference of an anticompetitive conspiracy. *Matsushita*, 475 U.S. at 594; *accord Twombly*, 550 U.S. at 554 (parallel conduct that is consistent with "rational and competitive business strategy unilaterally prompted by common perceptions of the market" does not support an inference of an anticompetitive conspiracy); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 11 (1st Cir. 2016) ("Where the challenged conduct is as consistent with permissible competition as with illegal conspiracy, a plaintiff must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.") (quotations omitted). Plaintiffs allege nothing like that here. *See supra*, n.8.

Nor do Plaintiffs' boilerplate allegations of "false advertising" support an inference of an anticompetitive agreement. The antitrust laws "do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Co.,* 509 U.S. 209, 225 (1993). "[D]eception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961). Indeed, even "wrong" or "misleading" advertising is "indicative of competition on the merits." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524 (5th Cir. 1999). Here, consumers had access to the same publicly available information regarding fossil-fuel-related climate risks that Plaintiffs cite in the Amended Complaint. That information was widely disseminated. Even if (and they did not) Defendants made statements that were "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech." *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989).[9] The Magistrate Judge correctly noted that

---

[9] Nor does Defendants' membership in trade organizations suggest an illegal agreement. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[M]ere participation in trade-organization

dismissal would likely be warranted if this case turned only on false advertising.  Dkt. 315 at 74.
He erred, however, in concluding that dismissal is not warranted here because, in his view, "Plaintiffs' allegations of anticompetitive behavior do not rely solely on false advertising."  *Id.*  Plaintiffs have not plausibly alleged the existence of any anticompetitive conduct or agreement.

### B.   Plaintiffs Do Not Plausibly Plead Harm To Competition

"Injury to competition is usually measured by a *reduction in output* and an *increase in prices* in the relevant market."  *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) (quotations omitted, emphases in original).  But here, Plaintiffs alleged the opposite—that Defendants "increased production" and "lower[ed] prices."  Dkt. 205 ¶ 7(d), 767.  Increasing output and lowering prices, however, is *procompetitive* behavior that the antitrust laws encourage.  *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,* 468 U.S. 85, 114 (1984).  As competitors, Defendants had every incentive to increase output.  Absent an allegation that they priced below cost—which is entirely absent here—the complaint does not explain how alleged price-cutting could have harmed competition.  *Brooke Grp.,* 509 U.S. at 223 (rejecting "notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws").  Even assuming unnamed renewable energy companies could not match Defendants' prices, there was no harm to competition.

### C.   Plaintiffs Do Not Plausibly Plead *Antitrust Injury*

To establish "antitrust standing," Plaintiffs must plead an antitrust injury.  *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 293 (1st Cir. 2022).  "Lack of an antitrust injury is typically enough by itself to negate [antitrust] standing."  *Id.* at 294.  An antitrust injury is "injury of the

---

meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [the defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior.").

type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). The injury must "be 'the type of loss that the claimed violations . . . would be likely to cause,' and should therefore 'reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Sterling Merch.*, 656 F.3d at 121 (quoting *Brunswick Corp.*, 429 U.S. at 489). Thus, Plaintiffs must show that (1) "they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation," and (2) "their injury is the type of injury the antitrust violation would cause *to competition.*" *Id.*

The Magistrate Judge erred in finding that Plaintiffs pleaded antitrust injury. Dkt. 315 at 77–78. Such injury requires that a private party be "adversely affected by an *anticompetitive* aspect of the defendant's conduct; in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340–41 (1990) (quotations omitted) (cleaned up) (emphasis added). Predatory pricing requires below-cost pricing and a dangerous probability of recoupment through supracompetitive pricing. *Brooke Grp.*, 509 U.S. at 222–24. Plaintiffs do not allege either. To the contrary, Plaintiffs allege Defendants have "maintain[ed] low prices," Dkt. 205 ¶ 80, while "experienc[ing] unprecedented profits," *id.* ¶ 579. *See also id.* ¶ 557 ("record-breaking profits"), ¶ 617 ("profits soared" over "three decades"). But "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atl. Richfield*, 495 U.S. at 340.

The Magistrate Judge ignored the procompetitive nature of Defendants' low prices and concludes instead that Plaintiffs were injured because they were "prevented . . . from reducing their purchase of Defendants' products and buying instead alternative, non-carbon-based energy

sources." Dkt. 315 at 77 (quotations omitted). But the purported deprivation of access to alternative energy "sources" is not a cognizable "antitrust injury." *See Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 414 (3d Cir. 1997) ("Depriving consumers of 'energy sources' is not . . . cognizable antitrust injury. An 'energy source' is not the same as a 'competitor[.]'").

Nor do consumers sustain an *antitrust* injury when potential entrants are unable to compete on price. "When a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed violation." *Atl. Richfield*, 495 U.S. at 337.[10]

In any event, this is not what Plaintiffs allege. Plaintiffs allege that Defendants' supposed "deceit" "prevent[ed] the Municipalities . . . from having the knowledge that they needed to adequately prepare for the 'hotter and wetter' storms that pummeled the Island in 2017," which allegedly caused Plaintiffs to "incur billions in damages" because of those hurricanes. Dkt. 205 ¶ 770. Plaintiffs do not allege that Defendants' purported deceit harmed the competitive process. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 140 (1998) (rejecting antitrust claims based on alleged conspiracy to defraud rate regulators and drive up telephone rates because alleged harm to consumers did not derive from "harm[] to the competitive process itself"). Rather, Plaintiffs allege harm in the form of "billions" in storm-related damages.

But Plaintiffs' storm-related damages are not antitrust injuries, nor were the antitrust laws intended to prevent storms. *See, e.g., In re Multidistrict Vehicle Air Pollution,* 538 F.2d 231, 236–37 (9th Cir. 1976) (stating that liability for pollution was "never intended by the drafters" of

---

[10] The R&R was wrong in stating that "Plaintiffs allege that Defendants excluded other renewable players from entering the market." Dkt. 315 at 77. In fact, Plaintiffs do not even allege that any potential entrant was excluded from the market—only that Plaintiffs supposedly would have "implemented alternative, non-carbon-based energy sources, such as wind and solar energy" if they had known that purchasing Defendants' products would contribute to climate change. Dkt. 205 ¶ 767. In other words, Plaintiffs assert that alternative energy sources existed that they could have utilized but elected not to do so based on Defendants' alleged disinformation. As unsupported and implausible as this is, Plaintiffs' purported decision to consume lower-priced fossil fuels is not an "injury" under the antitrust laws.

antitrust laws).

### III.  Plaintiffs' Claims Are Barred by the First Amendment and *Noerr-Pennington*

The Magistrate Judge erred in denying Defendants' motion based on the First Amendment and

*Noerr-Pennington*.  Plaintiffs are suing Defendants based on their alleged speech, membership in

advocacy organizations, lobbying activities, and participation in public debate regarding climate

change—an issue of undisputed public importance.  *See, e.g.,* Dkt. 205 ¶¶ 327, 365, 387, 391, 418,

503, 505, 516–518, 520, 665.  As Defendants demonstrated, the First Amendment and *Noerr-*

*Pennington* bar Plaintiffs' attempt to hold Defendants liable for core political speech.  *See* Dkt.

