# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MUNICIPALITY OF BAYAMON et al., *Plaintiffs,* v. EXXON MOBIL CORP. et al., *Defendants.* | Case No. 3:22-cv-01550-SCC |

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF ON THE IMPLICATIONS OF *FULD V. PALESTINE LIBERATION ORGANIZATION***

i

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

I.     *Fuld* Eliminates Defendants' Reliance on the Fourteenth Amendment "Minimum Contacts" Test. ........................................................................................................... 1

        a.     Defendants Misconstrue the Applicable Sovereign Interest. ................................. 2

        b.     Defendants Misapply First Circuit Precedent as Reaffirmed in *Fuld*. ..................... 3

II.    Defendants Are Subject to Jurisdiction Under the Fifth Amendment Due to Their Nationwide Enterprise Activity. ................................................................................... 6

        a.     Each Defendant Purposefully Directed Conduct at the United States. ................... 7

        b.     Foreign Defendants Are Not Exempt: They Operated in U.S. Markets and Are Publicly Traded. ............................................................................................ 8

        c.     Personal Jurisdiction Over Rio Tinto PLC Is Constitutionally Sound Under the Fifth Amendment. .......................................................................................... 12

III.   Defendants Cannot Claim Foreign Policy Deference While Coordinating a Domestic Enterprise. .................................................................................................. 13

CONCLUSION ..................................................................................................................... 13

# TABLE OF AUTHORITY

**Cases**

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255 (2017) .................................... 3, 6

*Commonwealth of Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) ........................................... 3

*Fuld v. Palestine Liberation Organization*, No. 24-151, 2025 WL 1716140 (U.S. June 20, 2025) ................................................................................................................................ passim

*Lorelei Corp. v. County of Guadalupe,* 940 F.2d 717, 719 (1st Cir. 1991) ................................ 4, 5

*United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992) ........................................................................................................... 3, 4

*Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, (1st Cir. 2022) ......................................... 4

*Whistler Corp. v. Solar Elecs., Inc.*, 684 F. Supp. 1126, 1128 (D. Mass. 1988) ............................ 4

**Statutes**

U.S. Const. art. IV, § 3, cl. 2 .......................................................................................................... 2

**Rules**

Fed. R. Civ. P. 4 .............................................................................................................................. 5

Fed. R. Civ. P. 4(k)(1)(A) ............................................................................................................... 5

Fed. R. Civ. P. 81(d)(2) .................................................................................................................. 5

**INTRODUCTION**

Defendants attempt to limit the Supreme Court's ruling in *Fuld v. Palestine Liberation Organization*, No. 24-151, 2025 WL 1716140 (U.S. June 20, 2025), to its facts, disregarding its holdings and its explicit and broader clarification of the applicable Fifth Amendment standard for the exercise of personal jurisdiction. *Fuld* rejects the Fourteenth Amendment framework that Defendants relied on throughout this case and continue to invoke. The Supreme Court emphasized a constitutional distinction between state and federal sovereignty, firmly establishing that in cases involving federal-question jurisdiction—such as those under RICO and the Sherman Act—the Fifth Amendment's Due Process Clause exclusively governs.

Critically, under *Fuld*, the relevant question is whether each Defendant has sufficient contacts with the United States as a whole to render the exercise of jurisdiction reasonable, not whether they maintain contacts with any single forum state or territory. Here, Plaintiffs have alleged extensive, purposeful nationwide contacts for each Defendant, including foreign entities Shell, BP, BHP, and Rio Tinto. These include U.S.-based headquarters, substantial U.S. sales and operations, SEC registration and public trading on U.S. stock exchanges, active participation in U.S. trade associations, and deliberate conduct aimed at the U.S. market and policymakers. Defendants' narrow interpretation undermines the constitutional reasoning at the core of *Fuld* and Plaintiffs' well-pleaded allegations about continuous and systematic contacts with the United States that unequivocally satisfy the Fifth Amendment's reasonableness standard.

