In the United States Court
for the District of Puerto Rico

| | |
|---|---|
| MUNICIPALITY OF BAYAMÓN, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> EXXON MOBIL CORP., ET AL., <br><br> Defendants. | CIV. NO.: 22-1550 (SCC) |

**OMNIBUS OPINION AND ORDER**

Magistrate Judge Hector Ramos-Vega filed a Report and Recommendation ("R&R") as to the pending motions to dismiss at Docket Nos. 232, 234, 235, 236, 237, 239, 240, 242, 243, 244, 245, 246, 247, and 254 and for judicial notice at Docket Nos. 238 and 241. *Municipality of Bayamón v. Exxon Mobil Corp.*, 2025 WL 600430 (D.P.R. Feb. 20, 2025); Docket No. 315. For the reasons set forth below, the Court hereby **ADOPTS in part** the R&R.

## I. BACKGROUND

Plaintiffs, the municipalities of Bayamón, Caguas, Loíza, Lares, Barranquitas, Comerío, Cayey, Las Marías,

Trujillo Alto, Vega Baja, Añasco, Cidra, Aguadilla, Aibonito, Morovis, Moca, Barceloneta, Camuy, Cataño, Salinas, Adjuntas, Arroyo, Culebra, Dorado, Guaynabo, Hormigueros, Juncos, Lajas, Manatí, Naguabo, Naranjito, Utuado, Villalba, Coamo, Orocovis, Vieques, and Yabucoa (collectively, "Plaintiffs"), filed suit in November 2022 in their own right and on behalf of a proposed class consisting of the 78 Municipalities of Puerto Rico. Docket No. 1. The suit is against Exxon Mobil Corporation ("Exxon"), Shell PLC ("Shell"), Chevron Corporation ("Chevron"), BP PLC ("BP"), Motiva Enterprises LLC ("Motiva"), Occidental Petroleum ("Occidental"), BHP Group ("BHP"), Rio Tinto PLC ("Rio Tinto"), ConocoPhillips ("ConocoPhillips"), and American Petroleum Institute ("API"), as well as various unnamed individuals and entities. In their amended complaint, Docket No. 205, Plaintiffs allege that Exxon, Shell, Chevron, BP, Motiva, Occidental, BHP, Rio Tinto, and ConocoPhillips colluded with each other and API (collectively, "Defendants") to misrepresent risks posed by the carbon-based and fossil-fuel products they marketed and sold. According to Plaintiffs,

those actions ultimately led to hurricanes in 2017 that resulted in extensive damages throughout Puerto Rico.

## II. THE R&R

### A. The Joint Motions to Dismiss

Two of the motions to dismiss are joint. One argues lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Docket No. 234. Magistrate Judge Ramos-Vega recommends that this motion be denied. 2025 WL 600430, at * 43. He further recommends "limited discovery on the issue of jurisdiction . . . because a more developed record would assist the Court in making its jurisdictional finding." 2025 WL 600430, at * 8.

The other joint motion to dismiss argues failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Docket No. 235. Magistrate Judge Ramos-Vega recommends that this motion be granted in part and denied in part. 2025 WL 600430, at * 43. He recommends that the motion be granted as to the claims under Puerto Rico law: common law consumer fraud; conspiracy to commit common law consumer fraud and deceptive business practices; Rule 7 of the Puerto Rico rules

against misleading practices and advertisements; public nuisance; strict liability failure to warn; strict liability for design defect; negligent design defect; private nuisance; and unjust enrichment. As to the federal claims, Magistrate Judge Ramos-Vega recommends that the motion be granted as to two Racketeer Influenced and Corrupt Organizations Act ("RICO") claims, under 18 U.S.C. §§ 1962(a) and 1962(b), and denied as to the other two RICO claims, under 18 U.S.C. §§ 1962(c) and 1962(d), and the claim under the antitrust laws, 15 U.S.C. § 1 et. seq.

## B. The Individual Motions to Dismiss

All ten Defendants filed individual motions to dismiss: Occidental under Federal Rules of Civil Procedure 12(b)(2), 12(b)(5) and 12(b)(6), Docket No. 232; BP under Rule 12(b)(6), Docket No. 236; ConocoPhillips under Rule 12(b)(6), Docket No. 237; Chevron under Rule 12(b)(6), Docket No. 239; Motiva under Rules 12(b)(2), 12(b)(3), and 12(b)(6), Docket No. 240; Exxon under Rule 12(b)(6), Docket No. 242; BHP under Rule 12(b)(6), Docket No. 243, and under Rule 12(b)(2), Docket No. 245; Shell under Rule 12(b)(6), Docket No. 244; Rio Tinto

under Rule 12(b)(2), Docket No. 246, and under Rule 12(b)(6),

Docket No. 247; and API under Rule 12(b)(6), Docket No. 254.

Magistrate Judge Ramos-Vega recommendations as to

these motions are as follows:

(i) Grant in part and deny in part Occidental's motion to dismiss at Docket No. 232. Grant as to the failure to serve summons but deny on the other jurisdictional grounds. Grant in part and deny in part regarding the failure to allege all counts of the Amended Complaint as set forth for the Joint Motion at Docket No. 235.

(ii) Grant in part and deny in part BP's motion to dismiss at Docket No. 236 to reflect the recommendations as to the Joint Motion at Docket No. 235.

(iii) Deny Conoco's motion to dismiss at Docket No. 237.

(iv) Deny Chevron's motion to dismiss at Docket No. 239.

(v) Grant in part and deny in part Motiva's motion at Docket No. 240 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

(vi) Grant in part and deny in part Exxon's motion at Docket No. 242 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

(vii) Grant in part and deny in part BHP's motion at Docket No. 243 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

(viii) Grant in part and deny in part Shells' [sic] motion

at Docket No. 244 as set forth in the Joint Motion to dismiss at Docket No. 235.

(ix) Deny BHP's motion to dismiss on the basis of lack of jurisdiction at Docket No. 245.

(x) Deny Rio Tinto's motion to dismiss for lack of jurisdiction at Docket No. 246.

(xi) Grant in part and deny in part Rio Tinto's motion to dismiss for failure to plead at Docket No. 247, as recommended with respect to the Joint Motion to Dismiss at Docket No. 235.

(xii) Grant in part and deny in part API's motion to dismiss at Docket No. 254, as recommended for the Joint Motion to Dismiss at Docket No. 235.

2025 WL 600430, at * 43–44.

### C. The Motions for Judicial Notice

There are two motions for judicial notice under Rule 201 of the Federal Rules of Evidence. One was filed jointly by Defendants, Docket No. 238, and Magistrate Judge Ramos-Vega recommends that it be granted, "but only as to taking notice of the fact that the articles and reports [of which notice is sought] were published." 2025 WL 600430, at * 44. Magistrate Judge Ramos-Vega recommends that the other motion, filed by Chevron, Docket No. 241, be denied, *id.*

### III. Standard of Review

The Court must "make a de novo determination of those portions of the [R&R] to which objection [has been] made." 28 U.S.C. § 636(b)(1)(C). The Court "may accept, reject, or modify, in whole or in part, the [R&R]." *Id.*

The R&R notified the parties that failure to timely object means waiver. 2025 WL 600430, at * 44. They were given ample time to object, beyond the 14 days provided for in 28 U.S.C. § 636(b)(1)(C), Federal Rule of Civil Procedure 72(b)(2), and District of Puerto Rico Local Rule 72(d). *See* Docket No. 317. The parties having been given both notice and ample time, any failure to assert a specific objection irretrievably waived any right to review by this Court. *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998). New arguments cannot be introduced for the first time on the review of the R&R. *Robb Evans & Assocs., LLC v. United States*, 850 F.3d 24, 35 (1st Cir. 2017).

### IV. Analysis

The Court must determine personal jurisdiction before the merits. *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95

(2017). Proper service of process is a requirement for personal jurisdiction. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

## A. Insufficient Service

Occidental's individual motion to dismiss is based in part on insufficient service of process under Rule 12(b)(5). Docket No. 232. Magistrate Judge Ramos-Vega recommends that the motion be granted as to Rule 12(b)(5). 2025 WL 600430, at * 12–13. Plaintiffs did not object. For the first time in response to Occidental's individual objections, Docket No. 320, Plaintiffs argue that they "have shown a good-faith effort to serve Occidental and should be permitted to cure service if necessary," Docket No. 342, pg. 6.

To be sure, motions to dismiss for insufficient service of process are often construed as motions to quash service as courts are "reluctan[t] . . . to dismiss an action when there is a possibility that effective service will be completed." 5B Wright & Miller, Federal Practice & Procedure § 1354 (4th ed. May 2025 update) ("Wright & Miller"). But here the entire case will be dismissed, and the Court sees no reason why the

claims against Occidental do not also fail. The failure to object is determinative, *Santiago*, 138 F.3d at 4, but in any event, because the case will be dismissed, the Court will not engage in the futile exercise of allowing Plaintiffs another opportunity to effect service, *see* 5B Wright & Miller, § 1354.

Occidental's motion to dismiss at Docket No. 232 is **GRANTED in part and MOOT in part**. It is granted as to Rule 12(b)(5) and moot as to Rules 12(b)(2) and 12(b)(6). Accordingly, the claims against Occidental will be dismissed without prejudice. *See* Fed. R. Civ. P. 4(m).

### B. Personal Jurisdiction

Defendants object to the recommendation to deny their Rule 12(b)(2) motion at Docket No. 234. They argue that Plaintiffs "fail[] to establish personal jurisdiction over any Defendant." Docket No. 326, pg. 11. There are also individual objections to the recommended denial of the individual Rule 12(b)(2) motions. Docket No. 328 (Motiva); Docket No. 330 (Rio Tinto); Docket No. 332 (BHP). Plaintiffs object to the recommendation for jurisdictional discovery. Docket No. 323.

Plaintiffs bear the burden of showing that personal jurisdiction exists. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002). The Court "may choose from among several methods for determining whether [Plaintiffs] ha[ve] met this burden." *Id.* at 50–51. "Where, as here, a motion to dismiss for want of in personam jurisdiction is made at the inception of the case and the issue of jurisdiction is not intertwined with the merits, the prima facie approach controls." *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 121 (1st Cir. 2022). Under that approach, the Court "draw[s] the relevant facts 'from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to [Plaintiffs'] version of genuinely contested facts.'" *Kuan Chen v. United States Sports Academy, Inc.*, 956 F.3d 45, 52 (1st Cir. 2020) (quoting *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016)). The Court also "take[s] into account undisputed facts put forth by [Defendants]." *Id.* (quoting throughout *Baskin-Robbins*, 825 F.3d at 34).

Federal courts have "power to decide 'diversity' cases, between 'citizens of different States' whose dispute involves more than a stated sum (the so-called amount-in-controversy)." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) (quoting 28 U.S.C. § 1332(a)). Federal courts also have power to "resolve cases 'arising under' federal law," and such jurisdiction is "more often known as federal-question jurisdiction." *Id.* (quoting 28 U.S.C. § 1331). The amended complaint invokes 28 U.S.C. § 1332(a) and diversity jurisdiction. Docket No. 205, ¶ 12. At the same time, though there is no citation to 28 U.S.C. § 1331, amongst the causes of action are claims under RICO and federal antitrust law.

Where "<u>subject-matter</u> jurisdiction rests wholly or in part on the existence of a federal question, the constitutional limits of the court's <u>personal</u> jurisdiction are drawn in the first instance" by the Fifth Amendment. *Lorelei Corp. v. Cty. of Guadalupe*, 940 F.2d 717, 719 (1st Cir. 1991) (emphasis in original). Plaintiffs thus have to "show that [Defendants] ha[ve] adequate contacts with the United States as a whole, rather than with a particular state," as is the case under the

Fourteenth Amendment. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) (*Swiss Am. Bank II*). Even where there is "no direct constitutional check" on the exercise of personal jurisdiction, there is still "a statutory limitation." *Lorelei Corp.*, 940 F.2d at 719. Specifically, there must be service of process "grounded within a federal statute or Civil Rule." *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992). Under Rule 4(k)(1), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" under three circumstances: the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," the defendant is joined under Rules 14 or 19 and appropriately served, or "when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(A)-(C).

The Supreme Court in *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.* expressly "le[ft] open the question whether the Fifth Amendment imposes the same restrictions [as the Fourteenth] on the exercise of personal jurisdiction by a federal court." 582 U.S. 255, 269 (2017). The

First Circuit, as recently as last year, held that, in determining whether there are adequate contacts with the United States as a whole under the Fifth Amendment, a "'federal court's role is the same' as when it 'adjudicates state-created rights based on diversity of citizenship jurisdiction'" under the Fourteenth Amendment. *SEC v. Gastauer*, 93 F.4th 1, 8 (1st Cir. 2024) (quoting *Baskin-Robbins*, 825 F.3d at 34 n. 2). *See also Lewis v. Mutond*, 62 F.4th 587, 592 (D.C. Cir. 2023); *Fuld v. Palestine Liberation Organization*, 82 F.4th 74, 86 (2d. Cir. 2023); *Herederos de Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*, 43 F.4th 1303, 1308 (11th Cir. 2022); *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022) (en banc). *But see id.* at 249 (Elrod, J., dissenting); *id.* at 282 (Higginson, J., dissenting); *id.* at 284 (Oldham, J., dissenting); *Mutond*, 62 F.4th at 596 (Rao, J., concurring); *Fuld v. Palestine Liberation Organization*, 101 F.4th 190, 203 (2d. Cir. 2024) (Menashi, J., dissenting from the denial of rehearing en banc). Under that framework, to determine whether the exercise of personal jurisdiction comports with the Fifth Amendment, a court has to apply the

familiar "minimum contacts" standard from *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

Recently, the Supreme Court, on certiorari from the Second Circuit, addressed the question it had reserved and held that "the Fifth Amendment does not impose the same jurisdictional limitations as the Fourteenth." *Fuld v. Palestine Liberation Org.*, 145 S.Ct. 2090, 2106 (2025). The Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment" and held that the Fifth Amendment "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 2105. The Supreme Court did not, however, determine the Fifth Amendment's "outer limits on the territorial jurisdiction of federal courts." *Id.* at 2106.

The day the Supreme Court decided *Fuld*, this Court ordered the parties to file supplemental briefs regarding the decision and the impact it could have on this case. Docket No. 390. They dutifully complied. Docket Nos. 399, 400, 401, 402.

Except for Rio Tinto, Docket No. 246, pg. 8; Docket No. 330, pg. 6; Docket No. 400, pgs. 15–18, no one amongst Defendants has anywhere, *Fuld* briefs included, questioned the constitutionality of exercising personal jurisdiction under the Fifth Amendment. The Court thus need not consider the matter as to them. *See Motus*, 23 F.4th at 122. As to Rio Tinto, it cannot, as will be explained below, be properly served, and there is thus no personal jurisdiction over it. The Court need not undertake any Fifth Amendment analysis. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").

## 1. RICO

The Court starts with RICO, which includes a provision on, as stated in its title, "Venue and process." 18 U.S.C. § 1965. That provision authorizes service under certain circumstances. Plaintiffs invoke it in the amended complaint. Docket No. 205, ¶ 18.

Magistrate Judge Ramos-Vega considered the matter. 2025 WL 600430, at * 11–12. He recommends that, "[b]ecause

[RICO] requires a finding of jurisdiction over at least one defendant," the analysis under RICO "be conducted once jurisdictional discovery is completed." *Id.* at * 12.