235 at 17–24; Dkt. 297 at 12–17.[11]  This defect alone warrants dismissal of all claims.

The Supreme Court has recognized that "climate change" is a "matter[] of profound value and

concern to the public."  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.,* 585 U.S. 878, 913–14

(2018) (quotations omitted).  Speech about climate change thus "occupies the highest rung of the

hierarchy of First Amendment values" and warrants "special protection."  *Id.* (quotations omitted).

Defendants' speech is thus entitled to *more* constitutional protection, not less.  No "consensus"—

scientific or otherwise—is regarded by the law as beyond criticism or disagreement.  That is be-

cause "the First Amendment protects an individual's right to speak his mind regardless of whether

the government considers his speech sensible and well intentioned or deeply 'misguided.'"  *303*

*Creative LLC v. Elenis,* 600 U.S. 570, 586 (2023).  "Contrarian theories," no less than "established

science," are entitled to constitutional protection.  *See* Dkt. 205 ¶¶ 72, 362–63, 381–83.  The First

Amendment protects not only the heartland of political speech, but also "the *prospect* of chilling

---

[11] *Noerr-Pennington* protects activities intended to influence the government—including campaigns designed to in-
fluence voters—under the Petition Clause of the First Amendment.  Courts regularly apply *Noerr-Pennington* when
evaluating RICO and antitrust claims.  *See Allied Tube & Conduit Colp. v. Indian Head, Inc*., 486 U.S. 492, 499, 503
(1988); *United Mine Workers v. Pennington,* 381 U.S. 657, 669–70 (1965); *Noerr,* 365 U.S. 127; *Davric Maine Corp.
v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000).  Courts regularly apply *Noerr-Pennington* to RICO.  *See, e.g., Content
Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,* 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Sosa v.
D1RECTV, Inc.,* 437 F.3d 923, 933 (9th Cir. 2006).

fully protected expression." *Counterman v. Colorado,* 600 U.S. 66, 75 (2023) (emphasis added). Therefore, where the government seeks to regulate disfavored speech, "[t]he First Amendment requires heightened scrutiny." *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 566 (2011).

There is no question that Plaintiffs here are attempting to punish Defendants for protected speech. Plaintiffs' RICO and antitrust claims are premised on Defendants' alleged association with organizations—trade associations, lobbying groups, and think tanks—whose objectives include speaking on issues of public concern and petitioning the government. *See, e.g.,* Dkt. 205 ¶¶ 205–208, 211, 718–25, 728–29, 770. To that end, Plaintiffs allege that a core purpose of the alleged RICO "enterprise" was "to oppose the Kyoto Protocol." *Id.* ¶ 211(a). *See also id.* ¶¶ 387, 391, 396, 517. Plaintiffs also complain about an "Action Memo" that "outlin[ed] plans to reach the media, the public, and policy makers," *id.* ¶ 429, disseminating a "petition," *id.* ¶ 434, money spent on "climate lobbying," *id.* ¶ 518, and efforts to influence legislators, *see* Dkt. 206 ¶ 8(b). The Amended Complaint alleges that Defendants did these things to "change public opinion" and influence government policy. Dkt. 205 ¶¶ 482, 674, 728(h). But advocating against proposed legislation is core political speech, and "[i]t is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is" Defendants' First Amendment right. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462 (1958); *303 Creative*, 600 U.S. at 586 (noting that "the First Amendment protects acts of expressive association"). Because Plaintiffs do not identify any allegedly harmful speech *except* for protected lobbying and advocacy activity, Plaintiffs' claims violate the First Amendment and *Noerr-Pennington*. *See NAACP v. Claiborne Hardware*, 458 U.S. 886, 934 (1982) (plaintiff bears "[t]he burden of demonstrating that [unprotected conduct] rather than protected conduct" caused injury).

Contrary to the Magistrate Judge's suggestion, there is no reason to defer ruling on these issues.

The First Circuit has affirmed pleading stage dismissals on *Noerr-Pennington* grounds, *see United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*, 902 F.3d 1 (1st Cir. 2018), as have many other federal courts of appeal.[12] No "highly factual determination[s]" need be made to find that the First Amendment and *Noerr-Pennington* bar Plaintiffs' claims. Dkt. 315 at 44. Dismissal, therefore, is essential to vindicate Defendants' constitutional rights. *See, e.g.*, *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988) ("In order not to chill legitimate lobbying activities, it is important that a plaintiff's complaint contain specific allegations demonstrating that the *Noerr–Pennington* protections do not apply," or else it must be dismissed).[13]

Finally, the narrow "sham" exception to *Noerr-Pennington* does not apply, as *Noerr* itself illustrates. There, plaintiffs alleged the defendants were engaged in a "publicity campaign" that was supposedly "fraudulent," because "the publicity matter circulated in the campaign was made to appear as spontaneously expressed views of independent persons and civic groups when, in fact, it was largely prepared and produced by [the defendant railroads' PR firm] and paid for by the railroads." *Noerr*, 365 U.S. at 130. The Supreme Court reversed the trial court's finding for plaintiffs, explaining that "publicity campaign[s]" aimed at influencing government action cannot be the grounds for civil liability, as "representative democracy . . . depends upon the ability of the people"—including businesspeople—"to make their wishes known to their representatives." *Id.* at

---

[12] *E.g.*, *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466 (6th Cir. 2023); *B&G Foods v. Embry*, 29 F.4th 527 (9th Cir. 2022); *FTC v. AbbVie, Inc.*, 976 F.3d 327 (3d Cir. 2020).

[13] The Magistrate Judge also suggests that Defendants' alleged statements satisfy the commercial fraud exception to the First Amendment and the "sham lawsuit" exception to *Noerr-Pennington*. Dkt. 315 at 43–44. But the R&R does not justify why the alleged statements are *either* fraudulent or commercial, much less both. Commercial speech is speech that does "no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). The alleged statements here are not "commercial" because they do not merely (if at all) "propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014). In fact, Plaintiffs admit that "[m]ost" of the alleged statements were "directed to the public and Plaintiffs about fossil fuel products generally." Dkt. 280 at 20. And any suggestion that the alleged statements satisfy the so-called "fraud" exception also founders on the Magistrate Judge's finding that Plaintiffs failed to properly plead fraud. Dkt. 315 at 54.

137.  The Court held that claims that defendants "deliberately deceived the public and public offi-

cials" were irrelevant.  *Id.* at 145.  To apply the "sham" exception here would eviscerate *Noerr*.[14]

## IV. Plaintiffs' Claims Should Be Dismissed As Untimely

The Magistrate Judge erred in recommending that this Court deny Defendants' Motion to

Dismiss on statute of limitations grounds, by concluding that the continuous tort doctrine and eq-

uitable tolling apply here.  Dkt. 315 at 35–41.  The Magistrate Judge also erred in his analyses

regarding the level of notice required to trigger the statute of limitations and judicial notice.  As

Defendants demonstrated, application of the statute of limitations is straightforward and bars Plain-

tiffs' claims.  *See* Dkt. 235 at 11–17; Dkt. 297 at 4–11.  Plaintiffs sued Defendants for their alleged

role "in causing the losses . . . resulting from the catastrophic storms of September 2017 and their

aftermath." Dkt. 205 ¶ 1.[15]  Plaintiffs knew of their alleged injuries when they occurred in 2017,

and—as Defendants' briefing explained and as another court found at the pleading stage in a sim-

ilar climate change lawsuit—"the general public had knowledge of or had access to information .