I. ***Fuld* Eliminates Defendants' Reliance on the Fourteenth Amendment "Minimum Contacts" Test.**

Defendants cling to the tenuous notion that Plaintiffs must allege "minimum contacts" with Puerto Rico under the Fourteenth Amendment. *Fuld* resoundingly forecloses that argument. The

1

Supreme Court explained that "interstate federalism concerns" underlying the Fourteenth Amendment do not restrict federal courts operating under the Fifth Amendment. 2025 WL 1716140, at *9. Because this case involves the RICO and Sherman Acts, both federal laws with nationwide reach, *Fuld* requires applying the broader and more flexible jurisdictional standard of the Fifth Amendment.

    a. **Defendants Misconstrue the Applicable Sovereign Interest.**

Defendants, in arguing that the Fourteenth Amendment applies, fundamentally misconstrue the sovereign interests involved in this litigation. *See* Defendants' Supplemental Brief, at 5 ("a federal district court's authority to exercise personal jurisdiction is determined by whether the state in which the federal court sits could properly exercise personal jurisdiction over the challenging party…."). However, as discussed in *Fuld*, the relevant governmental authority for jurisdictional purposes is not a state sovereign constrained by the principles of federalism outlined in the Fourteenth Amendment; rather, it is the federal court. *Id.* at *8 ("These interstate federalism concerns, however, do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts. "). In this case, the relevant sovereign is the United States District Court for the District of Puerto Rico, which was established directly by Congress under the Territory Clause. U.S. Const. art. IV, § 3, cl. 2. Unlike state courts, this federal territorial court is explicitly created to adjudicate matters of national concern and to implement federal legislative intent, particularly in cases involving federal statutes such as RICO and the Sherman Antitrust Act.

    Puerto Rico's unique constitutional status markedly distinguishes jurisdictional analysis in territorial federal courts from that in state courts. The Supreme Court has continuously affirmed that Puerto Rico is not a state for constitutional purposes and does not exercise sovereignty

2

independent of Congress. *See, e.g., Commonwealth of Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) (finding that Puerto Rico is not a "separate sovereign" from the federal government for purposes of double jeopardy prosecutions). The First Circuit has explicitly acknowledged this distinction, confirming that in federal-question cases involving extraterritorial considerations, personal jurisdiction is governed solely by the Due Process Clause of the Fifth Amendment. *See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992). Consequently, congressionally established territorial courts, such as the District Court for Puerto Rico, are not subject to the traditional federalism constraints that generally limit state court jurisdiction under the Fourteenth Amendment or otherwise. This distinction underscores and supports the broader jurisdictional framework consistent with the due process protections of the Fifth Amendment.

Defendants' repeated reliance on jurisprudence related to the Fourteenth Amendment and principles of state sovereignty fundamentally misstates and misapplies constitutional law, as do their arguments regarding the scope of territorial jurisdiction under the Puerto Rico Constitution as applied to federal claims. These arguments overlook Puerto Rico's distinctive territorial status and the specific manner in which Congress established this federal court. In this case, jurisdiction fully conforms to the constitutional due process principles outlined by Congress and the Supreme Court.

### b. Defendants Misapply First Circuit Precedent as Reaffirmed in *Fuld*.

The Supreme Court's recent decision in *Fuld* resolves a question that had remained open since *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255 (2017): whether the Fifth Amendment imposes the same personal jurisdiction constraints as the Fourteenth. The Court held definitively that it does not, explaining that the Fifth Amendment "necessarily permits a more

3

flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." 2025 WL 1716140, at *9.

This clarification aligns with the reasoning articulated by the First Circuit in several earlier decisions. The First Circuit has previously held that when a plaintiff files claims under federal statutes that allow nationwide service of process, the applicable due process analysis is based on the Fifth Amendment, not the Fourteenth. For example, in *Lorelei Corp. v. County of Guadalupe,* 940 F.2d 717, 719 (1st Cir. 1991), the First Circuit held that that "[w]hen the district court's subject-matter jurisdiction rests wholly or in part on the existence of a federal question, the constitutional limits of the court's personal jurisdiction are drawn in the first instance with reference to the due process clause of the Fifth Amendment." The court further stated that "[i]t is clear that the Fifth Amendment 'permits a federal court to exercise personal jurisdiction over a defendant in a federal question case if that defendant has sufficient contacts with the United States as a whole.'" *Id.* (quoting *Whistler Corp. v. Solar Elecs., Inc.*, 684 F. Supp. 1126, 1128 (D. Mass. 1988)).