Plaintiffs and Defendants filed objections. Plaintiffs object to jurisdictional discovery generally and to "defer[ring] the [RICO] jurisdictional analysis . . . until jurisdictional discovery is completed." Docket No. 323, pg. 6. Defendants in the joint objections state that RICO jurisdiction is "inapplicable" and that "jurisdictional discovery is unwarranted" because "Plaintiffs have not adequately alleged personal jurisdiction over any defendant." Docket No. 326, pg. 46. They further that that the R&R does not "address[] Defendants' point that [RICO] cannot permit <u>international</u> service of process, making it inapplicable to Shell, BP, BHP, and Rio Tinto." *Id.* at pgs. 46–47 n. 29 (emphasis in original).

Section 1965(a) provides that "[a]ny civil action or proceeding under [RICO] against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent,

or transacts his affairs." 18 U.S.C. § 1965(a). Section 1965(b) provides that "[i]n any action" under 18 U.S.C. § 1964—which provides for a private cause of action for violations of § 1962, the provision Plaintiffs allege Defendants violated—"in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof." Finally, § 1965(d) provides that "[a]ll other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs."

Section 1965 "is not a model of clarity." *World Depot Corp. v. Onofri*, 2017 WL 6003052, at * 5 (D. Mass. Dec. 4, 2017). The first two circuit courts to consider the issue identified § 1965(b) as creating personal jurisdiction. *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538–39 (9th Cir. 1986); *Lisak v. Mercantile Bancorp Inc.*, 834 F.2d 668, 671–72 (7th Cir. 1987). A decade after those two decisions, the Eleventh and

Fourth Circuits focused on § 1965(d). *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). A year later, in *PT United Can Co. v. Crown Cork & Seal Co., Inc.*, the Second Circuit held that "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant" and that "§ 1965(b) provides for nationwide service and jurisdiction over 'other parties' not residing in the district, who may be additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants," as long as there is "a showing that the 'ends of justice' so require." 138 F.3d 65, 71 (2d Cir. 1998).

The Second Circuit was "[t]he first federal appellate court to actually analyze § 1965's full text and offer reasoning for its choice of subsections." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1230 (10th Cir. 2006). Since then, every circuit court to consider the issue, namely the Third, Sixth, Tenth, and D.C. Circuits, have agreed with the Second Circuit's analysis. *PT*

*United Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 120 (3d Cir. 2020); *Peters Broad. Eng'r, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 440–41 (6th Cir. 2022); *Cory*, 468 F.3d at 1229–33; *FC Inv. Grp. v. IFX Markets, Ltd.*, 529 F.3d 1087, 1098–1100 (D.C. Cir. 2008).

Courts in the First Circuit—including one court in this District at the recommendation of the undersigned, then a Magistrate Judge—have overwhelmingly adopted the majority approach. *See, e.g., Dispensa v. Nat'l Conf. of Cath. Bishops*, 2020 WL 2573013, at * 10 (D.N.H. May 21, 2020); *Kalika, LLC v. Boston & Maine Corp.*, 2019 WL 1276099, at * 7 (D. Mass. Mar. 20, 2019); *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.*, 2015 WL 5719801, at * 3 (D.P.R. Sept. 29, 2015), report and recommendation adopted, 2016 WL 9459821 (D.P.R. Mar. 31, 2016); *Ginsburg v. Dinicola*, 2007 WL 1673533, at * 4–5 (D. Mass. June 7, 2007).

To the Court's understanding, there have been two deviations, in decisions rendered a few months apart by the same judge. *See Bridge v. Invest Am., Inc.*, 748 F. Supp. 948 (D.R.I. 1990); *Omni Video Games, Inc. v. Wing Co., Ltd.*, 754 F.

Supp. 261 (D.R.I. 1991). *Bridge* relied on various decisions by district courts in circuits that eventually adopted the majority approach. *See* 748 F. Supp. at 951. Further, like the Eleventh Circuit in *Republic of Panama*, 119 F.3d at 942, which cited to the Seventh Circuit's decision in *Lisak* for support even though *Lisak* identified § 1965(b) as governing personal jurisdiction, *Bridge*, 748 F. Supp. at 951, cited to both *Lisak* and the Ninth Circuit's decision in *Butcher's Union*—which also identified § 1965(b) as governing personal jurisdiction. In another parallel, *Omni Video Games* summarily reached its conclusion, 754 F. Supp. at 263, after citing to "th[at] [c]ourt['s] recent[] h[o]ld[ing]" in *Bridge*, like the Fourth Circuit cited to the Eleventh Circuit's decision in *Republic of Panama* after a brief discussion of § 1965, though not subsection b, *see ESAB Grp.*, 126 F.3d at 626.

Considering "the language and structure of the RICO provision itself as well as the relative absence of reasoning in support of the minority position," *Laurel Gardens*, 948 F.3d at 117, the Court aligns with the majority position. *Cf. Biden v. Texas*, 597 U.S. 785, 798–99 (2022) (looking at the text first and

"confirm[ing] [its] conclusion" by looking at statutory structure). "[B]cause '§ 1965(a) grants personal jurisdiction over an initial defendant . . . to the district court for the district in which that person resides, has an agent, or transacts his or her affairs,' nationwide jurisdiction hinges on whether at least one defendant has minimum contacts with the forum state," *Peters Broad.*, 40 F.4th at 439 (quoting *Laurel Gardens*, 948 F.3d at 117–18), under the "traditional contacts test," *Laurel Gardens*, 948 F.3d at 120.

Under that test, there are two types of personal jurisdiction: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). "[G]eneral jurisdiction [can be exercised] only when a defendant is 'essentially at home' in the State" and "extends to 'any and all claims' brought against a defendant." *Id*. (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)). Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Id.* at 359.

Here, there is no suggestion by Plaintiffs of general jurisdiction, so the Court only assesses specific jurisdiction. "Questions of specific jurisdiction are always tied to the particular claims asserted." *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999). Plaintiffs, then, must demonstrate the three requirements of relatedness, purposeful availment, and reasonableness, *see id.* at 288, as to the particular defendant and RICO.

It is rather clear that there is personal jurisdiction in Puerto Rico as to RICO over the first named defendant, Exxon. Further, because the Puerto Rico long-arm statute applies, the same tripartite framework of relatedness, purposeful availment, and reasonableness, *Negrón-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 24 (1st Cir. 2007), the Court, in the interest of avoiding repetitiousness, will address here service under that statute over Exxon for the antitrust and Puerto Rico law claims.

Exxon's individual objections to the R&R focus, like its motion to dismiss, on the merits. Docket No. 321. Defendants are clear in the joint objections that, at least as to those

amongst them that did not file individual Rule 12(b)(2) motions, and Exxon did not, they "take all material jurisdictional allegations as true for purposes of the joint motions and objections." Docket No. 326, pg. 13. So does the Court. Further, in the joint Rule 12(b)(2) motion, Defendants rightly state that "[s]pecific jurisdiction exists only if" there is relatedness, purposeful availment, and reasonableness, Docket No. 234, pg. 14, but argue that Plaintiffs have not made a prima facie case of personal jurisdiction because they have not showed relatedness or reasonableness, *id.* at pg. 15. It is conceded then that there is purposeful availment, and the Court examines only relatedness and reasonableness. *See Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 7 (1st Cir. 2018).

Starting with relatedness, it requires that the claims "arise out of <u>or relate to</u> the defendant's contacts with the forum." *Ford Motor Co.*, 592 U.S. at 362 (quoting throughout *Bristol-Myers*, 582 U.S. at 262) (emphasis in original). "The first half of that standard asks about causation," and "the back half, after the 'or,' contemplates that some relationships will

support jurisdiction without a causal showing." *Id.* "That does not mean anything goes," but rather that there may be relatedness without causation "because of another activity or occurrence involving the defendant that takes place in the State." *Id.* (cleaned up). For example, "if Audi and Volkswagen's business deliberately extended into Oklahoma (among other States), then Oklahoma's courts could hold the companies accountable for a car's catching fire there—even though the vehicle had been designed and made overseas and sold in New York." *Id.* at 363.

The amended complaint alleges that Exxon "advertises, markets, and sells its products in Puerto Rico," and that Exxon's "downstream operation" consists of "marketing, refining, and retail operations" and "includes sales of its petroleum-based consumer products in Puerto Rico." Docket No. 205, ¶¶ 97, 103. The amended complaint further names specific kinds of products that, as alleged, Exxon sells in Puerto Rico. *See id.* at ¶¶ 101–02.

The amended complaint shows relatedness as to Exxon as to all claims. Even if Exxon's products are manufactured

elsewhere, the amended complaint alleges extensive marketing and sales in Puerto Rico as part of a scheme between Defendants that violates RICO and the antitrust laws by colluding to defraud and maintain an illegal monopoly and resulting in injury in tort and consumer protection violations under Puerto Rico law. *See Ford Motor Co.*, 592 U.S. at 362; *id.* at 368 ("An automaker regularly marketing a vehicle in a State . . . has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless of where it was first sold).") (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *Goya Foods Inc. v. Oy*, 959 F. Supp. 2d 206, 213–14 (D.P.R. 2013) (finding relatedness where defendant consistently marketed in the forum and shipped to vendors for sale in the forum and dispute arose from those activities in the forum).

The cases on which Defendants rely do not help their case. Defendants cite extensively to *Ford Motor Co.*, which shows relatedness, as just determined. It also forecloses Defendants the causal standard Plaintiffs embrace. *See* Docket

No. 234, pg. 15–22. For support, Defendants cite to *City of Oakland v. BP p.l.c.*, where a court in the Northern District of California rested its finding of no personal jurisdiction on the lack of a "causal chain." 2018 WL 3609055, at * 4 (N.D. Cal. July 27, 2018). *Ford Motor Co.* expressly rejected such a standard. 592 U.S. at 362.

Defendants also cite to *Vapotherm, Inc. v. Santiago*, 38 F.4th 252 (1st Cir. 2022). There, the First Circuit found no relatedness under *Ford Motor Co.* because "[t]he actions which form[ed] the basis of the tort claim, [the defendant's] alleged solicitation of" three "clinical managers [who] provided training and support to hospitals that use [the plaintiff's] product," did "not arise out of or relate to [the defendant's] contacts with" the forum state, New Hampshire. *Id.* at 256 n. 2, 261. Rather, "the three [clinical managers] [we]re connected to [the defendant] through their contacts in Florida and Georgia where they all worked throughout the duration of their employment with [the plaintiff]." *Id.* at 261.

The facts here are different. As alleged in the amended complaint, there was an illegal monopoly and RICO scheme

to defraud and sell products to consumers in Puerto Rico by misrepresenting their impact on climate change.

Defendants also rely on the Rhode Island Supreme Court's decision in *Martins v. Bridgestone Am. Tire Ops., LLC*, 266 A.3d 753 (R.I. 2022). They argue that in *Martins* "personal jurisdiction did not exist because the plaintiff's claims did not arise from the use and malfunction of the product in Rhode Island, even though the plaintiff alleged that the defendant-manufacturers had 'extensive contacts with Rhode Island and their intent [was] to conduct business in Rhode Island.'" Docket No. 234, pg. 17 (quoting *Martins*, 266 A.3d at 759).

But Defendants do not tell the whole story. *Martins* involved a Rhode Island resident who drove a truck from Massachusetts to Connecticut and struck a tree in Connecticut after a tire made and installed in Tennessee failed. 266 A.3d at 756. The only connection between Rhode Island, where the suit was brought, and the suit was that the driver was a Rhode Island resident who died in Rhode Island. *Id.* at 761. The Rhode Island Supreme Court accordingly did not find relatedness. *Id.* Again, the facts are entirely different here.

Finally, Defendants rely on the Second Circuit's decision in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021). That case is irrelevant here because it involved federal preemption, not personal jurisdiction. *Id.* at 85. Indeed, the district court decision the Second Circuit affirmed made it explicit that judgment on the personal jurisdiction challenge was deferred. *City of New York v. BP P.L.C.*, 325 F.Supp.3d 466, 470 n. 1 (S.D.N.Y. 2018).

There is, in short, relatedness. As explained, that there is purposeful availment is conceded. The Court jumps to the third and last requirement, reasonableness, which is determined by considering five factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *Pleasant St.*, 960 F.2d at 1088.

Starting with Exxon's burden of appearing, "modern travel creates no especially ponderous burden for business

travelers," and, accordingly, "[f]or this type of burden to affect the analysis, the defendant must show that it is special or unusual." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 70 (1st Cir. 2014) (cleaned up). There is no such showing, and this factor goes to jurisdiction.

As to the second factor, Puerto Rico's interest in adjudicating this dispute, Defendants argue that "assertion of jurisdiction here would offend the principles underlying the interstate judicial system because Plaintiffs seek to use Puerto Rico tort law to penalize and regulate Defendants' nationwide (indeed, worldwide) activities, including fossil fuel production, promotion, marketing, and sales—activities heavily regulated, and in many instances encouraged, by the federal government, all 50 States, and every other country in the world in which these companies operate." Docket No. 234, pg. 24. But the Court's task "is not to compare the interest of [different] sovereigns." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 718 (1st Cir. 1996). Rather, the Court must "determine whether [Puerto Rico] has an interest . . . in exercising jurisdiction." *Id.* (emphasis in original). It clearly

does, and this factor also goes to jurisdiction.

The third factor, Plaintiffs' interest in obtaining convenient and effective relief, does as well. Plaintiffs' "choice of forum must be accorded a degree of deference." *Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995).

The fourth factor, the judicial system's interest in obtaining the most effective resolution of the case, is "self-evidently a wash." *Baskin-Robbins*, 825 F.3d at 41. "Even though [Puerto Rico] courts can effectively administer justice in this dispute, they have no corner on the market." *Id.*

The fifth and final factor, the common interests of all sovereigns in promoting substantive social policies, is the one Defendants contest the most. They argue that "the substantive social policies Plaintiffs seek to advance—chilling Defendants' speech on matters of public concern that Plaintiffs deem misleading, curbing energy production and the use of fossil fuels, or allocating the downstream costs of global climate change to the energy companies to bear directly—are not shared uniformly across all the various States and nations." Docket No. 234, pg. 25. "Plaintiffs'

claims," Defendants also argue, "implicate the interests of numerous other States and Nations, and thus this Court cannot reasonably exercise jurisdiction over Defendants." *Id.* For this they cite to an August 2021 statement by the National Security Advisor at the time articulating a policy to encourage an increase in crude oil production because it, Defendants posit, "w[as] (and still [is]) essential to the 'ongoing global recovery' from the pandemic." *Id.*

The Court must "consider[] the interests of the 'several States,' in addition to [Puerto Rico], in the efficient judicial resolution of the dispute and the advancement of substantive policies." *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cty.*, 480 U.S. 102, 115 (1987). It must also "consider the procedural and substantive policies of other nations whose interests [may be] affected by the assertion of jurisdiction" over the non-U.S.-based Defendants. *Id.* "[T]hose interests, as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an

alien defendant outweighed by minimal interests on the part of [Plaintiffs] or [Puerto Rico]." *Id.*

The Court takes into account this argument here even though Exxon is a domestic corporation. The Court also assumes the soundness of Defendants' framing of this case and an interest by some other jurisdiction to "protect[] [Defendants'] businesses," even though that jurisdiction would have to serve as a forum for adjudication of this dispute, *Nowak*, 94 F.3d at 719, and Defendants are wholly unclear what that jurisdiction may be. *Nowak*, 94 F.3d at 719.

Even on that assumption, this factor does not go against jurisdiction. As to speech, the First Circuit has been clear that "no weight" ought to be placed "on First Amendment values" because "the [Supreme] Court has shied away from allowing First Amendments concerns to enter into the jurisdictional analysis." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 211–12 (1st Cir. 1994). And regardless of any interest by some other jurisdiction, Puerto Rico still "has an interest in protecting its citizens from out-of-state providers of goods and services" and providing "a

convenient forum" for the resolution of disputes. *Nowak*, 94 F.3d at 719. Accordingly, and even with all assumptions in Defendants' favor, the balance "tips only slightly in [Plaintiffs'] favor." *Id.*

The Court concludes that jurisdiction over Exxon here does not "make[] litigation so gravely difficult and inconvenient as to render the exercise of personal jurisdiction unreasonable and unfair." *Fuld*, 145 S.Ct. at 2110 (cleaned up). Relatedness, purposeful availment, and reasonableness all being present as to all claims, the Court can exercise personal jurisdiction over Exxon as to all claims.