. . regarding the existence of climate change and [its] effects" well before then.  *See Delaware*,

2024 WL 98888, at *19; *see also Baltimore*, 2024 WL 3678699, *15 (dismissing similar climate

---

[14] Plaintiffs nowhere allege other activities that might trigger the "sham" exception.  They do not allege that Defend-ants filed "objectively baseless" lawsuits motivated by an "attempt to interfere directly with the business relationships of a competitor."  *United Food*, 902 F.3d at 13 (quotations omitted) (emphases and alterations original).  Nor do they allege that Defendants "subverted the integrity of the governmental process" by "effectively barr[ing] [Plaintiffs'] access to [those] processes" or "attempt[ing] to influence governmental action through overtly corrupt conduct, such as bribes."  *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 262–63 (D.C. Cir. 1981).  Indeed, Plain-tiffs allege Defendants' alleged lobbying activities were "highly successful," Dkt. 205 ¶ 391, and "a successful 'effort to influence governmental action . . . certainly cannot be characterized as a sham.'"  *Pro. Real Est. Invs., Inc. v. Co-lumbia Pictures Indus., Inc.*, 508 U.S. 49, 58 (1993) (quoting *Allied Tube*, 486 U.S. at 502).

[15] *See also* Dkt. 205 ¶ 11 (alleging Plaintiffs' claims are premised on "the devastating storms of September 2017, all subsequent storms, and the aftermath of those storms which occurred as a result of the Defendant's [sic] acts and omissions"); *id.* ¶ 76 (alleging Defendants' conduct was "a substantial factor contributing to the Municipalities' dam-ages in September 2017 and thereafter"); *id.* ¶ 78 (alleging, absent Defendants, "the Municipalities would not have suffered the intense 2017 storms and subsequent losses and damages and severe storms thereafter"); *id.* ¶ 79 (alleging Defendants' conduct led to an accelerated pace of ferocious storms "reaching a new peak in September 2017").  Plain-tiffs specify that they do not "claim damages for future storms or catastrophes," but rather only for "the damages that [they] suffered beginning with the hurricanes in September 2017 and all of the ensuing impacts.  *Id.* ¶ 10.

change claims because a reasonable municipality would have known of the claims "years before 2015"). Yet despite the four-year statute of limitations for the federal claims and one-year statute of limitations for the Puerto Rico law claims, Plaintiffs waited more than five years after the September 2017 hurricanes before filing suit. That unjustified delay bars their claims.

### A.    Plaintiffs Fail to Adequately Allege That the Continuous Tort Doctrine Applies

The Magistrate Judge erred in concluding that the continuous tort doctrine extended the statutes of limitations. The Magistrate Judge looked to Puerto Rico law, which provides that a "continuous tort" is one in which a series of continuous acts or omissions cause the alleged harm. Dkt. 315 at 36 (citing *McMillan v. Rodríguez-Negrón*, 511 F. Supp. 3d 75, 83 (D.P.R. 2020)). In such circumstances, the statute of limitations renews with each act or omission that contributes to the harm in question. *McMillan*, 511 F. Supp. 3d at 83. But this doctrine has no application here.

First, the Magistrate Judge went far beyond Plaintiffs' arguments. Plaintiffs scarcely argued that the continuous tort doctrine applied at all, except for a narrow analogous issue applicable only to antitrust claims. *See* Dkt. 280 at 6–18. Although the R&R cites Puerto Rico law, neither Plaintiffs nor the Magistrate Judge provided any support for the proposition that Puerto Rico's tolling doctrines apply to Plaintiffs' federal RICO or antitrust claims, or that there is a federal "continuing tort" doctrine applicable to these claims. Nor could a continuous tort doctrine apply here. Plaintiffs' suit seeks damages related to the 2017 storms, but no act or omission *after* those storms could logically have caused those storms (or resulting injuries). The relevant "continuous" activity necessarily must have ceased by 2017. *McMillan*, 511 F. Supp. 3d at 83. Accordingly, "the statutory period," cannot begin "running again" with subsequent new acts because the new acts are not "part of the violation" being alleged and did not independently "injur[e] the plaintiff" within the scope of the claim. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

Plaintiffs argue that they claim losses from the 2017 hurricanes that are "continuous,

wrongful, and ongoing," Dkt. 280 at 6; Dkt. 205 ¶ 20, but a "continuous tort should not be confused with the injury" produced by a completed event. *McMillan*, 511 F. Supp. 3d at 83; *see* Dkt. 235 at 12. Here, Plaintiffs allege that "2017 is when the hurricanes and the physical harm to the island were visibly and physically incurred," Dkt. 280 at 9, though they claim that they continue to suffer adverse consequences from the storms. Dkt. 205 ¶¶ 1, 23–25. But such "continual ill effects from an original violation," are not a basis for tolling. *Bonilla v. Trebol Motor Corp.*, 913 F. Supp. 655, 659 (D.P.R. 1995). In short, Plaintiffs are only seeking to recover for tortious conduct that allegedly caused the 2017 hurricanes, and it is logically impossible for post-2017 conduct to have caused the 2017 storms. Accordingly, the tortious conduct in question is not "continuous," and the doctrine does not apply.

The Magistrate Judge's error is even more glaring with respect to the RICO claims. Plaintiffs never suggested that the continuing tort doctrine applies to RICO claims, yet the Magistrate Judge found it did. Further, applying a form of the continuous tort doctrine to RICO's four-year statute of limitations conflicts with Supreme Court precedent. Indeed, the Supreme Court has rejected certain circuit-made accrual rules precisely *because* they would open the door to continuous tolling. *Klehr*, 521 U.S. at 187–91; *Rotella v. Wood*, 528 U.S. 549, 555–61 (2000).

The Magistrate Judge also erred in finding that "Plaintiffs pleaded a pattern of [un]interrupted acts of deceit on Defendants' part." Dkt. 315 at 37. Plaintiffs allege very few post-2017 statements, and none with the requisite level of particularity—even assuming those allegations would survive First Amendment scrutiny (they do not). Instead, the Magistrate Judge cites Plaintiffs' allegations of decades-old conduct and vague assertions that a marketing campaign of deception "continues to this day," Dkt. 315 at 37 (citing Compl. ¶ 6, ¶ 429), along with purported "green-washing" campaigns, Dkt. 315 at 37 (citing Compl. ¶¶ 501, 557). But those allegations are

conclusory and fall well short of the Rule 9(b) pleading standard; they thus would not restart the limitations period in any event. *See Cacho González v. Santarrosa*, 203 D.P.R. 215, 226 (2019) (holding that each allegedly defamatory statement gives rise to one-year period during which a plaintiff may sue, and rejecting allegations that an alleged campaign of defamation gave rise to a continuous tort). Notably, the allegation referenced in paragraph 429 of the Complaint—which the Magistrate Judge relies on here—constitutes core protected speech, namely, public speech "to stave off approval of the [Kyoto] treaty." *Id.* Those flaws are fatal. *See supra* at 20–23.[16]

## B. Plaintiffs Fail to Adequately Allege Facts Justifying Equitable Tolling

The Magistrate Judge erred in invoking equitable tolling to recommend salvaging Plaintiffs' untimely claims. Equitable tolling does not apply because Plaintiffs failed to plead fraudulent concealment or reasonable diligence.