The First Circuit reaffirmed this principle in *163 Pleasant St. Corp.*, 960 F.2d at 1085 (1st Cir. 1992), emphasizing that, "[i]n actions that implicate federal rights, the constitutional limits of the court's personal jurisdiction are defined by the Due Process Clause of the Fifth Amendment." The court stated that "[w]hen Congress has spoken by authorizing nationwide service of process, the relevant minimum contacts analysis shifts from the forum state to the entire United States." *Id.*

Most recently, in *Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, (1st Cir. 2022), the First Circuit agreed that the Fourteenth Amendment does not directly limit a federal court's jurisdiction over purely federal-law claims. Rather, the court stated that, "as a constitutional matter, the 'constitutional limits' of a federal court's jurisdiction over federal-law claims 'are

4

drawn in the first instance with reference to the [D]ue [P]rocess [C]lause of the [F]ifth [A]mendment,' a point which [Defendant] concedes, as it must." 23 F. 4th at 92 (quoting *Lorelei Corp. v. County of Guadalupe*, 940 F.2d 717, 719 (1st Cir. 1991)).

Defendants themselves acknowledge this line of precedent. *See* Defendants' Supplemental Brief, at 5 ("The Constitution limits a federal district court's exercise of personal jurisdiction through the Fifth Amendment. *See Lorelei Corp. v. Cnty. of Guadalupe*, 940 F.2d 717, 719 (1st Cir. 1991)."). Rather than applying the appropriate precedent, however, Defendants attempt to reintroduce the Fourteenth Amendment by claiming that Federal Rule 4(k)(1)(A)[1] controls because Plaintiffs have not met the requirements of RICO. *See id.* ("But, in the absence of a federal statute that provides for personal jurisdiction, a federal district court's authority to exercise personal jurisdiction is determined by whether the state in which the federal court sits could properly exercise personal jurisdiction over the challenging party….."). Defendants' claim that personal jurisdiction must be assessed under a Fourteenth Amendment framework is contrary not only to *Fuld* but to First Circuit precedent that they have cited.

Additionally, Defendants' argument hinges on the erroneous conflation of the jurisdictional and merits analyses, attempting to merge the constitutional test for jurisdiction with broader substantive concerns. *See also id.* at 14-15. The Supreme Court in *Fuld* specifically emphasized that jurisdictional analysis under the Fifth Amendment focuses on conduct related to the United States and the reasonableness of compelling defendants to litigate in U.S. federal courts—not the ultimate merits or potential preemption of Plaintiffs' substantive claims.

---

[1] Defendants twice materially misrepresent the text of Rule 81(d)(2) generally and as it related to Rule 4. *See* Defendants' Supplemental Brief, at 5, footnote 4. Rule 81(d)(2), in its entirety, reads: (2) *"State" Defined.* The term "state" includes, *where appropriate*, the District of Columbia and any United States commonwealth or territory. (emphasis added). Plaintiffs contend that this application is not appropriate for reasons addressed here, in the prior briefing, and across their filings in this case.

5

Defendants' attempt to bootstrap jurisdictional limitations with merits arguments misunderstands and misrepresents the holdings in *Fuld*.

As this Court noted, since *Bristol-Myers*, every circuit court to consider the issue, including the First Circuit, has applied to cases under the Fifth Amendment the familiar "minimum contacts" standard under the Fourteenth Amendment. *See* Order, ECF 390, at 1. *Fuld* has now provided clarification of the proper standard. The decision articulates a jurisdictional framework grounded in federal sovereignty—confirming that in cases like the one at bar, where Congress has expressly authorized nationwide service under statutes such as RICO, the Fifth Amendment standard applies

In sum, Defendants cannot escape First Circuit precedent that aligns with *Fuld*, which now makes undeniable that when Congress enacts statutes including RICO or the ATA authorizing nationwide service of process, the court's jurisdictional inquiry under the Fifth Amendment must consider the defendant's contacts with the United States as a whole, not any state or territory. In such cases, fairness—not federalism—is the guiding principle.