Because the Court can exercise personal jurisdiction over that defendant, under RICO, "summonses can be served nationwide on [the] other defendants <u>if required by the ends of justice</u>." *Cory*, 468 F.3d at 1231 (emphasis added).

RICO does not define "ends of justice." One reading, embraced by the Ninth Circuit, is that a plaintiff must show that there is no other district where a court would have personal jurisdiction over all defendants. *Butcher's Union*, 788 F.2d at 539. Another, adopted by the Tenth Circuit, is that the

"ends of justice" is "a flexible concept uniquely tailored to the facts of each case." *Cory*, 468 F.3d at 1232. Courts in the First Circuit have adopted the latter approach. *See Dispensa*, 2020 WL 2573013, at * 10; *Kalika*, 2019 WL 1276099, at * 8.

Per the amended complaint, the "interests of justice require that [Plaintiffs] be permitted to bring the Defendants before the Court in a single trial." Docket No. 205, ¶ 18. There is similar language in *Butcher's Union*. *See* 788 F.2d at 539. The joint Rule 12(b)(2) motion does not address the matter. Motiva, in its individual motion, quotes *Butcher's Union* and argues that Plaintiffs have not shown that there is no other district that has jurisdiction over Defendants. Docket No. 240, pg. 11. It further argues that Plaintiffs fail under *Butcher's Union* because they have not alleged a single nationwide RICO conspiracy, *id.* at pg. 12, an argument Rio Tinto also raises, *see* Docket No. 246, pgs. 16–19. Motiva also argues, this time by citation to *Cory*, that "sustaining damages and litigation costs in Puerto Rico is not by itself sufficient to meet the 'ends of justice' requirement." Docket No. 240, pg. 12.

Because "the parties in this case do not recognize th[e] conflict," between the Ninth Circuit and the Tenth Circuit, and because "Plaintiffs establish both that no other district would have traditional jurisdiction over [Defendants] and that the exercise of jurisdiction satisfies a flexible understanding of the 'ends of justice,'" the Court "need not—and do[es] not—decide whether the Ninth or the Tenth Circuit is correct." *Laurel Gardens*, 948 F.3d at 121. It "likewise need not—and do[es] not—decide whether [Plaintiffs] must specifically allege . . . '[a] single nationwide RICO conspiracy' encompassing [Defendants]." *Id.* at 121 n. 11 (quoting *Butcher's Union*, 788 F.2d at 539).

Under the flexible approach, "courts consider a variety of factors" including "the location of the parties, witnesses, records, and acts or omissions giving rising to the claims," "whether judicial economy favors trying the action in one court," and the existence of an alternative forum. *Crenshaw v. Antokol*, 287 F. Supp. 2d 37, 42 (D.D.C. 2003). As to the last factor, "virtually all courts to have considered the question have noted [that] the existence of an alternative forum will be

a significant and often dispositive factor." *Dispensa*, 2020 WL 2573013, at * 10. The Ninth Circuit's approach, as explained above, requires no alternative forum.

The Court does not see an alternative forum. Defendants hail from different parts of the country and the world. It is not as if, say, "New Hampshire provides a forum with personal jurisdiction over all [Defendants]," thus "militat[ing] against concluding that the ends of justice require that [the other Defendants] 'be brought before [this Court].'" *Kalika*, 2019 WL 1276099, at * 8 (quoting 18 U.S.C. § 1965(b)). On the contrary, "it is unlikely that all [Defendants] are subject to venue in one district." *Southmark Prime Plus, L.P. v. Falzone*, 768 F.Supp. 487, 491 (D. Del. 1991). And the acts "giving rise to this case occurred in Puerto Rico." *Marrero-Rolón*, 2015 WL 5719801, at * 3.

The Court holds that the "ends of justice" requirement is met. Accordingly, "summonses can be served <u>nationwide</u>." *Cory*, 468 F.3d at 1231 (emphasis added).

Naturally, Defendants contest whether summonses can also be served <u>internationally</u>. And because Shell, BP,

BHP, and Rio Tinto were served abroad, RICO jurisdiction does not, per Defendants, apply. Docket No. 234, pgs. 26–27.

Under Rule 4, "[a] foreign entity may be served with process pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters." *AngioDynamics, Inc. v. Clarion Med. Tech.*, 2019 WL 10787926, at * 11 (D. Mass. Sept. 25, 2019). In February 2023, Plaintiffs asked for an extension of time for service of process, stating that they had "commenced efforts" to serve BP, Shell, BHP, Rio Tinto, "all of which are located internationally, pursuant to the applicable provisions of the Hague Convention." Docket No. 9, ¶ 6. "As a practical matter," Plaintiffs stated, "international process service pursuant to the Hague Convention can take between three to six months due to the lengthy legal process required to ensure service has been completed correctly." *Id.* Eventually, the parties filed a motion outlining a proposed briefing schedule and dealing with other procedural matters and there stated that Shell, BP, BHP, and Rio Tinto "will agree to waive service of process or to accept service of process by direct mail at the

addresses to be provided to Plaintiffs." Docket No. 25, pg. 2. They reserved, though, "any right, defense, affirmative defense, claim, or objection, including lack of subject matter jurisdiction, lack of personal jurisdiction, or insufficient service of process." *Id.* at pg. 2 n. 1. There is no suggestion from Plaintiffs that BP, Shell, BHP, or Rio Tinto were served in the United States. Rio Tinto in particular states that it "agreed to accept service of summons by mail in London as part of [the] agreement." Docket No. 246, pg. 15 n. 5.

The Court "begin[s], of course, with RICO's text." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237 (1989). Under § 1965(b), the Court "may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof." 18 U.S.C. § 1965(b). Under § 1965(d), "[a]ll other process . . . may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). Whatever side of the debate on which subsection provides the basis for nationwide jurisdiction under RICO is correct, the common

denominator here is that for service to be satisfactory, it must be, at minimum, in a judicial district of the United States. That is in contrast with statutes such as the Clayton Act, which will be discussed below, that provide for service "'wherever the defendant may be found,' or similar language, which is not limited to the judicial districts of the United States." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000).

To the Court's understanding, courts are universally in agreement that RICO allows for only nationwide service. Indeed, circuits that have taken different sides in the debate on which subsection of § 1965 provides for personal jurisdiction agree that service must take place in the United States. *See Stauffacher v. Bennett*, 969 F.2d 455, 460–61 (7th Cir. 1992); *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1293 (11th Cir. 2021). Also in agreement are district courts within circuits to have taken a position on which RICO subsection determines nationwide service but not considered the issue of international service. *See, e.g., Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667

F.Supp.3d 83, 119 (S.D.N.Y. 2023); *Nuevos Destinos, LLC v. Peck*, 2019 WL 78780, at * 12 (D.D.C. Jan. 2, 2019). So are courts in circuits that have not considered that issue. *See, e.g., Marani v. Cramer*, 2024 WL 1511329, at * 6 (N.D. Cal. Feb. 2, 2024); *Skidmore Energy, Inc. v. KPMG*, 2004 WL 2804888, at * 7 (N.D. Tex. Dec. 3, 2004). Courts in the First Circuit agree. *See, e.g., Ayasli v. Korkmaz*, 2020 WL 4287923, at * 26 (D.N.H. July 27, 2020). That includes the one outlier identified above that sided with the minority approach in the debate on which RICO subsection determines nationwide service. *See Omni Video Games*, 754 F. Supp. at 263.

On this at least, § 1965 is clear. For there to be jurisdiction under § 1965 over BP, Shell, BHP, and Rio Tinto, there need to have been service in the United States. There was not. The only hook then on which Plaintiffs can rely for RICO jurisdiction over BP, Shell, BHP, and Rio Tinto is the Puerto Rico long-arm statute. *Stauffacher*, 969 F.2d at 461. And Plaintiffs appear to concede this. *See* Docket No. 281, pg. 16.

Plaintiffs allege that BP "markets and sells its products in Puerto Rico," including "oils, greases and similar

products." Docket No. 205, ¶¶ 137, 140. As to Shell, Plaintiffs allege that "Shell branded gasoline was sold in Puerto Rico through the Sol Group . . .  and Sol Puerto Rico Limited," which, per Plaintiffs, is "the exclusive distributor of Shell Fuels in Puerto Rico." *Id.* at ¶ 111. "Shell's website," Plaintiffs further allege, "reflect[ed] 121 Shell gas stations in Puerto Rico as of November 14, 2022." *Id.* Plaintiffs also allege that "Shell advertises, markets, and sells its products, including consumer products, in Puerto Rico." *Id.* at ¶ 113.

BP and Shell join the joint Rule 12(b)(2) motion. They did not file individual Rule 12(b)(2) motions. The analysis as to them is no different than that as to Exxon. There is personal jurisdiction over them as to all claims under the Puerto Rico long-arm statute.

BHP and Rio Tinto are a different story. Besides joining the joint Rule 12(b)(2) motion, they both filed individual Rule 12(b)(2) motions. Docket Nos. 245 (BHP), 246 (Rio Tinto). Plaintiffs do not carry the burden as to either.

Starting with Rio Tinto, the Court sees no purposeful availment and thus jumps to that. *See Adams v. Adams*, 601

F.3d 1, 6 (1st Cir. 2010). "The purposeful availment requirement ensures that the exercise of jurisdiction is essentially voluntary and foreseeable, not premised on a defendant's random, fortuitous, or attenuated contacts." *Plixer*, 905 F.3d at 7 (cleaned up). Voluntariness requires that the contacts "proximately result from actions by the defendant <u>himself</u>." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis in original). Foreseeability requires contacts such that the defendant could "reasonably anticipate being haled into court [in the forum]." *World-Wide Volkswagen*, 444 U.S. at 297.

The only contact with Puerto Rico alleged in the amended complaint is membership in trade associations, something that was "performed in the US with US groups[] and targeted US legislation and the US public, including the Municipalities and their citizens in Puerto Rico." Docket No. 205, ¶ 184. Plaintiffs in their opposition point to that allegation. *See* Docket No. 281, pgs. 17–18. They further offer conclusory allegations. *See id.* at pg. 25 ("Plaintiffs' Amended Complaint asserts sufficient facts to demonstrate Rio Tinto's

purposeful availment with Puerto Rico. Plaintiffs asserts [sic] that Rio Tinto has contacts with Puerto Rico and the United States."). And the one slightly more specific argument attempts to equate United States contacts with Puerto Rico contacts. *See id.* ("Though Rio Tinto alleges that it has not had coal reserves in the United States since 2013, the information Plaintiffs provide says otherwise. Despite Rio Tinto's contention, Plaintiffs still allege a foundation to demonstrate contacts between Rio Tinto and the forum through their business and involvement within the United States.") (cleaned up).

With its Rule 12(b)(2) motion, Docket No. 246, Rio Tinto provided a declaration under penalty of perjury by its Head Secretariat, Docket No. 246-1. The affidavit states that Rio Tinto is based in England. *Id.* at ¶ 4. It further states that Rio Tinto "does not own any assets located in Puerto Rico," that it "does not sell or market products in Puerto Rico," that it "is not registered to do business in Puerto Rico," that it "is not subject to income tax in Puerto Rico," that it "does not have bank accounts" or a "registered agent for service of

process in Puerto Rico," that it "does not have employees based in Puerto Rico," that it "does not have offices, telephone listings, or mailing addresses in Puerto Rico," that it "does not maintain corporate books or records in Puerto Rico," that it "does not own or operate personal or real property in Puerto Rico," and that it has not "directed any marketing or sales of its products in Puerto Rico." *Id.* at ¶ 6.

The affidavit also disputes Plaintiffs' allegation in the amended complaint, apparently derived from a May 2007 third party document, that Rio Tinto is "a major holder of US Coal Reserves, holding an estimated 1.4 billion short tons of US coal reserves." Docket No. 205, ¶ 183 (citing National Mining Association, 2006 Coal Producer Survey (May 2007)). The affidavit states that none of Rio Tinto, its affiliates, or its subsidiaries "currently hold any U.S.-based coal assets" and that "no Rio Tinto subsidiary has engaged in coal production, held U.S. coal reserves, marketed, or sold coal in the U.S. since at least 2013." Docket No. 246-1, ¶ 9.

Finally, in response to Plaintiffs' allegation that Rio Tinto "avails itself to [sic] the United States through their

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 45

large mining operations in Utah, California, and Arizona," Docket No. 205, ¶ 183, the affidavit states that "no Rio subsidiary currently mines, markets, or sells any fossil fuel and has not since at least 2018." Docket No. 246-1, ¶ 11.

"[J]urisdictional facts may be adduced by means of an affidavit made by a person who—like [Rio Tinto's Head Secretariat]—has adequate knowledge of the situation." *Kuan Chen*, 956 F.3d at 56. Plaintiffs "did not dispute the contents of [the] affidavit either with a dueling affidavit or with any other evidentiary proffer." *Id.* at 55. Their "memorandum in opposition to [the Rule 12(b)(2)] motion[s] to dismiss did not even mention the affidavit." *Id.* at 56. Plaintiffs summarily dismiss the affidavit in response to Rio Tinto's objections to the R&R. *See* Docket No. 343, pg. 8 ("Rio Tinto's jurisdictional declaration—crafted in self-serving fashion—does not override the allegations in the Complaint [sic]."). But the affidavit is "not deemed disputed merely because [Plaintiffs'] counsel, in an unsworn brief . . . challenges [it]." *Kuan Chen*, 956 F.3d at 56. The Court then has "every right to treat the factual assertions embedded in the affidavit as undisputed

Municipality of Bayamón, et al.                                    Page 46
v. Exxon Mobil Corp., et al.

and to rely on those facts [in] resolving the motion." *Id.* And
the affidavit shows no purposeful availment. *See Boit v. Gar-*
*Tec Prods., Inc.*, 967 F.2d 671, 681–83 (1st Cir. 1992) (finding no
purposeful availment of Maine where there was no evidence
that manufacturer intended to serve market in Maine,
designed product for Maine, advertised in Maine, established
channels for providing regular advice to customers in Maine,
or marketed products to distributor who had agreed to serve
as sales agent for Maine).

As to Plaintiffs' oft-repeated claim that Rio Tinto's
alleged membership in trade associations establishes personal
jurisdiction, the most Plaintiffs do is cite to a page on
riotinto.com and encourage the downloading of a document
that cannot be found on that page. *See* Docket No. 205, ¶ 183
& n. 166; Docket No. 281, pg. 18 (citing to amended
complaint); Docket No. 343, pg. 7 (citing to the R&R). Worse,
there is no argument that, even if taken at face value, the
contacts are sufficient to show purposeful availment—or any
of the other two requirements for specific jurisdiction.

One court has found personal jurisdiction over a trade association itself on the basis of "longstanding relationships with several [forum state] entities who comprise a significant percentage of [the trade association's] membership and pay a proportional share of dues." *Wright by Wright v. Sherwin-Williams Co.*, 708 F.Supp. 705, 707 (W.D. Pa. 1989). Another has found no personal jurisdiction over a corporate defendant after the plaintiff "failed to present any other evidence which may give rise to a finding of personal jurisdiction over [the corporate defendant] other than possible lobbying activities which alone cannot give rise to jurisdiction." *Herman v. YellowPages.com, LLC*, 780 F.Supp.2d 1028, 1034 (S.D. Cal. 2011). Plaintiffs "offer[] no citations nor any reasoned argument," and the Court's "own brief look into the law reveals that there is a diversity of views among various courts." *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg.*, 295 F.3d 59, 67 (1st Cir. 2002). Plaintiffs' association-related "proposition is arguable but not obvious," and "no other colorable basis for jurisdiction has been preserved as to" Rio Tinto. *Id.*

The same is true as to BHP. The Court again sees no purposeful availment and jumps to that. *Adams*, 601 F.3d at 6.