To begin, the Magistrate Judge's equitable tolling recommendation is flawed because it fails to address several of Defendants' counterarguments. The Magistrate Judge expressly recognized that Defendants made various arguments against equitable tolling but summarily ignored them, stating: "I need not address these arguments because they do not alter the conclusion that Plaintiffs' claims are timely based on the continuous tort doctrine." *Id.* But this renders the equitable tolling recommendation illusory, since it depends on the continuous tort recommendation.

Even for those arguments that the Magistrate Judge did address, the analysis was incorrect. He found that equitable tolling applies because Plaintiffs supposedly "have alleged that they pursued their rights diligently, conducting investigations prior to filing." Dkt. 315 at 40. But equitable tolling requires Plaintiffs to plead *particularized* allegations of *fraudulent concealment* after

---

[16] The Magistrate Judge may have been confused about what allegations were in the Amended Complaint. The R&R quotes Plaintiffs' Opposition—"Defendants continue to this day to deceive the public and harm the Plaintiffs and their injury is ongoing and extends the limitations period"—but cites it as if it comes from the Amended Complaint. Dkt. 315 at 37. However, the underlying allegations discuss equitable tolling and say nothing about continuing torts.

2017—Plaintiffs make no such allegations here.  *See J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996).  Indeed, elsewhere the Magistrate Judge appropriately concluded that Plaintiffs' fraud allegations fail to satisfy Rule 9(b).  Dkt. 315 at 54.  That holding cannot be squared with his recommendation on equitable tolling.

The Magistrate Judge also erred in concluding that "extraordinary circumstances exist because Defendants conducted a well-organized campaign of deceit."  Dkt. 315 at 40.  Among other things, this ignored Plaintiffs' failure to allege, as required, that Defendants somehow affirmatively prevented them from investigating their own claims.  Dkt. 297 at 9–10.  There is no allegation that Defendants (or anyone else) did anything that would "preven[t]" Plaintiffs from timely investigating.  *Ramírez Morales v. Rosa Viera*, 815 F.2d 2, 4 (1st Cir. 1987).  This defeats Plaintiffs' equitable tolling claims.  *Rivera-Díaz v. Humana of Puerto Rico, Inc.*, 748 F.3d 387, 390–91 (1st Cir. 2014) (failure to meet filing deadline must be attributable to "circumstances beyond [the Plaintiffs'] control"); *see* Dkt. 235 at 13–14.

The Magistrate Judge also never addressed Defendants' argument that, given the allegations or properly judicially noticeable facts, there was no concealment in the first place.  Dkt. 297 at 9.  The damage from the storms was—by Plaintiffs' own admission—"visibly and physically" apparent in 2017, Dkt. 280 at 9, and years earlier the very allegations against the energy industry that Plaintiffs level here were being discussed publicly.  *See* Dkt. 235 at 13–14 (noting various news articles and similar lawsuits brought by other governmental entities).

Similarly inadequate are Plaintiffs' allegations that they *diligently* pursued their claims.  The Magistrate Judge credits Plaintiffs' unsupported assertion that Plaintiffs diligently pursued their rights but only "learned which entities have a causal link to Plaintiffs' injuries and their respective market shares in the fossil fuel industry" after viewing a 2022 report entitled "How Much Have

the Oil Supermajors Contributed to Climate Change?"  Dkt. 315 at 39 (citing Dkt. 280 at 7).[17]
This is error for multiple reasons.[18]

    To begin, Plaintiffs never alleged in the Complaint that this report was relevant to the discovery of their claims; they only asserted this contention in the brief.  *See* Dkts. 205, 280 at 7.[19]  Accordingly, the assertion is not part of the "pleaded facts" and so the Magistrate Judge erred in relying on it.  *Iqbal*, 556 U.S. at 679.

    And even if it were appropriate to consider Plaintiffs' unpleaded assertion, it does not establish that the Plaintiffs were diligent.  The Magistrate Judge reasoned that "[b]ecause this is an action based on fraud and concealment, the key is when Plaintiffs learned of the deception."  R&R at 40.  But the 2022 report does not contain information about deception, and all Plaintiffs argued they learned from it were Defendants' identities and purported market share.  Dkt. 280 at 7.  And, in their Amended Complaint, Plaintiffs rely on several earlier published and publicly available sources that would have enabled them to make the same allegations—sources that any diligent plaintiff would have found.  *See, e.g.*, Dkt. 205 ¶ 74, n.22 (citing Richard Heede, "Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854–2010." Climatic Change 122, no. 1 (2014)).

    Moreover, going back at least to 2015, numerous other public sources—including sources cited in Plaintiffs' two complaints—discussed the very allegations that form the basis of Plaintiffs'

---

[17] Jiarui Chen, et al., *How Much Have the Supermajors Contributed to Carbon Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors*, Columbia Center of Sustainable Investment (Mar. 2022), https://ccsi.columbia.edu/content/oil-supermajors-carbon-footprint-refining-sales-climate-change.

[18] In addition to the reasons set forth below, the argument that the statute of limitations only began to run as to Rio Tinto, BHP, Motiva, and Occidental upon publication of the report fails because the report ***does not even mention these Defendants***. Furthermore, the report names as "supermajors" two entities not named as Defendants in this lawsuit—Eni and TotalEnergies—undercutting Plaintiffs' argument further.  Dkt. 315 at 39 (citing Dkt. 280 at 7).

[19] The Amended Complaint cites the 2022 report in passing about the alleged distribution of damages among Defendants and never alleges that it (or anything but the 2017 hurricanes) triggered the limitations period.  *See* Dkt. 205 ¶ 76 & n.25.

belated 2022 lawsuit. Those sources claim a link between Defendants and climate change, and even a link between Defendants and the same 2017 hurricanes that Plaintiffs now assert they had no reason to investigate until 2022. *See* Dkt. 235 at 13–14 & n.8. For example, the widely reported-on 2015 "Climate Deception Dossiers," which Plaintiffs cited, made many of the same allegations Plaintiffs now recycle. Dkt. 205 ¶ 368 n.395.[20]

Likewise, for more than a decade prior to the filing of this Complaint, numerous high-profile lawsuits—including several at the U.S. Supreme Court—raised similar claims about Defendants, fossil fuels, climate change, and even hurricanes. *E.g.*, *American Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 417 (2011) ("AEP") (noting EPA's determination that the "dangers of greenhouse gas emissions" from fossil fuels include "more frequent and intense hurricanes"); *Massachusetts v. EPA*, 549 U.S. 497, 522 (2007) (noting that fossil fuels and the related release of carbon dioxide "may contribute to the ferocity of hurricanes"); *Rhode Island v. Shell Oil Products Co., L.L.C.*, 979 F.3d 50, 53–54 (1st Cir. 2020) (noting 2018 filing of climate change lawsuit by State of Rhode Island alleging increased hurricanes); *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460 (5th Cir. 2013) (referencing 2005 lawsuit "alleging that emissions by energy company Defendants caused global warming which increased the destructive capacity of Hurricane Katrina."); Complaint ¶ 41, *Comer v. Murphy Oil USA, Inc.*, No. 1:11-cv-00220-LG-RHW (S.D. Miss. May 27, 2011), Dkt. 1 (alleging "an illegal conspiracy to prevent dissemination of scientific information