## II.     Defendants Are Subject to Jurisdiction Under the Fifth Amendment Due to Their Nationwide Enterprise Activity.

Under the Fifth Amendment, the due process inquiry centers on whether the defendant's conduct has a significant connection to the United States and whether jurisdiction is reasonable.[2] Each Defendant satisfies that standard.

---

[2] While *Fuld* leaves some ambiguity regarding whether Fifth Amendment due process still independently requires national minimum contacts or focuses solely on reasonableness, Plaintiffs satisfy either formulation. Under a pure reasonableness standard, jurisdiction is justified by Defendants' purposeful, substantial, and widespread impact on U.S. commerce and communities. Even if the Court considers a "national minimum contacts plus reasonableness" standard, Defendants' extensive and purposeful activities directed towards and significantly affecting U.S. interests undeniably meet that higher threshold. Therefore, any residual uncertainty about the precise standard post-*Fuld* is immaterial; under either approach, jurisdiction is proper and constitutional.

### a. Each Defendant Purposefully Directed Conduct at the United States.

Each Defendant participated in a decades-long racketeering enterprise to mislead the American public, including Plaintiffs, about the catastrophic dangers of fossil fuel use, as explicitly alleged in the Amended Complaint and supported by substantial evidence. Plaintiffs' Amended Complaint diligently unravels the decades-long conspiracy, and motives behind it, in *more than 100 pages of allegations*. *See* Amended Compl. Sections VI.H-I.

Plaintiffs allege that Defendants engaged in a "coordinated, multi-front effort" to conceal from and deceive U.S. consumers, including Plaintiffs, as to the effects and threats of their carbon-based products. Am. Compl. ¶¶ 79, 84; *see also id*. ¶¶ 206, 346, 353, 360, 362, 367-68, 373, 387, 395, 405, 414, 432, 503, 610, 616-18. More specifically, in the face of warnings from the scientific community regarding increasing concentrations of atmospheric $CO_2$ (*id*. ¶¶ 297-300), and Defendants own investigations and confirmation of the same (*id*. ¶¶ 301-02, 305-08, 315, 317-26, 342-43), Defendants chose to conspire with each other to "manufacture and spread propaganda and deception about climate science." *Id*. ¶ 345. Defendants worked in concert "to undermine climate science" via a "multi-decade long campaign of denial to deceive consumers, the media, policymakers, and the public about the potentially 'catastrophic' impacts of their business practices and ensure the longevity of the fossil fuel industry." *Id*. ¶ 346; *see also id*. at 616-18.

Defendants formalized their scheme of peddling intentional skepticism to their customers and the public at large by funding and directing the Global Climate Coalition (GCC) and the American Petroleum Institute (API) to produce false and misleading information targeting U.S. consumers (*id*. ¶¶ 397, 405, 414, 423, 503); disseminating disinformation about climate science through op-eds, press releases, and "front groups" with the obvious intent to stall change and protect fossil fuel profits (*id*. ¶¶ 207, 211, 362-63, 397, 405); all while selling fossil fuel products

across the United States, including Puerto Rico, falsely marketing them as safe and sustainable. *Id.* ¶¶ 3, 17, 499, 525, 658.

These acts meet the "pattern" requirement under RICO and demonstrate that the Defendants targeted the U.S. forum. Magistrate Judge's Report and Recommendation, at 55. The Supreme Court in *Fuld* confirmed that such conduct—when connected to a nationwide statutory remedy—justifies the exercise of jurisdiction. 2025 WL 1716140, at *10, 12. For the Court's convenience, Plaintiffs have prepared an Appendix, attached here, which contains a summary table of each Defendant's contacts with the United States as alleged in the Amended Complaint. *See* App'x A. These contacts, and as illustrated concisely by the included Appendix, demonstrate the significant connection each Defendant has to the United States and the reasonableness of haling them into the U.S. District Court.