Plaintiffs' sole related allegation is that BHP "is a 1/3 owner in . . . Cerrejón," a "large open-pit coal mine in Colombia." Docket No. 205, ¶ 172. "Typically," Plaintiffs say, "about 1.6 million short tons of coal are imported annually from Cerrejon to supply Puerto Rico's coal-fired electricity generating plant at Guayama." *Id.* at ¶ 174.

As with Rio Tinto, the Court factors in, *Kuan Chen*, 956 F.3d at 56, the uncontested affidavit tendered by BHP, Docket No. 245-1. The affidavit is by a longtime BHP employee familiar with companies and joint ventures in which BHP "holds interests" but which "are independently managed and operated." *Id.* at ¶ 2. He states that BHP had no share in the Cerrejón mine and that there were "indirect subsidiaries" of BHP that were minority shareholders in three entities related to the mine. *Id.* at ¶ 9.

On the basis of the affidavit, BHP states in the motion that no facts are pled "to overcome th[e] presumption" of corporate separateness and that "[e]ven if BHP itself had been

the minority shareholder of the Cerrejón Entities (which it was not), the purported forum contacts of the Cerrejón Entities still could not be imputed to BHP" considering that they are "separate and distinct from BHP, which was at most an indirect 1/3 shareholder." Docket No. 245, pg. 11. BHP reiterates the argument in its individual objections to the R&R. Docket No. 332, pgs. 4–9.

Plaintiffs' entire response is that "[d]espite 'corporate separateness' between the two companies, BHP still targeted Puerto Rico customers, its electricity market, and pursued their business ventures in this jurisdiction." Docket No. 281, pg. 23. Plaintiffs do not address the matter at all in the response to BHP's objections—the only mention of jurisdiction is as to discovery. Docket No. 336, pgs. 6–7.

"The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary." *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980). To be sure, the presumption of corporate separateness may be overcome if the parent exercises a

"greater" degree of control "than that normally associated
with common ownership and directorship." *Donatelli v. NHL*,
893 F.2d 459, 466 (1st Cir. 1990) (quoting throughout *Hargrave
v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983)). But
Plaintiffs fail to provide any argument, let alone evidence, of
control by BHP over the subsidiaries. They, in short, show no
jurisdiction over BHP.

A final matter as to RICO jurisdiction. Defendants
argue that § 1965 authorizes jurisdiction "only if a plaintiff
first pleads viable RICO claims as to th[e] defendant" over
whom there is traditional jurisdiction. Docket No. 234, pg. 26
(emphasis in original). *See also* Docket No. 326, pg. 46.
Defendants for support cite to *Casio Computer Co. Ltd. v. Savo*,
2000 WL 1877516, at * 26 (S.D.N.Y. Oct. 13, 2000), stating that
that court "declin[ed] to apply § 1965(b) where a RICO claim
suffered from 'fatal' pleading deficiencies," Docket No. 234,
pg. 27.

In *Casio Computer*, the report and recommendation that
the court adopted "recommend[ed] dismissal of the action"
for "lack[] [of] personal jurisdiction over defendants"

because, although "§ 1965(b) permits a district court to
exercise nationwide jurisdiction over a defendant . . . when
'the ends of justice require,'" the "plaintiff's RICO claim [wa]s
fatal," and "the 'ends of justice' [thus] d[id] not mandate the
exercise of national jurisdiction." *Casio Computer*, 2000 WL
1877516, at * 26 (quoting *PT United*, 138 F.3d at 71).

Other courts have articulated a similar concept—that
nationwide service of process requires a "colorable" claim. *See
Nunes v. Fusion GPS*, 531 F.Supp.3d 993, 1003 (E.D. Va. 2021)
("Some claims may be so 'implausible, insubstantial, or
frivolous' that they fail to state a 'colorable' RICO claim. A
plaintiff bringing such an action cannot rely on RICO's
nationwide-service-of-process provision.") (quoting
*D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003)).
Those courts state that "[w]hen a jurisdictional motion to
dismiss depends . . . on the assertion of a right created by a
federal statute, the court should dismiss for lack of
jurisdiction only if the right claimed is so insubstantial,
implausible, foreclosed by prior decisions of this Court, or
otherwise devoid of merit as not to involve a federal

controversy." *Republic of Panama*, 119 F.3d at 941 (cleaned up). That "requirement . . . is a <u>subject matter</u> jurisdiction requirement." *Noble Sec., Inc. v. MIZ Engineering, Ltd.*, 611 F.Supp.2d 513, 551 (E.D. Va. 2009) (emphasis added).

Those courts place a "high burden" on the defendant to show that the claim is not colorable. *D'Addario*, 264 F. Supp. 2d at 388. And the "pleading standard" is "lower . . . than [that] required under Rule 12(b)(6)." *Rilley v. MoneyMutual, LLC*, 2017 WL 3822727, at * 3 (D. Minn. August 30, 2017). A plaintiff's allegations can be "infirm" and still state a colorable claim. *See Burnett v. Al Baraka Inv. and Development Corp.*, 274 F.Supp.2d 86, 98 (D.D.C. 2003). On these standards, Defendants make no winning argument.

Defendants embrace a higher standard. *See* Docket No. 234, pg. 26 (stating that RICO nationwide service requires that "a plaintiff first pleads <u>viable</u> RICO claims") (emphasis added); *id.* at pg. 27 (stating that the RICO claim here "is <u>inadequately pleaded</u>, [so] RICO's nationwide jurisdiction provision is inapplicable") (emphasis added); Docket No. 326, pg. 46 (same). But that puts the cart before the horse.

"Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [the plaintiff] could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). Plaintiffs' claims do not "clearly appear[] to be immaterial and made solely for the purpose of obtaining jurisdiction," nor are they "wholly insubstantial and frivolous." *Id.* at 682–83 Therefore, whether the amended complaint "states a cause of action on which relief could be granted [under RICO] is a question of law [which] must be decided after and not before [this Court] has assumed jurisdiction over the controversy." *Id.* at 682.

### 2. Puerto Rico Long-Arm Statute

The Court has found jurisdiction as to all claims over Exxon, Shell, and BP. It has found jurisdiction under RICO over ConocoPhillips, Chevron, Motiva, and API. It has finally found no jurisdiction as to BHP and Rio Tinto under RICO or the Puerto Rico long-arm statute. The Court addresses here jurisdiction under the Puerto Rico long-arm statute over ConocoPhillips, Chevron, Motiva, and API as to antitrust and the Puerto Rico law claims.

The analysis is the same for ConocoPhillips and Chevron as it was for Exxon. The allegations as to their respective contacts with Puerto Rico are similar as to the respective contacts of Exxon. *See* Docket No. 205, ¶¶ 120–32 (Chevron), 147–55 (ConocoPhillips). As with Exxon, the arguments raised in the joint Rule 12(b)(2) motion are the only personal jurisdiction arguments raised by Chevron and ConocoPhillips. They were addressed and rejected above.

That leaves Motiva and API. Starting with Motiva, it filed an individual motion, which diverges from the approach in the joint Rule 12(b)(2) motion by disputing, besides relatedness and reasonableness, purposeful availment. Docket No. 240. The allegations in the amended complaint are similar as to Motiva as they are regarding Exxon. *See* Docket No. 205, ¶¶ 156–64. Motiva does not make any new arguments in its individual motion as to relatedness and reasonableness, and the analysis is the same as for Exxon above. But purposeful availment must be addressed here.

The amended complaint alleges that Motiva "markets and sells its products in Puerto Rico through its joint ventures

with [the other Defendants]." Docket No. 205, ¶ 163. Motiva
argues that Plaintiffs "fail to allege that [it] has a substantial
connection with Puerto Rico through any voluntary or
deliberate actions in Puerto Rico." Docket No. 240, pg. 9. The
amended complaint, Motiva says, "lacks any factually
specific, non-conclusory allegations that Motiva has
voluntarily or foreseeably subjected itself to jurisdiction in
Puerto Rico." *Id.*

Plaintiffs in their opposition do not provide much
elaboration. *See* Docket No. 281, pg. 18. They cite to, amongst
other parts of the amended complaint, the one paragraph, ¶
163, that alleges any contact by Motiva with Puerto Rico.

Motiva replies that ¶ 163 "makes [a] conclusory
allegation" and that "[b]ecause the court 'does not "credit
conclusory allegations or draw farfetched inferences,"'
[Plaintiffs] fail to meet the relatedness and purposeful
availment requirements of establishing specific personal
jurisdiction." Docket No. 302, pg. 3 (quoting *Vargas-Santos v.
Sam's West, Inc.*, 2021 WL 4768387, at * 2 (D.P.R. Oct. 12, 2021)).

In the objections to the R&R, Motiva makes a similar

argument. It says that Plaintiffs "do not even allege or provide evidence that Motiva is registered to do business in Puerto Rico," that "[a] search on the Puerto Rico department of State's website does not reveal any business registration by Motiva," and that "[t]here are no allegations or evidence to support the conclusory allegations that Motiva marketed, promoted, or sold products in Puerto Rico." Docket No. 328, pg. 3 & n. 5 (citation omitted). Motiva repeats the argument as to conclusory allegations in its reply to Plaintiffs' response, Docket No. 341, to its objections, Docket No. 369, pgs. 1–2.

Motiva applies the wrong standard. The Court "draw[s] the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by [Plaintiffs] as true and construing disputed facts in the light most hospitable to [them]." *Ticketmaster-New York*, 26 F.3d at 203. To be sure, the Court "do[es] not credit conclusory allegations or draw farfetched inferences." *Id.* But there is a difference between "facts" and "conclusions" that Motiva misses. "[F]acts are susceptible to objective verification," whereas conclusions "are empirically

unverifiable in the usual case" and "represent the pleader's reactions to, sometimes called 'inferences from,' the underlying facts." *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 16 (1st Cir. 1989).

And as explained in the case to which Motiva cites, in the sentence right before the one Motiva quotes, "[t]he defendant may put forward undisputed facts to rebut the plaintiff's prima facie showing, but any factual disputes are construed in the plaintiff's favor when deciding the jurisdictional question." *Vargas-Santos*, 2021 WL 4768387, at * 2. Here, Plaintiffs make factual allegations as to Motiva's activities in Puerto Rico, in particular that it markets and sells products through joint ventures. Motiva does not dispute that anywhere. Indeed, across four filings, it is careful not to make a suggestion to the contrary, chastising instead Plaintiffs for not providing evidence. Even as to whether it is registered to do business in Puerto Rico, Motiva does not make an affirmative statement, instead tap dancing around whether Plaintiffs have alleged that it is registered and stating that the website of the Puerto Rico State Department does not show

such a registration. *See* Docket No. 328, pg. 3 & n. 5. Motiva itself brings up registration, but what relevance registration has Motiva does not explain. Indeed, registration is "of little significance" in the purposeful availment inquiry, *RPB SA v. Hyla, Inc.*, 2020 WL 12187801, at * 11 (C.D. Cal. June 9, 2020), so the Court sees this as nothing more than a strawman.

From the undisputed allegation of marketing and sale of products by Motiva in Puerto Rico, the Court sees purposeful availment. *See Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 29–30 (1st Cir. 1988) (Breyer, J.) (finding purposeful availment where Brazilian pressure cooker manufacturer placed its products into the stream of commerce and contacted a sales agent to discuss a marketing strategy for Puerto Rico).

The Court finally turns to API. To begin, API in its objections raises personal jurisdiction arguments, including as to purposeful availment. *See* Docket No. 319, pgs. 4–5. API filed an individual Rule 12(b)(6) motion, Docket No. 254, but not an individual Rule 12(b)(2) motion. The joint Rule 12(b)(2) motion did not, as explained above, deal with purposeful

availment. Objections to a report and recommendation are not an opportunity for a do-over. *See Robb Evans*, 850 F.3d at 35. The Court will limit its review to the joint Rule 12(b)(2) motion, the joint objections, and related briefs.

The Court starts with relatedness. And it ends there, because, as discussed below, it finds that relatedness is not present.

Plaintiffs' federal antitrust claim is premised on the following: "Defendants, separate economic actors, and competitors who have substantial market power in the energy market, and each of them, consciously committed to a common scheme designed to restrain trade." Docket No. 205, ¶ 765. API is not a "competitor . . . in the energy market," let alone have "substantial market power" in that market. As to the Puerto Rico law claims, Plaintiffs similarly focus on the activities of Exxon, Chevron, Motiva, BP, Shell, and ConocoPhillips. *See* Docket No. 205, ¶ 636 (common law consumer fraud); *id.* at ¶ 691 (conspiracy to commit common law consumer fraud and deceptive businesses practices); *id.* at ¶ 704 (Puerto Rico Rules); *id.* at ¶ 778 (public nuisance); *id.*

at ¶ 784 (strict liability for failure to warn); *id.* at ¶ 799 (strict liability for design defect); *id.* at ¶ 810 (negligent design defect); *id.* at ¶ 825 (private nuisance); *id.* at ¶ 830 (unjust enrichment).

To the extent Plaintiffs attempt to impute the contacts of API's members to it, the presence of members in Puerto Rico does not automatically confer jurisdiction on API itself. The Court rather "assess[es] the extent of control, if any, exercised by [API] over [those] members" and "the extent to which the member[s] act[ed] for, a[re] . . . agent[s] of, or [are] synonymous with, [API]." *Donatelli*, 893 F.2d at 469. "The barometer for control . . . is whether or not [API] exercised substantial influence over the member's decision to carry on the in-forum activities which constitute the relevant 'minimum contacts.'" *Id.* If Plaintiffs "cannot show that [API] substantially influenced the decisionmaking leading to the member's in-forum activities, then there can be no attribution." *Id.*

Plaintiffs allege some control of API by members with contacts to Puerto Rico, *see* Docket No. 205, ¶¶ 205–08, but

they do not allege that API in any way influenced a member's contacts with Puerto Rico. Accordingly, the contacts of its members cannot sustain jurisdiction over API itself. *See Donatelli*, 893 F.2d at 470–71 (finding no jurisdiction over association, although member advertised and sold tickets in Rhode Island and broadcast its games there, because member "entered the Rhode Island market by [its] own choice and for [its] own benefit, not as the association's handmaiden"). *Cf. Relevent Sports, LLC v. United States Soccer Federation, Inc.*, 61 F.4th 299, 305–06 (2d Cir. 2023) (finding minimum contacts with New York by international association that vested with the exclusive authority to sanction all men's professional soccer leagues and games played in the United States a national association that incorporated as a New York not-for-profit, acted as international association's agent, and transacted substantial business on behalf of international association in New York).

### 3. Antitrust

Plaintiffs argue in the opposition to the Rule 12(b)(2) motions that "[l]ike RICO Section 1965, antitrust claims confer

personal jurisdiction through global service of process so long as a plaintiff can demonstrate minimum contacts with the United States." Docket No. 281, pg. 25 (citing *Amtrol, Inc. v. Vent-Rite Valve Corp.*, 646 F. Supp. 1168, 1172 (D. Mass. 1986)). This is in response to Rio Tinto's argument that Section 12 of the Clayton Act, 15 U.S.C. § 22, does not confer jurisdiction over it, *see* Docket No. 246, pgs. 19–21. One other defendant addresses Section 12: Motiva. *See* Docket No. 240, pgs. 12–13. The joint Rule 12(b)(2) motion does not mention Section 12.