---

[20] The Magistrate Judge took judicial notice of that document and the following articles that make similar assertions to those alleged in the Complaint: Andrew C. Revkin, *A Deep Dive Into What Exxon Knew About Global Warming And When (1978) It Knew It*, N.Y. Times (Sept. 16, 2015), https://nyti.ms/310WmRz; Felicity Barringer, *Flooded Village Files Suit, Citing Corporate Link to Climate Change*, N.Y. Times (Feb.27, 2008), https://bit.ly/3KzfSXv; Umair Irfan, *One of the Clearest Signs of Climate Change in Hurricanes Maria, Irma, and Harvey Was the Rain*, Vox (Sep. 29, 2017), bit.ly/3S40R2a (cited in Compl. ¶ 298 n.187); Angela Fritz, Harvey. Irma. María. *Why Is This Hurricane Season So Bad?*, Wash. Post (Sep. 23, 2017), bit.ly/3S2inUI (cited in Compl. ¶ 240 n.217); Puerto Rico Climate Change Council, *Puerto Rico's State of the Climate* (2013) (cited in Compl. ¶ 263 n. 245); Lauren Lluveras, *Puerto Rico's Bankruptcy Will Make Hurricane Recovery Brutal—Here's Why, The Conversation* (Sep. 26, 2017) (cited in Compl. ¶ 229 n.207 and Dkt. 205 ¶ 253 n.262)). *See* Dkt. 315 at 34.

regarding the specific hazards created by Global Warming"); *Native Village of Kivalina v. Exxon Mobil Corp.*, 663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849, 854 (9th Cir. 2012) ("Kivalina's complaint . . . charged the Energy Producers with acting in concert to create, contribute to, and maintain global warming and with conspiring to mislead the public about the science of global warming.").[21]  Plaintiffs cannot plausibly argue that, with reasonable diligence, they could not have accessed these materials at the time of their publication or filing years earlier.  *See* Dkt. 315 at 33–35 (noting "Plaintiffs have not refuted that the articles and reports were published" and thus taking judicial notice of the articles' publication and availability more than four years before bringing suit).[22]

The Magistrate Judge erred in disregarding all these articles, cases, and other public documents—including more noted in the briefs, Dkt. 235 at 13–15—in concluding the Plaintiffs plausibly alleged diligence.  The Magistrate Judge's entire analysis is as follows:

> I am not convinced by Defendants pointing to several articles and reports regarding the relationship between climate change and fossil fuels and even the concerted efforts of the major fuel companies to misinform the public.  Their contention that these articles should have put Plaintiffs on notice even prior to 2017 of their potential cause of action is unavailing because I only took judicial notice of the fact that those documents were published, not the truth of their contents.

Dkt. 315 at 40.  The Magistrate Judge was wrong to conclude that he was being asked to consider the *truth* of the articles' contents.  All that is required for limitations purposes is that Plaintiffs be

---

[21] Tellingly, Plaintiffs' *original* complaint (Dkt. 1) cited to and relied on articles published in 2017 in the Washington Post and on Vox that *expressly* linked the intensity of the 2017 storms that hit Puerto Rico to greenhouse gas emissions. *See* Dkt. 235 at 14 n.8 (citing Compl. ¶¶ 209 n. 187, 240 n. 217).  After Defendants filed their first motion to dismiss, raising the statute of limitations issue, Plaintiffs amended their complaint to exclude those articles.  But removing the citations from the Amended Complaint does not change the fact that the materials were publicly available and contained information that Plaintiffs relied upon when asserting the same claims.

[22] As discussed *infra*, the Magistrate Judge erred in concluding that the articles were irrelevant for statute of limitations purposes because he could not take notice of the truth of the assertions within the articles.  Defendants understand that to be an error in the *application* of judicial notice, but to the extent the Magistrate Judge declined to take notice that the assertions contained within the documents were publicly available (not for the truth of the matter asserted), Defendants object to the Magistrate Judge's recommendation on judicial notice.  *See* Dkts. 238, 298.

"on notice" of their claims, without regard to whether the specific information is truthful or not or the claims turn out to be valid (of course, Defendants certainly contest the validity of the claims therein).  As Defendants discussed in their briefing—and not disputed by Plaintiffs—statutes of limitations bar suit when a would-be plaintiff had inquiry notice of the same *allegations* that are in the complaint, *regardless of whether those allegations are actually true*.  Dkt. 235 at 11, 15–17; Dkt. 298 at 6.  "Once a plaintiff is made aware of facts sufficient to put her on notice that she has a *potential* tort claim, she must pursue that claim with reasonable diligence."  *Rodríguez-Suris v. Montesinos*, 123 F.3d 10, 16 (1st Cir. 1997); *see López-Flores v. Cruz-Santiago*, 526 F. Supp. 2d 188, 190 (D.P.R. 2007) (similar).  In making that determination, courts routinely take judicial notice of the content of the relevant documents (in addition to the dates and sources of publication); the court need not assess whether or not that content was truthful, but the court can and should take notice of *what* was published in order to determine whether such publications put plaintiffs on inquiry notice of their potential claims.[23]  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (taking judicial notice of "the fact that press coverage . . . contained certain information, without regard to the truth of their contents").[24]

The Magistrate Judge should have found that the articles cited in Defendants' briefing (and Plaintiffs' own complaints) put the Plaintiffs on inquiry notice, if not actual notice, of their claims prior to the limitations periods.  While Plaintiffs claim to have relied on a 2022 article, they do not explain why that article is any different from the dozens of articles before or after 2017, or from the other high-profile climate suits that leveled the same allegations against Defendants.  *See Delaware*, 2024 WL 98888, at *19 (dismissing similar climate change claims on statute of limitations

---

[23] *See* Dkt. 298 at 7, n.4 (collecting cases taking judicial notice of the content of assertions and publication dates).

[24] To the extent the Court construes the Magistrate Judge's report as denying Defendants' Second Motion for Judicial Notice, Defendants object to it for the reasons set forth in the Motion, Reply, and herein.  *See* Dkts. 238, 298.

grounds); *see also Baltimore*, 2024 WL 3678699, *15 (dismissing similar climate change claims on statute of limitations grounds).  It strains credulity that diligent plaintiffs—interested in learning of the cause of the 2017 hurricanes—would not have known the names of fossil-fuel companies that contemporaneous commenters publicly accused of worsening those storms.

## V.  Plaintiffs Do Not Establish Personal Jurisdiction Over Any Defendant.

The Magistrate Judge erred by failing to dismiss the Amended Complaint for lack of personal jurisdiction.  As Defendants demonstrated, Plaintiffs' claims do not relate to Defendants' alleged Puerto Rico contacts,  the exercise of jurisdiction would not be reasonable, and RICO's nationwide jurisdiction provision does not apply.  *See* Dkt. 234; Dkt. 296.