### b. Foreign Defendants Are Not Exempt: They Operated in U.S. Markets and Are Publicly Traded.

Defendants argue that merely having a foreign corporate status prevents jurisdiction. *See* Defendants' Supplemental Brief, at 7. That is incorrect and explicitly dismissed by *Fuld*. 2025 WL 1716140, at *8 ("The Constitution confers upon the Federal Government—and it alone—both nationwide and extraterritorial authority."). Under this clarified Fifth Amendment framework, the relevant inquiry for federal claims is whether each Defendant has sufficient contacts with the United States as a whole to render the exercise of jurisdiction reasonable. To illustrate each Foreign Defendant's purposeful and continuous nationwide contacts more specifically, Plaintiffs highlight the following allegations from their Amended Complaint, demonstrating their deliberate and sustained engagement with the United States market:

i. **Shell** and **BP** both maintain U.S. operational headquarters in Houston, Texas, anchoring their continuous domestic operations. (Am. Compl. ¶¶108, 133).

8

    ii.    **Shell**, **BP** and **Rio Tinto** are registered with the U.S. Securities and Exchange Commission and publicly traded on U.S. stock exchanges under the symbols SHEL, BP p.l.c. and RIO, respectively, demonstrating their deliberate access to U.S. capital markets. (Am. Compl. ¶¶109, 140, 181).

    iii.    **BHP** and **Rio Tinto** have actively participated in U.S.-based trade associations such as the American Petroleum Institute and the National Mining Association, supporting the alleged enterprise and targeting U.S. policy. (Am. Compl. ¶¶175, 183).

    iv.    **Shell** sells its engine oil and lubricants throughout the United States and worldwide, integrating its U.S. sales into its global revenue stream. (Am. Compl. ¶113).

    v.    **Shell** advertises, markets, and sells its consumer products broadly within the United States. (Am. Compl. ¶113).

    vi.    **BP**'s Castrol brand, its main line for industrial and automotive lubricants, is sold widely throughout the United States, including Puerto Rico, and is applied to a large range of BP oils, greases, and related products for numerous lubrication applications. (Am. Compl. ¶137).

    vii.    **BP** has three major refineries located in the United States that account for approximately 40% of its total global refining capacity. (Am. Compl. ¶137).

    viii.    **BP** has a larger presence in the United States than anywhere else in the world. Among BP's more than 80,000 global employees, over 30,000 are based in the United States, and every major BP business unit is active in the U.S. market. (Am. Compl. ¶138).

    ix.    **BP** operates and conducts business, including producing, selling, and marketing fossil fuels and related products, in 39 states across the United States. (Am. Compl. ¶138).

9

x.  **BP** has actively acquired oil and gas assets in the United States, including a 2018 acquisition of a portfolio of unconventional oil and gas assets from BHP Petroleum (North America) for $10.5 billion. (Am. Compl. ¶140).

xi.  **BHP** maintains business operations in Arizona, California, New Mexico, and Utah, with corporate offices in Tucson, Arizona, and Washington, D.C., demonstrating its sustained and deliberate engagement with multiple U.S. jurisdictions. (Am. Compl. ¶175).

xii.  **BHP** has also established a charitable foundation headquartered in the United States, further reflecting its continuous operational presence. (Am. Compl. ¶175).

xiii.  **BHP** was a member of API since at least 2019, and likely before 2017, actively participating in U.S.-based trade associations that advanced the interests of the alleged RICO enterprise. (Am. Compl. ¶175).

xiv.  **BHP**'s contact with the United States is directly connected to Plaintiffs' claims because its mining operations contribute to climate change, and its membership and participation in the GCC and other fossil fuel trade associations occurred in the U.S., targeting U.S. legislation and the U.S. public, including the Plaintiffs and their citizens in Puerto Rico. (Am. Compl. ¶176).

xv.  **Rio Tinto** is the parent company of Rio Tinto Energy America Inc., a wholly owned subsidiary incorporated in the State of Delaware, with its principal place of business in Gillette, Wyoming, establishing a direct corporate presence in the United States. (Am. Compl. ¶182).

xvi.  **Rio Tinto** holds an estimated 1.4 billion short tons of U.S. coal reserves, making it a major holder of domestic coal assets. (Am. Compl. ¶183).