Plaintiffs' argument is undeveloped, and it does not, unlike the § 1965 argument, appear in the amended complaint. In any event, the argument fails on the merits. For the three defendants, BHP, Rio Tinto, and API, over which there is no jurisdiction under the Puerto Rico long-arm statute for the antitrust claim, Section 12 does not confer it.

Section 12 provides that:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served

in the district of which it is an inhabitant, or wherever
it may be found.
15 U.S.C. § 22.

The first clause sets venue where the "corporation" is
an "inhabitant," "may be found," or "transacts business." The
second clause provides for process where the corporation is
"an inhabitant" or "wherever it may be found."

Section 12 is by terms limited to "corporation[s]," but
not domestic corporations. *See United States v. Scophony Corp.
of Am.*, 333 U.S. 795, 810 (1948) (applying Section 12 to foreign
corporation); Black's Law Dictionary 273 (2d ed. 1910)
(defining "[c]orporation" as "[a]n artificial person or legal
entity created by or under the authority of the laws of a state
or nation." Here, BHP states that it is "an Australian
corporation." Docket No. 245, pg. 2. And Rio Tinto states that
"Plaintiffs correctly identify [it] as an entity 'incorporated in
England and Wales.'" Docket No. 246, pg. 8 (quoting Docket
No. 205, ¶ 180). Section 12 thus may apply.

But it does not apply to API. API is an association.
Courts have consistently and over decades rightly refused to

apply Section 12 to associations. *See Cal. Clippers, Inc. v. U.S. Soccer Football Ass'n*, 314 F. Supp. 1057, 1061 (N.D. Cal. 1970) ("unincorporated association"); *Thill Securities Corporation v. New York Stock Exchange*, 283 F.Supp. 239, 242 (E.D. Wis. 1968) (same); *Pacific Seafarers, Inc. v. Pacific Far East Line*, 48 F.R.D. 347, 349 (D.D.C. 1969) ("voluntary association"); *McManus v. Tato*, 184 F.Supp. 958, 959 (S.D.N.Y. 1959) (same). In all, then, since the Puerto Rico long-arm statute is not a hook as to API, as explained above, the only claims for which there is jurisdiction as to API is the four RICO claims.

Section 12 provides for worldwide service. Plaintiffs make this point by citing to *Amtrol*. There is higher, indeed binding, authority. The First Circuit has twice described Section 12 as "providing for worldwide service of process." *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 36 (1st Cir. 1999) (*Swiss Am. Bank I*); *Pleasant St.*, 960 F.2d at 1086 n. 6.

Whether for that worldwide service to establish personal jurisdiction requires venue that is proper under the first clause of Section 12, is the subject of a circuit split. On this, the First Circuit has not spoken.

Most circuit courts to have considered the issue have held that Section 12 confers personal jurisdiction over a corporation under its second clause only when there is proper venue under the first clause. *See KM Enterprises, Inc. v. Global Traffic Technologies, Inc.*, 725 F.3d 718, 730 (7th Cir. 2013) (Wood, J.); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). The Ninth Circuit, by contrast, sees the two clauses as independent of one another and allows plaintiffs to pair the second clause with 28 U.S.C. § 1391, the general venue provision. *See Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1417 (9th Cir. 1989). The Third Circuit agrees, *In re Auto. Refinishing Paint Antitrust Litigation*, 358 F.3d 288, 296–97 (3d Cir. 2004), though it has emphasized the distinction between "alien" and "out-of-state" corporation, *id.* at 296 n. 10.

Motiva embraces the majority approach. Docket No. 240, pgs. 12–13. Rio Tinto recognizes the split but does not take a position. Docket No. 246, pgs. 19–20 n. 9.

As to Plaintiffs, they cite to *Amtrol*. That court did not read Section 22 as a whole. *See* 646 F. Supp. at 1171. To the Court's understanding, only one other court in the First Circuit has addressed the matter. That court found "persuasive" the then-recent "comprehensive" decision by the Third Circuit in *In re Auto. Refinishing Paint Antitrust Litigation* and "s[aw] no reason as a trial court . . . to repeat what [the Third Circuit] has done." *In re New Motor Vehicles Canadian Export*, 307 F.Supp.2d 145, 149 (D. Me. 2004).

This Court agrees with the majority approach embraced by the Second, Seventh, and D.C. Circuits. In statutory interpretation, courts "look first to . . . ordinary meaning." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011). Courts then look to "the provision's 'entire text,' read as an 'integrated whole.'" *Id.* at 408 (quoting *Graham Cty. Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290, 293 n. 12 (2010)).

Section 12 "consists of two parts," one "before the semicolon," which "addresses venue [and] permit[s] antitrust actions against corporations to be maintained 'not only in the

judicial district whereof [the corporate defendant] is an inhabitant, but also in any district wherein it may be found or transacts business,'" and another "after the semicolon," which "provides for worldwide service of process and, therefore, the exercise of personal jurisdiction 'in such cases.'" *Daniel*, 428 F.3d at 422. "It is 'in such cases,' i.e., such venued cases, that Section 12 makes worldwide service of process available." *Id.* at 424. *See also GTE New Media*, 199 F.3d at 1350 ("The language of the statute is plain, and its meaning seems clear: The clause before the semi-colon relates to a supplemental basis for venue in actions under the Clayton Act; the clause after the semi-colon relates to nationwide service of process in antitrust cases; and invocation of the nationwide service clause rests on satisfying the venue provision.").

The Ninth Circuit's approach is unpersuasive. Amongst the "most basic of interpretative canons" is that against antisuperfluousness, under which a "statute should be constructed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or

insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up). "Even the Ninth Circuit seems to recognize that its sweeping interpretation of Section 12 tends to make the venue provision 'wholly redundant.'" *GTE New Media*, 199 F.3d at 1351 (quoting *Go-Video*, 885 F.2d at 1413). *See also KM Enterprises*, 725 F.3d at 729 ("If the clauses are not linked, then the venue language is superfluous. Interpretations that render words of a statute superfluous are disfavored as a general matter and this principle has even greater force in a context such as this, where, in order to decouple Section 12's venue and service-of-process provisions, we would have to assume that Congress intentionally joined the two provisions with a semicolon, but nevertheless intended for the second provision to render the first disposable.") (cleaned up); Areeda & Hovenkamp, Antitrust Law ¶ 271 (updated May 2025) ("[G]enerally accepted canons of statutory construction would appear to favor the narrower construction.").

In short, for the service effected on BHP and Rio Tinto to confer jurisdiction over it, there must be proper venue under the first clause of Section 12. BHP and Rio Tinto must

either be "inhabitant[s]" of this District or "may be found" or "transact[] business" in this District.

"Inhabitant" in Section 12 is "synonymous with 'resident,'" and a corporation is "resident" where it is "incorporated." *Aro Mfg. Co. v. Automobile Body Research Corp.*, 352 F.2d 400, 404 (1st Cir. 1965). BHP and Rio Tinto clearly are not "inhabitant[s]" of this District.

As to "found," it is "the equivalent of saying that [the corporation] must be present there by its officers and agents carrying on the business of the corporation." *Id.* "In this way only can a corporation be said to be 'found' within the district." *Id.* BHP and Rio Tinto do not meet that definition.

Finally, as to "transact[ing] business," the Supreme Court has found it to be a broader concept than being "found." It means "the practical, everyday business or commercial concept of doing business or carrying on business 'of any substantial character.'" *Scophony Corp. of Am.*, 333 U.S. at 807. *See also Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 374 (1927) (holding that a defendant transacted business for Section 12 purposes in a district where it

promoted its goods through product demonstrations, solicited orders through salesmen in the district, and shipped its products to the district); *Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corp.*, 46 F.2d 623, 625 (1st Cir. 1931) ("[W]hile a single transaction of business may not be sufficient to establish venue in a district, it does not require the maintenance of an office or place of business or the presence of agents soliciting or taking orders.").

Here, the only possible hook as to both BHP and Rio Tinto is, as explained above, through subsidiaries. But that is inapplicable here for the same reasons it fails above. Corporate separateness applies with equal force in the Section 12 context. *See Aro Mfg. Co.*, 352 F.2d at 404.

In all, this District is not proper venue for BHP and Rio Tinto under the first clause of Section 12, and worldwide service under the second clause of Section 12 thus does not apply to BHP and Rio Tinto. The Court having already determined that RICO and the Puerto Rico long-arm statute do not apply to BHP and Rio Tinto, that Section 12 does not

apply either means that there is no personal jurisdiction over
BHP and Rio Tinto as to any claim.

A final matter. Motiva invokes, besides Rules 12(b)(2)
and 12(b)(6), Rule 12(b)(3), which provides for dismissal for
improper venue. The only mention of venue is in arguing that
Plaintiffs "cannot satisfy the venue requirements under 15
U.S.C. § 22" and "the Court [thus] lacks jurisdiction over
Motiva." Docket No. 240, pg. 13.

It is undisputed that Motiva is a limited liability
company ("LLC"). Section 12 applies only to corporations,
and courts accordingly have refused to apply Section 12 to
LLCs. *See, e.g., GovernmentGPT Inc. v. Axon Enterprise Inc.*, 769
F.Supp.3d 959, 978–79 (D. Ariz. 2025). Section 12 never could
apply to Motiva, and since the only discussion of venue in its
motion being as to Section 12, any argument that the claims
against it should be dismissed for improper venue is waived.
*See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

### 4. Jurisdictional Discovery

In response to Rio Tinto's and BHP's objections to the
recommendation in the R&R to deny their individual Rule

12(b)(2) motions, Plaintiffs cite to *New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987) and ask for jurisdictional discovery. Docket No. 336, pgs. 6–7; Docket No. 343, pgs. 7–8.

*Becher* is irrelevant. There, the First Circuit held "that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud." 829 F.2d at 290. It then held that, if specificity is lacking, the "court should make a <u>second</u> determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint." *Id.* (emphasis in original). *Becher*, in other words, has nothing to do with jurisdictional discovery. And, in any event, the First Circuit "has never applied *Becher* in a case . . . where the complaint fell short not only of Rule 9(b)'s heightened particularity requirements but also of the ordinary plausibility standard." *Douglas v. Hirshon*, 63 F.4th 49, 59 (1st Cir. 2023). Here, as will be explained below, "it is not simply the details [Plaintiffs] lack, but the substance of a RICO claim." *Id.* (quoting throughout *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 44 (1st Cir. 2001)). Accordingly, "*Becher* discovery is unwarranted." *Id.*

More importantly, Plaintiffs themselves want nothing to do with jurisdictional discovery—per their own objections to the R&R. There, they object to Magistrate Judge Ramos-Vega's "recommendation of limited jurisdictional discovery." Docket No. 323, pg. 6. Indeed, they dedicate a paragraph to explaining that "[e]ven 'limited' jurisdictional discovery will generate an extensive motions practice about what is appropriate to include in a presently undefined 'limited' jurisdictional discovery." *Id.* at pg. 8. And there is no mention anywhere in the Rule 12(b)(2) briefing of jurisdictional discovery. *See* Docket No. 281.

Plaintiffs "had ample opportunity to move for jurisdictional discovery" but "cho[se] not to avail [themselves] of an opportunity for discovery" and thus "can scarcely be heard to complain [now that] the lack of such discovery . . . redounds to [their] detriment." *Kuan Chen*, 956 F.3d at 56. To be sure, "district courts have a certain amount of leeway to treat informal requests for jurisdictional discovery made in opposition papers as if made by motion when there is no prejudice to the other party." *Motus*, 23 F.4th

at 128. But the Court sees no leeway to grant jurisdictional discovery to a party asking for such discovery in its response to the other side's objections to a report and recommendation when that party not only never brought up jurisdictional discovery in the original Rule 12(b)(2) briefing, *Robb Evans*, 850 F.3d at 35, it expressly objected to the magistrate judge's jurisdictional discovery recommendation.

A plaintiff must bring forth facts "which show why jurisdiction would be found if discovery were permitted." *Swiss Am. Bank II*, 274 F.3d at 626. Indeed, a plaintiff must identify "what relevant information it hope[s] to glean through such discovery." *Motus*, 23 F.4th at 128. Even in the two filings where Plaintiffs bring up jurisdictional discovery, there is no mention of what Plaintiffs would seek in the discovery.

### 5. Conclusion as to Personal Jurisdiction

BHP's Rule 12(b)(2) motion at Docket No. 245 and Rio Tinto's Rule 12(b)(2) motion at Docket No. 246 are both **GRANTED**. BHP's Rule 12(b)(6) motion at Docket No. 243 and Rio Tinto's Rule 12(b)(6) motion at Docket No. 247 are

both **MOOT**. *See Lightfoot*, 580 U.S. at 95. The joint Rule 12(b)(2) motion at Docket No. 234 is **GRANTED in part, DENIED in part and MOOT in part**. It is granted as to Rio Tinto and BHP as to all claims and API as to the federal antitrust and Puerto Rico law claims. It is denied as to Exxon, Shell, BP, Chevron, ConocoPhillips, and Motiva. It is also denied as to API and RICO. It is moot as to Occidental.

The personal jurisdiction dismissals will be without prejudice because "'[n]o jurisdiction' and 'with prejudice' are mutually exclusive." *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004) (Easterbrook, J.). But "new process [belongs] in a <u>different court</u>." *Rodi v. Southern New England Sch. of Law*, 389 F.3d 5, 18 (1st Cir. 2004) (emphasis added). These "jurisdictional disposition[s]" are, in other words, "conclusive on the jurisdictional question[s]." *Frederiksen*, 384 F.3d at 438.

### C. Judicial Notice

There are two motions for judicial notice. The motion at Docket No. 238 was filed by Defendants jointly. It asks the Court to take judicial notice of certain articles and reports. The

motion at Docket No. 241 was filed by Chevron and involves a legal services contract.

Magistrate Judge Ramos-Vega recommends that the motion at Docket No. 238 be granted, "but only as to taking notice of the fact that the articles and reports were published" and not "regarding the truth of their contents." 2025 WL 600430, at * 16.

Plaintiffs' objections do not address these two motions. And it is unclear whether Defendants actually object to this recommendation. In a footnote, Defendants argue that Magistrate Judge Ramos-Vega "erred in concluding that the articles were irrelevant for statute of limitations purposes because he could not take notice of the truth of the assertions within the articles" and state that they "understand that to be an error in the application of judicial notice." Docket No. 326, pg. 40, n. 22 (emphasis in original). "[T]o the extent," they say, that Magistrate Judge Ramos-Vega "declined to take notice that the assertions contained within the documents were publicly available (not for the truth of the matter asserted), [they] object to the Magistrate Judge's recommendation." *Id.*

In another footnote, Defendants state that "[t]o the extent the
Court construes the [R&R] as denying [their motion], [they]
object to it for the reasons set forth in the Motion, Reply, and
[the objections]." *Id.* at pg. 41 n. 24 (citing Docket Nos. 238,
289). All other portions of the objections where notice comes
up, it is tied to the merits of the statute of limitations
argument. *See id.* at pgs. 40–41.

Assuming Defendants have asserted, as is required to
preserve the argument, not just an objection but a "specific
objection," *Santiago*, 138 F.3d at 4, it fails. Defendants have
made it clear that they are asking the Court to "take notice of
the relevant facts contained in th[e] documents, namely the
date of publication and the assertions contained therein (the
simple fact those assertions were made, not the truth of those
assertions)." Docket No. 298, pg. 2. That is Magistrate Judge
Ramos-Vega's recommendation exactly. And it could not be
otherwise: "courts have routinely held that newspaper
articles constitute inadmissible hearsay because they usually
provide no evidence of the reporter's perception, memory or
sincerity." *Democracy Forward Foundation v. Pompeo*, 474

F.Supp.3d 138, 150 (D.D.C. 2020) (cleaned up). Everything else ties to the merits of the statute of limitations argument, and Defendants themselves have differentiated between "a merits argument about whether [their] statute of limitations arguments should prevail" and "whether judicial notice of the[] documents' publication date and their contents is appropriate." Docket No. 298, pg. 7.