### A.  Plaintiffs' Claims Do Not "Arise Out Of Or Relate To" Defendants' Contacts

The Magistrate Judge erred in concluding that Plaintiffs' claims sufficiently relate to Defendants' contacts with Puerto Rico to establish specific personal jurisdiction.

The Magistrate Judge did not apply the correct standard to analyze whether the "arise out of or relate to" prong of the test for specific personal jurisdiction is met.  As Plaintiffs conceded (Dkt. 281 at 22), Supreme Court precedent requires a "***strong*** relationship among the defendant, the forum, and litigation." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 353 (2021) (emphasis added, quotation omitted).  Likewise, the First Circuit "emphasize[s] the importance of proximate causation," *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 716 (1st Cir. 1996), and cautions that in-forum effects of out-of-forum activity generally do not suffice to allege personal jurisdiction, *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016).  However, the Magistrate Judge looked to whether there was a "***mere*** 'affiliation between the forum and the underlying controversy'" before concluding that because Defendants' alleged marketing and promotional activities in Puerto Rico are "***conceivably related***" to the alleged nationwide deception campaign,

specific jurisdiction is proper. Dkt. 315 at 20, 22 (emphases added).[25]  This misstates the law, and indeed resembles the very sort of "loose and spurious form of general jurisdiction" that the Supreme Court has roundly rejected.  *See Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 264 (2017).

As discussed in Defendants' Motion, the "arising out of or related to" prong of specific jurisdiction is not met unless the plaintiff alleges facts showing either a but-for causal relationship between the contacts, the claim, and the forum, or that the use and malfunction of a defendant's product in the forum injured the plaintiff in the forum.  Dkt. 234 at 2 (citing *Ford Motor*, 592 U.S. at 363).  Here, Defendants' alleged Puerto Rico contacts are not the but-for cause of Plaintiffs' claims, and Plaintiffs do not argue otherwise:  Plaintiffs allege injuries from *global* climate change based on *worldwide* greenhouse gas emissions, of which at most a *de minimis* fraction was released within Puerto Rico.  *See* Dkt. 296 at 9–11; *City of New York*, 993 F.3d at 92 ("Since greenhouse gases once emitted become well mixed in the atmosphere, emissions in New York or New Jersey may contribute no more to flooding in New York than emissions in China.").  Nor do Plaintiffs allege that their injuries arose from the in-forum use and malfunction of Defendants' products.  The R&R refers to allegations of general business activities, but never identifies injuries resulting from the use and malfunction of products in Puerto Rico.

The Magistrate Judge failed to address Defendants' argument that finding jurisdiction here would be akin to finding general jurisdiction.  *See* Dkt. 296 at 12–13.  Plaintiffs did not dispute that any alleged Puerto Rico conduct cannot be any more than a *de minimis* portion of their claims.

---

[25] The Magistrate Judge also asserted that "the RICO claim" is premised on "representations [that] were allegedly made as part of the marketing and advertising disinformation campaign in Puerto Rico." Dkt. 315 at 22–23.  It is not clear what the Magistrate Judge is referring to, as he did not cite any statements and neither Plaintiffs nor Defendants argued that the RICO claim is premised on a "marketing and advertising campaign in Puerto Rico" specifically.

*See generally* Dkt. 281. Plaintiffs seek to hold Defendants liable for *global* conduct, which is many orders of magnitude greater than all of Defendants' alleged conduct in Puerto Rico combined.

Accordingly, Plaintiffs' theory—and the Magistrate Judge's "mere affiliation" and "conceivably related" standard—"resemble[s] a loose and spurious form of general jurisdiction," *Bristol-Myers Squibb*, 582 U.S. at 264, lacking any "real limits" and where "anything goes," *Ford Motor*, 592 U.S. at 362. This is precisely what the Supreme Court has condemned. *See id.* at 365 (reiterating that there must be a "**strong** relationship among the defendant, the forum, and litigation" (emphasis added)). Plaintiffs bear the burden of showing the strong connection the law requires. *See Negrón-Torres v. Verizon Communications, Inc.*, 478 F.3d 19, 23 (1st Cir. 2007). They have failed to carry that burden here.

The Magistrate Judge also erred by considering it sufficient to allege that Defendants "s[old] fossil fuel products throughout Puerto Rico," "target[ed] consumers including Plaintiffs' residents as well as municipal officials" through trade associations, and "failed to warn the Plaintiffs" in Puerto Rico. Dkt. 315 at 20–21 (emphasis added). But the alleged promotion, advertising, and sales largely concern engine lubricants, transmission fluids, and other non-combustible products rather than the energy products at issue here. *E.g.*, Dkt. 205 at ¶ 527. Moreover, Plaintiffs do not allege advertisements specifically directed to Puerto Rico.[26] And none of the allegations "relate to" claims predicated on *global* climate change.[27]

---

[26] As evidenced by the Declaration of Michael Pasmore in support of its motion to dismiss for lack of personal jurisdiction, ECF No. 246-1, Rio Tinto has never sold any products in Puerto Rico or the U.S. Pasmore Decl. ¶ 6. Plaintiffs failed to refute and thus, concede this argument.

[27] More generally, the Magistrate Judge relies on contacts in the "relatedness" prong that do not constitute purposeful availment. For example, even if "Defendants have … failed to warn the Plaintiffs about the risks" of their products, that is inaction not availment of the forum. Dkt. 315 at 21. And that alleged "contact" is at least in tension with the Magistrate Judge's conclusion that there was no duty to warn in Puerto Rico. In addition, many of the alleged contacts with the forum are decades old, *see* Dkt. 205 ¶¶ 99, 126, but the dispute relies on purportedly recent activity—which is not alleged to have taken place in Puerto Rico—to attempt to survive the statute of limitations.

**B. Exercising Personal Jurisdiction Over Defendants Would Be Unreasonable And Would Conflict With Principles Of Federalism.**

The Magistrate Judge incorrectly concluded that exercising specific jurisdiction would be reasonable as a matter of due process perspective. Dkt. 315 at 23–25. His cursory analysis did not consider Defendants' arguments to the contrary. *Id.* As laid out in the Joint Motion, it is unreasonable to allow specific jurisdiction for claims related to *global* climate change in a forum where Defendants conduct only a small or even *de minimis* portion of their business (if any at all); and it is unreasonable for a Puerto Rico court to enforce local "substantive social policies" not shared by all States, Territories, and Nations against Defendants' global activities. Dkt. 234 at 17–21.