xvii. **Rio Tinto** operates in 35 countries worldwide, but most of its assets are located in North America, including the United States. (Am. Compl. ¶183).

xviii. **Rio Tinto** has substantial mining operations in Utah, California, and Arizona, including the Arizona Resolution Copper Project, which alone has the potential to supply up to 25% of U.S. copper demand. (Am. Compl. ¶183).

xix. Approximately 15.9% of all of **Rio Tinto**'s consolidated sales revenue is derived from the United States, underscoring its significant commercial ties to the U.S. market. (Am. Compl. ¶183).

xx. In the United States, **Rio Tinto** actively participates in and contributes to U.S.-based groups, including providing administrative support for the Rio Tinto America Political Action Committee (PAC). In 2022 alone, Rio Tinto contributed $626,000 to the U.S. National Mining Association (NMA), a domestic trade group that opposes progressive climate policy. (Am. Compl. ¶183).

xxi. **Rio Tinto**'s contacts with the United States are directly connected to Plaintiffs' claims, as its U.S.-based mining operations contribute to climate change, and its membership in the GCC and other fossil fuel trade associations was conducted in the U.S., targeted U.S. legislation and policymakers, and impacted the Municipalities and their citizens in Puerto Rico. (Am. Compl. ¶184).

As in *Fuld*, where activities by foreign defendants touching the United States supported jurisdiction, here too the foreign Defendants intentionally engaged in conduct designed to impact U.S. markets and government policy. Their involvement in such a coordinated enterprise warrants the exercise of personal jurisdiction at this stage.

### c. Personal Jurisdiction Over Rio Tinto PLC Is Constitutionally Sound Under the Fifth Amendment.

Rio Tinto PLC, a multinational mining and energy conglomerate, is subject to personal jurisdiction due to its deliberate involvement in a coordinated racketeering enterprise targeting the United States and its direct ties to U.S. markets, institutions, and disinformation campaigns. As detailed above (see Section B) Rio Tinto maintains substantial U.S. operations through its subsidiary, Rio Tinto Energy America Inc., incorporated in Delaware with its principal place of business in Wyoming, placing Rio Tinto's operations directly within the jurisdiction of federal courts. It holds extensive U.S. coal reserves, operates major mining projects in multiple states, and derives a significant portion of its consolidated revenue from U.S. activities.

Notably, Rio Tinto's membership in the Information Council for the Environment (ICE), positioned it to actively fund and steer coordinated disinformation campaigns intended to undermine climate science, delaying change, and misleading the American public. *Id.* ¶ 368. These efforts were deliberate and used U.S. media platforms, targeting U.S. consumers and policymakers. These aggressive campaigns implemented newspaper advertisements, radio commercials, a public relations tour, and mailers discrediting the science of climate change. As a member of the ICE, Rio Tinto actively supported the GCC's goals of disseminating false information. Such materials reached decision-makers in U.S. territories, influencing public spending and infrastructure development, resulting in harm that RICO and federal law are designed to address. *Id.* ¶ 148.

Moreover, as shown above, Rio Tinto is publicly traded in the U.S. and files annual Form 20-F disclosures with the SEC, confirming its deliberate engagement with U.S. capital markets and investors. *Id.* ¶ 181. Rio Tinto cannot claim immunity from jurisdiction after leveraging U.S.

systems, including mail, wire, banking, media, and capital markets, to perpetuate a decades-long deception.

Therefore, under the Fifth Amendment framework reaffirmed in *Fuld*, jurisdiction over Rio Tinto is constitutionally proper and adequately pled under the statutory scheme enacted by Congress. Rio Tinto's coordinated actions with U.S. co-defendants, its domestic operations through a U.S. subsidiary, its participation in U.S.-based trade associations, and its intentional disinformation campaigns all provide ample basis for personal jurisdiction under federal law.