  The motion at Docket No. 238 is **GRANTED** as to judicial notice that the exhibits to the motion were publicly available reports and news articles and not for the truth of the matter asserted.

  As to the motion at Docket No. 241, Magistrate Judge Ramos-Vega recommends that it be denied. 2025 WL 600430, at * 16. Chevron reiterates in its objections that the document "was 'offered only for the purposes of showing that amendment [of the Amended Complaint] would be futile, not for the merits of the Motion to dismiss.'" Docket No. 325, pg. 4 (quoting Docket No. 241, pg. 2). As will be explained below, no leave to amend further will be granted. The motion at Docket No. 241 is **MOOT**.

### D. The Merits

There were no objections to the recommendation to dismiss claims 1 through 3, all under Puerto Rico law and concerning respectively common law consumer fraud, conspiracy to commit common law consumer fraud and deceptive business practices, and the Puerto Rico Rules against misleading practices and advertisements. The recommendation thus will be adopted. *Santiago*, 138 F.3d at 4. In any event, the Court discerns no reason why the conclusion below that the other Puerto Rico law claims are—as are the federal claims—time-barred, does not apply with equal force to claims 1 through 3.

Under Rule 12(b)(6), parties may move, as Defendants have done jointly and individually, for dismissal for "failure to state a claim upon which relief can be granted." Lest it be dismissed, the amended complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "draw[s] the facts from the [amended]

complaint, documents attached to or fairly incorporated into the complaint, facts susceptible to judicial notice, and concessions in [Plaintiffs'] response to the motion[s] to dismiss." *Cheng v. Neumann*, 51 F.4th 438, 441 (1st Cir. 2022) (cleaned up). The Court "credit[s] neither conclusory legal allegations nor factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33–34 (1st Cir. 2022) (cleaned up).

Magistrate Judge Ramos-Vega recommends that the claims in this case be found to be timely. 2025 WL 600430, at * 19. He makes three specific recommendations: that the claims are "not time-barred . . . under the continuous tort rule," that "even if the injury wasn't continuous, equitable tolling would make Plaintiffs' claims timely," and that Plaintiffs' "arguments regarding class action tolling under Puerto Rico law are unconvincing." *Id.*

There is no objection by Plaintiffs as to class action tolling, so the recommendation is adopted. *Santiago*, 138 F.3d at 4. Defendants in the joint objections object to the

recommendation by Magistrate Judge Ramos-Vega not to dismiss on statute of limitations grounds. *See* Docket No. 326, pgs. 33–42. ConocoPhillips also objects in its individual objections. Docket No. 329, pgs. 9–10.

Plaintiffs' claims are barred by the applicable statutes of limitations, and no equitable doctrine salvages them. Given the findings below, the Court need not consider ConocoPhillips's objections.

Statutes of limitations "are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314 (1945). But they are also "by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay." *Id.* Statutes of limitations "find their justification in necessity and convenience rather than in logic" and "represent expedients, rather than principles." *Id.* They "have come into the law not through the judicial process but through legislation," *id.*, a

choice by the legislative branch that the courts are, as a matter of the separation of powers, duty-bound to accept.

"Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998). That means that "the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel." *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (quoting *LaChapelle*, 142 F.3d at 509–10).

For the Puerto Rico law claims, the Court "must apply the substantive law of Puerto Rico." *Rodríguez v. Señor Frog's de la Isla, Inc.*, 642 F.3d 28, 36 (1st Cir. 2011). The Court accordingly applies as to those claims "Puerto Rico's statute of limitations, as well as the concomitant tolling provisions." *Montalvo v. González-Amparo*, 587 F.3d 43, 46 (1st Cir. 2009).

Per Plaintiffs, "the acts or omissions alleged in this action occurred before" the 2020 Puerto Rico Civil Code went into effect, Docket No. 280, pg. 19, in other words, November 28 of that year, *Rivera-Rosario v. LSREF2 Island Holdings, Ltd., Inc.*, 79 F.4th 1, 5 n. 1 (1st Cir. 2023). Plaintiffs thus apply the 1930 Puerto Rico Civil Code. Docket No. 280, pgs. 19–20. Defendants are in agreement on this. Docket No. 297, pg. 14 n. 2. Under the 1930 Civil Code, the statute of limitations is one year from knowledge of the injury, "that is, notice of the injury, plus notice of the person who caused it." *Arturet-Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 14 (1st Cir. 2005) (cleaned up). As to the federal claims, Section 4 of the Clayton Act provides for a private right of action under the antitrust laws, 15 U.S.C. § 15, and such claims must be filed "within four years after the cause of action accrued," *id.* § 15b. The Supreme Court has imported the four-year term from the Clayton Act into civil RICO claims. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987).

Plaintiffs argue that it was only in March 2022 that they identified Defendants by reviewing a Columbia University

report "entitled 'How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors.'" Docket No. 280, pg. 20. It was after reviewing that report, the argument goes, that Plaintiffs "learned which entities have a causal link to Plaintiffs' injuries and their respective market shares in the fossil fuel industry." *Id.*

First, the amended complaint contains a section on why "No Statute of Limitations Bars Plaintiff's [sic] Claims." Docket No. 205, pgs. 13–15. This was filed after Defendants raised timeliness arguments in seeking to dismiss the original complaint. Docket No. 185, pgs. 26–32. Yet Plaintiffs' argument made its first appearance in the opposition to the Rule 12(b)(6) motions.

Second, the original complaint was filed on November 22, 2022, and the amended complaint on November 3, 2023. "Under the doctrine of relation back, an amended complaint can be treated, for purposes of the statute of limitations, as having been filed on the date of the original complaint." *Pessotti v. Eagle Mfg. Co.*, 946 F.2d 974, 975 (1st Cir. 1991).

Plaintiffs make no argument that the amended complaint, relates back to the original. Under Plaintiffs' own theory then the Puerto Rico law claims are clearly time-barred.

Third, as Defendants point out in their joint objections, Docket No. 326, pg. 38, n. 18, the Columbia report addresses two entities not party to this suit, Eni and TotalEnergies, and does <u>not</u> address four of the nine Defendants here, Rio Tinto, BHP, Motiva, and Occidental. Defendants filed a response to Defendants' joint objections, Docket No. 345, but offered no response to this point. If the 2022 report is what determined in Plaintiffs' eyes who to sue, this suit would have had half the named defendants it actually has. Or perhaps three quarters—swap Rio Tinto, BHP, Motiva, and Occidental for Eni and TotalEnergies, which it appears has, perhaps through a subsidiary, been doing business in Puerto Rico for more than a decade. *See TotalEnergies Marketing Puerto Rico Corp. v. Rivera-Robles*, 2024 WL 5423045, at * 1–3 (D.P.R. Jan. 25, 2024). And it—or its subsidiaries—has been sued alongside many of the Defendants here in similar cases. *See, e.g., Delaware v. BP America Inc.*, 578 F.Supp.3d 618 (D. Del. 2022) (2020 case).

Regardless of these three matters, there is overwhelming evidence of public knowledge of articles, reports, and cases making the connection between Defendants and Plaintiffs' claims, including as to Puerto Rico. The Court has taken judicial notice of numerous articles in the popular press and reports. One in a national outlet in September 2017 tied to climate change the hurricanes that had just occurred and are central to Plaintiffs' claims. Docket No. 238-4. Plaintiffs themselves cited to this article in the original complaint. Docket No. 1, ¶ 240 n. 217. Another is a 2008 article in different national outlet on the lawsuit that had just been filed by Kivalina, a coastal village in Alaska, against "5 oil companies, 14 electric utilities and the country's largest coal company," including Exxon, ConocoPhillips, and BP America. Docket No. 238-2, pg. 2. Amongst the claims noted in the article are public nuisance and conspiracy, *id.*, claims Plaintiffs bring here.

There is also a 2013 report on the impact of climate change in Puerto Rico published by the Puerto Rico Climate Change Council. Docket No. 238-7. This was also cited in the

original complaint. Docket No. 1, ¶ 263 n. 245. In the foreword, the report notes the "Puerto Rico . . . general public['s] . . . primar[y] concern[] about the potential impacts of climate change . . . and the potential increase in the frequency and magnitude of storms and hurricanes, storm surges, floods, and coastal erosion." Docket No. 238-7, pg. 13. And in the first paragraph of the introduction, it speaks of "[s]torm surges, winter swells, tsunamis, [and] coral bleaching" as examples of "rapid-onset events," which, with their "slow-onset" counterparts, pose "substantial risks" to Puerto Rico. *Id.* at pg. 16.

There have been also many a plaintiff bringing similar cases, and the Court can take judicial notice, *Freeman v. Town of Hudson*, 714 F.3d 29, 36–37 (1st Cir. 2013). The Kivalina case reached the Ninth Circuit in 2012, and amongst the defendants there were—other than, as noted in the article, Exxon, ConocoPhillips, and BP America—Chevron and Shell. *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012). "Kivalina's survival," the Ninth Circuit explained, "has been threatened by erosion resulting from wave action

and sea storms for several decades," and "Kivalina attribute[d] the impending destruction of its land to the effects of global warming, which it allege[d] results in part from emissions of large quantities of greenhouse gases by the" defendants in that case. *Id.* at 853–54.

Major hurricanes have also been at the center of suits. *See Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 464–65 (5th Cir. 2013) ("A group of Mississippi Gulf Coast residents and property owners . . . first filed suit . . . in 2005, alleging that emissions by energy company Defendants caused global warming which, increased the destructive capacity of Hurricane Katrina, which, in turn, damaged the class members' property. Plaintiffs asserted claims of public and private nuisance, trespass, negligence, unjust enrichment, fraudulent misrepresentation, and civil conspiracy against the companies.") (cleaned up).

And as far back as 2007, the Supreme Court noted expert testimony that, first, there is amongst "qualified scientific experts involved in climate change research . . . a strong consensus that global warming threatens (among other

things) a precipitate rise in sea levels by the end of the century" and "severe and irreversible changes to natural ecosystems" and, second, "rising ocean temperatures may contribute to the ferocity of hurricanes." *Massachusetts v. EPA*, 549 U.S. 497, 521–22 (2007).

Under RICO, the clock starts "when a plaintiff knew or should have known of his injury." *Álvarez-Maurás v. Banco Popular of Puerto Rico*, 919 F.3d 617, 625–26 (1st Cir. 2019) (quoting throughout *Rodríguez v. Banco Cent.*, 917 F.2d 664, 666 (1st Cir. 1990) (Breyer, C.J.)). The clock begins "even if the plaintiff is unaware of the precise acts of racketeering that caused the injury." *Id.* at 626 (quoting throughout *Lares Group, II v. Tobin*, 47 F.Supp.2d 223, 230 (D.R.I. 1999) aff'd, 221 F.3d 41 (1st Cir. 2000)). By September 2021, the 2017 hurricanes' four-year mark, Plaintiffs knew or should have known they had suffered considerable injury and who to sue. *See City of Boston v. Express Scripts, Inc.*, 765 F.Supp.3d 31, 42 (D. Mass. 2025) ("By 2018, all the telltale warning signs were present that the City suffered injury as a result of the [pharmacy benefit managers'] role in the opioid epidemic. Thus, despite

Defendants' misrepresentations, the City's actions to combat the opioid epidemic, combined with the widespread scrutiny and litigation concerning the role of [pharmacy benefit managers], leave no doubt that the City knew or should have known of its injuries.") (cleaned up). *Cf. Marrero-Rolón*, 2015 WL 5719801, at * 6–8 (finding no inquiry notice where there were two news reports and one lawsuit, a comptroller report, and government internal audits that were not "the subject of press coverage," let alone "substantial press coverage").

Moving to the Clayton Act, "[g]enerally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). And "relevant authority uniformly supports the requirement" that an antitrust plaintiff must "'show[] that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997) (quoting 2 Areeda & Hovenkamp, ¶ 338b (rev. ed. 1995)). *See also Rodríguez*, 917 F.2d at 666 (finding RICO's rule of "known or should have known" to be "at least roughly

similar to the Clayton Act's rule" under *Zenith*). As with RICO, Plaintiffs felt the adverse impact in September 2017 and the clock began to run then. *See Blenheim Capital Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 298 (4th Cir. 2022) (finding that statute of limitations begun to run on October 6, 2016, because the "complaint's allegations place October 6, 2016, as the date when [the plaintiff] was cut out of the offset transaction" and "describe how, as of that date, [the plaintiff] was injured in its business and property and [the defendants] were enriched by the product of [the plaintiff's] years of work and effort, seizing the fruits and denying [the plaintiff] the benefits of the deal"); *DJ Mfg. Corp. v. Tex-Shield, Inc.*, 275 F. Supp. 2d 109, 120–22 (D.P.R. 2002), aff'd, 347 F.3d 337 (1st Cir. 2003) (finding that statute of limitations began to run when the defendant supplier of chemical protective clothing material made higher quote to the plaintiff unsuccessful bidder for chemical protective clothing contract than to successful bidder, rather than when Department of Defense agency awarded contract, as the former was the act that injured the plaintiff's business).

Under Puerto Rico law, "it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information." *Arturet-Vélez*, 429 F.3d at 14. "Once a plaintiff is made aware of facts sufficient to put her on notice that she has a potential tort claim, she must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run." *Rodríguez-Suris v. Montesinos*, 123 F.3d 10, 16 (1st Cir. 1997). And "once a plaintiff is put on notice that someone or some entity is the cause of the injury, the plaintiff may not succeed in a late-filed claim by asserting ignorance about the precise identity of the tortfeasor." *Id.* "[C]orporate identities and intracorporate relationships are a matter of public record," and "knowledge of the precise corporate identity of the entity responsible for a plaintiff's injury is [thus] not required before the period prescribed by the statute of limitation begins to run." *Id.*

The injury and which entities to sue and on what basis were all readily apparent from the coverage in the popular

press, the court cases, and the reports, and Plaintiffs were not diligent. *See Estate of Alicano Ayala v. Philip Morris, Inc.*, 263 F.Supp.2d 311, 317–19 (D.P.R. 2003) (finding lack of diligence in suit alleging conspiracy by major tobacco companies to defraud the public and conceal information regarding health hazards of tobacco product consumption given "widespread knowledge of the health hazards of smoking," including because of court cases, scientific reports, and news coverage).

### a. Continuing Violation, Separate Accrual Rule, Continuing Tort

Per the amended complaint, "[n]o statute of limitation can be pleaded against the Plaintiffs as the allegations and losses are continuous, wrongful, and ongoing, and the Defendants' wrongful conduct has just recently come to the knowledge of [Plaintiffs]." Docket No. 205, ¶ 20. The latter theory was just rejected. As to the former, Plaintiffs' argument in the original briefing on the Rule 12(b)(6) motions is limited to a single sentence that repeats the allegation from the amended complaint, with no developed argumentation or citation to authority. *See* Docket No. 280, pg. 19. Plaintiffs had

a responsibility to make their case before Magistrate Judge Ramos-Vega. *Robb Evans*, 850 F.3d at 35. Magistrate Judge Ramos-Vega generously considered the argument regardless. *See* 2025 WL 600430, at * 16–17. *See also McMillan v. Rodríguez-Negrón*, 511 F.Supp.3d 75, 82 (D.P.R. 2020) (Gelpí, J.) (entertaining—before granting dismissal—a continuous tort theory that was "strongly hint[ed]" by the pleadings, "[e]xamined collectively"). The Court will consider—and reject—the theory under Puerto Rico law and similar doctrines under RICO and the Clayton Act.