*First*, exercising specific jurisdiction over nonresident Defendants for global climate-change-related claims expands the jurisdiction of the Court beyond the limits of due process and interstate federalism. Dkt. 234 at 18–19. Making companies subject to suit in a single forum based on *global* conduct is only permissible in a forum with *general jurisdiction* over the Defendants—but there is no general jurisdiction here. Plaintiffs do not dispute that they seek to hold Defendants liable for the alleged consequences of global marketing and emissions, yet they assert that it is reasonable to do so in Puerto Rico based on local harms. *See* Dkt. 281 at 24–25, 37. But in-forum effects are generally an insufficient basis for personal jurisdiction. *All Am. Plumbing, Inc.*, 812 F.3d at 60. Relatedly, the exercise of specific jurisdiction here would offend the principles of the interstate judicial system because it would use Puerto Rico tort law to regulate Defendants' nationwide—indeed *worldwide*—activities regarding the production, promotion, and sale of energy products. Dkt. 234 at 19–20. As the Second Circuit observed in a similar lawsuit brought by the City of New York, "a substantial damages award like the one requested by the City would effectively regulate the [energy companies'] behavior far beyond [the State]'s borders." *City of New York*, 993 F.3d at 92. The interests of the "interstate judicial system" are not served by requiring

witnesses and counsel to litigate the same climate-change actions simultaneously under different legal rules, especially given the substantial risk of inconsistent decisions.

*Third*, the substantive social policies Plaintiffs promote—chilling Defendants' speech on matters of public concern that Plaintiffs deem misleading, curbing energy production and use of fossil fuels, or allocating the downstream costs of global climate change to the energy companies to bear directly—are not shared uniformly across the various States and Nations. The Magistrate Judge simply asserted—without acknowledging Defendants' arguments—that this factor supports jurisdiction because "[a]ll sovereigns share an interest in preventing disinformation and fraudulent communications." Dkt. 315 at 24. But as other courts have recognized in materially identical cases, "[S]tates will invariably differ in their assessment of the proper balance between these national and international objectives, [and] there is a real risk that subjecting the [energy companies'] global operations to a welter of different states' laws could undermine important federal policy choices." *City of New York*, 993 F.3d at 93.[28]

## C. RICO's Nationwide Jurisdiction Provision Is Inapplicable Here.

The Magistrate Judge recommended deferring a ruling on the 18 U.S.C. § 1965(b) issue until jurisdictional discovery is completed because the statute provides for personal jurisdiction if there is personal jurisdiction over at least one Defendant and the ends of justice so require. Dkt. 315 at 26–27. But here, Plaintiffs' RICO claims are inadequately pleaded for the reasons stated above, so Section 1965(b) is inapplicable. Beyond that, Plaintiffs have not adequately alleged personal jurisdiction over any defendant, so jurisdictional discovery is unwarranted.[29]

---

[28] This last concern is especially acute with foreign Defendants. Plaintiffs seek to use Puerto Rico tort law to overrule the domestic energy policy of America's allies—raising comity concerns and interfering with the Federal Government's ability to steer U.S. foreign policy. *See* Dkt. 234 at 16–17. That is not something the Constitution permits. *See City of Oakland*, 325 F. Supp. 3d at 1026 ("[P]laintiffs would have a single judge or jury in [the forum] impose an abatement fund as a result of such overseas behavior. Because this relief would effectively allow plaintiffs to govern conduct and control energy policy on foreign soil, we must exercise great caution.").

[29] The Magistrate Judge also erred with respect to individual Defendants' motions on personal jurisdiction, as will be

## VI. Plaintiffs' Puerto Rico Law Claims Should Be Dismissed For Additional Reasons

The Magistrate Judge appropriately recommended dismissing each of the Puerto Rico law claims for failure to state a claim under Commonwealth law. Dkt. 315 at 83–90. The Magistrate Judge rejected other, additional bases for dismissing those claims, including (1) lack of personal jurisdiction, (2) limitations, and (3) because the federal structure of the U.S. Constitution and federal law preclude and preempt those claims. To the extent Plaintiffs object to the Magistrate Judge's recommended dismissal of the Puerto Rico law claims, Defendants object to the Magistrate Judge's recommendations against dismissing those claims. The first two issues are addressed above, but the third bears further discussion.

As discussed in the Joint 12(b)(6) Motion, Dkt. 235 at 43–52, and Reply, Dkt. 297 at 30–43, the Constitution, its structure, and core principles of federalism and comity bar application of Commonwealth law in disputes involving interstate and international emissions. The Magistrate Judge failed to consider Defendants' central argument that the *only* theory of causation and injury that Plaintiffs allege depends on Defendants' alleged conduct purportedly increasing *interstate and international* greenhouse gas emissions, thereby contributing to *global* climate change. *See* Dkt. 297 at 31–35. Nor did the Magistrate Judge engage with Defendants' argument that it is inappropriate to look just to the first step in the alleged causal chain, rather than needing to examine whether any step in the theory "involve[s]" interstate or international emissions and thus implicates federal and interstate interests. *Id.* at 34 (quoting *City of New York*, 993 F.3d at 91); *see AEP*, 564 U.S. at 421 (cases that "deal with" interstate emissions cannot use state law).[30]

The Magistrate Judge erred by relying on cases discussing *remand* to state courts (and federal

---

addressed in individual motions. And he nowhere addressed Defendants' point that Section 1965 cannot permit *international* service of process, making it inapplicable to Shell, BP, BHP, and Rio Tinto. *See* Dkt. 234 at 21–22.

[30] To the extent Plaintiffs' state or federal claims also seek to use tort law to circumvent the Clean Air Act's ("CAA's") emissions regulations, those claims are similarly precluded by the CAA. *See AEP*, 564 U.S. at 423–49.

court subject-matter jurisdiction), rather than on cases analyzing federal preemption and preclusion principles. The First Circuit cautioned against relying on removal cases like *Rhode Island* in evaluating cases on the merits (as here), noting that there are "heightened standard[s] unique to the removability inquiry." *Rhode Island v. Shell Oil Products Co., L.L.C.*, 35 F.4th 44, 55 (1st Cir. 2022). Moreover, the Magistrate Judge's conclusion in this respect goes against the growing consensus among "federal and state courts across the country that have rejected the availability of state tort law in the climate change context," precisely on federal preemption grounds, among others, *see Platkin*, 2025 WL 604846, at *3 (N.J. Super. Ct. Law Div. Feb. 5, 2025), *supra*, n.1 (collecting cases).

In addition, it was error to reject the foreign affairs preemption argument for the same reason as the constitutional structure argument: "[T]he allegations here do not implicate greenhouse emissions or foreign policy." R&R at 82. But this misses the fact that the only theory of causation and damages relies on increased *interstate* and especially *international* emissions that allegedly accelerated global warming, strengthened the 2017 storms, and thereby injured Plaintiffs.

## CONCLUSION

The Court should reject these objected-to portions of the Report and Recommendation and dismiss the Amended Complaint with prejudice.

**CERTIFICATE OF SERVICE:** We hereby certify that on this same date the foregoing joint motion was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys and participants of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 21st day of March, 2025.