### III. Defendants Cannot Claim Foreign Policy Deference While Coordinating a Domestic Enterprise.

Defendants cannot simultaneously coordinate and collude through trade associations and misinformation campaigns to protect their fossil fuel profits within the U.S. market, while cloaking themselves in foreign policy deference when faced with judicial accountability. As previously noted, *Fuld* expressly rejected that strategy. 2025 WL 1716140, at *8 ("The Constitution confers upon the Federal Government—and it alone—both nationwide and extraterritorial authority."). It affirmed that jurisdiction does not vanish merely because international issues are implicated— especially where the defendants' own conduct invited those consequences by targeting U.S. institutions and consumers. *See id.* (recognizing that the geographical limitations on the power of the States under the due process clause of the Fourteenth Amendment do not equivalently restrict the power of the Federal Government because Constitution creates no such relation between the United States and foreign countries as it creates between the States themselves). The Constitution and due process require fairness, not immunity by obfuscation.

### CONCLUSION

Defendants' attempt to diminish *Fuld's* significance seeks to distort the Supreme Court's mandate and evade liability. They coordinated and funded climate disinformation campaigns via

13

U.S. mail, the internet, wires, and banking systems—acts intended to deceive the American public, including Plaintiffs, to protect fossil fuel profits. Many of these entities are publicly traded and have disclosed such activities to U.S. markets, thereby increasing their jurisdictional exposure. The claim that this federal district court lacks personal jurisdiction contradicts Supreme Court and First Circuit precedent. Defendants' racketeering scheme targeted U.S. audiences and institutions; accordingly, personal jurisdiction is proper under the Fifth Amendment, and Plaintiffs respectfully request that Defendants' motions to dismiss be denied.

By: */s/Roy L. Mason*
Roy L. Mason
USDC-PR Bar No. 308164
SMOUSE & MASON LLC
223 Duke of Gloucester Street
Annapolis, Maryland 21401
Telephone: (410) 269-6620
Facsimile: (410) 269-1235
rlm@smouseandmason.com

Luis Valiente Almeida-Olivieri
USDC-PR Bar No. 308307
MILBERG COLEMAN BRYSON PHILLIPS GROSMAN LLC
1311 Ponce de Leon Ave, Suite 700
San Juan, Puerto Rico 00907
Telephone: (866) 252-0878
lalmeida@milberg.com

*Attorney for Plaintiffs*

# APPENDIX A

## Summary of Defendants' U.S. Activities Alleged in the Amended Complaint

| Defendant | Sold Products in PR | Operated Gas Stations | Airport Contracts | Funded Climate Denial | Denial Info Relayed in PR | Complaint Section(s) |
|---|---|---|---|---|---|---|
| Motiva Enterprises LLC | ✓ | ✓ (Shell-branded) | ✓ (LMM Airport fuel supply) | | | ¶¶ 73, 77, 79–81, 170 |
| Shell PLC | ✓ (via Motiva) | ✓ (Shell brand) | ✓ (historically) | ✓ | ✓ | ¶¶ 4, 50, 129–134, 154 |
| Chevron Corp. | ✓ | ✓ (Texaco brand) | | ✓ | ✓ | ¶¶ 4, 47, 94, 98, 109, 126–127, 129–132, 136, 154 |
| Exxon Mobil Corp. | ✓ | ✓ (Esso brand) | | ✓ | ✓ | ¶¶ 4, 48, 95, 99–100, 110, 126–127, 129–134, 154 |
| BP P.L.C. | ✓ (subsidiaries) | ✓ (Amoco brand) | ✓ (airport consortium) | ✓ | ✓ | ¶¶ 4, 46, 93, 97, 108, 126, 129–134, 154 |
| ConocoPhillips | ✓ | ✓ (Phillips 66) | | ✓ | ✓ | ¶¶ 4, 49, 96, 101–102, 111, 126–127, 129–134 |
| Occidental Petroleum | | | | ✓ | ✓ | ¶¶ 4, 103, 112, 126, 129–134 |
| BHP Group Ltd. | | | | ✓ (via API) | ✓ | ¶¶ 4, 116, 129–134 |
| Rio Tinto PLC | | | | ✓ (via API) | ✓ | ¶¶ 4, 117, 129–134 |
| American Petroleum Institute (API) | | | | ✓ (organized denial) | ✓ | ¶¶ 4, 118–122, 129–134 |