Starting with the federal claims, the Supreme Court first spoke of "continuing violation" under the Clayton Act in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n. 15 (1968). Such conduct "inflict[s] continuing and accumulating harm on [the plaintiff]." *Id.* Three years later, in *Zenith*, the Supreme Court held that, under the Clayton Act, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused

by that act and that, as to those damages, the statute of limitations runs from the commission of the act." 401 U.S. at 338.

In *Klehr*, the Supreme Court noted that the Clayton Act "provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" 521 U.S. at 189 (quoting 2 Areeda & Hovenkamp, ¶ 338b (rev. ed. 1995)). "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Id. Klehr*, though a RICO case, provided a "definition of a continuing violation [that] follows longstanding Supreme Court precedent," *Hanover Shoe* and *Zenith. In re Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059, 1064–65 (8th Cir. 2017) (en banc).

"The fact that some damages [a]re to accrue in the future does not extend the accrual date." *Blenheim Capital Holdings*, 53 F.4th at 299 (emphasis in original). Rather, "to recover future damages, the plaintiff still must 'sue within the requisite number of years from the accrual of the action,' when it <u>first</u> felt 'the adverse impact of [the] antitrust conspiracy.'" *Id.* (quoting *Zenith*, 401 U.S. at 339) (emphasis in original).

Under RICO, the First Circuit has held that "each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." *Rodríguez*, 917 F.2d at 665–66 (quoting throughout *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988)). This is the "separate accrual" rule. *Rhoades*, 859 F.2d at 1103. The Supreme Court in *Klehr* held that under RICO, "as in the antitrust cases, the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." 521 U.S. at 190.

Here, starting with RICO, Plaintiffs make clear that the racketeering activity preceded the 2017 storms. *See* Docket No. 205, ¶ 743 (§ 1962(a)) ("Defendants knew that their predicate acts, material misrepresentations, fraudulent concealments, omissions, and deceit of the Plaintiffs and their citizens as detailed in this Count, would, and did, cause the Plaintiff Government and the Municipalities represented by the Plaintiffs to accept a substantial risk that they otherwise would not have taken, by purchasing the Defendants' carbon-based products, and prevent the Plaintiffs and their citizens from having the knowledge that they needed to adequately prepare for the 'hotter and wetter' storms that pummeled the Island in 2017."); *id.* at ¶ 754 (§ 1962(b)) (same); *id.* at ¶ 762 (§ 1962(d)) (same).  And where Plaintiffs allege specific kinds of damage, it is, as with Puerto Rico law claims, related to the 2017 storms. *See* Docket No. 205, ¶ 741 (§ 1962(a)); *id.* at ¶ 752 (§ 1962(b)); *id.* at ¶ 760 (§ 1962(d)).

Plaintiffs do not allege some "separable, new predicate act within a 4–year limitations period" that "caused them harm over and above the harm that the earlier acts caused."

*Klehr*, 521 U.S. at 190. The separate accrual rule thus does not apply. *See City of Boston*, 765 F.Supp.3d at 41 ("Without plausible allegations of ongoing predicate acts causing additional injury, the City cannot rely on the separate-accrual rule."); *Alaska v. Express Scripts, Inc.*, 774 F.Supp.3d 1150, 1163 (D. Alaska 2025) ("Because the State fails to identify which, if any, of Express Scripts' acts constitutes a new overt act inflicting a new injury within the limitations period, the Court finds that the separate accrual rule does not apply. The [second amended complaint] contains specific, dated allegations of certain acts by Express Scripts, but those allegations all pre-date August 2019 and therefore fall outside of the four-year limitations period.").

The antitrust claim is similarly all about activity leading up to the 2017 storms. *See* Docket No. 205, ¶ 767 ("Defendants' agreement had a substantially adverse effect on competition in Puerto Rico because, had the Plaintiffs and their citizens known that their purchase and use of the Defendants' products would lead to increasingly intense hurricanes as a result of the acceleration of climate change,

Plaintiffs would have substantially reduced their purchases of the Defendants' products and instead implemented alternative, non-carbon-based energy sources, such as wind and solar energy, many years ago. This would have prevented the storms of September 2017."). Plaintiffs do not allege some new "overt act that is part of the violation and that injures [them]." *Klehr*, 521 U.S. at 189 (quoting throughout 2 Areeda & Hovenkamp, ¶ 338b (rev. ed. 1995)). Plaintiffs did not sue within four years of "<u>first</u> fe[eling] 'the adverse impact of [the] antitrust conspiracy.'" *Blenheim Capital Holdings*, 53 F.4th at 299 (quoting *Zenith*, 401 U.S. at 339) (emphasis in original). Plaintiffs thus did not allege continuing violation. *See id.* (finding 2021 claim time-barred because the plaintiff "felt adverse impacts immediately upon [the defendant's] October 2016 termination of the brokerage agreement"). *See also Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984) (affirming summary judgment against plaintiff whose claims were based upon the defendants' allegedly wrongful agreement regarding the sale of banana-growing properties in Guatemala because "no subsequent overt act in furtherance

of the alleged conspiracy [was] described or even hinted at"
in the plaintiff's complaint and "any subsequent harm" thus
had to "be seen as the unabated inertial consequence of the
earlier events") (cleaned up).

There is one count that the Court has not discussed,
under § 1962(c). The wording there is somewhat different
than the other RICO claims. *See* Docket No. 205, ¶ 735
("Defendants knew that their predicate acts, material
misrepresentations, fraudulent concealments, omissions, and
deceit of the Plaintiffs as detailed in this Count, would, and
did, cause the Plaintiffs and their citizens to face an unknown
substantial risk that they otherwise would not have taken, by
purchasing the Defendants' carbon-based products, and
prevented the Plaintiffs and their citizens from having the
knowledge they needed to adequately prepare for the 'hotter
and wetter' storms that pummeled Puerto Rico in 2017,
causing damages and losses at the time and ongoing."). The
kinds of damage alleged are the same as with the other RICO
claims and the Puerto Rico law claims, however. *See id.* at ¶
733.

First, even with the use of the word "ongoing,"
Plaintiffs rather clearly limit the racketeering allegations to
pre-storms conduct. Second, "[s]imply labeling allegations as
'ongoing' does not convert conclusory statements into 'factual
allegations.'" *City of Boston*, 765 F.Supp.3d at 40 (quoting
*Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

That applies equally to the allegations of continuing or
ongoing conduct in the "Nature of the Case" and "Allegations
of Fact" sections of the amended complaint. *See* Docket No.
205, ¶ 6 ("[Plaintiffs] . . . seek[] damages for ongoing deceit of
[sic] the Defendants."); *id.* at ¶ 429 ("In 1998, . . . to stave off
approval of the [Kyoto] treaty by the U.S. Senate and other
climate action in the United States, [API] mapped out a
multifaceted deception strategy for the fossil fuel industry
that continues to this day."); *id.* at ¶ 557 ("[G]reenwashing
tactics have been and continue to be used to conceal the
Defendants' continuous sponsorship of climate denial and
their record-breaking profits from fossil fuels."); *id.* at ¶ 611
("Defendants have deceived and continue to deceive
[Plaintiffs] and their citizens."); *id.* at ¶ 618 (alleging "ongoing

pattern of dishonesty and deception designed to keep a market for their products and increase industry profits"). The Court cannot credit the "meager, vague, or conclusory." *Legal Sea Foods*, 36 F.4th at 33–34 (quoting throughout *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

As to Puerto Rico law, continuous tort requires "continued, or uninterrupted, disturbance of unlawful acts or omissions which cause foreseeable lasting damages." *McMillan*, 511 F.Supp.3d at 83. An example in the public nuisance context is where a "city factory's smoke and gases affects other nearby workers in the area." *Id.* The doctrine applies because of the "ongoing injuries produced by the smoke and gases to nearby workers." *Id.* Another example is "continuing omission by a municipality to fix a sewer," which "caused recurrent flooding." *Ahmad Hamdallah v. CPC Carolina PR, LLC*, 556 F.Supp.3d 34, 55 (D.P.R. 2021).

A continuous tort is "not a continuing harmful effect." *M.R. (Vega Alta), Inc. v. Caribe General Elec. Products, Inc.*, 31 F.Supp.2d 226, 240 (D.P.R. 1998). A continuous tort, in other words, "should not be confused with the injury it produces."

*McMillan*, 511 F.Supp.3d at 83. It is a "misconception" of the doctrine to apply it to "the injury suffered," as opposed to "acts or omissions that produce the harm." *Id.* To go "back to the public nuisance example, possible damages, such as emotional distress, caused to the city factory workers can be considered to be the injury itself." *Id.*

Here, Plaintiffs, across the Puerto Rico law claims, treat the injury as the 2017 storms. *See* Docket No. 205, ¶ 781 (public nuisance) ("Defendants knew that their acts, omissions, and deceit of the Plaintiffs and their citizens as detailed in this Count, would, and did, prevent [Plaintiffs] and those represented by the Plaintiffs from having the knowledge that they needed to adequately prepare for the 'hotter and wetter' storms that pummeled the Island in 2017."); *id.* at ¶ 796 (strict liability for failure to warn) (same); *id.* at ¶ 807 (strict liability for design defect) (same); *id.* at ¶ 817 (negligent design defect) (same); *id.* at ¶ 827 (private nuisance) (same); *id.* at ¶ 833 (unjust enrichment). Indeed, Plaintiffs explicitly state that "the acts or omissions alleged in this action occurred before the effective date of the 2020 Puerto Rico Civil Code," Docket

No. 280, pgs. 19, i.e. November 28, 2020, *Rivera-Rosario*, 79 F.4th at 5 n. 1. And where Plaintiffs list specific kinds of damage, everything is related to that 2017 injury. *See* Docket No. 205, ¶ 794 (strict liability for failure to warn); *id.* at ¶ 805 (strict liability for design defect); *id.* at ¶ 815 (negligent design defect).

These are "continual ill effects from an original violation," *Bonilla v. Trebol Motor Corp.*, 913 F. Supp. 655, 659 (D.P.R. 1995), not "continued . . . unlawful acts or omissions which cause foreseeable lasting damages," *McMillan*, 511 F.Supp.3d at 83. The doctrine does not apply. *See M.R. (Vega Alta), Inc.*, 31 F.Supp.2d at 240 (holding that property owners who sued private polluters and the Environmental Protection Agency for contamination of water supply arising from a contaminated industrial site did not show continuous tort because "the pollutants [that continued to] enter[] the land [we]re doing so without any further impetus on the part of the Defendants," who were not "continuously acting, i.e., continuing to dump pollutants on [the plaintiffs'] land").

### b. Fraudulent Concealment

Plaintiffs' last hope is to "sketch a factual predicate that would warrant the application of . . . equit[y]." *Trans-Spec Truck Serv.*, 524 F.3d at 320 (quotation marks omitted). They argue fraudulent concealment. *See* Docket No. 205, ¶ 23.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and it is accordingly "incumbent upon the plaintiff 'to plead with particularity the facts giving rise to the fraudulent concealment claim,'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189 (1st Cir. 2006) (quoting *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996)). That "entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations." *Id.* (cleaned up).

In the amended complaint, Plaintiffs argue that their claims are "subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged [in the amended complaint]." Docket No. 205, ¶ 23. They allege that "Defendants knew of the wrongful acts set

[in the amended complaint], retained material information pertinent to their discovery, and continue to conceal them from [Plaintiffs] and their citizens." *Id.* "Plaintiffs did not know," they say, "and could not have known through the exercise of reasonable diligence, of its causes of action, as a result of Defendants' misrepresentations." *Id.* "For example," Plaintiffs state <u>in the opposition</u>, "a long-lasting strategy was that the Defendants 'collaborate[d] through a variety of formal trade groups and informal associations to promote "contrarian theories" emphasizing the uncertainty of climate science and oppose regulatory action.'" Docket No. 280, pg. 23 (quoting Docket No. 205, ¶ 362). Per Plaintiffs, "[t]his included Defendants funding and direction of front groups like the Global Climate Science Communications Team, which 'outlined a multimillion-dollar campaign to undermine public belief in the validity of climate science.'" *Id.* (quoting Docket No. 205, ¶ 407). And "[m]ore recently," allege Plaintiffs, "Defendants have found ways to funnel their donations to 'climate obstructionist organizations through third party, dark money organizations including Donors

Trust and Donors Capital Fund that obscure the identity of the donor.'" *Id.* (quoting Docket No. 205, ¶ 503).

Plaintiffs make it explicit that Defendants "violated the law by concealing and misrepresenting the risks associated with their fossil fuel products." Docket No. 280, pg. 24. In other words, "fraud in the sale of [fossil fuel products] underlies [the amended] complaint," but "there is no charge of affirmative conduct by [Defendants] intended to . . . deceive [Plaintiffs] into believing that [they] did not have a cause of action." *Berkson*, 743 F.2d at 56. At bottom, the allegations in the amended complaint, where the specificity needs to be, of <u>fraudulent concealment</u> as a statute of limitations matter are limited to the single conclusory allegation at Docket No. 205, ¶ 23. That is insufficient under Rule 9(b). *See Humana, Inc. v. Biogen, Inc.*, 666 F.Supp.3d 135, 146 (D. Mass. 2023) (RICO) ("The complaint . . . simply alleges in general terms that 'Biogen concealed its arrangements with CDF and TAF' and 'did this while certifying to Humana that it was following federal law.'"); *In re Niaspan Antitrust Litigation*, 42 F.Supp.3d 735, 748 (E.D. Pa. 2014) (antitrust)

("While plaintiffs do aver that defendants redacted specific dollar amounts in public filings, refused to disclose certain details about their arrangements, and falsely characterized the settlement agreements as procompetitive, these facts, even if true, are insufficient to establish that plaintiffs were actively mislead.").

And even if the allegations go to the fraudulent concealment claim and meet the Rule 9(b), fraudulent concealment does not apply. The First Circuit has harmonized fraudulent concealment in the RICO and antitrust contexts. *See Álvarez-Maurás*, 919 F.3d at 626. It has three requirements:

> 1) wrongful concealment by defendants of their actions; and 2) failure of the claimant to discover, within the limitations period, the operative facts which form the basis of the cause of action; 3) despite the claimant's diligent efforts to discover the facts.
> *Id.*

"The burden rests squarely on the party pleading fraudulent concealment." *Berkson*, 743 F.2d at 55. "If a claimant fails to establish the above elements, then the limitations period applies, and the claimant 'is charged with the knowledge of what he or she would have uncovered

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 109

through a reasonably diligent investigation.'" *City of Boston*, 765 F.Supp.3d at 41 (quoting *In re Celexa & Lexapro Mktg. & Sales Pracs. Litigation*, 915 F.3d 1, 15 (1st Cir. 2019)).

Here, assuming Defendants contributed to the 2017 storms and that they engaged in misrepresentations, by 2021, all the "telltale warning signs" were present that Plaintiffs suffered injury because of Defendants' alleged contribution to the severity of the 2017 storms. *Álvarez-Maurás*, 919 F.3d at 628 (quoting throughout *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002)). Even if they "did not know the criminal methods [Defendants] had employed," they "knew or should have known" who to sue and on what basis. *Id.* at 627–28.

Plaintiffs argue that "the 'mere affirmative act of denying wrongdoing may constitute fraudulent concealment where the circumstances create reliance upon such denial.'" Docket No. 280, pg. 25 (quoting *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 802 (1st Cir. 1987)). "Be that as it may, what is determinative [here] is that, despite [any] stonewalling, there were enough warning signs to put [Plaintiffs] on notice

that something was seriously amiss." *Álvarez-Maurás*, 919 F.3d at 628.