By: /s/ Roberto C. Quiñones-Rivera

Roberto C. Quiñones-Rivera
USDC-PR Bar No. 211512
Eduardo A. Zayas-Marxuach
USDC-PR Bar No. 216112
Myrgia M. Palacios-Cabrera
USDC-PR Bar No. 230807
MCCONNELL VALDES LLC
P.O. Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: (787) 250-2631
Facsimile: (787) 474-9201
Email: rcq@mcvpr.com

Theodore J. Boutrous, Jr. (*pro hac vice*)
William E. Thomson (*pro hac vice*)
Joshua D. Dick (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: wthomson@gibsondunn.com
Email: jdick@gibsondunn.com

Thomas G. Hungar (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 887-3784
Email: thungar@gibsondunn.com

Neal S. Manne (*pro hac vice* forthcoming)
Erica Harris (*pro hac vice* forthcoming)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
Email: nmanne@susmangodfrey.com
Email: eharris@susmangodfrey.com

*Attorneys for Defendant CHEVRON CORPORATION*

By: *s/ Néstor M. Méndez Gómez*
Néstor M. Méndez Gómez
USDC-PR Bar No. 118409
María D. Trelles Hernández
USDC-PR Bar No. 225106
PIETRANTONI MENDEZ & ALVAREZ LLC
Popular Center, 19th Floor
208 Ponce de León Avenue
San Juan, Puerto Rico 00918
Telephone: (787) 274-1212
Facsimile: (787) 274-1470
Email: nmendez@pmalaw.com
Email: mtrelles@pmalaw.com

Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Yahonnes Cleary (*pro hac vice*)
Caitlin E. Grusauskas (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: twells@paulweiss.com
Email: dtoal@paulweiss.com
Email: ycleary@paulweiss.com
Email: cgrusauskas@paulweiss.com

*Attorneys for Defendant EXXON MOBIL
CORPORATION*

By: *s/Kenneth C. Suria*
Kenneth C. Suria
USDC-PR Bar No. 213302
ESTRELLA, LLC
P.O. Box 9023596
San Juan, Puerto Rico 00902-3596
Telephone: (787) 977-5050
Facsimile: (787) 977-5090
Email: kcsuria@estrellallc.com

Tracie J. Renfroe (*pro hac vice*)
KING & SPALDING LLP

- 41 -

1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
Email: trenfroe@kslaw.com

Oliver Thoma (*pro hac vice*)
WEST, WEBB, ALLBRITTON & GENTRY, P.C.
1515 Emerald Plaza
College Station, TX 77845
Telephone: (979) 694-7000
Facsimile: (979) 694-8000
Email: oliver.thoma@westwebblaw.com

*Attorneys for Defendant MOTIVA ENTERPRISES LLC*


By: s/ *David Indiano*
David Indiano
USDC-PR Bar No. 200601
Jeffrey M. Williams
USDC-PR Bar No. 202104
INDIANO & WILLIAMS, P.S.C.
207 del Parque Street, 3rd Floor
San Juan, Puerto Rico 00912


Duke K. McCall, III (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington D.C. 20004


*Attorneys for Defendant OCCIDENTAL PETROLEUM
CORPORATION*

By: *s/Carlos A. Rodriguez Vidal*
Carlos A. Rodriguez Vidal
USDC-PR Bar No. 201213
GOLDMAN ANTONETTI & CORDOVA, LLC
American International Plaza
250 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Telephone: (787) 759-4117
Facsimile: (787) 767-9177
Email: crodriguez-vidal@gaclaw.com

Victor L. Hou (*pro hac vice*)
Boaz S. Morag (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Email: vhou@cgsh.com
Email: bmorag@cgsh.com

*Attorneys for Defendant BHP GROUP LIMITED*

By: *s/ Roberto A. Cámara-Fuertes*
Roberto A. Cámara-Fuertes
USDC-PR Bar No. 219002
Jaime A. Torrens-Dávila
USDC-PR Bar No. 223810
Mónica Ramos Benítez
USDC-PR Bar No. 308405
FERRAIUOLI LLC
P.O. Box 195168
San Juan, Puerto Rico 00919
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com
Email: jtorrens@ferraiuoli.com
Email: mramos@ferraiuoli.com

Linda H. Martin (*pro hac vice*)
David Y. Livshiz (*pro hac vice*)
Noelle L. Williams (*pro hac vice*)

- 43 -

Jennifer E. King (*pro hac vice*)
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
Email: linda.martin@freshfields.com
Email: david.livshiz@freshfields.com
Email: noelle.williams@freshfields.com
Email: jennifer.king@freshfields.com

Jennifer Loeb (*pro hac vice*)
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
Email: jennifer.loeb@freshfields.com


*Attorneys for Defendant RIO TINTO PLC*


By: *s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa
USDC-PR Bar No. 206314
Luis A. Oliver Fraticelli
USDC-PR Bar No. 209204
ADSUAR
P.O. Box 70294
San Juan, Puerto Rico 00936-8294
Telephone: (787) 756-9000
Facsimile: (787) 756-9010
Email: epo@amgprlaw.com
Email: loliver@amgprlaw.com

*Attorneys for Defendant BP P.L.C.*

- 44 -

By: _s/Carlos A. Valldejuly-Sastre_
Carlos A. Valldejuly-Sastre
USDC No. 209505
José J. Colón García
USDC No. 308010
O'NEILL & BORGES LLC
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944
Email: carlos.valldejuly@oneillborges.com
Email: jose.colon@oneillborges.com

David C. Frederick (_pro hac vice_)
James M. Webster, III (_pro hac vice_)
Minsuk Han (_pro hac vice_)
Daniel S. Severson (_pro hac vice_)
Grace W. Knofczynski (_pro hac vice_)
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
Email: dfrederick@kellogghansen.com
Email: jwebster@kellogghansen.com
Email: mhan@kellogghansen.com
Email: dseverson@kellogghansen.com
Email: gknofczynski@kellogghansen.com

_Attorneys for Defendant SHELL PLC_
_(f/k/a ROYAL DUTCH SHELL PLC)_

By: _s/Ricardo F. Casellas Sánchez_
Ricardo F. Casellas Sánchez
USDC-PR No. 203114
Heriberto J. Burgos-Pérez
USDC-PR No. 204809
CASELLAS ALCOVER & BURGOS, P.S.C.
2 Tabonuco Street, Suite 400
San Patricio, Puerto Rico 00968
Telephone: (787) 756-1400
Facsimile: (787) 756-1401
Email: rcasellas@cabprlaw.com
Email: hburgos@cabprlaw.com

Matthew T. Martens (_pro hac vice_)
Ericka Aiken (_pro hac vice_)

- 45 -

WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: matthew.martens@wilmerhale.com
Email: ericka.aiken@wilmerhale.com

Hallie B. Levin (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: hallie.levin@wilmerhale.com

Robert Kingsley Smith (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
Email: robert.smith@wilmerhale.com

*Attorneys for Defendant ConocoPhillips*

By: */s/ Ramon Dapena*
Ramón Dapena
Bar No. 125005
Iván Lladó
Bar No. 302002
MORELL CARTAGENA & DAPENA
Ponce de León Ave. 273 Plaza 273, Suite 700
San Juan PR 00908 Puerto Rico
Telephone: 787-723-1233
Facsimile: 787-723-8763
Email: ramon.dapena@mbcdlaw.com
Email: ivan.llado@mbcdlaw.com

Jeremiah J. Anderson (*pro hac vice*)
MCGUIREWOODS LLP

- 46 -

845 Texas Avenue, 24th Floor
Houston, TX 77002-2906
Telephone: (713) 571-9191
Email: jjanderson@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice*)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1000
Email: bschmalzbach@mcguirewoods.com

*Attorneys for Defendant American Petroleum Institute*