In short, Plaintiffs knew or should have known of the numerous lawsuits and the reports linking Defendants to climate change and, in turn, climate change to storms, including in Puerto Rico, and any possible misrepresentations by Defendants do not change that conclusion. *See Álvarez-Maurás*, 919 F.3d at 627–28 (RICO) (finding no fraudulent concealment where customer knew of his injury—that funds had disappeared from his investment account—and even though he did not know the criminal methods allegedly employed to steal his money); *City of Boston*, 765 F.Supp.3d at 41–42 (RICO) (finding no fraudulent concealment even though Rule 9(b) was met and despite misrepresentations by ten defendant pharmacy benefit managers given the plaintiff's "actions to combat the opioid epidemic, combined with the widespread scrutiny and litigation concerning the role of [pharmacy benefit managers]"); *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 138 F.Supp.2d 25, 29 (D. Me. 2001) (antitrust) (finding no fraudulent

inducement absent allegation of facts showing due diligence in discovering the defendants' alleged price-fixing conspiracy or reasonable reliance on the defendants' affirmative acts of concealment). *See also Berkson*, 743 F.2d at 55 (antitrust) (summary judgment) (rejecting the plaintiff's fraudulent concealment argument that he "lacked the requisite factual basis for filing an antitrust complaint though his suspicions were already aroused" and "only became aware of [the defendants'] specific misconduct in [the four years prior to the filing of claim] through a Wall Street Journal article").

As to Puerto Rico law, the statute of limitations is tolled "if—because of active or fraudulent concealment—a reasonable person would not have been able to discover the basis for the lawsuit." *Rivera-Ramos v. Román*, 156 F.3d 276, 282 (1st Cir. 1998). But "even assuming such culpable concealment, Puerto Rico law requires due diligence by the plaintiff in investigating suspicious circumstances." *Id.*

Even if Plaintiffs relied, as they claim, on statements by Defendants that concealed their connection to Plaintiffs' injuries, the public information was more than enough to

raise suspicion, and that in turn means they had to exercise due diligence in investigating. The fraudulent concealment doctrine thus does not save their Puerto Rico law claims. *See Estate of Alicano Ayala*, 263 F.Supp.2d at 319 ("Even if Plaintiffs were legitimately confused or assuaged, the easy access to public sources of information confirming the health hazards of smoking—including government reports, warning labels, and the health care industry—imposed on the Plaintiffs an obligation to at least investigate further.").

### c. A Few Final Matters

First, the R&R discusses equitable tolling under more general principles and there mentions "fraud and concealment." *See* 2025 WL 600430, at * 17–19. It found it applicable here, and Defendants object, *see* Docket No. 326, pgs. 36–42.

Plaintiffs consistently base their argument for equitable tolling on fraudulent concealment. *See, e.g.*, Docket No. 205, ¶ 23. Defendants also discuss fraudulent concealment in opposing equitable tolling. *See* Docket No. 235, pgs. 29–30. "Following the parties' lead," the Court

"address[ed] the matter primarily in terms of" fraudulent concealment. *Rivera-Gómez v. de Castro*, 900 F.2d 1, 2 n. 2 (1st Cir. 1990).

The outcome is no different under general principles of equitable tolling. The "litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Plaintiffs meet neither requirement. Equitable tolling does not "rescue a plaintiff from his or her lack of diligence." *Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 119 (1st Cir. 2009). Plaintiffs "fail[ed] to act diligently [and thus] cannot invoke equitable principles to excuse that lack of diligence." *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984). And the one possible argument for meeting the second requirement, "affirmative misconduct on the part of [Defendants that] lulled [Plaintiffs] into inaction," *id.*, fails for the same reasons fraudulent concealment does not apply. In all, Plaintiffs do not carry the burden of showing either diligence or

extraordinary circumstances, let alone both. *See City of Boston*, 765 F.Supp.3d at 43 ("The City's failure to exercise due diligence in pursuing its rights after the role of the [pharmacy benefit managers] in causing its harm was showcased in [a multi-district litigation] is fatal to its equitable tolling claim.").

Second, Plaintiffs argue that they, "as Municipalities of Puerto Rico, may limit application of the statute of limitations through Puerto Rico's autonomous Municipal Code, PRS ST T. 21 § 7181." Docket No. 280, pg. 27. There is no official translation of PRS ST T. 21 § 7181 or the case from the Puerto Rico Court of Appeals, *Caballer Velázquez v. Municipio Autónomo de Carolina*, 2014 WL 5343480, to which Plaintiffs cite in support of this argument in both the amended complaint, Docket No. 205, ¶ 22, and the opposition to the joint Rule 12(b)(6) motion, Docket No. 280, pg. 31.

By statute, "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." 48 U.S.C. § 864. And by local rule, "[a]ll documents not in the English language which are presented or filed, whether as evidence

or otherwise, must be accompanied by a certified translation into English which meets one of [four] criteria" listed in the rule. D.P.R. R. Civ. 5(c). This Court has a "duty to faithfully uphold the English language requirement" and will not consider Plaintiffs' argument. *United States v. Rivera-Rosario*, 300 F.3d 1, 8 n. 9 (1st Cir. 2002) (Torruella, J.). *See also In re Santana*, 2024 WL 5058554, at * 12 (Bankr. D.P.R. Dec. 10, 2024) (refusing to address arguments as to the same statute cited by Plaintiffs here for failure to provide a translation).

Third, Plaintiffs make the following argument in response to Chevron's seeking judicial notice for a "publicly-available engagement agreement between [Plaintiffs' law firm] and Plaintiff Municipality of Vega Baja" dated November 2022 and stating that two similar cases that were dismissed in 2018 were dismissed "last year," *see* Docket No. 239, pgs. 16–17. Plaintiffs argue that they have a "heightened duty to investigate and not bring forth frivolous litigation" and that this action "required more certainty and the mere retention of a law firm to investigate should not thwart a discovery tolling." Docket No. 280, pg. 28.

Going to a law firm can be significant even if no suit is brought due to, say, cost. *See GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007). In any event, this does not affect the conclusion that Plaintiffs were on notice in 2017. *See id.*; *González-Pérez v. Hospital Interamericano De Medicina Avanzada*, 355 F.3d 1, 4 (1st Cir. 2004) ("Often . . . there is a span of time during which the prospective plaintiff mulls over the injury and the tortfeasor's liability before initiating legal process. Under Puerto Rico's discovery rule, these two moments are distinct, and only the former has legal significance.").

Further, it appears that Plaintiffs admit they had notice but were cautious out of a concern for not bringing frivolous litigation. "[T]he decision to prosecute is particularly ill-suited to judicial review," *Wayte v. United States*, 470 U.S. 598, 607 (1985), and the Court sees no reason, even at Plaintiffs' invitation, to inquire into whether, as the Supreme Court noted in a somewhat different context, they exercised their "discretion . . . intelligently or wisely," *Myers v. United States*, 272 U.S. 52, 135 (1926). But if Plaintiffs admitted what it

appears they have admitted, that is yet another reason to rule they were on notice.

Fourth, Plaintiffs advance, this time in response to ConocoPhillips's pointing to its own Form 10-K filed with the Securities and Exchange Commission as notice to Plaintiffs, *see* Docket No. 237, pgs. 19–20, the following argument. "Any question," Plaintiffs assert, "as to whether [they] read such filings or whether a municipal representative would have seen such a filing in the course of its governmental duty would be questions of fact not ready to be assessed at this stage." Docket No. 280, pg. 25.

Plaintiffs cite to no authority that whether some particular official read a given document is relevant. Determinative here is that Plaintiffs should have known of who to sue and on what claims. And the weight of authority is on the other side of Plaintiffs' argument: in suits brought by state and local authorities, no court has focused on whether a particular official had notice. *See, e.g., City of New York v. Exxon Mobil Corp.*, 226 N.Y.S.3d 863, 883–84 (N.Y. Sup. Ct. 2025); *City of Boston*, 765 F.Supp.3d at 38–43; *Alaska*, 774 F.Supp.3d at

1159-67.

It is true, though, that, as Plaintiffs point out in advancing this and other arguments, *see* Docket No. 280, pgs. 22, 25, 28, the question of notice is often reserved for the jury. That is the case under federal law and under Puerto Rico law. *See Espada v. Lugo*, 312 F.3d 1, 4 (1st Cir. 2002); *Humana*, 666 F.Supp.3d at 144–46.

But that is no rule. On the contrary, "it is well settled in th[e] [First Circuit] that a motion to dismiss may be granted on the basis of an affirmative defense, such as the statute of limitations, as long as the facts establishing the defense are clear on the face of the plaintiff's pleadings." *Álvarez-Maurás*, 919 F.3d at 628 (cleaned up). *See also Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005) (applying Puerto Rico law). Indeed, amongst the cases where claims were dismissed for untimeliness at the motion-to-dismiss stage is one of the two cases to which Plaintiffs cite to argue against dismissal at this stage. *See Hoff v. Popular, Inc.*, 727 F.Supp.2d 77, 99 (D.P.R. 2010) (Gelpí, J.).

Where it has made comparisons between this and other cases, and it has done so as to all of the timeliness issues and claim types, the Court has cited to at least one case at the motion-to-dismiss stage: *Álvarez-Maurás* (RICO); *City of Boston* (same); *Marrero-Rolón* (same); *Alaska* (same); *Humana* (same); *Blenheim Capital Holdings* (antitrust); *DJ Mfg. Corp.* (same); *In re Niaspan Antitrust Litigation* (same); *In re Compact Disc Minimum Advertised Price Antitrust Litigation* (same); *Estate of Alicano Ayala* (Puerto Rico law); *M.R. (Vega Alta), Inc.* (same).  And it has made it clear in the two instances that it provided an additional citation that was at the summary judgment stage—*Berkson*.

### 3. Conclusion as to the Merits

The joint Rule 12(b)(6) motion at Docket No. 235 is **GRANTED in part and MOOT in part**. It is granted as to Exxon, Shell, Chevron, BP, ConocoPhillips, and Motiva as to all claims and as to API and the RICO claims. It is moot as to Occidental, Rio Tinto, and BHP as to all claims and as to API and the federal antitrust and Puerto Rico law claims. BP's Rule 12(b)(6) motion at Docket No. 236 is **MOOT**.

ConocoPhillips's Rule 12(b)(6) motion at Docket No. 237 is
**MOOT**. Chevron's Rule 12(b)(6) motion at Docket No. 239 is
**MOOT**. Exxon's Rule 12(b)(6) motion at Docket No. 242 is
**MOOT**. Shell's Rule 12(b)(6) motion at Docket No. 244 is
**MOOT**. API's Rule 12(b)(6) motion at Docket No. 254 is
**MOOT**. Motiva's motion at Docket No. 240 is **DENIED in
part and MOOT in part**. It is denied as to Rule 12(b)(2) and
Rule 12(b)(3). It is moot as to Rule 12(b)(6).

### D. Leave to Amend

Plaintiffs conclude their objections to the R&R with a
"conditional request for leave to amend." Docket No. 323, pg.
28. "To the extent the Court finds the Complaint deficient in
any regard," they "respectfully request dismissal without
prejudice with leave to amend so that it may amend to cure
any deficiencies." *Id.*

The Court has no view on the complaint. It has found
the <u>amended</u> complaint deficient. It will not grant leave to
amend again.

There being neither a motion by Plaintiffs for leave to
file a second amended complaint nor "exceptional

circumstances," the Court is "under no obligation" to "invite [Plaintiffs], sua sponte, to further amend [their] complaint[]." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 735–36 (1st Cir. 2016). Plaintiffs "were put on notice of the deficiencies in the [amended] complaint by [not only] the motion[s] to dismiss," *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015), but also, and more importantly, the R&R. Plaintiffs did not seek leave or file a proposed second amended complaint. They thus failed to "exercise due diligence." *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 58 (1st Cir. 2006). And there is "no suggestion that amendment would be anything other than futile." *Fire & Police Pension Ass'n*, 778 F.3d at 247. Finally, the amended complaint was filed in November 2023. The objections to the R&R were filed in March 2025. Plaintiffs cannot "deliberately wait in the wings for a year and a half with another amendment to a complaint should the court hold the first amended complaint was insufficient." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008).

## V. CONCLUSION

The claims being barred by the applicable statutes of limitations, the Court has not examined the merits, or lack thereof, of the legal theories advanced by Plaintiffs. But the Court is not insensitive to the plight of the people of Puerto Rico resultant from the 2017 hurricanes. It is perhaps most often in dismissing a claim because of the applicable statute of limitations that judges are reminded that "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." *United States v. Clark*, 96 U.S. 37, 49 (1877) (Harlan, J., dissenting) (quoting throughout *East India Co. v. Paul*, 7 Moo. P.C.C. 111 (1849) (Lord Campbell)).

The Court's rulings are as follows:

A. The R&R at Docket No. 315 is **ADOPTED in part**.

B. Occidental's motion to dismiss at Docket No. 232 is **GRANTED in part and MOOT in part**. The motion is granted as to Rule 12(b)(5) and moot as to Rule 12(b)(2) and Rule 12(b)(6).

C. The joint Rule 12(b)(2) motion at Docket No. 234 is

**GRANTED in part, DENIED in part and MOOT in part**. It is granted as to Rio Tinto and BHP as to all claims and API as to the federal antitrust and Puerto Rico law claim. It is denied as to Exxon, Shell, BP, Chevron, ConocoPhillips, Motiva. It is also denied as to API and RICO. It is moot as to Occidental.

D. The joint Rule 12(b)(6) motion at Docket No. 235 is **GRANTED in part and MOOT in part**. It is granted as to Exxon, Shell, Chevron, BP, ConocoPhillips, and Motiva as to all claims and as to API and the RICO claims. It is moot as to Occidental, Rio Tinto, and BHP as to all claims and as to API and the federal antitrust and Puerto Rico law claims.

E. BP's Rule 12(b)(6) motion at Docket No. 236 is **MOOT.**

F. ConocoPhillips's Rule 12(b)(6) motion at Docket No. 237 is **MOOT**.

G. The motion for judicial notice at Docket No. 238 is **GRANTED** as to judicial notice that the exhibits to the motion were publicly available and not for the truth of the matter asserted.

H.  Chevron's Rule 12(b)(6) motion at Docket No. 239 is **MOOT**.

I.  Motiva's motion at Docket No. 240 is **DENIED in part and MOOT in part**. It is denied as to Rule 12(b)(2) and Rule 12(b)(3). It is moot as to Rule 12(b)(6).

J.  The motion for judicial notice at Docket No. 241 is **MOOT**.

K.  Exxon's Rule 12(b)(6) motion at Docket No. 242 is **MOOT**.

L.  BHP's Rule 12(b)(6) at Docket No. 243 is **MOOT**.

M.  Shell's Rule 12(b)(6) motion at Docket No. 244 is **MOOT**.

N.  BHP's Rule 12(b)(2) motion at Docket No. 245 is **GRANTED**.

O.  Rio Tinto's Rule 12(b)(2) motion at Docket No. 246 is **GRANTED**.

P.  Rio Tinto's Rule 12(b)(6) motion at Docket No. 247 **MOOT**.

Q.  API's Rule 12(b)(6) motion at Docket No. 254 is **MOOT**.

R.  Judgment will be entered dismissing all claims against Occidental, Rio Tinto, and BHP without prejudice.

S.  Judgment will be entered dismissing the RICO claim against API with prejudice and the federal antitrust claim and Puerto Rico law claims against API without prejudice.

T.  Judgment will be entered dismissing all claims against Exxon, Shell, Chevron, BP, ConocoPhillips, and Motiva with prejudice.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of September 2025.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE